No. 18-15071

## IN THE
# United States Court of Appeals for the Eleventh Circuit

CHRISTOPHER CANTU,

Plaintiff-Appellant,

v.

CITY OF DOTHAN, ALABAMA, et al.

Defendant-Appellee.

**On Appeal from the United States District Court**
**For the Middle District of Alabama**
**Civil Case No. 1:16-cv-1003-MHT-DAB**

**APPELLANT'S APPENDIX**
**Volume 1 of 1**
**Pages 1-246**

OF COUNSEL:
PATRICIA E. ROBERTS
KELLY A. RONDINELLI (A LAW STUDENT)
TESSA B. TILTON (A LAW STUDENT)
WILLIAM & MARY LAW
SCHOOL APPELLATE AND SUPREME
COURT CLINIC
P.O. Box 8795
Williamsburg, VA 23187
757-221-3821

TILLMAN J. BRECKENRIDGE
PIERCE BAINBRIDGE
BECK PRICE & HECHT, LLP
One Thomas Cir., NW, Suite 700
Washington, D.C. 20005
202-759-6925
tjb@piercebainbridge.com

HENRY F. SHERROD III
HENRY F. SHERROD III, P.C.
119 South Court Street
Florence, AL 35630
256-764-4141

*Counsel for Plaintiff-Appellant*

February 15, 2019

# TABLE OF CONTENTS

**TAB**

Docket Entries.................................................................................A

Complaint
     filed December 29, 2016................................................................1

Answer of Defendant Adrienne Woodruff
     filed March 21, 2017...................................................................23

Second Amended Complaint
     filed March 27, 2017...................................................................28

Answer of Defendant Adrienne Woodruff to Plaintiff's Second Amended
Complaint
     filed April 6, 2017......................................................................29

Deposition of Adrienne Woodruff
     filed October 27, 2017.............................................................44-3

Deposition of Adrienne Woodruff
     filed October 27, 2017.............................................................44-4

Defendants' Narrative Summary of Facts
     filed April 19, 2018....................................................................65

Report and Recommendation
     filed July 25, 2018.....................................................................73

Memorandum Opinion and Order
     filed November 8, 2018.............................................................82

Final Judgment
     filed November 8, 2018.............................................................83

Plaintiff's Notice of Appeal
     filed December 7, 2018.............................................................84

Certificate of Service................................................................B

# TAB A

**DOCKET**

| Date Filed | # | Docket Text |
|---|---|---|
| 12/29/2016 | 1 | COMPLAINT against Greg Benton, City of Dothan, Alabama, Chris Summerlin, Adrian Woodruff ( Filing fee $ 400.00 receipt number 4602043582.), filed by Christopher Cantu. (Attachments: # 1 Filing Fee Receipt)(dmn, ) (Entered: 12/29/2016) |
| 12/29/2016 | | DEMAND for Trial by Jury by Christopher Cantu. (dmn, ) (NO PDF, see Doc. 1 for pdf.) (Entered: 12/29/2016) |
| 12/29/2016 | 2 | Corporate/Conflict Disclosure Statement by Christopher Cantu. (dmn, ) (Entered: 12/29/2016) |
| 12/29/2016 | 3 | Summons Issued as to City of Dothan, Alabama and returned to counsel for personal service. (dmn, ) (Entered: 12/29/2016) |
| 01/03/2017 | 4 | ORDER REFERRING CASE to Magistrate Judge David A. Baker for consideration and disposition or recommendation on all pretrial matters as may be appropriate. Signed by Honorable Judge Myron H. Thompson on 1/3/17. (djy, ) (Entered: 01/03/2017) |
| 01/04/2017 | 5 | REQUEST FOR WAIVER of Service sent to Greg Benton on 12/29/16 by Christopher Cantu. Waiver of Service due by 1/30/2016. (Morris, William) (Entered: 01/04/2017) |
| 01/04/2017 | 6 | REQUEST FOR WAIVER of Service sent to Chris Summerlin on 12/29/16 by Christopher Cantu. Waiver of Service due by 1/30/2017. (Morris, William) (Entered: 01/04/2017) |
| 01/04/2017 | 7 | REQUEST FOR WAIVER of Service sent to Adrian Woodruff on 12/29/16 by Christopher Cantu. Waiver of Service due by 1/30/2017. (Morris, William) (Entered: 01/04/2017) |
| 01/10/2017 | 8 | SUMMONS Returned Executed by Christopher Cantu. City of Dothan, Alabama served on 1/4/2017, answer due 1/25/2017. (Morris, William) (Entered: 01/10/2017) |
| 01/24/2017 | 9 | MOTION for More Definite Statement with Supporting Brief by Greg Benton, City of Dothan, Alabama, Chris Summerlin, Adrian Woodruff. (White, Freddie) (Entered: 01/24/2017) |

| | | |
|---|---|---|
| 01/24/2017 | 10 | Corporate/Conflict Disclosure Statement by Adrian Woodruff. (White, Freddie) (Entered: 01/24/2017) |
| 01/24/2017 | 11 | Corporate/Conflict Disclosure Statement by Chris Summerlin. (White, Freddie) (Entered: 01/24/2017) |
| 01/24/2017 | 12 | Corporate/Conflict Disclosure Statement by Greg Benton. (White, Freddie) (Entered: 01/24/2017) |
| 01/24/2017 | 13 | Corporate/Conflict Disclosure Statement by City of Dothan, Alabama. (White, Freddie) (Entered: 01/24/2017) |
| 01/24/2017 | | BRIEF/MEMORANDUM in Support of 9 MOTION for More Definite Statement filed by Greg Benton, City of Dothan, Alabama, Chris Summerlin, Adrian Woodruff. (dmn, ) (NO PDF, see Doc. 9 ) (Entered: 01/27/2017) |
| 01/26/2017 | 14 | WAIVER OF SERVICE Returned Executed by Christopher Cantu. Greg Benton waiver sent on 12/29/2016, answer due 2/27/2017. (Morris, William) Modified on 1/30/2017 to correct dates and deadlines. (dmn, ) (Entered: 01/26/2017) |
| 01/26/2017 | 15 | WAIVER OF SERVICE Returned Executed by Christopher Cantu. Chris Summerlin waiver sent on 12/29/2016, answer due 2/27/2017. (Morris, William) Modified on 1/30/2017 to correct dates and deadlines. (dmn, ) (Entered: 01/26/2017) |
| 01/26/2017 | 16 | WAIVER OF SERVICE Returned Executed by Christopher Cantu. Adrian Woodruff waiver sent on 12/29/2016, answer due 2/27/2017. (Morris, William) Modified on 1/30/2017 to correct dates and deadlines. (dmn, ) (Entered: 01/26/2017) |
| 01/26/2017 | | Set/Reset Answer Deadlines due to wrong dates/deadlines entered when waivers of service (Doc. 14 , 15 , 16 ) were filed: Greg Benton 2/27/2017; Chris Summerlin 2/27/2017; Adrian Woodruff 2/27/2017. (dmn, ) (NO PDF) (Entered: 01/30/2017) |
| 01/26/2017 | | NOTICE of Docket Text Correction re Waivers of Service Executed (Doc. 14 , 15 , 16 ). The referenced docket entries were modified to correct the dates and deadlines to reflect the mailing date as 12/29/2016 and the answer deadline as 2/27/2017; the original entries contained incorrect dates and deadlines. (dmn, ) (NO PDF) (Entered: 01/30/2017) |
| 01/31/2017 | 17 | ORDER: This matter is before the court on Defendant City of Dothan's 9 Motion a More Definite Statement. It is |

| | | |
|---|---|---|
| | | ORDERED that the Plaintiff shall file response to Defendant's motion by 2/14/2017. Signed by Honorable Judge David A. Baker on 1/31/2017. (dmn, ) (Entered: 01/31/2017) |
| 02/14/2017 | 18 | RESPONSE to 9 MOTION for More Definite Statement with Supporting Brief filed by Christopher Cantu. (Sherrod, Henry) Modified on 2/15/2017 to clean up text. (dmn, ) (Entered: 02/14/2017) |
| 03/07/2017 | 19 | ORDER that Defendant's 9 Motion for More Definite is hereby denied as further set out in the order. Defendants are directed to file their response to Plaintiff's complaint within fourteen (14) days from the date of this Order. Signed by Honorable Judge David A. Baker on 3/7/2017. (dmn, ) (Entered: 03/07/2017) |
| 03/21/2017 | 20 | ANSWER to 1 Complaint by Greg Benton.(White, Freddie) (Entered: 03/21/2017) |
| 03/21/2017 | 21 | ANSWER to 1 Complaint by City of Dothan, Alabama.(White, Freddie) (Entered: 03/21/2017) |
| 03/21/2017 | 22 | ANSWER to 1 Complaint by Chris Summerlin.(White, Freddie) (Entered: 03/21/2017) |
| 03/21/2017 | 23 | ANSWER to 1 Complaint by Adrian Woodruff.(White, Freddie) (Entered: 03/21/2017) |
| 03/22/2017 | 24 | MOTION for Leave to File Second Amended Complaint by Christopher Cantu. (Attachments: # 1 Second Amended Complaint)(Sherrod, Henry) (Entered: 03/22/2017) |
| 03/23/2017 | 25 | ORDER: This matter is before the court on Plaintiff's 24 Motion for Leave to File Second Amended Complaint. To the extent opposed, it is ORDERED that the Defendants shall file their response to Plaintiff's motion by 4/6/2017. Signed by Honorable Judge David A. Baker on 3/23/2017. (dmn, ) (Entered: 03/23/2017) |
| 03/24/2017 | 26 | CONSENT by Greg Benton, City of Dothan, Alabama, Chris Summerlin, Adrian Woodruff to 24 MOTION for Leave to File Second Amended Complaint (White, Freddie) Modified on 3/24/2017 to reflect actual title. (dmn, ) (Entered: 03/24/2017) |
| 03/27/2017 | 27 | ORDER that Plaintiff's 24 Motion for Leave to File Second Amended Complaint is granted to the extent that Plaintiff is permitted to file an amended complaint within five (5) days from the date of this Order. Defendants shall file their responses to the amended complaint within |

| | | |
|---|---|---|
| | | fourteen (14) days of the filing of the amended complaint. Signed by Honorable Judge David A. Baker on 3/27/2017. (dmn, ) (Entered: 03/27/2017) |
| 03/27/2017 | 28 | SECOND AMENDED COMPLAINT with Jury Demand against Greg Benton, City of Dothan, Alabama, Chris Summerlin, and Adrianne Woodruff (previously named as Adrian Woodruff), filed by Christopher Cantu.(Sherrod, Henry) Modified on 3/28/2017 to clean up text and reflect jury demand and party name correction. (dmn, ) (Entered: 03/27/2017) |
| 04/06/2017 | 29 | ANSWER to 28 Amended Complaint, by Adrianne Woodruff.(White, Freddie) (Entered: 04/06/2017) |
| 04/06/2017 | 30 | ANSWER to 28 Amended Complaint, by Greg Benton.(White, Freddie) (Entered: 04/06/2017) |
| 04/06/2017 | 31 | ANSWER to 28 Amended Complaint, by City of Dothan, Alabama.(White, Freddie) (Entered: 04/06/2017) |
| 04/06/2017 | 32 | ANSWER to 28 Amended Complaint, by Chris Summerlin.(White, Freddie) (Entered: 04/06/2017) |
| 04/19/2017 | 33 | RULE 26(f) ORDER directing the parties to file the Rule 26(f) report containing the proposed discovery plan as further set out in the order. Rule 26 Meeting Report due by 5/3/2017. Signed by Honorable Judge David A. Baker on 4/19/2017. (dmn, ) (Entered: 04/19/2017) |
| 05/02/2017 | 34 | REPORT of Rule 26(f) Planning Meeting. (White, Freddie) (Entered: 05/02/2017) |
| 05/03/2017 | 35 | UNIFORM SCHEDULING ORDER: An on-the-record Pretrial Conference is set for 9/13/2018 at 10:00 AM in Montgomery, Alabama before Honorable Judge Myron H. Thompson. Jury Trial set for 10/15/2018 trial term in Dothan, AL before Honorable Judge Myron H. Thompson. Amended Pleadings due by 11/3/2017. Discovery due by 3/2/2018. Motions due by 4/2/2018. Mediation Notice due by 3/2/2018. Signed by Honorable Judge David A. Baker on 5/3/2017. Copies furnished to calendar group, AG.(dmn, ) (Entered: 05/03/2017) |
| 06/06/2017 | 36 | ORDER: Telephone Status Conference set for 7/11/2017 at 01:45 PM before Honorable Judge David A. Baker. Each party must be represented by at least one attorney of record, and lead counsel should attend if possible. Counsel are directed to call 334-954-3275 and use passcode 246860# to join the telephone conference. Counsel should |

| | | be prepared to discuss all aspects of this case including pending motions, if any. It is ORDERED that for all future motions in this case, the parties are to confer in good faith to resolve any disputes, to stipulate to points of agreement and narrow any remaining issues, and to indicate whether the motion is opposed or agreed to. Responses to motions shall be due fourteen days after the filing of the motion, and any reply to the response within seven days of the filing of the response. Counsel are reminded of the continuing judicial emergency affecting this District and the ability of the parties to consent to Magistrate Judge jurisdiction to preside over disposition of the case. If there is consent by all parties, counsel should execute and submit the forms as prescribed by the Clerk of Court. Signed by Honorable Judge David A. Baker on 6/6/2017. Copies furnished to calendar group, ALL Mag CRD's.(dmn, ) (Entered: 06/06/2017) |
|---|---|---|
| 07/11/2017 | 37 | Minute Entry for proceedings held before Honorable Judge David A. Baker: Status Conference held on 7/11/2017 (PDF available for court use only). (Recording Time FTR: 1:42 PM - 1:55 PM.) (war, ) (Entered: 07/11/2017) |
| 10/09/2017 | 38 | First MOTION to Compel by Christopher Cantu. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Sherrod, Henry) (Entered: 10/09/2017) |
| 10/13/2017 | 39 | MOTION for Order FOR TIME TO RESPOND TO PLAINTIFF'S 38 MOTION TO COMPEL by Greg Benton, City of Dothan, Alabama, Adrianne Woodruff. (White, Freddie) Modified on 10/18/2017 to create link to Doc. 38 . (dmn, ) (Entered: 10/13/2017) |
| 10/17/2017 | 40 | ORDER denying as moot defs' 39 Motion for Order for Time to respond to Motion to Compel in light of the existing schedule, as further set out in order. Signed by Honorable Judge David A. Baker on 10/17/17. (djy, ) (Entered: 10/17/2017) |
| 10/23/2017 | 41 | BRIEF/MEMORANDUM in Opposition re 38 First MOTION to Compel filed by Greg Benton, City of Dothan, Alabama, Chris Summerlin, Adrianne Woodruff. (White, Freddie) (Entered: 10/23/2017) |
| 10/24/2017 | 42 | REPLY BRIEF in Support of 38 First Motion to Compel filed by Christopher Cantu. (Sherrod, Henry) Modified on |

| | | |
|---|---|---|
| | | 10/25/2017 to create link to Doc. 38 . (dmn, ) (Entered: 10/24/2017) |
| 10/27/2017 | 43 | MOTION for Partial Summary Judgment and Brief in Support by Christopher Cantu. (Sherrod, Henry) (Entered: 10/27/2017) |
| 10/27/2017 | 44 | Evidentiary Submission In Support of 43 Motion for Partial Summary Judgment filed by Christopher Cantu. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3 - Part 1, # 4 Exhibit 3 - Part 2, # 5 Exhibit 4 (Dash Camera Video on DVD), # 6 Exhibit 5 (Audio Recording on USB flash drive), # 7 Exhibit 6 (Audio Recording on USB flash drive), # 8 Exhibit 7 (Audio Recording on USB flash drive), # 9 Exhibit 8 (Video Recording on USB flash drive), # 10 Exhibit 9, # 11 Exhibit 10 (Video recording on USB flash drive, see Doc. 81 ) (DVD and Flash Drive filed conventionally, placed in small brown envelope in file in Clerk's office attached to a copy of Doc. 45 Notice of Filing.)(Sherrod, Henry) Modified on 11/1/2017 to include description of exhibits, text regarding location of exhibits filed conventionally, and link. (dmn, ) Modified on 9/6/2018 flash drive originally received on 11/1/2017 was blank. Flash drive has been replaced/substituted, see Doc. 81 . (dmn, ) (Entered: 10/27/2017) |
| 10/27/2017 | 45 | NOTICE of Filing Conventionally Exhibits 4 (dash camera video on DVD), 5 (Audio recording on USB flash drive), 6 (Audio recording on USB flash drive), 7 (Audio recording on USB flash drive), 8 (Video recording on USB flash drive), and 10 (Video recording on USB flash drive) re 44 Evidentiary Submission in Support of 43 Motion for Summary Judgment, by Christopher Cantu of Filing Conventionally (Sherrod, Henry) Modified on 10/31/2017 to create links. (dmn, ) Modified on 11/1/2017 to reflect that a DVD and flash drive were filed conventionally and both have been placed in a small brown envelope attached to a copy of this notice in the file located in the Clerk's office. (dmn, ) Modified on 9/6/2018 original flash drive blank; new flash drive substituted, see Doc. 81 . (dmn, ) (Entered: 10/27/2017) |
| 10/27/2017 | | BRIEF/MEMORANDUM in Support re 43 MOTION for Partial Summary Judgment and Brief in Support filed by |

| | | |
|---|---|---|
| | | Christopher Cantu. (dmn, ) (NO PDF, see Doc. 43 for pdf.) (Entered: 10/30/2017) |
| 11/13/2017 | 46 | Unopposed MOTION to Modify 35 Scheduling Order to Extend Expert Disclosure Deadline by 30 Days by Christopher Cantu. (Sherrod, Henry) Modified on 11/14/2017 to create link. (dmn, ) (Entered: 11/13/2017) |
| 11/15/2017 | 47 | ORDER: Upon consideration, Plaintiff's 46 Unopposed Motion to Modify 35 Scheduling Order to Extend Expert Disclosure Deadlines by 30 Days is hereby granted. Plaintiff shall disclose his experts by 1/2/2018, and Defendants shall disclose their experts by 2/5/2018. No other deadlines are changed by this order. Signed by Honorable Judge David A. Baker on 11/15/2017. (dmn, ) (Entered: 11/15/2017) |
| 11/17/2017 | 48 | BRIEF/MEMORANDUM in Opposition re 43 MOTION for Partial Summary Judgment and Brief in Support filed by Greg Benton, City of Dothan, Alabama, Chris Summerlin, Adrianne Woodruff. (Attachments: # 1 Exhibit A, # 2 Exhibit A-1, # 3 Exhibit A-2, # 4 Exhibit A-3, # 5 Exhibit A-4, # 6 Exhibit A-5, # 7 Exhibit A-6, # 8 Exhibit B, # 9 Exhibit B-1, # 10 Exhibit B-2)(White, Freddie) (Entered: 11/17/2017) |
| 11/21/2017 | 49 | NOTICE of Conventional Filing of Exhibits A-5 and A-6 (DVD No. 1) and Exhibit B-1 (DVD No. 2) re 48 Brief/Memorandum in Support of 43 Motion, by Greg Benton, City of Dothan, Alabama, Chris Summerlin, Adrianne Woodruff. (Attachments: # 1 Exhibit A-5, Grissett Cell Phone Video (DVD no. 1)), # 2 Exhibit A-6, Inside Animal Shelter Video (DVD no. 1), # 3 Exhibit B-1, Police Radio Traffic (DVD no. 2)) (Exhibits (2) DVDs placed in small envelope attached to this document in file located in Clerk's office.)(dmn, ) (Entered: 11/21/2017) |
| 12/01/2017 | 50 | MOTION to Modify Summary Judgment Briefing Schedule by Christopher Cantu. (Sherrod, Henry) (Entered: 12/01/2017) |
| 12/01/2017 | 51 | ORDER: This matter is before the court on Plaintiffs Motion to Modify SummaryJudgment Briefing Schedule. (Doc. 50 ). By the motion, Plaintiff seeks a 7-day extension to file his reply brief to Defendants response to motion for summary judgment. Upon consideration, Plaintiffs motion (Doc. 50 ) is granted. Plaintiff shall file |

| | | his reply brief by 12/8/2017. Signed by Honorable Judge David A. Baker on 12/1/2017. (Entered: 12/01/2017) |
|---|---|---|
| 12/08/2017 | 52 | REPLY BRIEF in Support of 43 MOTION for Partial Summary Judgment and Brief in Support filed by Christopher Cantu. (Sherrod, Henry) Modified on 12/12/2017 to reflect actual title. (dmn, ) (Entered: 12/08/2017) |
| 01/02/2018 | 53 | NOTICE by Christopher Cantu Expert Witness Disclosures (Sherrod, Henry) (Entered: 01/02/2018) |
| 01/02/2018 | 54 | NOTICE by Christopher Cantu Plaintiff's Amended Expert Witness Disclosures (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6)(Sherrod, Henry) (Entered: 01/02/2018) |
| 01/12/2018 | 55 | ORDER: A telephonic Motion Hearing is set for Tuesday, 1/25/2018 at 11:00 AM CST before Honorable Judge David A. Baker. Each party must be represented by at least one attorney of record, and lead counsel should attend if possible. Counsel are directed to call 334-954-3275 and use passcode 246860# to join the telephone conference. Counsel should be prepared to discuss all aspects of this case including all pending motions. Signed by Honorable Judge David A. Baker on 1/12/2018. Copies furnished to calendar group, All MJ CRDs.(dmn, ) (Entered: 01/12/2018) |
| 01/16/2018 | 56 | AMENDED ORDER: A telephonic motion hearing is set for Thursday, 1/25/2018 at 11:00 AM CST before Honorable Judge David A. Baker. Each party must be represented by at least one attorney of record, and lead counsel should attend if possible. Counsel are directed to call 334-954- 3275 and use passcode 246860# to join the telephone conference. Counsel should be prepared to discuss all aspects of this case including all pending motions. Signed by Honorable Judge David A. Baker on 1/16/2018. Copies furnished to calendar group, All MJ CRDs.(dmn, ) (Entered: 01/16/2018) |
| 01/25/2018 | 57 | Minute Entry for proceedings held before Honorable Judge David A. Baker: Motion Hearing held on 1/25/2018 by telephone re 43 MOTION for Partial Summary Judgment filed by Christopher Cantu, 38 First MOTION to Compel filed by Christopher Cantu (PDF available for |

| | | court use only). (Recording Time 10:58 - 11:45.) (jct, ) (Entered: 01/25/2018) |
|---|---|---|
| 01/26/2018 | 58 | Joint MOTION to Modify 35 Scheduling Order by Greg Benton, City of Dothan, Alabama, Chris Summerlin, Adrianne Woodruff, Christopher Cantu. (White, Freddie) Modified on 1/29/2018 to create link and include additional filer. (dmn, ) (Entered: 01/26/2018) |
| 01/29/2018 | 59 | ORDER that the 38 Motion to Compel is granted in part as further set out in the order. All production required hereby shall be produced by 2/2/2018. To the extent not granted herein, the motion is denied without prejudice. Signed by Honorable Judge David A. Baker on 1/29/2018. (dmn, ) (Entered: 01/29/2018) |
| 01/30/2018 | 60 | ORDER granting in part 58 Joint Motion to Modify 35 Scheduling Order; The Scheduling Order is modified as follows: Dfts' expert witness deadline is extended to 3/5/2018; Discovery deadline is extended to 4/6/2018; Dispositive motion deadline is extended to 4/20/2018; No other dates are changed by this order; To the extent not granted herein, the 58 motion is denied. Signed by Honorable Judge David A. Baker on 1/30/2018. (alm, ) (Entered: 01/30/2018) |
| 02/23/2018 | 61 | ORDER: This matter comes before the Court on its own initiative. The parties are ORDERED to file a joint status report not later than 3/9/2018, indicatingwhether the parties anticipate dispositive motions other than what has been filed to date and whether the upcoming deadlines regarding discovery, expert disclosures, and face-to-face settlement conference will be timely met. The parties shall alsoindicate whether referral to private mediation would be beneficial. Signed by Honorable Judge David A. Baker on 2/23/2018. (dmn, ) (Entered: 02/23/2018) |
| 03/09/2018 | 62 | STATUS REPORT Joint by Greg Benton, City of Dothan, Alabama, Chris Summerlin, Adrianne Woodruff, Christopher Cantu. (White, Freddie) Modified on 3/9/2018 to include additional filer. (dmn, ) (Entered: 03/09/2018) |
| 04/19/2018 | 63 | MOTION for Summary Judgment by Greg Benton, City of Dothan, Alabama, Chris Summerlin, Adrianne Woodruff. (White, Freddie) (Entered: 04/19/2018) |
| 04/19/2018 | 64 | BRIEF/MEMORANDUM in Support re 63 MOTION for Summary Judgment filed by Greg Benton, City of Dothan, |

| | | |
|---|---|---|
| | | Alabama, Chris Summerlin, Adrianne Woodruff. (Attachments: # 1 Exhibit A, # 2 Exhibit A-1, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit D-1, # 7 Exhibit D-2, # 8 Exhibit D-3, # 9 Exhibit D-4, # 10 Exhibit D-5, # 11 Exhibit D-6, # 12 Exhibit D-7, # 13 Exhibit E, # 14 Exhibit E-1, # 15 Exhibit E-2, # 16 Exhibit F, # 17 Exhibit G, # 18 Exhibit G-1, # 19 Exhibit G-2, # 20 Exhibit G-3, # 21 Exhibit H, # 22 Exhibit H-Part 2, # 23 Exhibit H-Part 3, # 24 Exhibit I, # 25 Exhibit J, # 26 Exhibit K, # 27 Exhibit L, # 28 Exhibit M, # 29 Exhibit N, # 30 Exhibit O, # 31 Exhibit P, # 32 Exhibit Q)(White, Freddie) Modified on 4/26/2018 to include the following text: USB/Drive containing Exhibits J, K, L, M, N, O, P, Q placed in small brown envelope in the file attached to 67 Motion. (dmn, ). (Entered: 04/19/2018) |
| 04/19/2018 | 65 | NARRATIVE SUMMARY OF FACTS re 63 Motion and 64 Brief in Support filed by Greg Benton, City of Dothan, Alabama, Chris Summerlin, Adrianne Woodruff. (White, Freddie) Modified on 4/20/2018 to reflect actual title and clean up text. (dmn, ) (Entered: 04/19/2018) |
| 04/20/2018 | 66 | ORDER: it is hereby ORDERED that Plf's response to the 63 motion shall be filed by Friday, 5/11/2018; Dfts may, if they choose, file a reply to Plf's response no later than Friday, 5/18/2018; further ORDERED that a motion hearing in the above captioned cause is set for Thursday 5/24/2018, at 11:00 AM Central Time, in Courtroom 2E, before Honorable Judge David A. Baker, as further set out in order. Signed by Honorable Judge David A. Baker on 4/20/2018. (Furnished: Calendar, CB, JT, KF, WR, & WS) (alm, ) (Entered: 04/20/2018) |
| 04/25/2018 | 67 | MOTION for Leave to File Exhibits (J, K, L, M, N, O, P, Q (USB/Drive) Conventionally to 64 Brief, by Greg Benton, City of Dothan, Alabama, Chris Summerlin, Adrianne Woodruff. (USB/Drive placed in small brown envelope in the file attached to this motion.) (dmn, ) Modified on 4/25/2018 to include location of usb/drive. (dmn, ) (Entered: 04/25/2018) |
| 04/26/2018 | 68 | ORDER: This matter is before the court on Defendants Motion to File Exhibits Conventionally. (Doc. 67 ). By the motion, Defendants seek to file conventionally with the Clerk of Court a USB flash drive containing exhibits J, K, |

| | | |
|---|---|---|
| | | L, M, N, O, P, and Q in support of their motion for summary judgment. Upon consideration, Defendants motion (Doc. 67 ) is granted. Within five days of the date of this order, Defendants shall submit to the Clerk a flash drive containing the exhibits, along with a courtesy copy of the flash drive for Chambers. Signed by Honorable Judge David A. Baker on 4/26/2018. (dmn, ) (Entered: 04/26/2018) |
| 05/11/2018 | 69 | Evidentiary Submission in Opposition to Defendants' 63 Motion for Summary Judgment filed by Christopher Cantu. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3 - Part 1, # 4 Exhibit 3 - Part 2, # 5 Exhibit 4 - Part 1, # 6 Exhibit 4 - Part 2, # 7 Exhibit 5 - Part 1, # 8 Exhibit 5 - Part 2, # 9 Exhibit 6 - Part 1, # 10 Exhibit 6 - Part 2, # 11 Exhibit 7 - Part 1, # 12 Exhibit 7 - Part 2, # 13 Exhibit 7 - Part 3, # 14 Exhibit 7 - Part 4, # 15 Exhibit 8 - Part 1, # 16 Exhibit 8 - Part 2, # 17 Exhibit 9, # 18 Exhibit 10, # 19 Exhibit 11, # 20 Exhibit 12)(Sherrod, Henry) Modified on 5/15/2018 to create link. (dmn, ) (Entered: 05/11/2018) |
| 05/11/2018 | 70 | RESPONSE to Motion re 63 MOTION for Summary Judgment filed by Christopher Cantu. (Sherrod, Henry) (Entered: 05/11/2018) |
| 05/18/2018 | 71 | REPLY BRIEF re 70 Response to Motion filed by Greg Benton, City of Dothan, Alabama, Chris Summerlin, Adrianne Woodruff. (White, Freddie) (Entered: 05/18/2018) |
| 05/24/2018 | 72 | Minute Entry for proceedings held before Honorable Judge David A. Baker: Motion Hearing held on 5/24/2018 re 63 MOTION for Summary Judgment filed by Chris Summerlin, City of Dothan, Alabama, Greg Benton, Adrianne Woodruff (PDF available for court use only). (Recording Time FTR: 11:03 AM - 12:10 PM.) (war, ) (Entered: 05/24/2018) |
| 07/25/2018 | 73 | REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE that: 1. Plaintiff's 43 Motion for Partial Summary Judgment be denied; and 2. Defendants' 63 Motion for Summary Judgment on behalf of the City of Dothan, Alabama; Greg Benton, and Chris Summerlin be granted and final summary judgment be entered in these Defendants' favor, and Defendants' Motion for Summary |

| | | Judgment as to Adrienne Woodruff (Doc. 63 ) be denied. Objections to R&R due by 8/8/2018. Signed by Honorable Judge David A. Baker on 7/25/2018. (dmn, ) (Entered: 07/25/2018) |
|---|---|---|
| 07/30/2018 | 74 | MOTION for Extension of Time to File Objections to Magistrate Judge's August 8, 2018 73 Report and Recommendation by Adrianne Woodruff. (Attachments: # 1 Text of Proposed Order Order)(White, Freddie) Modified on 7/31/2018 to clean up text, reflect actual title. (dmn, ) (Entered: 07/30/2018) |
| 07/31/2018 | 75 | ORDER: This matter is before the Court on Defendants Motion to Modify forExtension of Time to File Objections to Magistrate Report and Recommendation.(Doc. 74 ). Upon consideration, Defendants motion is GRANTED, and it isORDERED that objections to the Report and Recommendation shall be filed byAugust 15, 2018. Signed by Honorable Judge David A. Baker on 7/31/2018. (dmn, ) (Entered: 07/31/2018) |
| 08/15/2018 | 76 | Case reassigned to Honorable Judge Emily C. Marks. Honorable Judge Myron H. Thompson no longer assigned to the case as presiding judge. (dmn, ) (Entered: 08/15/2018) |
| 08/15/2018 | 77 | Objection to re 73 REPORT AND RECOMMENDATIONS re 43 MOTION for Partial Summary Judgment and Brief in Support filed by Christopher Cantu, 28 Amended Complaint, filed by Christopher Cantu, 63 MOTION for Summary Judgment filed by Chris Summer filed by Adrianne Woodruff. (White, Freddie) (Entered: 08/15/2018) |
| 08/23/2018 | 78 | RESPONSE to Defendant's 77 Objections to 73 Report and Recommendation re 43 Motion for Partial Summary Judgment and Brief in Support, 28 Amended Complaint, 63 Motion for Summary Judgment, filed by Christopher Cantu. (Sherrod, Henry) Modified on 8/24/2018 to clean up text, create link. (dmn, ) (Entered: 08/23/2018) |
| 08/27/2018 | 79 | Joint MOTION to Modify 35 Scheduling Order by Christopher Cantu, Greg Benton, City of Dothan, Alabama, Chris Summerlin, Adrianne Woodruff. (Sherrod, Henry) Modified on 8/28/2018 to create link and include additional filers. (dmn, ) (Entered: 08/27/2018) |

| | | |
|---|---|---|
| 08/28/2018 | 80 | ORDER: The 79 Joint Motion to Modify Scheduling Order is granted to the extent that the Pretrial Conference on 9/13/2018 and the trial on 10/15/2018 are hereby continued and removed from the court's calendar while the District Judge has the Report and Recommendation under consideration and until further order of court. It is further ORDERED that all pretrial deadlines referenced in sections 9, 10, 11, 13, and 15 of the Uniform Scheduling Order, see Doc. 35 , are continued until further order of court. Signed by Honorable Judge David A. Baker on 8/28/2018. Copies furnished to calendar group, WS. (Deadlines terminated: Jury Trial set for 10/15/2018, Final PTC set for 9/13/2018.)(dmn, ) (Entered: 08/28/2018) |
| 09/06/2018 | 81 | NOTICE of Conventional Filing of a USB flash drive containing Exhibits 5-8 and 10 of plaintiff's 44 Evidentiary Submission, substituted for the USB flash drive (blank) originally received on 11/1/2017, by Christopher Cantu. (Sherrod, Henry) Modified on 9/6/2018 to include additional text, original flash drive received 11/1/2017 was blank. The flash drive received on 9/5/2018 replaces the originally submitted flash drive. Flash drive placed in a small brown envelope attached to a copy of this notice in the file in Clerk's office. (dmn, ) (Entered: 09/06/2018) |
| 11/08/2018 | 82 | MEMORANDUM OPINION AND ORDER adopting in part and rejecting in part the 73 REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE ; ORDERING that plf's 43 motion for partial summary judgment be and is DENIED; further ORDERING that defs' City of Dothan, AL, Benton, and Summerlin's 63 motion for summary judgment be and is GRANTED; further ORDERING that def Woodruff's 77 objection is SUSTAINED and that her 63 motion for summary judgment be and is GRANTED. Signed by Honorable Judge Emily C. Marks on 11/8/18. (djy, ) (Entered: 11/08/2018) |
| 11/08/2018 | 83 | FINAL JUDGMENT, in accordance with the order entered on this date adopting in part and rejecting in part the Report and Recommendation of the Magistrate Judge, it is the ORDER, JUDGMENT and DECREE of the Court that this case is DISMISSED with prejudice; directing the Clerk to enter this document on the civil docket as a Final |

| | | |
|---|---|---|
| | | Judgment pursuant to Rule 58 of the FRCP. Signed by Honorable Judge Emily C. Marks on 11/8/18. (Attachments: # 1 civil appeals checklist)(djy, ) (Entered: 11/08/2018) |
| 12/07/2018 | 84 | NOTICE OF APPEAL by Christopher Cantu (Sherrod, Henry) Modified on 12/7/2018 to Create relationship to document # 82 MEMORANDUM OPINION AND ORDER and 83 FINAL JUDGMENT entered on 11/08/2018.(ydw, ) (Entered: 12/07/2018) |
| 12/07/2018 | | NOTICE of Docket Text Correction issued this date to reflect that 84 Notice of Appeal, was modified on 12/07/2018 to Create relationship to document # 82 MEMORANDUM OPINION AND ORDER and 83 FINAL JUDGMENT entered on 11/08/2018. No PDF with this docket entry. (ydw)(ydw, ) (Entered: 12/07/2018) |
| 12/07/2018 | 85 | Appeal Instructions sent to Attorney Henry F. (Hank) Sherrod III, counsel for plaintiff CHRISTOPHER CANTU, as the Administrator of the Estate of Robert Earl Lawrence, re 84 Notice of Appeal. A copy of the Transcript Information Form must be mailed to each court reporter from whom you are requesting a transcript. (Attachments: # 1 TRANSCRIPT INFORMATION FORM)(ydw, ) (Entered: 12/07/2018) |
| 12/07/2018 | 86 | Transmission of Notice of Appeal, 73 REPORT AND RECOMMENDATIONS, 77 Objection, 82 MEMORANDUM OPINION AND ORDER, 83 FINAL JUDGMENT, and Docket Sheet to US Court of Appeals re 84 Notice of Appeal. (Attachments: # 1 DOCKET SHEET)(ydw, ) (Entered: 12/07/2018) |
| 12/11/2018 | 87 | TRANSCRIPT INFORMATION FORM by Christopher Cantu (Sherrod, Henry) (Entered: 12/11/2018) |
| 12/11/2018 | 88 | USCA Case Number 18-15071-F for 84 Notice of Appeal filed by Christopher Cantu. (dmn, ) (Entered: 12/11/2018) |
| 12/11/2018 | 89 | STRICKEN AS A DUPLICATE DOCKET ENTRY - SEE DOCUMENT #88 FOR CORRECT ENTRY] Case Number 18-15071-F for 84 Notice of Appeal filed by Christopher Cantu; Notice of appeal filed by Appellant Christopher Cantu on 12/07/2018. Fee Status: Fee Not Paid. Awaiting Appellant's Certificate of Interested Persons due on or before 12/21/2018 as to Appellant Christopher Cantu. Awaiting Appellee's Certificate of |

| | | |
|---|---|---|
| | | Interested Persons due on or before 01/04/2019 as to Appellee City of Dothan, Alabama. (ydw, ) Modified on 12/12/2018 (ydw, ). (Entered: 12/12/2018) |
| 12/12/2018 | 90 | USCA Appeal Fees received $ 505.00 receipt number 4602051683 re 84 Notice of Appeal filed by Christopher Cantu 11th Circuit Appeal No. 18-15071-F. (ydw, ) (Entered: 12/12/2018) |
| 12/12/2018 | | Pursuant to F.R.A.P. 11(c), the Clerk of the District Court for the Middle District of Alabama certifies that the record is complete for purposes of this appeal re: 84 Notice of Appeal, Appeal No. 18-15071-F. The entire record on appeal is available electronically.(ydw, ) (Entered: 12/12/2018) |

# TAB 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

RECEIVED

2016 DEC 29   A 10: 22

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

|  |  |  |
|---|---|---|
| CHRISTOPHER CANTU, as the | ) | |
| Administrator of the Estate of | ) | |
| Robert Earl Lawrence, | ) | |
|  | ) | |
| Plaintiff | ) | |
|  | ) | |
| v. | ) | CASE NO. 1:16-cv-1003 |
|  | ) | **DEMAND FOR JURY TRIAL** |
| CITY OF DOTHAN, ALABAMA, | ) | |
| GREG BENTON, | ) | |
| CHRIS SUMMERLIN, and | ) | |
| ADRIAN WOODRUFF, | ) | |
|  | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Christopher Cantu complains of defendants, stating as follows:

### Parties

1.     Christopher Cantu is of legal age, a citizen and resident of the state of Alabama and Geneva County, and the duly-appointed representative of the estate of Robert Earl Lawrence.

2.     Defendant the City of Dothan, Alabama is a municipality organized and existing under the laws of the state of Alabama.

3.     Defendant Greg Benton was employed by the City of Dothan as the police chief at all times relevant to the allegations in this complaint and is a resident and citizen of the state of Alabama.  He is sued in his individual capacity.

4.      Defendant Chris Summerlin was employed by the City of Dothan as a police officer at all times relevant to the allegations in this complaint and is a resident and citizen of the state of Alabama. He is sued in his individual capacity.

5.      Defendant Adrian Woodruff was employed by the City of Dothan as a police officer at all times relevant to the allegations in this complaint and is a resident and citizen of the state of Alabama. She is sued in her individual capacity.

## Facts

6.      On or about December 30, 2014, Lawrence was attempting to take a stray dog to the Dothan Animal Shelter.

7.      Shelter employees demanded that Lawrence provide a driver's license as identification.

8.      Lawrence provided his name but refused to provide a driver's license based on his personal convictions and beliefs.

9.      Shelter personnel contacted the police.

10.     Dothan police officer Chris Summerlin was the first officer on the scene.

11.     Lawrence again provided his name but refused to provide a driver's license.

12.     Summerlin refused to permit Lawrence to leave without providing identification (in the form of a driver's license) and took Lawrence to the ground.

13.     After taking Lawrence to the ground, Summerlin let Lawerence up

2

without cuffing him.

14.     After Summerlin let Lawrence up, Lawrence continued to refuse to provide his identification, and, eventually, Summerlin told Lawrence he was under arrest.

15.     Lawrence put his hands up and backed away from Summerlin in order to avoid being arrested.

16.     Summerlin then tased Lawerence.

17.     After Summerlin tased Lawrence, Woodruff arrived on the scene and began assisting Summerlin.

18.     Despite the lack of any threat of death or serious bodily harm to any officer, Woodruff drew her weapon.

19.     Summerlin saw Woodruff draw her weapon, had an opportunity to intervene to protect Lawrence, but, nevertheless, failed and refused to intervene.

20.     Woodruff then shot Lawrence in the abdomen.

21.     Lawrence died from the gunshot wound.

22.     The detention and arrest of Lawrence was not based on reasonable suspicion or probable cause, as Lawrence had committed no crime.  He was not subject to any legal duty to provide identification.

23.     Because the detention and arrest were unlawful, under Alabama law Lawrence had a right to resist the arrest.

3

24. Lawrence, who all officers knew to be unarmed, resisted the arrest but did not assault or attempt to assault any officer. (Lawrence, who openly carries a handgun, removed his gun and put it in his glovebox when Summerlin arrived.)

25. There was no basis for Woodruff to even draw her gun, let alone shoot Lawrence.

26. Woodruff violated clear City policy in drawing her gun.

27. Woodruff violated clear City policy in discharging her gun.

28. Woodruff's use of deadly force was unnecessary and excessive and resulted in Lawrence's death.

29. The City of Dothan regularly receives calls from citizens who make complaints.

30. Many of these calls are regarding persons who have committed no crime.

31. It is a routine part of the business of the City of Dothan police department for its officers to respond to such complaints and make contact with persons who are the subject of the complaint.

32. In these routine situations, an officers's actions are restricted by clear constitutional rules.

33. One of these rules only permits the officer to detain the person if "the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).

4

"While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Id.* (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). In the absence of reasonable suspicion justifying the stop, a person approached by an officer "need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way." *Florida v. Royer*, 460 U.S. 491, 497-98 (1983) (citing *Terry*, 392 U.S. at 32-33 (Harlan, J., concurring) and 34 (White, J., concurring)). An individual "may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds." *Id.* at 498 (citing *United States v. Mendenhall*, 446 U.S. 544, 556 (1980)).

34.     Officers conducting traffic stops are subject to similar constitutional restrictions.

35.     It is highly predictable that constitutional violations will occur if officers are not trained and supervised regarding the limits on police officers' authority to make stops, including traffic stops.

36.     It is highly predictable that violations of these constitutional rules will lead to unnecessary physical confrontations, unlawful arrests (to justify the force used by the officer), and injuries to innocent citizens who oppose police officers who violate

these constitutional rules.

37.     Common charges used by officers in this situation are obstructing governmental operations, disorderly conduct, and resisting arrest.

38.     It is well known to experienced police officers and to City policymakers that officers, without proper training and supervision regarding the limits of their authority, are likely to violate the constitutional rules related to stops in an effort to be "proactive" in stopping crime and under the general mantra "better safe rather than sorry."

39.     That is particularly true here because the City evaluated officers' performance based in part on their statistics for contacts, arrests, and tickets, thereby encouraging officers to be aggressive in their approaches to citizens.

40.     In fact, the policies and practices of many police departments regarding stops, including traffic stops, have come under scrutiny in recent years.

41.     City policymakers knew to a moral certainty that City officers would regularly confront the question of whether a stop was permissible.

42.     Nevertheless, City policymakers, with deliberate indifference, failed to take steps to insure officers were trained and supervised regarding the constitutional limits on officers' authority in this area.

43.     Officers were encouraged to make stops without also being reminded of the limits on their authority to make them.

6

44.    Officers were not trained regarding the limited circumstances in which it is appropriate to arrest persons for disorderly conduct and other charges that are subject to abuse by officers.

45.    Officers are initially trained at a certified police academy and are instructed regarding the constitutional rules.

46.    Academy training, however, is followed by an extensive training program in which field training officers teach new officers how the job is really done.

47.    Prior to the Lawrence incident, City policymakers were aware of numerous incidents in which citizens were subjected to unconstitutional stops, searches, arrests, and uses of force but took no action to investigate and discipline officers.

48.    Press reports indicate that the City has a long history of tolerance for misconduct by its officers, including numerous false arrests based on planted or manufactured evidence and evidence that were covered up.

49.    In fact, even when a high-ranking Dothan police officer, Captain Keith Gray, complained about the false arrest of two black youths in 2012, there was no investigation.

50.    This very case presents a prime example, as even the obvious use of excessive force by Woodruff was not a basis for discipline, and the City's policymakers did not criticize Summerlin's arrest of Lawrence either.

7

51.     Summerlin and Woodruff were not disciplined because the City of Dothan does not take violations of constitutional rights seriously even when they result in an unnecessary death.

52.     Despite reviewing evidence, including video recordings, clearly showing that Lawrence's rights were violated, City policymakers determined the actions of the officers were within policy and constitutional limits.

53.     The City's actions regarding Lawrence are emblematic of a department that tolerates constitutional violations and uses internal investigations as a means to protect officers and the City from civil liability and bad publicity.

54.     The City's failure and refusal to discipline Summerlin and Woodruff and finding that their conduct was within City policy constitutes a ratification of Woodruff's constitutional violations and makes the City liable for Woodruff's constitutional violations under *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978).

55.     The actions of City policymakers regarding Lawrence are consistent with and reflective of a pre-existing policy and custom of tolerance for constitutional violations by officers, including illegal seizures, illegal searches, false arrests, and excessive force.

56.     Prior to the violations of Lawrence's rights, the City permitted, encouraged, and ratified a pattern and practice of misconduct in that the City:

        a.      failed to discipline or prosecute or in any manner deal with known

incidents of misconduct; and

b.  refused to investigate complaints of misconduct, and, instead, officially claimed such incidents were justified and proper.

57.  Thus, prior to Lawrence's death, few, if any, officers received informal criticism, let alone formal discipline and certainly were not terminated, for violating a citizen's constitutional rights.

58.  City policymakers were aware of prior incidents through use of force reports (which are approved through the chain of command), through reports from the City attorney's office (which prosecutes the false charges used by officers in City court), complaints from citizens, reports from officers, and through other sources.

59.  Through long-established practice, the City's policymakers established a custom or policy that incidents of possible, likely, or known misconduct are not investigated or are investigated only with an eye toward protecting the City from civil liability, with the foreseeable result that officers believe they can get away with violating citizens' rights.

60.  In furtherance of this custom or policy, the City has set up a system that discourages citizen complaints.  While publishing information about other police-related matters on its website, the City does not provide a vehicle for such complaints or inform citizens regarding how to make such complaints on the website. The City does not even state that it has an internal affairs officer, let alone a department

9

responsible for such investigations.

61.    In fact, instead of reviewing incidents of possible, likely, or known misconduct, such incidents are routinely approved through the chain of command.

62.    Because use of force reports and internal investigations are not a matter of public record, the number of excessive force and other incidents sanctioned by the City is not known.

63.    The foregoing acts, omissions, and systemic failures and deficiencies are policies and customs of the City and caused officers to believe that constitutional violations would be tolerated and that complaints would not be honestly or properly investigated, with the foreseeable result that officers would violate the constitutional rights of Lawrence and other similarly-situated citizens.

64.    The customs and policies described above were implemented by the acts and omissions of City policymakers, including the police chief, now retired, defendant Greg Benton.

### Count I - 42 U.S.C. § 1983 - Excessive Force

65.    On or about December 30, 2014, Woodruff, acting under color of law within the meaning of 42 U.S.C. § 1983, used deadly force on Lawrence, thereby depriving Lawrence of his rights under the Fourth and Fourteenth Amendments to the Constitution of the United States in violation of 42 U.S.C. § 1983. Specifically, she violated Lawrence's right to be free from excessive force.

66.    Summerlin not only precipitated the entire incident; he had an opportunity to intervene to protect Lawrence but failed to do so.

67.    Woodruff and Summerlin acted with malice or reckless indifference to Lawrence's constitutional rights.

68.    The City's policies and customs, including those regarding investigations of citizen complaints and tolerance for constitutional violations in general, were the moving force behind defendants' violation of Lawrence's Fourth Amendment rights.

69.    The City's customs and policies were established by City policymakers, including Benton.

70.    As a result of the conduct of defendants, Lawrence was shot and killed.

### Count II- State Law - Assault and Battery/Excessive Force

71.    On or about December 30, 2014, Woodruff shot and killed Lawrence.

72.    Woodruff did so in violation of clear City policy regarding when deadly force is permissible.

73.    Summerlin not only precipitated the entire incident; he had an opportunity to intervene to protect Lawrence but failed to do so.

74.    The conduct of Woodruff and Summerlin was either negligent, wanton, malicious, willful, or in bad faith.

75.    As a result of the conduct of defendants, Lawrence was shot and killed.

76.    To the extent the conduct of Woodruff and Summerlin was negligent or

11

careless, the City is liable for Woodruff's conduct.

## Other Matters

77.   All conditions precedent to the bringing of this suit have occurred.

## Relief Sought

78.   As relief, plaintiff seeks the following:

a.   That he be awarded such compensatory damages as a jury shall determine from the evidence he is entitled to recover;

b.   That he be awarded against the individual defendants only such punitive damages as a jury shall determine from the evidence he is entitled to recover;

c.   That he be awarded prejudgment and postjudgment interest at the highest rates allowed by law;

d.   That he be awarded the costs of this action, his reasonable attorney's fees, and his reasonable expert witness fees;

e.   That he be awarded such other and further relief to which he is justly entitled.

**Dated: December 29, 2016.**

Respectfully submitted,

/s Henry F. (Hank) Sherrod III
Henry F. (Hank) Sherrod III
No. ASB-1200-D63H
HENRY F. SHERROD III, P.C.
119 South Court Street
P. O. Box 606
Florence, Alabama 35631-0606
Phone: 256-764-4141
Fax: 877-684-0802
Email: hank@alcivilrights.com

William S. Morris
No. ASB-3931-Y85T
MORRIS CARY ANDREWS TALMADGE
& DRIGGERS, LLC
3334 Ross Clark Circle
Dothan, Alabama 36303
Phone: 334.702.0000
Fax: 334.673.0077
Email: wmorris@mcatlaw.com

Attorneys for Plaintiff

**Jury Demand**

Plaintiff requests a trial by jury.

# TAB 23

## UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| CHRISTOPHER CANTU, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| v. | ) CIVIL ACTION NO.:  1:16-cv-1003 |
| | ) |
| CITY OF DOTHAN, ALABAMA, | ) |
| et al., | ) |
| | ) |
| DEFENDANT. | ) |

## ANSWER OF DEFENDANT ADRIANNE WOODRUFF

Comes now the Defendant Adrianne Woodruff in the above styled cause, by and through the undersigned attorney and in answer to Plaintiff's Complaint states as follows:

### Parties

1.     Defendant is without information to either admit or deny the allegations contained in paragraph 1 of Plaintiff's Complaint.  Defendant therefore denies said allegations.

2.     Defendant admits the allegations contained in paragraph 2 of Plaintiff's Complaint.

3.     Defendant admits the allegations contained in paragraph 3 of Plaintiff's Complaint.

4.      Defendant admits the allegations contained in paragraph 4 of Plaintiff's Complaint.

5.      Defendant admits the allegations contained in paragraph 5 of Plaintiff's Complaint.

6.      Defendant admits Lawrence attempted to leave a dog at the Dothan Animal Shelter.

7.      Defendant admits employees requested to see Lawrence's driver's license.

8.      Defendant admits that Lawrence produced a document entitled, "AFFIDAVIT OF IDENTITY" and did not produce a driver's license.  Defendant admits Lawrence's refusal was consistent with the convictions and beliefs of sovereign citizens.

9.      Defendant admits the allegations contained in paragraph 9 of Plaintiff's Complaint.

10.     Defendant denies the allegations contained in paragraph 10 of Plaintiff's Complaint.

11.     Defendant admits Lawrence refused to produce a driver's license.  See Defendant's response to paragraph no. 8, supra.  Defendant denies he gave his name to Officer Summerlin.

12.    Defendant denies the allegations contained in paragraph 12 of Plaintiff's Complaint.

13.    Defendant denies the allegations contained in paragraph 13 of Plaintiff's Complaint.

14.    Defendant denies the allegations contained in paragraph 14 of Plaintiff's Complaint.

15.    Defendant denies the allegations contained in paragraph 15 of Plaintiff's Complaint.

16.    Defendant denies the allegations contained in paragraph 16 of Plaintiff's Complaint.

17.    Defendant denies the allegations contained in paragraph 17 of Plaintiff's Complaint.

18.    Defendant denies the allegations contained in paragraph 18 of Plaintiff's Complaint.

19.    Defendant denies the allegations contained in paragraph 19 of Plaintiff's Complaint.

20.    Defendant admits shooting Lawrence to protect herself and other police officers from the threat of death or serious physical harm posed by Lawrence.

21.    Defendant admits the allegations contained in paragraph 21 of Plaintiff's Complaint.

22.    Defendant denies the allegations contained in paragraph 22 of Plaintiff's Complaint.

23.    Defendant denies the allegations contained in paragraph 23 of Plaintiff's Complaint.

24.    Defendant denies the allegations contained in paragraph 24 of Plaintiff's Complaint.

25.    Defendant denies the allegations contained in paragraph 25 of Plaintiff's Complaint.

26.    Defendant denies the allegations contained in paragraph 26 of Plaintiff's Complaint.

27.    Defendant denies the allegations contained in paragraph 27 of Plaintiff's Complaint.

28.    Defendant denies the allegations contained in paragraph 28 of Plaintiff's Complaint.

29.    Defendant admits the allegations contained in paragraph 29 of Plaintiff's Complaint.

30.     Defendant admits the allegations contained in paragraph 30 of Plaintiff's Complaint.

31.     Defendant admits the allegations contained in paragraph 31 of Plaintiff's Complaint.

32.     Defendant denies that the circumstances she confronted with Lawrence were routine.  Defendant admits that federally protected rights of citizens exist even in the most exigent circumstances.

33.     Defendant denies that either <u>Terry v. Ohio</u>, 392 U.S. 1 (1968) or its progeny, are limited to routine situations encountered by law enforcement.

34.     See Defendant's response to no. 33, supra.

35.     Defendant denies she was not properly trained or supervised for investigatory stops, traffic stops and arrest.  Defendant further denies constitutional violations by Dothan police officers are predictable.

36.     Defendant denies that either she or other police officers involved with Lawrence violated Lawrence's constitutionally protected rights.  Defendant further denies it is highly predictable that any Dothan police officer would violate the constitutional rights of any citizen or person, innocent or guilty.

37.     Defendant admits that these are criminal offenses under the laws of the State of Alabama.  Defendant denies any abuse of these laws by Dothan police officers.

38.     Defendant denies that she or any other police officer involved with Lawrence had not received proper training and supervision for their authority as sworn police officers.  Defendant admits it was well known to the Dothan City Commission that their police officers receive proper training and supervision.

39.     Defendant denies the allegations contained in paragraph 39 of Plaintiff's Complaint.

40.     Defendant is without information to either admit or deny the allegations contained in paragraph 40 of Plaintiff's Complaint.  Defendant therefore denies said allegations.

41.     Defendant admits the Dothan City Commission was certain its police officers were properly trained in all discretionary functions of law enforcement. Defendant denies the Commission knew the frequency of when such occasions would arise.  See Defendant's response to no. 35, supra.

42.     Defendant denies the allegations contained in paragraph 42 of Plaintiff's Complaint.

43.     Defendant denies the allegations contained in paragraph 43 of Plaintiff's Complaint.

44.     Defendant denies the allegations contained in paragraph 44 of Plaintiff's Complaint.

45.     Defendant admits she was a certified police officer at all times materially relevant herein.  Defendant further admits she received instruction in both state and federal law related to the duties of law enforcement officers. Defendant denies her initial law enforcement training was at the police academy.

46.     Defendant denies there is any inconsistency in the training she received in the police academy and that which she received from field training officers.

47.     Defendant denies the allegations contained in paragraph 47 of Plaintiff's Complaint.

48.     Defendant is without information to either admit or deny the allegations contained in paragraph 48 of Plaintiff's Complaint.  Defendant therefore denies said allegations.

49.     Defendant is without information to either admit or deny the allegations contained in paragraph 49 of Plaintiff's Complaint.  Defendant therefore denies said allegations.

50.     Defendant denies using excessive force.  Defendant admits that the
Dothan City Commission did not criticize Defendant Summerlin's arrest of
Lawrence.

51.     Defendant admits she and officer Summerlin were not criticized or
disciplined for their actions.  Defendant denies the remaining allegations in
paragraph 51.

52.     Defendant denies the allegations contained in paragraph 52 of
Plaintiff's Complaint.

53.     Defendant denies the allegations contained in paragraph 53 of
Plaintiff's Complaint.

54.     Defendant denies the allegations contained in paragraph 54 of
Plaintiff's Complaint.

55.     Defendant denies the allegations contained in paragraph 55 of
Plaintiff's Complaint.

56.a.  Defendant denies the allegations contained in paragraph 56.a of
Plaintiff's Complaint.

56.b.  Defendant denies the allegations contained in paragraph 56.b of
Plaintiff's Complaint.

57.     Defendant denies that complaints against police officers are not investigated and disciplinary action not taken when appropriate.  Defendant admits the Dothan police department has an exemplary record for safeguarding civil rights.

58.     Defendant denies said allegations contained in paragraph 58 of Plaintiff's Complaint.

59.     Defendant denies the allegations contained in paragraph 59 of Plaintiff's Complaint.

60.     Defendant denies the allegations contained in paragraph 60 of Plaintiff's Complaint.

61.     Defendant denies the allegations contained in paragraph 61 of Plaintiff's Complaint.

62.     Defendant denies that either the City of Dothan or the Dothan Police Department has ever sanctioned the use of excessive force by its police officers. Defendant admits that Internal Affairs investigative reports are not public record.

63.     Defendant denies the allegations contained in paragraph 63 of Plaintiff's Complaint.

64.     Defendant denies the allegations contained in paragraph 64 of Plaintiff's Complaint.

## Count I - 42 U.S.C.
## § 1983 – Excessive Force

65.     Defendant denies the allegations contained in paragraph 65 of Plaintiff's Complaint.

66.     Defendant denies the allegations contained in paragraph 66 of Plaintiff's Complaint.

67.     Defendant denies the allegations contained in paragraph 67 of Plaintiff's Complaint.

68.     Defendant denies the allegations contained in paragraph 68 of Plaintiff's Complaint.

69.     Defendant denies the allegations contained in paragraph 69 of Plaintiff's Complaint.

70.     Defendant denies the allegations contained in paragraph 70 of Plaintiff's Complaint.

## Count II – State Law –
## Assault and Battery/Excessive Force

71.     Defendant admits the allegations contained in paragraph 71 of Plaintiff's Complaint.

72.     Defendant denies the allegations contained in paragraph 72 of Plaintiff's Complaint.

73.     Defendant denies the allegations contained in paragraph 73 of Plaintiff's Complaint.

74.     Defendant denies the allegations contained in paragraph 74 of Plaintiff's Complaint.

75.     Defendant denies the allegations contained in paragraph 75 of Plaintiff's Complaint.

76.     Defendant denies the allegations contained in paragraph 76 of Plaintiff's Complaint.

77.     Defendant is without information to either admit or deny the allegations contained in paragraph 77 of Plaintiff's Complaint.  Defendant therefore denies said allegations.

## Relief Sought

78.     Paragraphs 78.a-78.e do not call for responses from this Defendant. In the event this Court should determine a response is in order, those averments are denied.

## AFFIRMATIVE DEFENSES

## FIRST AFFIRMATIVE DEFENSE

Defendant asserts that the Plaintiff's Complaint has failed to state a claim against this Defendant for a federal constitutional violation pursuant to 42 U.S.C. § 1983.  Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1694, 85 L.Ed. 2d 1 (1985); Graham v. Conner, 490 U.S. 386, 109 S. Ct. 1865, 104 L.Ed. 2d 443 (1989); Scott v. Harris, 550 U.S. 372, 1275 Ct. 1769, 167 L. Ed. 2d 686 (2007).

## SECOND AFFIRMATIVE DEFENSE

Defendant asserts the affirmative defense of the statute of limitations.

## THIRD AFFIRMATIVE DEFENSE

The actions of Defendant were conducted in good faith and in the actual and reasonable belief that such actions were legal and proper under the circumstances.

## FOURTH AFFIRMATIVE DEFENSE

Defendant's alleged use of force applied to Plaintiff was objectively reasonable based on her knowledge and observations at the time of the incident.

## FIFTH AFFIRMATIVE DEFENSE

Defendant is immune from tort liability for her conduct during the course of this incident pursuant to Ala.Code § 6-5-338 1975.

## SIXTH AFFIRMATIVE DEFENSE

At all times material to this lawsuit Defendant was acting within her discretionary authority as a law enforcement officer employed by the City of Dothan and violated no clearly established federal constitutional law of which a reasonable police officer should have known.  Therefore, Defendant is entitled to qualified immunity from suit in her individual capacity.

## SEVENTH AFFIRMATIVE DEFENSE

Defendant asserts that, under the circumstances that existed, this Defendant reasonably believed it necessary to use deadly force in order to prevent injury to herself or others.

## EIGHTH AFFIRMATIVE DEFENSE

Defendant asserts that the incident alleged in the Plaintiff's Complaint was caused in whole or in part by the negligence and carelessness of Lawrence so as to proximately result or contribute to the alleged incident and alleged damages.

## NINTH AFFIRMATIVE DEFENSE

Defendant asserts that arguable reasonable suspicion existed for Defendant's actions.

## TENTH AFFIRMATIVE DEFENSE

Defendant asserts that this Defendant used that degree of force she reasonably believed necessary to protect herself and others and was privileged under Alabama law to do so.

## ELEVENTH AFFIRMATIVE DEFENSE

Defendant acted in self-defense.

## TWELFTH AFFIRMATIVE DEFENSE

Defendant asserts all applicable and relevant limits on judgments and claims against municipalities and municipal actions.

## THIRTEENTH AFFIRMATIVE DEFENSE

Defendant asserts the affirmative defense of municipal notice of claims statutes.

## FOURTEENTH AFFIRMATIVE DEFENSE

Defendant reserves the right to amend its affirmative defenses during the course of discovery.

Dated this 21st day of March, 2017.

s/F. Lenton White
F. Lenton White
City Attorney
P.O. Box 2128
Dothan, Alabama 36302
Telephone (334) 615-3130
Facsimile (334) 615-3139

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of March, 2017, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF System and by placing

the same in the U.S. Mail postage prepaid to the following:

*Henry F. (Hank) Sherrod, III*
*HENRY F. SHERROD III, P.C.*
*119 South Court Street*
*P.O. Box 606*
*Florence, Alabama 35631-0606*

*William S. Morris*
*MORRIS CARY ANDREWS TALMADGE*
*& DRIGGERS, LLC*
*3334 Ross Clark Circle*
*Dothan, Alabama 36303*

s/F. Lenton White
Of Counsel

# TAB 28

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER CANTU, as the Administrator of the Estate of Robert Earl Lawrence, | ) ) ) ) | |
| Plaintiff | ) ) | |
| v. | ) ) | CASE NO. 1:16-cv-1003 |
| CITY OF DOTHAN, ALABAMA, GREG BENTON, CHRIS SUMMERLIN, and ADRIANNE WOODRUFF, | ) ) ) ) ) | |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT

Plaintiff Christopher Cantu complains of defendants, stating as follows:

### Parties

1.     Christopher Cantu is of legal age, a citizen and resident of the state of Alabama and Houston County, and the duly-appointed representative of the estate of Robert Earl Lawrence.

2.     Defendant the City of Dothan, Alabama is a municipality organized and existing under the laws of the state of Alabama.

3.     Defendant Greg Benton was employed by the City of Dothan as the police chief at all times relevant to the allegations in this complaint and is a resident and citizen of the state of Alabama.  He is sued in his individual capacity.

4.     Defendant Chris Summerlin was employed by the City of Dothan as a police officer at all times relevant to the allegations in this complaint and is a resident and citizen of the state of Alabama.  He is sued in his individual capacity.

5.     Defendant Adrianne Woodruff was employed by the City of Dothan as a police officer at all times relevant to the allegations in this complaint and is a resident and citizen of the state of Alabama.  She is sued in her individual capacity.

**Facts**

6.     On or about December 30, 2014, Lawrence was attempting to take a stray dog to the Dothan Animal Shelter.

7.     Shelter employees demanded that Lawrence provide a driver's license as identification.

8.     Lawrence provided his name but refused to provide a driver's license based on his personal convictions and beliefs.

9.     Shelter personnel contacted the police.

10.     Dothan police officer Chris Summerlin was the first officer on the scene.

11.     Lawrence again provided his name but refused to provide a driver's license.

12.     Summerlin refused to permit Lawrence to leave without providing identification (in the form of a driver's license) and took Lawrence to the ground.

2

13.    After taking Lawrence to the ground, Summerlin let Lawerence up without cuffing him.

14.    After Summerlin let Lawrence up, Lawrence continued to refuse to provide his identification, and, eventually, Summerlin told Lawrence he was under arrest.

15.    Lawrence put his hands up and backed away from Summerlin in order to avoid being arrested.

16.    Summerlin then tased Lawerence.

17.    Before Summerlin tased Lawrence, Woodruff arrived on the scene and began assisting Summerlin.

18.    Despite the lack of any threat of death or serious bodily harm to any officer, Woodruff drew her weapon.

19.    Summerlin saw Woodruff draw her weapon, had an opportunity to intervene to protect Lawrence, but, nevertheless, failed and refused to intervene.

20.    Woodruff then shot Lawrence in the abdomen.

21.    Lawrence died from the gunshot wound.

22.    The detention and arrest of Lawrence was not based on reasonable suspicion or probable cause, as Lawrence had committed no crime.  He was not subject to any legal duty to provide identification.

23.    Because the detention and arrest were unlawful, under Alabama law

Lawrence had a right to resist the arrest.

24.    Lawrence, who all officers knew to be unarmed, resisted the arrest but did not assault or attempt to assault any officer.  (Lawrence, who openly carries a handgun, removed his gun and put it in his glovebox when Summerlin arrived.)

25.    There was no basis for Woodruff to even draw her gun, let alone shoot Lawrence.

26.    Woodruff violated clear City policy in drawing her gun.

27.    Woodruff violated clear City policy in discharging her gun.

28.    Woodruff's use of deadly force was unnecessary and excessive and resulted in Lawrence's death.

29.    The City of Dothan regularly receives calls from citizens who make complaints.

30.    Many of these calls are regarding persons who have committed no crime.

31.    It is a routine part of the business of the City of Dothan police department for its officers to respond to such complaints and make contact with persons who are the subject of the complaint.

32.    In these routine situations, an officers's actions are restricted by clear constitutional rules.

33.    One of these rules only permits the officer to detain the person if "the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois*

4

*v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).

"While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Id.* (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).  In the absence of reasonable suspicion justifying the stop, a person approached by an officer "need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way." *Florida v. Royer*, 460 U.S. 491, 497-98 (1983) (citing *Terry*, 392 U.S. at 32-33 (Harlan, J., concurring*)* and 34 (White, J., concurring)).  An individual "may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds." *Id.* at 498 (citing *United States v. Mendenhall*, 446 U.S. 544, 556 (1980)).

34.    Officers conducting traffic stops are subject to similar constitutional restrictions.

35.    It is highly predictable that constitutional violations will occur if officers are not trained and supervised regarding the limits on police officers' authority to make stops, including traffic stops.

36.    It is highly predictable that violations of these constitutional rules will lead to unnecessary physical confrontations, unlawful arrests (to justify the force used

by the officer), and injuries to innocent citizens who oppose police officers who violate these constitutional rules.

37.     Common charges used by officers in this situation are obstructing governmental operations, disorderly conduct, and resisting arrest.

38.     It is well known to experienced police officers and to City policymakers that officers, without proper training and supervision regarding the limits of their authority, are likely to violate the constitutional rules related to stops in an effort to be "proactive" in stopping crime and under the general mantra "better safe rather than sorry."

39.     That is particularly true here because the City evaluated officers' performance based in part on their statistics for contacts, arrests, and tickets, thereby encouraging officers to be aggressive in their approaches to citizens.

40.     In fact, the policies and practices of many police departments regarding stops, including traffic stops, have come under scrutiny in recent years.

41.     City policymakers knew to a moral certainty that City officers would regularly confront the question of whether a stop was permissible.

42.     Nevertheless, City policymakers, with deliberate indifference, failed to take steps to insure officers were trained and supervised regarding the constitutional limits on officers' authority in this area.

43.     Officers were encouraged to make stops without also being reminded of

6

the limits on their authority to make them.

44.     Officers were not trained regarding the limited circumstances in which it is appropriate to arrest persons for disorderly conduct and other charges that are subject to abuse by officers.

45.     Officers are initially trained at a certified police academy and are instructed regarding the constitutional rules.

46.     Academy training, however, is followed by an extensive training program in which field training officers teach new officers how the job is really done.

47.     Prior to the Lawrence incident, City policymakers were aware of numerous incidents in which citizens were subjected to unconstitutional stops, searches, arrests, and uses of force but took no action to investigate and discipline officers.

48.     Press reports indicate that the City has a long history of tolerance for misconduct by its officers, including numerous false arrests based on planted or manufactured evidence and evidence that were covered up.

49.     In fact, even when a high-ranking Dothan police officer, Captain Keith Gray, complained about the false arrest of two black youths in 2012, there was no investigation.

50.     This very case presents a prime example, as even the obvious use of excessive force by Woodruff was not a basis for discipline, and the City's

policymakers did not criticize Summerlin's arrest of Lawrence either.

51.     Summerlin and Woodruff were not disciplined because the City of Dothan does not take violations of constitutional rights seriously even when they result in an unnecessary death.

52.     Despite reviewing evidence, including video recordings, clearly showing that Lawrence's rights were violated, City policymakers determined the actions of the officers were within policy and constitutional limits.

53.     The City's actions regarding Lawrence are emblematic of a department that tolerates constitutional violations and uses internal investigations as a means to protect officers and the City from civil liability and bad publicity.

54.     The City's failure and refusal to discipline Summerlin and Woodruff and finding that their conduct was within City policy constitutes a ratification of Woodruff's constitutional violations and makes the City liable for Woodruff's constitutional violations under *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978).

55.     The actions of City policymakers regarding Lawrence are consistent with and reflective of a pre-existing policy and custom of tolerance for constitutional violations by officers, including illegal seizures, illegal searches, false arrests, and excessive force.

56.     Prior to the violations of Lawrence's rights, the City permitted,

encouraged, and ratified a pattern and practice of misconduct in that the City:

    a.    failed to discipline or prosecute or in any manner deal with known incidents of misconduct; and

    b.    refused to investigate complaints of misconduct, and, instead, officially claimed such incidents were justified and proper.

57.    Thus, prior to Lawrence's death, few, if any, officers received informal criticism, let alone formal discipline and certainly were not terminated, for violating a citizen's constitutional rights.

58.    City policymakers were aware of prior incidents through use of force reports (which are approved through the chain of command), through reports from the City attorney's office (which prosecutes the false charges used by officers in City court), complaints from citizens, reports from officers, and through other sources.

59.    Through long-established practice, the City's policymakers established a custom or policy that incidents of possible, likely, or known misconduct are not investigated or are investigated only with an eye toward protecting the City from civil liability, with the foreseeable result that officers believe they can get away with violating citizens' rights.

60.    In furtherance of this custom or policy, the City has set up a system that discourages citizen complaints. While publishing information about other police-related matters on its website, the City does not provide a vehicle for such complaints or inform citizens regarding how to make such complaints on the website. The City

does not even state that it has an internal affairs officer, let alone a department responsible for such investigations.

61.    In fact, instead of reviewing incidents of possible, likely, or known misconduct, such incidents are routinely approved through the chain of command.

62.    Because use of force reports and internal investigations are not a matter of public record, the number of excessive force and other incidents sanctioned by the City is not known.

63.    The foregoing acts, omissions, and systemic failures and deficiencies are policies and customs of the City and caused officers to believe that constitutional violations would be tolerated and that complaints would not be honestly or properly investigated, with the foreseeable result that officers would violate the constitutional rights of Lawrence and other similarly-situated citizens.

64.    The customs and policies described above were implemented by the acts and omissions of City policymakers, including the police chief, now retired, defendant Greg Benton.

## Count I - 42 U.S.C. § 1983 - Excessive Force

65.    On or about December 30, 2014, Woodruff, acting under color of law within the meaning of 42 U.S.C. § 1983, used deadly force on Lawrence, thereby depriving Lawrence of his rights under the Fourth and Fourteenth Amendments to the

Constitution of the United States in violation of 42 U.S.C. § 1983.  Specifically, she

violated Lawrence's right to be free from excessive force.

66.    Summerlin not only precipitated the entire incident; he had an

opportunity to intervene to protect Lawrence but failed to do so.

67.    Woodruff and Summerlin acted with malice or reckless indifference to

Lawrence's constitutional rights.

68.    The City's policies and customs, including those regarding investigations

of citizen complaints and tolerance for constitutional violations in general, were the

moving force behind defendants' violation of Lawrence's Fourth Amendment rights.

69.    The City's customs and policies were established by City policymakers,

including Benton.

70.    As a result of the conduct of defendants, Lawrence was shot and killed.

**Count II- State Law - Assault and Battery/Excessive Force**

71.    On or about December 30, 2014, Woodruff shot and killed Lawrence.

72.    Woodruff did so in violation of clear City policy regarding when deadly

force is permissible.

73.    Summerlin not only precipitated the entire incident; he had an

opportunity to intervene to protect Lawrence but failed to do so.

74.    The conduct of Woodruff and Summerlin was either negligent, wanton,

malicious, willful, or in bad faith.

75.     As a result of the conduct of defendants, Lawrence was shot and killed.

76.     To the extent the conduct of Woodruff and Summerlin was negligent or

careless, the City is liable for Woodruff's conduct.

## Other Matters

77.     All conditions precedent to the bringing of this suit have occurred.

## Relief Sought

78.     As relief, plaintiff seeks the following:

    a.     That he  be awarded such compensatory damages as a jury shall
           determine from the evidence he is entitled to recover;

    b.     That he be awarded against the individual defendants only such
           punitive damages as a jury shall determine from the evidence he
           is entitled to recover;

    a.     That he be awarded prejudgment and postjudgment interest at the
           highest rates allowed by law;

    b.     That he be awarded the costs of this action, his reasonable
           attorney's fees, and his reasonable expert witness fees;

    e.     That he be awarded such other and further relief to which he is
           justly entitled.

**Dated: March 22, 2017.**

<u>s/ Henry F. (Hank) Sherrod III</u>
Henry F. (Hank) Sherrod III
No. ASB-1200-D63H
HENRY F. SHERROD III, P.C.
119 South Court Street
Florence, Alabama 35630
Phone: 256-764-4141
Fax: 877-684-0802
Email: hank@alcivilrights.com

Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on March 22, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record.

<u>s/ Henry F. (Hank) Sherrod III</u>

13

# TAB 29

# UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| CHRISTOPHER CANTU, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| v. | ) CIVIL ACTION NO.: 1:16-cv-1003 |
| | ) |
| CITY OF DOTHAN, ALABAMA, | ) |
| et al., | ) |
| | ) |
| DEFENDANT. | ) |

## ANSWER OF DEFENDANT ADRIANNE WOODRUFF TO PLAINTIFF'S SECOND AMENDED COMPLAINT

Comes now the Defendant Adrianne Woodruff in the above styled cause, by and through the undersigned attorney and in answer to Plaintiff's Second Amended Complaint states as follows:

### Parties

1.     Defendant is without information to either admit or deny the allegations contained in paragraph 1 of Plaintiff's Second Amended Complaint. Defendant therefore denies said allegations.

2.     Defendant admits the allegations contained in paragraph 2 of Plaintiff's Second Amended Complaint.

3.     Defendant admits the allegations contained in paragraph 3 of Plaintiff's Second Amended Complaint.

4.      Defendant admits the allegations contained in paragraph 4 of Plaintiff's Second Amended Complaint.

5.      Defendant admits the allegations contained in paragraph 5 of Plaintiff's Second Amended Complaint.

6.      Defendant admits Lawrence attempted to leave a dog at the Dothan Animal Shelter.

7.      Defendant admits employees requested to see Lawrence's driver's license.

8.      Defendant admits that Lawrence produced a document entitled, "AFFIDAVIT OF IDENTITY" and did not produce a driver's license.  Defendant admits Lawrence's refusal was consistent with the convictions and beliefs of sovereign citizens.

9.      Defendant admits the allegations contained in paragraph 9 of Plaintiff's Second Amended Complaint.

10.     Defendant denies the allegations contained in paragraph 10 of Plaintiff's Second Amended Complaint.

11.     Defendant admits Lawrence refused to produce a driver's license.  See Defendant's response to paragraph no. 8, supra.  Defendant denies he gave his name to Officer Summerlin.

12.     Defendant denies the allegations contained in paragraph 12 of Plaintiff's Second Amended Complaint.

13.     Defendant denies the allegations contained in paragraph 13 of Plaintiff's Second Amended Complaint.

14.     Defendant denies the allegations contained in paragraph 14 of Plaintiff's Second Amended Complaint.

15.     Defendant denies the allegations contained in paragraph 15 of Plaintiff's Second Amended Complaint.

16.     Defendant denies the allegations contained in paragraph 16 of Plaintiff's Second Amended Complaint.

17.     Defendant denies the allegations contained in paragraph 17 of Plaintiff's Second Amended Complaint.

18.     Defendant denies the allegations contained in paragraph 18 of Plaintiff's Second Amended Complaint.

19.     Defendant denies the allegations contained in paragraph 19 of Plaintiff's Second Amended Complaint.

20.     Defendant admits shooting Lawrence to protect herself and other police officers from the threat of death or serious physical harm posed by Lawrence.

21.     Defendant admits the allegations contained in paragraph 21 of Plaintiff's Second Amended Complaint.

22.     Defendant denies the allegations contained in paragraph 22 of Plaintiff's Second Amended Complaint.

23.     Defendant denies the allegations contained in paragraph 23 of Plaintiff's Second Amended Complaint.

24.     Defendant denies the allegations contained in paragraph 24 of Plaintiff's Second Amended Complaint.

25.     Defendant denies the allegations contained in paragraph 25 of Plaintiff's Second Amended Complaint.

26.     Defendant denies the allegations contained in paragraph 26 of Plaintiff's Second Amended Complaint.

27.     Defendant denies the allegations contained in paragraph 27 of Plaintiff's Second Amended Complaint.

28.     Defendant denies the allegations contained in paragraph 28 of Plaintiff's Second Amended Complaint.

29.     Defendant admits the allegations contained in paragraph 29 of Plaintiff's Second Amended Complaint.

30.     Defendant admits the allegations contained in paragraph 30 of Plaintiff's Second Amended Complaint.

31.     Defendant admits the allegations contained in paragraph 31 of Plaintiff's Second Amended Complaint.

32.     Defendant denies that the circumstances she confronted with Lawrence were routine.  Defendant admits that federally protected rights of citizens exist even in the most exigent circumstances.

33.     Defendant denies that either Terry v. Ohio, 392 U.S. 1 (1968) or its progeny, are limited to routine situations encountered by law enforcement.

34.     See Defendant's response to no. 33, supra.

35.     Defendant denies she was not properly trained or supervised for investigatory stops, traffic stops and arrest.  Defendant further denies constitutional violations by Dothan police officers are predictable.

36.     Defendant denies that either she or other police officers involved with Lawrence violated Lawrence's constitutionally protected rights.  Defendant further denies it is highly predictable that any Dothan police officer would violate the constitutional rights of any citizen or person, innocent or guilty.

37.     Defendant admits that these are criminal offenses under the laws of the State of Alabama.  Defendant denies any abuse of these laws by Dothan police officers.

38.     Defendant denies that she or any other police officer involved with Lawrence had not received proper training and supervision for their authority as sworn police officers.  Defendant admits it was well known to the Dothan City Commission that their police officers receive proper training and supervision.

39.     Defendant denies the allegations contained in paragraph 39 of Plaintiff's Second Amended Complaint.

40.     Defendant is without information to either admit or deny the allegations contained in paragraph 40 of Plaintiff's Second Amended Complaint. Defendant therefore denies said allegations.

41.     Defendant admits the Dothan City Commission was certain its police officers were properly trained in all discretionary functions of law enforcement. Defendant denies the Commission knew the frequency of when such occasions would arise.  See Defendant's response to no. 35, supra.

42.     Defendant denies the allegations contained in paragraph 42 of Plaintiff's Second Amended Complaint.

43.     Defendant denies the allegations contained in paragraph 43 of Plaintiff's Second Amended Complaint.

44.     Defendant denies the allegations contained in paragraph 44 of Plaintiff's Second Amended Complaint.

45.     Defendant admits she was a certified police officer at all times materially relevant herein.  Defendant further admits she received instruction in both state and federal law related to the duties of law enforcement officers. Defendant denies her initial law enforcement training was at the police academy.

46.     Defendant denies there is any inconsistency in the training she received in the police academy and that which she received from field training officers.

47.     Defendant denies the allegations contained in paragraph 47 of Plaintiff's Second Amended Complaint.

48.     Defendant is without information to either admit or deny the allegations contained in paragraph 48 of Plaintiff's Second Amended Complaint. Defendant therefore denies said allegations.

49.     Defendant is without information to either admit or deny the allegations contained in paragraph 49 of Plaintiff's Second Amended Complaint. Defendant therefore denies said allegations.

50.     Defendant denies using excessive force.  Defendant admits that the Dothan City Commission did not criticize Defendant Summerlin's arrest of Lawrence.

51.     Defendant admits she and officer Summerlin were not criticized or disciplined for their actions.  Defendant denies the remaining allegations in paragraph 51.

52.     Defendant denies the allegations contained in paragraph 52 of Plaintiff's Second Amended Complaint.

53.     Defendant denies the allegations contained in paragraph 53 of Plaintiff's Second Amended Complaint.

54.     Defendant denies the allegations contained in paragraph 54 of Plaintiff's Second Amended Complaint.

55.     Defendant denies the allegations contained in paragraph 55 of Plaintiff's Second Amended Complaint.

56.a.  Defendant denies the allegations contained in paragraph 56.a of Plaintiff's Second Amended Complaint.

56.b.  Defendant denies the allegations contained in paragraph 56.b of Plaintiff's Second Amended Complaint.

57.     Defendant denies that complaints against police officers are not investigated and disciplinary action not taken when appropriate.  Defendant admits the Dothan police department has an exemplary record for safeguarding civil rights.

58.     Defendant denies said allegations contained in paragraph 58 of Plaintiff's Second Amended Complaint.

59.     Defendant denies the allegations contained in paragraph 59 of Plaintiff's Second Amended Complaint.

60.     Defendant denies the allegations contained in paragraph 60 of Plaintiff's Second Amended Complaint.

61.     Defendant denies the allegations contained in paragraph 61 of Plaintiff's Second Amended Complaint.

62.     Defendant denies that either the City of Dothan or the Dothan Police Department has ever sanctioned the use of excessive force by its police officers. Defendant admits that Internal Affairs investigative reports are not public record.

63.     Defendant denies the allegations contained in paragraph 63 of Plaintiff's Second Amended Complaint.

64.     Defendant denies the allegations contained in paragraph 64 of Plaintiff's Second Amended Complaint.

## Count I - 42 U.S.C.
## § 1983 – Excessive Force

65.     Defendant denies the allegations contained in paragraph 65 of Plaintiff's Second Amended Complaint.

66.     Defendant denies the allegations contained in paragraph 66 of Plaintiff's Second Amended Complaint.

67.     Defendant denies the allegations contained in paragraph 67 of Plaintiff's Second Amended Complaint.

68.     Defendant denies the allegations contained in paragraph 68 of Plaintiff's Second Amended Complaint.

69.     Defendant denies the allegations contained in paragraph 69 of Plaintiff's Complaint.

70.     Defendant denies the allegations contained in paragraph 70 of Plaintiff's Second Amended Complaint.

## Count II – State Law –
## Assault and Battery/Excessive Force

71.     Defendant admits the allegations contained in paragraph 71 of Plaintiff's Second Amended Complaint.

72.    Defendant denies the allegations contained in paragraph 72 of Plaintiff's Second Amended Complaint.

73.    Defendant denies the allegations contained in paragraph 73 of Plaintiff's Second Amended Complaint.

74.    Defendant denies the allegations contained in paragraph 74 of Plaintiff's Second Amended Complaint.

75.    Defendant denies the allegations contained in paragraph 75 of Plaintiff's Second Amended Complaint.

76.    Defendant denies the allegations contained in paragraph 76 of Plaintiff's Second Amended Complaint.

77.    Defendant is without information to either admit or deny the allegations contained in paragraph 77 of Plaintiff's Second Amended Complaint. Defendant therefore denies said allegations.

## Relief Sought

78.    Paragraphs 78.a-78.e do not call for responses from this Defendant. In the event this Court should determine a response is in order, those averments are denied.

## AFFIRMATIVE DEFENSES

## FIRST AFFIRMATIVE DEFENSE

Defendant asserts that the Plaintiff's Second Amended Complaint has failed to state a claim against this Defendant for a federal constitutional violation pursuant to 42 U.S.C. § 1983.  Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1694, 85 L.Ed. 2d 1 (1985); Graham v. Conner, 490 U.S. 386, 109 S. Ct. 1865, 104 L.Ed. 2d 443 (1989); Scott v. Harris, 550 U.S. 372, 1275 Ct. 1769, 167 L. Ed. 2d 686 (2007).

## SECOND AFFIRMATIVE DEFENSE

Defendant asserts the affirmative defense of the statute of limitations.

## THIRD AFFIRMATIVE DEFENSE

The actions of Defendant were conducted in good faith and in the actual and reasonable belief that such actions were legal and proper under the circumstances.

## FOURTH AFFIRMATIVE DEFENSE

Defendant's alleged use of force applied to Plaintiff was objectively reasonable based on her knowledge and observations at the time of the incident.

## FIFTH AFFIRMATIVE DEFENSE

Defendant is immune from tort liability for her conduct during the course of this incident pursuant to Ala.Code § 6-5-338 1975.

## SIXTH AFFIRMATIVE DEFENSE

At all times material to this lawsuit Defendant was acting within her discretionary authority as a law enforcement officer employed by the City of Dothan and violated no clearly established federal constitutional law of which a reasonable police officer should have known.  Therefore, Defendant is entitled to qualified immunity from suit in her individual capacity.

## SEVENTH AFFIRMATIVE DEFENSE

Defendant asserts that, under the circumstances that existed, this Defendant reasonably believed it necessary to use deadly force in order to prevent injury to herself or others.

## EIGHTH AFFIRMATIVE DEFENSE

Defendant asserts that the incident alleged in the Plaintiff's Second Amended Complaint was caused in whole or in part by the negligence and carelessness of Lawrence so as to proximately result or contribute to the alleged incident and alleged damages.

## NINTH AFFIRMATIVE DEFENSE

Defendant asserts that arguable reasonable suspicion existed for Defendant's actions.

## TENTH AFFIRMATIVE DEFENSE

Defendant asserts that this Defendant used that degree of force she reasonably believed necessary to protect herself and others and was privileged under Alabama law to do so.

## ELEVENTH AFFIRMATIVE DEFENSE

Defendant acted in self-defense.

## TWELFTH AFFIRMATIVE DEFENSE

Defendant asserts all applicable and relevant limits on judgments and claims against municipalities and municipal actions.

## THIRTEENTH AFFIRMATIVE DEFENSE

Defendant asserts the affirmative defense of municipal notice of claims statutes.

## FOURTEENTH AFFIRMATIVE DEFENSE

Defendant reserves the right to amend its affirmative defenses during the course of discovery.

Dated this 6th day of April, 2017.

s/F. Lenton White
F. Lenton White
City Attorney
P.O. Box 2128
Dothan, Alabama 36302
Telephone (334) 615-3130
Facsimile (334) 615-3139


## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of April, 2017, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF System and by placing

the same in the U.S. Mail postage prepaid to the following:


*Henry F. (Hank) Sherrod, III*
*HENRY F. SHERROD III, P.C.*
*119 South Court Street*
*P.O. Box 606*
*Florence, Alabama 35631-0606*

*William S. Morris*
*MORRIS CARY ANDREWS TALMADGE*
*& DRIGGERS, LLC*
*3334 Ross Clark Circle*
*Dothan, Alabama 36303*


s/F. Lenton White
Of Counsel

# TAB 44-3

Page 5

1    A. About -- roughly, 24 and a half.
2    Q. Is there a particular reason you retired?
3    A. Medical retirement.
4    Q. What medical condition did you have that
5 required you to retire?
6    A. Quite a few. I've had brain aneurysms. I
7 have extensive arthritis. I have been diagnosed
8 with PTSD. I've got a leaky valve in my heart. I
9 have seizures. That's the high points.
10    Q. Did you have any of these conditions at the
11 time you shot Mr. Lawrence?
12    A. Yes.
13    Q. What conditions did you have at that time?
14 Which, I guess, is December 30th, 2014; right?
15    A. That's correct. Exclude the PTSD, and I had
16 all the others.
17    Q. And what caused you PTSD?
18    A. The shooting.
19    Q. Are you receiving treatment for the PTSD?
20    A. I am.
21    Q. When did you first start seeking treatment
22 for any symptoms that you thought might be related
23 to the shooting?

Page 6

1    A. It was maybe a month after the shooting. I
2 have a friend who's a psychiatrist. She suggested I
3 go see one.
4    Q. Who's the friend?
5    A. Dr. Fay Farrell.
6    Q. Fay?
7    A. Yes.
8    Q. F-A-Y-E?
9    A. F-A-Y.
10    Q. And how do you spell her last name?
11    A. F-A-R-R-E-L-L.
12    Q. Does she currently practice psychiatry?
13    A. She is under contract with the United States
14 Army at Fort Rucker.
15    Q. What was the nature of your -- like, had you
16 ever had a therapist relationship with her, or was
17 she strictly a friend?
18    A. Just a friend.
19    Q. So you had a brain aneurysm when?
20    A. I was diagnosed in the end of 2011. I have
21 two of them. They have both been repaired.
22    Q. In December 2014, how did your medical
23 conditions limit your abilities, you know -- your

Page 7

1 ability to do your job as a police officer, if they
2 did?
3        MR. WHITE: Object to the form.
4    A. I don't think they did. Other than -- I
5 mean, arthritis, that slows you down a bit. I have
6 bad knees.
7    Q. Are there any physical fitness requirements
8 for being a Dothan police officer?
9    A. Yes.
10    Q. How often do you have to meet them?
11    A. They recently -- well not long before I
12 retired, they started doing a program. It was once
13 a year, but I never participated in that. It was
14 brand new.
15    Q. When was the last time you qualified
16 physically for the police job? Like, when you were
17 tested. I'm not saying you weren't qualified. Were
18 you required to --
19        MR. WHITE: Object to the form.
20    Q. -- pass any physical test?
21    A. I guess when I started. That's the last time
22 I tested. When I got hired.
23    Q. Were there any required physical fitness

Page 8

1 courses or anything that you had to do during your
2 time as a Dothan police officer?
3    A. Yes. We had a lot of different classes that
4 we went through.
5    Q. Now since I don't have any your personnel or
6 training records, I'm at a little bit of a loss to
7 ask you questions, but I'm talking about, like,
8 physical, like, where you took --
9    A. Takedown techniques.
10    Q. So when was the last time, you know, you
11 engaged in some sort of class that was oriented
12 toward your physical aspects? Towards your job as a
13 police officer?
14    A. Gosh, I can't remember.
15    Q. Was it years before you retired?
16    A. I'm -- when you say "years," I mean, it's
17 kind of relative.
18    Q. I'm not trying to commit you to -- you know,
19 20- something years or even 10 years, but I'm just
20 asking, was it years? Had it been years?
21    A. It had been a couple years anyway. Yeah.
22    Q. I mean, had you -- were you operating under
23 any medical restrictions in December of 2014?

Page 9

1    A. No.
2    Q. I mean, we all get older; right?
3    A. Sure.
4    Q. And how old are you currently?
5    A. I will be 60 this fall.
6    Q. So does that make you 56 or 57 when this
7    occurred?
8    A. In '14, three years ago, 57. I just
9    turned 57.
10   Q. What's your date of birth?
11   A. 11/5 of '57.
12   Q. And your social security number?
13   A. 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.
14   Q. So do any of your medical and psychiatric
15   issues affect your ability to testify today?
16   A. No.
17   Q. Was there any substantial change in your
18   medical condition between December 2014 and
19   September of 2015 in addition to the PTSD?
20   A. No. Just getting older.
21   Q. Have you applied for social security
22   disability?
23   A. I am currently on disability.

Page 10

1    Q. Right. So there's -- so you applied for
2    social security disability?
3    A. Yes.
4    Q. When did you apply for social security
5    disability?
6    A. Let's see, it was -- I know it was granted in
7    April of 2016. I think I applied five months prior
8    to that. Four or five months.
9    Q. We've been doing pretty good so far, but
10   there's sort of some things I usually cover with
11   witness, just about this process. I wanted to make
12   sure I covered them with you. I think it was
13   presumed that we have the usual stipulations and
14   that's fine, except that I would like you to read
15   and sign your deposition, which means that the court
16   reporter will send Mr. White or you a copy and you
17   will get an opportunity to read over all your
18   answers and correct any errors; okay?
19   A. Okay.
20   Q. And then the second thing is that verbal
21   answers are important particularly since we don't
22   have a videographer here. But in general -- so if
23   you forget to give a verbal answer like a yes or a

Page 11

1    no, I will -- I'm going to raise my hand. That's
2    just to avoid a bunch of extra words on the
3    transcript and that's just a cue for you to give me
4    a yes or no. Whatever you intended by your uh-huh,
5    or uh-uh, or whatever. Okay?
6    A. Yes.
7    Q. And if you don't understand any of my
8    questions I am happy to repeat them or have the
9    court reporter read them back or rephrase them, just
10   let me know. Okay?
11   A. Thank you.
12   Q. Sometime today I'm going to do, I guess, some
13   questions where I'm trying to exhaust your
14   knowledge. Sort of follow-up questions, you know,
15   Do you remember anything else about this or about
16   this. I trust you'll do your best to tell me what
17   you do remember; right?
18   A. Yes.
19   Q. If we get through with this line of
20   questions, you can't remember anything else but
21   later on in the deposition you remember something
22   else that I'd asked you about, will you please let
23   me know and fix that?

Page 12

1    A. Yes.
2    Q. And of course, I guess, theoretically, if you
3    read the transcript and you realize you remember
4    something that's, you know, inaccurate, you'll get
5    another opportunity to fix that; right?
6    A. Okay.
7    Q. I expect that we will take a break every hour
8    and half-ish. Sometimes less than that, maybe more
9    if we get going. But whatever the case is, if you
10   need a break then just let me know. I'm glad to
11   accommodate you. I only ask that unless it's
12   emergency of some kind that you give me a minute or
13   two to wrap up whatever I was questioning you about
14   so that I get to a good stopping place. Is that
15   okay?
16   A. Yes, sir.
17   Q. There are two reasons that I may interrupt
18   you today, for sure. One is accidentally. I don't
19   realize that you haven't finished the answer to your
20   question; okay?
21   A. Okay.
22   Q. And if you think I've interrupted your
23   answer, cut you off, feel free to let me know and

Page 13

1  I'll let you finish the answer to your question;
2  okay?
3     A.  Okay.
4     Q.  And the second reason -- and I'll try to make
5  this clear at the time -- it may be that I want to
6  withdraw that question because your answer is going
7  in a direction that I wasn't trying to ask about or
8  I think it's confusing, and I'm just trying to use
9  my time better.  And I'll try to let you know that
10  but, you know, sometimes there is a -- I think my
11  words are communicating that I need this information
12  and I'm not getting it, so clearly I need to get a
13  new question out, but we'll sort through that.  I'm
14  just letting you know that sometimes that could
15  happen.  Now, Mr. White has a right to object; do
16  you understand that?
17     A.  Yes.
18     Q.  Do you understand that unless he instructs
19  you not to answer a question that you still go ahead
20  and answer --
21     A.  Yes, sir.
22     Q.  Okay.  Now, Mr. White is your lawyer for this
23  case; right?

Page 14

1     A.  That's correct.
2     Q.  And your defense is being handled by the City
3  of Dothan; right?
4     A.  Yes, sir.
5     Q.  At any time, have you had a personal lawyer
6  for this shooting or for this case?
7     A.  Yes, sir.
8     Q.  And who was your personal lawyer?
9     A.  Pat Jones.
10     Q.  And when did Pat Jones represent you?  I
11  understand he's the current DA now.
12     A.  He is.  He was the union -- police union
13  lawyer.  And I called him and he had very little
14  involvement actually.
15     Q.  When did you contact him?
16     A.  Just a couple days after the shooting, I
17  believe.
18     Q.  Now, do you have any insurance coverage of
19  any kind that would apply to any judgment that a
20  jury might enter against you in this case?
21     A.  No.
22     Q.  Have you discussed with the -- any
23  representative for the City -- I'm not trying to

Page 15

1  intervade your attorney-client communications --
2  but any representative with The City regarding
3  whether or not you will be indemnified if there's a
4  judgment against you?  The City will pay it?
5        MR. WHITE:  Object to the form.
6     A.  I believe so.
7     Q.  Who have you had communications with about
8  the City paying any judgment that might be entered
9  against you?
10     A.  Well, let me -- let me back up just a moment.
11  No, not -- you mean -- let me get the question.  I
12  want to make sure I understand the question.
13     Q.  Sure.
14     A.  That the City would pay if --
15     Q.  Let me ask it this way:  You don't --
16  usually, okay, if somebody has a claim against me or
17  you, car accident, we have an insurance company.
18  They hire a lawyer to defend us and if there's a
19  jury verdict against us, they pay that jury verdict
20  at least up to a certain limits of the policy.  And
21  then if we don't have insurance, though, then
22  typically we're personally responsible for, you
23  know, paying any judgment out of our own assets.

Page 16

1  Cities are -- obviously, can be different.
2  Sometimes cities will -- what's called indemnify,
3  pay for the judgment; sometimes they won't.  So
4  instead of insurance with the City paying it,
5  typically it would be called indemnification.  And
6  I -- whether it's that term is used or not I'm just
7  trying to find out if you -- excluding your lawyer
8  -- if you had any communications with anybody
9  regarding who's going to pay any judgment that a
10  jury might enter against you?
11     A.  I understand the question now.  And the
12  answer is, no.
13     Q.  Did you review any materials, factual
14  materials -- for example, the video, police reports,
15  things like that -- to prepare for the deposition
16  today?
17     A.  Yes, sir.
18     Q.  What have you reviewed?
19     A.  The dash cam, the video from inside the
20  shelter.
21     Q.  Okay.
22     A.  The video that Mr. Lawrence's passenger had.
23  I listened to audiotapes of the dispatched calls

Page 17

1 from the shelter for my backup, and I listened to my
2 phone calls to --
3   Q.  So audio -- so what audiotapes did you listen
4 to?
5   A.  That was the comm center.  The communication
6 center, dispatch.  I listened to their dispatch as
7 they were dispatching me in the units out there for
8 my backup, and also the phone call that I had made
9 to them and kept them on the line.
10   Q.  Now, what -- what's the shelter video you
11 looked at?  What does it show?
12   A.  It shows -- it shows Mr. Lawrence coming in.
13 It shows Pat Holly, the secretary, walking back into
14 my office.  It shows me coming out of my office.  I
15 believe Office Skipper is seen in there kind of
16 going back and forth through --
17   Q.  Does it have the audio?
18   A.  No, sir.
19     MR. SHERROD:  Lenn, I haven't seen the
20 inside-the-shelter video.
21     MR. WHITE:  I would have told you that if
22 you got it -- and I'm expecting that it's probably
23 included -- well, it's on a separate video.  But --

Page 18

1     MR. SHERROD:  I mean.  He's looked
2 through everything.  I've looked through
3 everything --
4     MR. WHITE:  Well, I'm not going to
5 dispute you, but, you know, I certainly would have
6 anticipated that it was included in the, you know,
7 the initial disclosures and we can certainly go get
8 you a copy right now and I'll get -- Do you want to
9 call time and I'll --
10     MR. SHERROD:  We can call time and get
11 somebody working on that.  That would be great.  If
12 it's on a USB key, I'll just copy it to my laptop.
13     MR. WHITE:  Well, I can't do that right
14 now.  I'm going to get -- I'm going to see if I can
15 expedite this, but however I can do it if you'll
16 just give me a few minutes.  I'll see what I can do.
17     MR. SHERROD:  Okay.  We can go off the
18 record now.
19     (Brief recess taken.)
20   Q.  Did you review any of your written reports?
21   A.  Yes.
22   Q.  So we've got the dash cam, inside-shelter
23 video, the video prepared by the -- done by the

Page 19

1 passenger, the dispatch audio, the three -- the
2 telephone conference calls you made that were
3 recorded, your reports.  Anything else that you
4 reviewed in preparation for your deposition?
5   A.  I think I also read the reports from other
6 people that were brought.
7   Q.  Okay.  Anything else?
8   A.  No, sir, not that I remember.  No.
9   Q.  Is there anything that you -- that caught
10 your eye from your reports or your recorded
11 statements that you recognized as being inaccurate
12 in any way?
13     MR. WHITE:  Object to the form.
14   A.  No, sir.
15   Q.  Did you look over the use of force policy for
16 the City of Dothan by any chance?
17   A.  Recently?  No, sir.
18   Q.  So if I'm reading this correctly, there are
19 basically three Use of Force reports.  I'm just
20 going by -- there's a five-page report I'm going to
21 mark at Plaintiff's Exhibit 1.
22     (Plaintiff's Exhibit No. 1 was marked for
23     identification.)

Page 20

1     MR. SHERROD:  Here's an extra copy for
2 Lenn.
3   Q.  Is that a report that you prepared?
4   A.  I didn't -- I wouldn't have typed it.
5   Q.  Well, you would not have typed it?  If you
6 look at the last page, page 5, is that your
7 signature?
8   A.  Let me read it.  Hold on.  Yes, it is.
9   Q.  Okay.  And then who are all the people who
10 are signed off on that report?
11   A.  Captain Stacy Robinson, Major Steve Parrish,
12 internal affairs Sergeant Donnie Smith, and Police
13 Chief Greg Benton.
14   Q.  Now, your signature is dated when?
15   A.  January 8th of 2015.
16   Q.  There's also a Use of Deadly Force report.
17 If you take a look at what I marked as Plaintiff's
18 Exhibit 2.
19     (Plaintiff's Exhibit No. 2 was marked for
20     identification.)
21   Q.  This does not have your signature.  If you'll
22 look at the last page.  I don't think -- it says,
23 "A. Rhodes" in type?

Page 21

1   A. It's got my signature on the last page.
2   Q. Oh, it does. Which one is your signature?
3   A. The top one, officer's signature.
4   Q. Oh, I'm looking -- maybe I'm looking at the
5   wrong one. I think I -- did I give you both my
6   copies over there?
7   A. Use of Deadly Force report.
8   Q. How many copies of that are there? I don't
9   have one for myself is what I'm realizing. I must
10  have printed one short.
11      MR. SHERROD: Lenn, can I have -- borrow
12  your copy back?
13  Q. (By Mr. Sherrod) Yeah. I was looking at the
14  wrong report. I knew your signature should be
15  there, but I was looking at the next exhibit.
16  That's my fault.
17      MR. SHERROD: You know, listen, I've got
18  a printer and you can print three copies and I was
19  printing them out last night and one time I probably
20  just printed one. Let's just stick -- I've got a
21  copy on the computer.
22  Q. So your signature is on the Use of Deadly
23  Force report; right?

Page 22

1   A. That's correct.
2   Q. Okay. And then what's the date of your
3   signature on that report?
4   A. It's also on January 8th, 2015 -- well, yeah,
5   January 2015.
6   Q. And what other signatures are on that report?
7   A. Lieutenant Mike Etress, Captain
8   Stacy Robinson, internal affairs Sergeant Donnie
9   Smith, and Police Chief Greg Benton.
10  Q. What is -- is it Lieutenant Etress?
11  A. Yes, sir.
12  Q. How do you spell his name?
13  A. His last name is, E-T-R-E-S-S.
14      MR. WHITE: You may have met him this
15  morning.
16      MR. SHERROD: I did meet him this
17  morning.
18  Q. (By Mr. Sherrod) So what was his role
19  regarding this report?
20  A. He was my direct supervisor.
21  Q. Okay. Also I assume -- the report I was
22  accidentally referring to -- but Plaintiff's
23  Exhibit 3, I'm going to show you and that would be

Page 23

1   the report by Officer Rhodes.
2       (Plaintiff's Exhibit No. 3 was marked for
3       identification.)
4   Q. Did -- so who are the -- so his signature is
5   typed in and then who are the other folks that are
6   on this report?
7   A. Sergeant Tim Odom. Captain Todd David.
8   Q. Todd David?
9   A. Yes, it looks like his signature.
10  Q. And who else?
11  A. Below that is internal affairs
12  Sergeant Donnie Smith and Police Chief Greg Benton.
13  Q. And when are these -- when is Officer
14  Rhodes's signature dated?
15  A. On December 30th of 2014.
16  Q. And when was Sergeant Odom's signature dated?
17  A. On December 30th, 2014.
18  Q. Do you know why -- do you recall why your
19  reports were not submitted until January 8th? At
20  least -- going by Plaintiff's Exhibit 1 and 2?
21  A. No.
22  Q. You don't recall why?
23  A. Well --

Page 24

1   Q. Here's what I'm asking: Did you prepare a
2   report on December 30th, the date of the incident?
3   A. I'm not sure if I wrote a report that day. I
4   believe I did, but it was an offense report, an
5   offense incident report. It was the wrong kind of
6   report. I'm not sure.
7   Q. Where would you -- let's --
8   A. I'm not sure because these are the correct
9   reports to fill out.
10  Q. So let's -- after Mr. --
11  A. And time may have been an issue as well.
12  Q. What do you mean time?
13  A. Anytime an officer is involved in a major
14  incident, they have to go down and do the testing
15  for alcohol, drug testing. And that's what I did.
16  I spent time doing that.
17  Q. Well, let's --
18  A. So that may have been an issue. I was pretty
19  exhausted after all this.
20  Q. So this incident occurred in the early
21  afternoon?
22  A. It was approximately 12:30 p.m.
23  Q. And after the incident, what did you do?

Page 25

1    A. Immediately?
2    Q. Yeah, I guess I'd like you to -- I mean,
3 obviously --
4    A. Immediately, I started checking Mr. Lawrence
5 in an attempt to offer some kind of first aide, but
6 there was no blood visible. There was not really
7 anything that I could do that I was trained to do.
8 So, I mean, we called for -- I don't -- I think
9 Alan Rhodes is the one that called for the
10 ambulance. While I was on the ground looking --
11 checking -- pulling his clothing back to see where
12 he had been hit.
13    Q. So did you check the entrance and the exit
14 wound?
15    A. I did not see the exit wound.
16    Q. Was there an exit -- I saw one on the autopsy
17 so --
18    A. There was an exit wound.
19    Q. And I believe I, actually, saw it in the
20 video but you just --
21    A. I didn't see the exit wound.
22    Q. You did check the entrance wound?
23    A. I did.

Page 26

1    Q. And it was not bleeding?
2    A. That's correct.
3    Q. Was it an open wound?
4    A. It was a hole.
5    Q. And the gun you brought me to look at today,
6 what is the model?
7    A. Model 23 Glock. It's a smaller one.
8    Q. What caliber is it?
9    A. 40 caliber.
10    Q. And what ammunition were you using at the
11 time?
12    A. I'd have -- what I was using is still in
13 there. I would have to check to see what it was.
14 It's federal.
15    Q. Hollow point?
16    A. Yes.
17    Q. Any particular type of --
18    A. It's not a -- nothing special. It's not like
19 a Hydra-Shok or anything. It's just a hollow point.
20    Q. Is that the ammo that was issued by the
21 department?
22    A. Yes, sir.
23    Q. On the day -- on December 30th, 2014, what

Page 27

1 was your chain of command?
2    A. Mike Etress was my lieutenant; next up would
3 have been Stacy Robinson, the captain; and then
4 Major Steve Parrish and Chief Greg Benton.
5    Q. Did you speak with any of those persons at
6 the animal shelter that day?
7    A. Yes.
8    Q. Who?
9    A. All of them, I believe.
10    Q. At the time of the incident, you were not
11 carrying a Taser; right?
12    A. That's correct.
13    Q. Were you certified in it at the time?
14    A. Yes.
15    Q. When was the last time you had carried a
16 Taser?
17    A. I always carried one when I'm on the street,
18 and I had been at the shelter for about five years.
19    Q. Had you had any Taser training in the last
20 five years prior?
21    A. Oh, yes. Yes.
22    Q. Like, when was the last time you had Taser
23 training?

Page 28

1    A. It was probably less than a year. Would have
2 been that -- during that year.
3    Q. Is that something that was -- people were
4 recertified on a yearly basis?
5    A. Yes, sir.
6    Q. Is there any particular reason you didn't
7 carry a Taser and only carried a gun?
8    A. I didn't wear a gun belt. I dressed
9 differently. I didn't wear a full unform. It was
10 just no room.
11    Q. So how long had you been at the animal
12 shelter?
13    A. Approximately five years.
14    Q. And what did you do before the animal
15 shelter?
16    A. I was a street supervisor, patrol.
17    Q. Did you have a particular rank?
18    A. Sergeant.
19    Q. So did you have any officers under your
20 supervision at the animal shelter?
21    A. Yes.
22    Q. So who were the officers under your
23 supervision at the animal shelter?

Page 29

1    A.  Police officers were Renee Skipper.  That's
2  the only police officer.
3    Q.  What other persons were under your
4  supervision at the animal shelter?
5    A.  Pat Holly, my secretary.  Beth Fason, she was
6  a kennel worker.  Robert Freeman, he was a kennel
7  worker.  I also oversaw the trustees that came out
8  there.
9    Q.  I think I saw a Freeman -- and for some
10  reason I think I wrote Anthony.  Does he go by -- is
11  that the same guy as Broderick?
12    A.  I don't think so.
13    Q.  Or maybe I misread it.  I just wrote -- was
14  there more than one black guy with the last Freeman
15  that worked for you?
16    A.  No, sir.
17    Q.  And what did Mr. Freeman do?
18    A.  He was a kennel worker.  He cleaned kennels.
19    Q.  Did -- you supervised everybody at the animal
20  shelter then?
21    A.  Yes, I also had -- I also had two animal
22  control officers who worked the street.
23    Q.  And who were they at that time?

Page 30

1    A.  Let's see, at the time, it was
2  Stephanie Tillery and I believe Michelle Baryla was
3  still there.
4    Q.  Michelle who?
5    A.  Baryla.
6    Q.  How do you spell that?
7    A.  B-A-R-Y-L-A.  She doesn't work there anymore.
8  She wasn't working that day, I don't think.
9    Q.  At the time of -- that Officer Rhodes arrived
10  on the scene -- I haven't gone back and checked but
11  it was a relatively short period of time between
12  when he arrived, when he engaged Mr. Lawrence, and
13  when you shot Mr. Lawrence.  And I guess -- who were
14  you aware of that was in the immediate vicinity at
15  the time of the shooting?  Other than --
16  Mr. Freeman's on the video.  Ms. Skipper is on the
17  video.  Mr. Rhodes, yourself, Mr. Lawrence's
18  girlfriend, the three children, is anybody else that
19  you were aware of at the -- at the time -- that
20  would have been there to see the shooting?
21        MR. WHITE:  Object to the form.
22    A.  No, sir.
23    Q.  Now, there are some recorded interviews, I

Page 31

1  believe, from some people who saw all or part of the
2  incident from the Humane Society or from elsewhere,
3  but you don't recall being aware of any of them?
4    A.  No, sir.
5    Q.  How long have you lived at your current
6  residence address?
7    A.  27 years.
8    Q.  Who has lived there with you in the last
9  decade, if anyone?
10    A.  My brother from California, Clint Woodruff,
11  and my mother who has since passed.
12    Q.  When did she pass?
13    A.  In 2009.
14    Q.  Have you been in a romantic relationship in
15  the last decade?
16        MR. WHITE:  Object to the form.
17    A.  No.
18    Q.  Do you have any -- don't have any children?
19    A.  No.
20    Q.  Don't have any ex-spouses or -- have you ever
21  been married before?
22    A.  No. I've had boyfriends.
23    Q.  Do you attend church anywhere?

Page 32

1    A.  No.
2    Q.  Have you ever attended church anywhere
3  locally?
4    A.  No.
5    Q.  In the last five years, what have been your
6  social activities?
7    A.  I don't -- I don't do -- I don't do a lot.  I
8  go fishing.  I have a motorcycle.  I have a
9  motorcycle club and that's -- that's about it.  I
10  don't do anything.
11    Q.  So what are your -- what have been your
12  hobbies in the last five years?  Other than riding
13  your motorcycle and fishing?
14    A.  I play with leather, I make leather bags and
15  different things.  I do beadwork, Native American
16  beadwork.  I like to work on motorcycles.  I have a
17  lot of interests.
18    Q.  What other interests do you have?
19    A.  Making bracelets and dog collars that are
20  woven out of paracord.  Just building things.
21  Working on my house.  My dogs.
22    Q.  What dogs do you have?
23    A.  I have five; four of them rescue dogs.  Two

Page 33

1 of them are poodles.  One is a Maltese/Havanese mix,
2 one is a yorkie, and the other one is a doberman.
3    Q.  Do you ever do work for other people or sell
4 any of your items?
5    A.  No.
6    Q.  Do you give them away as gifts or --
7    A.  Yes.
8    Q.  So in the last five years who have been the
9 people that you would say that you were closest to?
10    A.  Laurie Grubbs, Sue Moring, Betty Cherry,
11 Debbie Reed, Ron Elskinner, Steve Grubbs,
12 Houston Adkins.
13    Q.  I'm sorry?
14    A.  Houston Adkins.
15    Q.  Anybody else?
16    A.  No. That's pretty much my circle.
17    Q.  Are these people that are -- are these people
18 that are connected to each other in addition to
19 being connected to you?
20    A.  Houston Adkins is Sue Moring's son-in-law,
21 and Steve Grubbs is Laurie Grubbs's husband.
22    Q.  And how do you know Laurie and Steve Grubbs?
23    A.  I met Laurie at the shelter.  She fosters for

Page 34

1 the shelter.  Takes in foster dogs.
2    Q.  Is Laurie your closest friend?
3    A.  Yes.
4    Q.  And how do you spell Moring?
5    A.  M-O-R-I-N-G.
6    Q.  And how do you know Sue Moring?
7    A.  She used to work for the City in the jail.  I
8 met her there, and then she moved into my
9 neighborhood and we got reacquainted.
10    Q.  And how do you know Betty Cherry?
11    A.  Her husband was a police officer in Ozark and
12 she's my dog groomer.
13    Q.  Does she have a public dog grooming place?
14    A.  Yes, Rainbow Kennels.
15    Q.  And what about Debbie Reed, how do you know
16 her?
17    A.  Debbie and I have known each other for years.
18 When I lived in Columbus, Georgia, many years ago
19 she played music for a band at the same bars that I
20 bartended at.  I've known her many years, and our
21 mothers were also very good friends.
22    Q.  So are you originally from this area?
23    A.  Army brat.

Page 35

1    Q.  Do you have any -- you have a brother you
2 mentioned?
3    A.  I have two brothers.
4    Q.  So one brother is in California?
5    A.  As far as I know.
6    Q.  You're not in contact with him currently?
7    A.  No.
8    Q.  And what about the other brother?
9    A.  I don't know where he is.
10    Q.  Not in contact with him either?
11    A.  No.
12    Q.  So at the time of this incident were you
13 estranged from both of them?
14    A.  Yes. Also I have a sister.
15    Q.  I'm sorry?
16    A.  I have a sister as well.
17    Q.  And what's your sister -- what's her name?
18    A.  Allison Day.
19    Q.  Are you close to her?
20    A.  No, sir.
21    Q.  Did you have any communications with your
22 brothers or sister about this incident?
23    A.  No, sir.

Page 36

1    Q.  Do they even know about it?
2    A.  I don't know.  Not unless somebody else told
3 them.
4    Q.  So how do you know Mr. Elskinner?
5    A.  Ron Elskinner?
6    Q.  Yeah.
7    A.  He was in my motorcycle club.  He is not
8 currently.
9    Q.  Do you still have a motorcycle club?
10    A.  Sort of.  We have dwindled down.  Just have a
11 couple members.
12    Q.  So who are the current members?
13    A.  Me and Laurie Grubbs.
14    Q.  So what do y'all do related to the motorcycle
15 club?
16    A.  We ride, we go on charitable rides,
17 primarily.
18    Q.  And what does Laurie do for a living?
19    A.  She works for the State of Alabama.
20    Q.  Doing what?
21    A.  She works at DHR.
22    Q.  What's her -- is she a social worker or is
23 she a --

Page 37

1    A.  She collects money from babies' daddies.

2    Q.  Child support?

3    A.  Child support, yeah.

4    Q.  What does her -- Steve -- husband, Steve, do?

5    A.  I'm not really sure.  He's under contract out

6  at Fort Rucker right now.

7    Q.  So where were you born?

8    A.  In Columbus, Georgia.

9    Q.  And when did you first come to this area?

10   A.  First time was 1984.

11   Q.  And why were you here in 1984?

12   A.  My brother -- jobs were tight.  I was living

13  in Columbus with my parents.  Jobs were tight.  He

14  said, "Come on down here, there's jobs."  So I moved

15  in with him and my sister-in-law and nephews and I

16  liked it.

17   Q.  What's his name?

18   A.  That's Rick Woodruff.

19   Q.  And what's the -- his wife's name?

20   A.  Ex-wife.

21   Q.  Ex-wife?

22   A.  Bonnie.

23   Q.  And the nephew?

Page 38

1    A.  There's two nephews, Jeffrey and Jason.

2    Q.  And how long did you stay with them?

3    A.  It was about -- it was less than a year

4  before I got my own apartment.  I was saving up

5  money to get my own apartment.

6    Q.  And where did you work then?

7    A.  At Saving Appliance.

8    Q.  So where did you go next?

9    A.  My father had already had several heart

10  attacks and he got sick again, and I moved back to

11  Columbus to help them, help my parents.

12   Q.  Okay.  And what years were you in Columbus

13  helping them?

14   A.  Gosh, I can't remember.  We weren't there

15  long because they sold their house.  It was on the

16  market when I got back and it sold fast.  And they

17  moved to Arkansas and I went with them.  I can't

18  remember what year that was; maybe '85.

19   Q.  And then what -- sort of take me through your

20  major life events until you got back to Dothan

21  again.

22   A.  My father passed away in 1988.  My brother,

23  Rick, told us that if we would move here he would

Page 39

1  help us with things.  And I told my mother I loved

2  the area, I loved Dothan and she said, "Let's go."

3  So in 1990 we sold our house and we moved here.

4    Q.  And then so you and your mother moved in with

5  your brother?

6    A.  No, we bought a house and we shared the

7  house.

8    Q.  Okay.  So at some point you started working

9  for the police department after that?

10   A.  Yes.

11   Q.  What did you do before you started working

12  for the police department?

13   A.  I was working on fixing the house.  Some of

14  the repairs that were needed on the house and I also

15  worked part-time at DSI.

16   Q.  So what led you to, you know, apply to become

17  a police officer?

18   A.  There -- there was a police officer that used

19  to come by where I worked at DSI, and he told me I

20  should apply.  And he just kept on and kept on and I

21  finally did.

22   Q.  So when did you and Rick have a falling out?

23       MR. WHITE:  Object to the form.

Page 40

1    A.  When my mother got cancer.

2    Q.  So he's no longer in the area or --

3    A.  I don't -- I don't know.

4    Q.  He could be?

5    A.  He could be but he's -- was an engineer on

6  the ships.  So I --

7    Q.  Do you have any contact with any of your

8  nieces or nephews?

9    A.  Jeffrey calls me occasionally.

10   Q.  Where does he live?

11   A.  I believe he's in Enterprise.

12   Q.  When was the last time you talked to Jeffrey?

13   A.  Months and months.  I talk to Bonnie more

14  than I talk to him.

15   Q.  So Bonnie is still in the area?

16   A.  She's in Enterprise.

17   Q.  So on what occasions are you in communication

18  with Bonnie?

19   A.  There's not any particular occasion.  One of

20  us will get to thinking about the other one and

21  call.

22   Q.  Who are the people that you've talked to,

23  obviously excluding your lawyer, about your PTSD

Page 41

1 related to the shooting?
2    A.  Two Ray Little, he's since retired.  He was
3 my counselor.  I -- I talked to my friends.
4    Q.  What friends have you talked to about it?
5    A.  Laurie, Sue, they're my support group.
6    Q.  Anyone else?
7    A.  Not really, no.  No.
8    Q.  Do you currently have a counselor?
9    A.  No.
10    Q.  So when have you had counseling for this
11 incident?  What time period?
12    A.  It was a couple months afterwards when it
13 started, and I saw Ray for probably six months or so
14 but he retired.  So I lost my good counselor.
15    Q.  Is he still in the area?
16    A.  I don't know.
17    Q.  When did you -- well, did you start seeing a
18 psychiatrist?
19    A.  Yes.
20    Q.  So are you ex-military?
21    A.  No, sir.
22    Q.  So do you -- do you have any -- you said
23 something about going to see somebody at

Page 42

1 Fort Rucker, I thought, maybe?
2    A.  Fay Farrell.  She works at Fort Rucker.
3    Q.  So you talked to Fay Farrell about it?
4    A.  She's just a friend.
5    Q.  Right.  I was just trying to get a list of
6 friends you've talked to about your PTSD.  When that
7 label -- just who are other friends who have
8 supported you, other than Laurie and Sue and
9 Dr. Farrell and of course your therapist Ray Little?
10    A.  I've probably had hundreds of people come up
11 to me and tell me that they supported me.
12    Q.  Why would you need support to --
13       MR. WHITE:  Object to the form.
14    Q.  I mean was there -- I didn't know -- was
15 there some issue where you were getting something
16 you needed --
17       MR. WHITE:  Object to the form.
18    A.  I received -- the shelter received threats.
19 Calling me a murderer.  There was a video broadcast
20 where people were talking about dragging me out on
21 the street and setting me on fire or hanging me.
22 That's disturbing.
23    Q.  So was this -- I mean, I got involved in this

Page 43

1 case very late, but there didn't seem there was much
2 in the media about it; is that correct?
3    A.  In the Dothan Eagle, no.
4    Q.  Where was it -- where was there publicity of
5 any kind about it if --
6    A.  Well, that little podcast gave all the
7 information except they turned it into he was
8 rescuing a kitten.
9    Q.  What podcast was this?
10    A.  I would have to check it on my phone.  I
11 don't have my phone with me.  But it was an
12 interview with somebody claiming to be
13 Mr. Lawrence's brother.
14    Q.  Did he make -- this person who was
15 interviewed make threats?
16    A.  People that were calling in were making the
17 threats, but we had -- we had threats on the phone
18 and in e-mail form at the shelter that were ugly.
19    Q.  Did you -- do you have any of those threats?
20    A.  I probably have the e-mails.
21    Q.  So was any investigation done about these
22 threats?
23    A.  They said they couldn't trace them.

Page 44

1    Q.  Were the threats to your physical safety or
2 just, you know --
3    A.  Yeah, "You need to die, you need to die for
4 what you did."  Those are the kind of threats I got.
5    Q.  So do you know the identity -- so how much
6 e-mails were there, roughly?
7    A.  Half a dozen.
8    Q.  And how many phone calls were there?
9    A.  About the same.
10    Q.  Were these all in the days immediately after
11 the shooting?
12    A.  Some of them are, like, more like a month
13 later.
14    Q.  So within the first month after is when all
15 these calls and e-mails were?
16    A.  I would say most of them, yeah.
17    Q.  Well have you received any since a month
18 after --
19    A.  There may -- it may have been more than a
20 month -- but I haven't -- as of late -- lately I
21 have not.
22    Q.  Can we agree that all -- whatever e-mails or
23 threats there were, were within the first couple of

Page 45

1   months?
2       A.  Yes.
3       Q.  Were all of them investigated by the Dothan
4   Police Department?
5       A.  They were all turned over to them.
6       Q.  And I assume you were informed they couldn't
7   trace anybody?
8       A.  That was my understanding.
9       Q.  Do y'all not have caller ID on the --
10  ability on the phones at the shelter?
11      A.  By the time they said what they had to say it
12  was too late, they'd hang up.
13      Q.  It was what?
14      A.  By the time they said what they said it was
15  too late, they would hang up.  "You're going to burn
16  in hell for what you did," click.
17      Q.  So I want to be clear about what -- were
18  the -- that wouldn't actually be a threat just to be
19  fair --
20          MR. WHITE:  Object to the form.
21      Q.  You wouldn't consider, "You should burn in
22  hell," to be a threat, would you?
23          MR. WHITE:  Object to the form.

Page 46

1       A.  Yes.
2       Q.  You would?
3       A.  Yes.
4       Q.  So what did you -- I mean, I assume you
5   understand how people could be upset about at
6   Mr. Lawrence being killed --
7           MR. WHITE:  Object to the form.
8       Q.  Right?
9       A.  Not if they knew the facts.
10      Q.  So let -- I mean, let's just go ahead and
11  knock this out.  So you believe that the shooting
12  was justified; right?
13      A.  Yes, sir.
14      Q.  You have no feelings of remorse or guilt
15  about it; right?
16      A.  No, sir.
17      Q.  You would do the same thing again; right?
18      A.  Yes, sir.
19      Q.  You have been completely supported by your
20  chain of command regarding your actions; right?
21      A.  Yes, sir.
22      Q.  No one as criticized you in any respect for
23  the shooting or killing of Mr. Lawrence; right?

Page 47

1       A.  Not within the department, no.
2       Q.  Nobody within the department has criticized
3   anything you did in connection with the incident
4   involved Mr. Cantu; right -- excuse me,
5   Mr. Lawrence.
6       A.  Correct.
7       Q.  And I want to be crystal clear because in all
8   these communications -- let's go back.  So probably
9   too many to really have -- might be difficult to get
10  into.  You talked with a bunch of people on the day
11  of the incident including all the people in your
12  chain of command; right?
13      A.  Yes, sir.
14      Q.  Approximately -- according to the recording
15  on January 5th, you gave a statement to ABI agents;
16  right?
17      A.  I believe that was the date.
18      Q.  On January 8th you made your written reports;
19  right?
20      A.  Yes.
21      Q.  On May 11, you gave a recorded statement to
22  internal affairs?
23      A.  Yes.

Page 48

1       Q.  You understand that your chain of command has
2   reviewed all the video and audio evidence about the
3   incident; right?
4       A.  I would assume they have.
5       Q.  And you did not receive, like, even one word
6   of criticism of any kind regarding how you handled
7   the incident?
8       A.  No, sir.
9       Q.  Are you absolutely sure about that?
10      A.  Yes, sir.
11      Q.  Nobody said anything to you about, you know,
12  for example, your reference to Mr. Lawrence's teeth?
13      A.  I think that came up in the grand jury.
14      Q.  I'm just asking in terms of your chain of
15  command, in terms of anybody -- nobody criticized
16  you for that; right?
17      A.  No.
18      Q.  Nobody criticized you for commenting on
19  Mr. Lawrence's lack of wealth; right?
20      A.  Correct.
21      Q.  Nobody criticized you for asking
22  Mr. Lawrence -- or commenting about him being off
23  his meds; right?

Page 49

1    A.  Correct.  I don't remember if those were the
2  words I used to him.  I would have to listen to that
3  again.
4    Q.  What words would you recall -- that's how he
5  characterized it, I believe, but did you --
6    A.  I asked him if he was on meds or off his
7  meds, but I'm not positive.
8    Q.  Did you go back to work at the shelter?
9    A.  Yes.
10    Q.  When did you go back to work?
11    A.  The next day.
12    Q.  And how long did you continue to work?
13    A.  They pulled me out of there and put me in --
14  at the police department.
15    Q.  When was that?
16    A.  I think the second day after the shooting.
17  The next day.
18    Q.  So within a day or two of the shooting
19  itself?
20    A.  Well, it was after they got the report from
21  the psychologist.
22    Q.  What was the report from the psychologist?
23        MR. WHITE:  Object to the form.

Page 50

1    A.  He suggested that I not work at the shelter
2  for a while.
3    Q.  So this is a report he sent to your superiors
4  with his recommendations?
5    A.  Yes.
6    Q.  So had you met with a psychiatrist or a
7  psychologist immediately after the incident?
8    A.  It wasn't immediate, but it was -- it was a
9  couple weeks.
10    Q.  Who was that?
11    A.  Paskell?  I think, Paskell [sic].  He gives
12  all of the testing for incoming police officers.
13    Q.  So would -- when did you see Dr. Paskell?
14    A.  I'm not sure of the date.
15    Q.  After he met with you, he asked for you to be
16  relieved of animal shelter duty?
17    A.  Yes.
18    Q.  Did he ever release you back to animal
19  shelter duty?
20    A.  I didn't see him again.
21    Q.  Did you anybody -- did you ever go back to
22  work at the animal shelter after that?
23    A.  Yes.

Page 51

1    Q.  So when did you go back to work at the animal
2  shelter?
3    A.  It was after I spoke to internal affairs.  So
4  it was several months.
5    Q.  There's a memo that says you were placed on
6  administrative duties the day of the incident.  It's
7  Page No. 642 of the documents.
8    A.  Yup, that was following -- that was the day
9  after -- on what date?
10    Q.  It says -- December 30th is the memo we have
11  here.  If you want to look at it on his iPad you
12  can.
13    A.  I didn't see it that date.  It may have been
14  written that day, but I didn't see it.
15    Q.  It's number 642.
16    A.  I didn't receive it that day.
17    Q.  In any event, you were placed on
18  administrative duties and after you were cleared by
19  internal affairs you went back to the animal
20  shelter?
21    A.  Correct.
22    Q.  Roughly, when was that?
23    A.  It was about eight months later.

Page 52

1    Q.  So this is the next page, 643, that says that
2  you were returned to regular duty in February.  So I
3  guess I'm -- I'm --
4    A.  I may have been.
5    Q.  So it would have been after.  So to get this
6  straight there was administrative duties, you
7  returned active duty, and then you needed to be off
8  because of the psychiatrist recommendation?
9    A.  I had forgot this.
10    Q.  And that's based -- do you remember it now,
11  though?
12    A.  No.
13    Q.  When we get all the records, I'm sure there
14  will be personal records to make all this crystal
15  clear, but is it consistent with your memory that
16  you were placed administrative duty, you came back
17  to work, and then due to the psychiatrist
18  recommendation you went back off of work?
19    A.  Correct.
20    Q.  Okay.  After the psychiatrist took you off,
21  did you ever go back to regular duty?
22    A.  Yes.
23    Q.  Okay.  How long were you off as a result of

Page 53

1 the psychiatrist recommendation?
2    A.  Two weeks, I believe.
3    Q.  Do you recall that -- when that would have
4 been?
5    A.  Not exactly, no, sir.
6        MR. SHERROD:  Why don't we -- we've been
7 going a good bit.  I need to plug my computer in.
8 Let's take a break.
9        (Brief recess taken.)
10   Q.  When was the grand jury?
11   A.  That date fails me.  I don't know.  I'm not
12 sure.
13   Q.  Do you know approximately?
14   A.  Gosh, it may have been as far away as a year
15 after.  I'm not -- I can't -- I can't even hazard a
16 guess.
17   Q.  Did you testify in the grand jury?
18   A.  I did.
19   Q.  So the teeth came up in the grand jury how?
20 Was that a question from the grand juror or --
21       MR. WHITE:  Objection to the form.
22   A.  My comment about --
23   Q.  You said something came up in the grand jury

Page 54

1 about the teeth, I thought.
2    A.  Yes.
3    Q.  So how did it come up in the grand jury?
4    A.  I believe Mr. Velesqa brought it up and asked
5 if I had made any comments to him.
6    Q.  Do you know if the video was played for the
7 grand jury?
8    A.  Yes, it was.
9    Q.  Were you there when it was played?
10   A.  Yes, I was.
11   Q.  When was the first time you saw the video?
12   A.  About a week after.
13   Q.  Who did you see it with?
14   A.  My attorney and Chris Barberee of internal
15 affairs.
16   Q.  Did you get a copy of the video?
17   A.  Not at that point, no, sir.
18   Q.  When did you get a copy of the video?
19   A.  When Mr. White gave me one prior to preparing
20 for this.
21   Q.  Do you know if the cell phone video was
22 played for the grand jury?
23   A.  I don't recall if that one was played or not.

Page 55

1 But I think they played -- I know they played the
2 dash cam video.  I don't remember whether or not
3 they played that one or the one from inside the
4 shelter.  I'm not sure.
5    Q.  What was -- did Chris Barber [sic] ask you
6 any questions about it or anything?
7    A.  While we were watching it?
8    Q.  Or after it.
9    A.  No, the only questions he asked me were in
10 his official capacity as the internal affairs
11 investigator.
12   Q.  Right.  And I'm just trying to find out what
13 questions did he ask you --
14       MR. WHITE:  Object to form.
15   Q.  -- in that meeting.
16   A.  I don't remember all of them.  He just asked
17 me to tell him what happened.  Asked me a couple
18 questions.  I don't remember what they were.
19   Q.  Was this before -- this would have been
20 before you wrote your report; right?
21   A.  No, that was five months later.
22   Q.  I thought you said it was a week after.
23   A.  That's when I saw the video.

Page 56

1    Q.  With Chris Barberree.
2    A.  And my -- and my attorney.
3    Q.  Right.  So a week after and then --
4    A.  He didn't ask me anything then.
5    Q.  Did you look at -- here's my question:  Did
6 you look at the video before you prepared your
7 report?
8    A.  No.  I don't believe --
9    Q.  Going by the time, ma'am, I'm just saying
10 December 30th, 2014, a week later would be --
11   A.  I don't think -- I don't think -- no, I
12 prepared the report first.  If I remember correctly.
13   Q.  So when did you start experiencing symptoms
14 that you would attribute to PTSD?
15   A.  Immediately.  Immediately.
16   Q.  And what were those symptoms?
17   A.  Nightmares, on edge all the time.  Every time
18 a car would drive down my road it would wake me up.
19 Every noise makes me jump.  It was mainly that.
20 Always looking over my shoulder.  Not wanting to sit
21 in a room with my back to the door.  Worried about
22 what's going to happen, is somebody going to
23 retaliate.

Page 57

1  Q. So, I mean, would you attribute your symptoms
2  to fear of people doing something to you, like,
3  related more to the threats than to the incident?
4  A. I have to worry about people doing things to
5  me, yes.
6  Q. Right, I mean --
7  A. I mean, they have been threatening so --
8  Q. The threats were long past though; right?
9  A. To me I still feel threatened.
10  Q. But nobody's threatening you?
11  A. No, not outwardly.
12  Q. Nobody has done anything even remotely
13  approaching threatening you since two months after
14  the incident; right?
15  A. Trying to think when the podcast was.
16  Q. Did -- I asked you -- did -- so. Okay.
17  A. I guess not.
18  Q. The video was not released publicly; right?
19  A. No.
20  Q. Do you have any sense of how it would be
21  perceived if it was?
22      MR. WHITE: Object to the form.
23  Q. Do you have any fear -- let me ask you this:

Page 58

1  Do you have any fears of it being released publicly?
2      MR. WHITE: Object to the form.
3  A. No.
4  Q. So how many times have you reviewed the
5  video?
6  A. The dash cam?
7  Q. Dash cam.
8  A. Dozens.
9  Q. Most of them recently?
10  A. Yes.
11  Q. Have you watched it in slow motion?
12  A. Parts of it, yes.
13  Q. Have you watched it frame by frame?
14  A. Parts of it, yes.
15  Q. The parts where you drew the gun, have you
16  watched in slow motion and frame by frame?
17  A. Yes.
18  Q. Okay. Most of your communications with
19  Mr. Lawrence are -- have been recorded; right?
20      MR. WHITE: Object to the form.
21  A. About half of them. Yeah.
22  Q. Well, so you're saying -- so how long -- you
23  know, I haven't looked at the video from the

Page 59

1  shelter, okay. So do you know how many minutes,
2  roughly, Mr. Lawrence was in the shelter?
3  A. Maybe three minutes.
4  Q. And then he left the shelter; right?
5  A. Correct.
6  Q. And then you came after him; right?
7  A. Correct.
8  Q. And then pretty much the entire audio --
9  strike that -- are we missing recordings of what was
10  said outside between you and Mr. Lawrence? In other
11  words, I know we don't have recordings of what was
12  said inside the shelter; right?
13  A. Right.
14  Q. And we have -- between his girlfriend's video
15  and the recording of your dispatch, we have nine,
16  ten minutes of audio recording of your
17  communications with Mr. Lawrence; right?
18  A. Yes.
19  Q. Is there -- other than the audio from the
20  three minutes inside the shelter, are we -- is there
21  any other communication that happened between you
22  and Mr. Lawrence that isn't recorded?
23  A. We spoke, yes.

Page 60

1  Q. Where? When, that's not recorded? Other
2  than inside the shelter?
3  A. As he was leaving the front door and he
4  pushed the door open. When he did, I saw a holster
5  sticking out below his jacket, a gun holster, but I
6  couldn't tell if there was a gun in it --
7  Q. I'm talking about communications.
8  A. Well, that's --
9  Q. I'm not asking you tell the story right now.
10  You can tell the story later, perhaps.
11  A. All right. I'm not sure I understand what
12  you're asking then.
13  Q. We have audio recordings that -- between the
14  girlfriend's video and the phone call recording and
15  the dash cam from Officer Rhodes that cover roughly
16  ten minutes before the incident through the incident
17  itself; right?
18      MR. WHITE: Object to the form.
19  A. I heard -- I heard an audio of him talking to
20  the comm center on the radio. But, not him talking
21  to Mr. Lawrence.
22  Q. Did I say -- here's what I'm talking about:
23  You and Mr. Lawrence, y'all communicated; right?

Page 61

1  A. Yes.
2  Q. What communications were there between the
3  two of you that are not recorded? Other than those
4  that took place inside the shelter and as he was
5  leaving?
6  A. What did we talk about?
7  Q. No.
8  A. I'm still not understanding.
9  Q. I could start the recording, but we have an
10 audio recording from you on the phone to somebody
11 asking for backup; right?
12 A. Right.
13 Q. And we have a second call where you followed
14 up about backup; right?
15 A. Yes.
16 Q. And we have a third call that goes on, I
17 think, for roughly nine minutes, but I may be wrong
18 about the exact time, where you're on the phone and
19 recording your communications with Mr. Lawrence.
20 A. The second phone call asking how far out are
21 they, that was Officer Skipper. I made two phone
22 calls, I think.
23 Q. Okay. There's a call -- a lengthy call where

Page 62

1  you record until --
2  A. Yes.
3  Q. -- Officer Rhodes arrives.
4  A. Yes.
5  Q. Before that call, are there any
6  communications with Mr. Lawrence that occurred in
7  the -- outside the building that are not recorded?
8  A. I still don't -- I'm still not following the
9  question.
10 Q. Okay.
11 A. You're asking if we had any communications.
12 Talking is a communication.
13 Q. Recordings.
14 A. Recordings? Oh no, no, no. I recorded
15 nothing.
16 Q. Right. So I'm asking what -- and I know I'm
17 asking inartfully but we --
18 A. He had a phone -- he had a phone -- in fact
19 during the course -- yes, he had a phone but I don't
20 know if -- whether or not he was recording.
21 Q. I thought you said you watched that
22 recording?
23 A. I watched the one in the car, but he had the

Page 63

1  phone in his hand when we were talking.
2  Q. That was the same phone, as I understand it.
3  He handed that phone back to the girlfriend at the
4  time of the incident.
5  A. Well, actually, he handed it to me and I
6  handed it her. I gave it back to her so it wouldn't
7  be broken.
8  Q. So he handed you the phone? I'm sure that's
9  on the video, I just don't remember it. But he
10 handed you the phone and you gave it to the
11 girlfriend?
12 A. Correct.
13 Q. Do you recall what your communications were
14 with Mr. Lawrence before the recordings start
15 outside the building?
16 A. Between the door and when he got to his car?
17 Q. Correct, if any?
18 A. Yes.
19 Q. Okay. So if I -- and he left out the door
20 and went to his car; right?
21 A. Right.
22 Q. When you got there you were being recorded;
23 right?

Page 64

1  A. I don't know.
2    MR. WHITE: Object to the form.
3  Q. Well have you seen that recording from inside
4  the car?
5  A. Yes, but that was after -- that was later.
6  That was taken later when he was retrieving his
7  affidavit of identification.
8  Q. Right. And so what was your communication
9  with him as he was -- you know, outside the building
10 and immediately after he walked out?
11 A. I asked him if he had a gun because I saw the
12 holster when he opened the door.
13 Q. Okay. And what did he say?
14 A. He said, "It's in the car."
15 Q. Okay.
16 A. He headed for the car and he yelled at the
17 woman in the car, "Get the video. This is going to
18 be a good one."
19 Q. Okay.
20 A. And I walked around to the back of the car.
21 Q. Okay.
22 A. To get his tag number.
23 Q. Okay. And you were on the phone at this

Page 65

1  time; right?
2     A.  No.
3     Q.  Well, the --
4     A.  I was -- I had told my secretary to call for
5  backup as I left the building.
6     Q.  Okay.  There is a audio recording where you
7  say, "He's blocking the tag"; do you remember that?
8     A.  Yup.
9     Q.  Or trying to block the tag?
10    A.  Yeah.
11    Q.  Did you not -- were you not on the phone
12  calling that tag in?
13    A.  I was trying to.
14    Q.  Right.  And that's recorded; right?
15    A.  Yes.
16    Q.  So --
17       MR. WHITE:  Object to the form.
18    Q.  So as you understand it, before you got to
19  the car and started getting his tag, the only
20  communication you had had outside the building with
21  Mr. Lawrence was where you asked him if he had a gun
22  and he said it was in the car; right?
23    A.  And he was telling me --

Page 66

1     Q.  That it was going to be a good one?
2     A.  It was an unlawful detainer and I had no
3  right to stop him and he was citing federal codes.
4     Q.  And that's recorded, though; right?
5     A.  That's not recorded.  You asked me what -- if
6  there was anything --
7     Q.  Have you not heard the recording --
8        MR. WHITE:  Object to the form.  She
9  testified that the video was the second time or that
10  that came later.  So that is not the beginning of
11  the incident --
12    Q.  Here's what I'm trying to get to; okay?  What
13  is the -- he comes out, tells you the gun is in the
14  car in response to your question; right?
15    A.  Correct.
16    Q.  Then he goes to the car and speaks to the
17  girlfriend about getting the video recording; right?
18    A.  He got in the car.
19    Q.  He got in the car and spoke to her about
20  recording; right?
21    A.  He was saying that before he got in the car.
22    Q.  And then you went to the back of the car and
23  got on the phone and called the tag in?

Page 67

1     A.  I was going to call the tag in.
2     Q.  Well you, in fact, have you listened to the
3  recording where you did call the tag in?
4        MR. WHITE:  Objection.  She said that was
5  later.  You're missing a whole segment of time.
6     Q.  Ms. Woodruff, you went to the back -- he
7  didn't prevent you from getting the tag number, did
8  he?
9     A.  Yes, at that point, he did.  He kept standing
10  in front of it.  And telling me it was private
11  property and I didn't have the right to get it.
12    Q.  Okay.
13    A.  And started talking about federal codes and
14  state codes and this is a violation of his privacy
15  rights.
16    Q.  And then what happened?
17    A.  That went on for a couple minutes.  I stepped
18  to the right, he stepped over in front, back and
19  forth.
20    Q.  So you were not -- you were not calling --
21    A.  I was trying to get through on my phone.  We
22  were working on portable phones at the time.  Our
23  phone system was down and I couldn't get through.  I

Page 68

1  wanted to make sure that my secretary heard me when
2  I left out the door and told her to call for backup.
3     Q.  Do you know whether -- okay.  Let me see if I
4  have this a hundred percent right.
5        He left, you asked him about the holster, he
6  told you the gun was in the car; right?
7     A.  Correct.
8     Q.  He continued on and as he was getting in the
9  car he made a statement regarding her recording?
10    A.  Right.
11    Q.  And then he sat in the car; right?
12    A.  Yes.
13    Q.  And then you went behind the car; right?
14    A.  I was going to get the tag.
15    Q.  Right.  Have you looked at her video to see
16  if it, in fact, starts right there where you say he
17  got in to the car?
18    A.  That's the second time he got in.
19    Q.  So he got in a second time telling her to
20  record?
21    A.  No.  That's -- that's later, I believe.  Oh,
22  yes.  'Cause that's not what he said.
23    Q.  So you were not able -- even though you

Page 69

1 walked behind his car and he was not anywhere in the
2 way --
3    A.   Well, yes he was, because he immediately
4 jumped out of the car and came back over there.
5    Q.   Ms. Woodruff, listen carefully.  You were not
6 able to see and call in the tag when you walked back
7 there?
8    A.   Correct.
9    Q.   You could not -- you could not process that
10 tag when -- at the time you were back there when he
11 was sitting in the driver's seat?
12          MR. WHITE:  Object to the form.  That's
13 not what she testified too.  She testified that he
14 blocked her.  He got out of the car and came back
15 and blocked her.
16    A.   He immediately got out of the car when he saw
17 me walk behind the car.
18    Q.   Right.  But you got behind the car first;
19 right?
20    A.   I walked back -- I walked back there and
21 started trying to dial dispatch.
22    Q.   And you just couldn't dial dispatch?
23    A.   Our phones were messed up.  That's correct.

Page 70

1    Q.   So is this notion that there was this time
2 when all the phones were messed up, is this
3 documented anywhere?
4    A.   It may be with -- with our IT department.
5    Q.   So you're saying there should be -- well,
6 what was the problem calling dispatch with the tag,
7 Ms. Woodruff?
8    A.   I couldn't -- first, I couldn't get through.
9 By then he was out of the car and at the back of the
10 car.
11    Q.   So how long did he obstruct -- keep you
12 from --
13    A.   I walked away.
14    Q.   You walked away?
15    A.   I walked away thinking that he would move
16 away from the car and I could get the tag.
17    Q.   So you let him -- you just let him block --
18 keep you from getting the tag?
19    A.   No, I walked away thinking that he would move
20 and I could get it.
21    Q.   So did -- so he blocked.  How -- where did
22 you walk to?
23    A.   Just a few feet away from the car.  But he --

Page 71

1    Q.   Well like to the left, to the right?
2    A.   I don't remember which side of the car.  The
3 left -- yeah, the left towards the parking lot.
4    Q.   So did you take the visibility of the tag out
5 of your view?
6    A.   Yes, it was at that point.  So I had to go
7 back and get it again.
8    Q.   Well, how did -- so how did that happen?
9    A.   I got it when he was distracted.
10    Q.   How did you distract him?
11    A.   We were just talking and he kept talking
12 about codes and statutes and he makes $1,600 an hour
13 talking to people like me and I had no authority
14 over him.  It was an unlawful detainer.  He just
15 kept talking nonstop.
16    Q.   That's what he had done inside the building
17 too; right?
18    A.   That's correct.
19    Q.   He talked a lot; right?
20    A.   Yes, sir.
21    Q.   He talked about his right not to have to give
22 you a driver's license; right?
23    A.   Any kind of identification.

Page 72

1    Q.   He talked about that you were violating your
2 oath; right?
3    A.   Yes.
4    Q.   So let me see if I've got it correct.  In the
5 animal control office there was talking; right?
6    A.   Yes.  Yelling.
7    Q.   He answered questions; right?
8    A.   He was yelling, yes.
9    Q.   So was it -- so when was there yelling?
10    A.   When Pat Holly told him that he was from
11 Geneva and we could not take the dog.
12    Q.   Okay.  Can we agree that there was no yelling
13 by him on any of the recordings that we have?
14          MR. WHITE:  Object to the form.
15    A.   Oh, he's yelling.
16    Q.   Can we agree that when he spoke inside that
17 he was speaking, roughly, the same as he is recorded
18 speaking?
19    A.   Pretty -- no, it escalated.
20    Q.   It got worse outside, didn't it?
21    A.   Yes.
22    Q.   He was calmer inside; right?
23          MR. WHITE:  Object to the form.

Page 73

1    A. Somewhat, yes. He just got worse and worse.

2    Q. After you followed him out there; right?

3    A. I did.

4    Q. And wouldn't let him leave, right?

5    A. Correct.

6    Q. And so even though we don't have anything

7 recorded inside the animal control shelter we know

8 that whatever happened there wasn't as bad as what

9 was recorded outside; right?

10   A. Right.

11   Q. Can we agree that you never told Mr. Lawrence

12 he was under arrest?

13   A. Yes.

14   Q. In fact, you never accused him of committing

15 any crime; right?

16   A. At one point he asked me if he had committed

17 a crime.

18   Q. And you didn't tell him any crime --

19   A. I said, yes.

20   Q. You told him that the crime was that driving

21 without a license; right?

22   A. No, I don't -- I don't remember telling him

23 that part.

Page 74

1    Q. Well, that was the crime you were interested

2 in, wasn't it?

3    A. No, not only that.

4    Q. So what other crime was he committing?

5    A. Well, what he had threatened to do, which was

6 the whole point of me following him out of the

7 building to begin with.

8    Q. So the possibility that he might return the

9 dog where he had gotten it.

10   A. Dump it. He said he was going to -- "I'm

11 going to dump the damn dog at the end of the road."

12   Q. And --

13   A. And then he picked --

14   Q. That's not on any of the recordings; right?

15   A. No, that's inside the building.

16   Q. You don't accuse him of -- let's back that

17 up. I think it does come up in the recording. So

18 he didn't actually dump the dog; right?

19   A. He never left.

20   Q. He tried to turn the dog over to the animal

21 shelter; right?

22   A. Yes.

23   Q. Y'all refused the dog?

Page 75

1    A. Initially.

2    Q. When you refused he left; right?

3       MR. WHITE: Objection. She said

4 "initially."

5    A. No. He kept getting louder, which is why I

6 came out of my office.

7    Q. Was he ever told that, We'll take the dog

8 without you having to fill out any paperwork?

9    A. He had to sign. It got -- when -- when --

10   Q. So here's --

11   A. You --

12   Q. Was he ever told --

13      MR. WHITE: If you would please let her

14 answer.

15   A. Let me finish. Let me finish.

16   Q. It's a yes or no question, Ms. Woodruff. Was

17 he ever told --

18      MR. WHITE: Let her -- I'm going to

19 object. Would you read the question back, please.

20   Q. I withdraw the question. Ms. Woodruff, did

21 he -- was he ever told anything that said, We will

22 take the dog without you signing or turning over ID

23 or anything?

Page 76

1    A. He had to sign, no.

2    Q. And that was when he took the dog and left;

3 right?

4    A. And threatened to dump it at the end of the

5 road, yes.

6    Q. Would it be -- is it a crime to say -- say

7 that?

8       MR. WHITE: Object to the form.

9    Q. To say those words? To make a threat to dump

10 a dog?

11   A. He's threatening to commit a crime.

12   Q. You told him that was against the law, didn't

13 you?

14   A. I said, "You can't do that. It's illegal."

15   Q. Okay. So that was information that he might

16 not have had; right?

17      MR. WHITE: Object to the form.

18   A. I don't know.

19   Q. In any event, he stated an intention to do

20 something that you thought was illegal; right?

21   A. Correct.

22   Q. You informed him that that was -- in response

23 you told him that was illegal; right?

Page 77

1  A.  Correct.
2  Q.  Now, do you have any understanding about
3  whether, legally, you had the right to arrest him
4  merely for having stated that intention to you, to
5  dump the dog --
6      MR. WHITE:  Object to the form.
7  Q.  -- without actually dumping the dog?
8  A.  Well, when I asked -- at that point I asked
9  for his identification.
10  Q.  I'm talking about dumping the dog.  Can we
11  agree that just because he says he's going to do
12  something illegal in the future, you can't arrest
13  him for it?
14  A.  That's correct.
15  Q.  Then you demanded his identification; right?
16  A.  Correct.
17  Q.  And he gave you his paperwork that was not an
18  official --
19  A.  That was far later.
20  Q.  But, eventually, he gave you only his -- the
21  paperwork out of his car; right?
22  A.  Right.
23  Q.  And you refused to return that paperwork to

Page 78

1  him; right?
2  A.  That's correct.
3  Q.  Now, did he commit -- actually commit any
4  crime?
5  A.  Yes.
6  Q.  What?
7  A.  Through the course of it all?
8  Q.  Yeah.
9  A.  He failed to produce his driver's license.
10  Q.  Okay.
11  A.  Disorderly conduct.  Resisting arrest.
12  That's a pretty good start right there.
13  Q.  So the first crime was refusing to produce
14  his driver's license to you in the parking lot;
15  right?
16  A.  Correct.
17  Q.  And then the disorderly conduct was the
18  response after that in the parking lot?
19  A.  It was him getting very close to me, up in my
20  face, backing me -- backing me backwards.
21  Q.  Okay.  That was the disorderly conduct?
22  A.  Yes.
23  Q.  Do you -- and then after that, of course,

Page 79

1  Officer Rhodes physically tried to put him in cuffs;
2  right?
3  A.  That was later, yes.
4  Q.  Well, that was the resisting arrest?
5  A.  Yes.
6  Q.  But we have -- of course have to have a
7  reason to arrest in the first place; right?
8  A.  Correct.
9  Q.  Now, why is he subject to arrest for not
10  producing a driver's license to you?
11      THE WITNESS:  Do you have the code?  Do
12  you have the code?
13      MR. WHITE:  I'll have to go --
14  Q.  (By Mr. Sherrod)  I know the code.  I know
15  the code.
16      MR. WHITE:  Well, I can go get it.  I
17  mean, she's talking about the Alabama code that
18  says, upon a lawful request from a officer police
19  officer, you know, it's lawful command plus him
20  not --
21      MR. SHERROD:  I don't need your
22  testimony.  I'm --
23      MR. WHITE:  Well, she said code and I

Page 80

1  said I can get it and we can give you all of it.
2      MR. SHERROD:  I understand it.  I
3  understand.
4  Q.  (By Mr. Sherrod)  You said you're referring
5  to an Alabama statute?
6  A.  Yes.
7  Q.  I'm aware of two such statutes, one that
8  applies to someone operating a motor vehicle and
9  another that is -- doesn't.  Which one are you
10  talking about?
11      MR. WHITE:  Object to the form.  You know
12  she's not going to operate any kind of mental guess
13  as to what you're familiar with.  We can go get the
14  code and she can refer -- not what you say the code
15  is but what the code says the code is.
16  Q.  Ms. Woodruff, what do you understand the code
17  to require that was applicable, Ms. Woodruff, to Mr.
18  Lawrence?
19  A.  I'm not sure I understand what you're asking.
20  Q.  What does the code say, just roughly in
21  general, that you understand it to say?
22  A.  That he has to comply.  He has to produce his
23  identification when asked for it.  His driver's

Page 81

1  license when asked for it.

2  Q. Is that your understanding of the law?

3  A. Yes.

4  Q. That just anytime you want to make a citizen

5  produce a driver's license, you can?

6      MR. WHITE: Object to the form.

7  A. No, this was more along the lines of the

8  Terry stop. I guess it would be comparable to it.

9  Q. The statute that talks about reasonable

10 suspicion or probable cause or something like that;

11 doesn't it?

12 A. Yes. I believe it does.

13 Q. So we've got he refused to produce a driver's

14 license, he was disorderly by getting in your face,

15 and then he resisted arrest with Officer Rhodes.

16 Did he commit any other crimes in your presence that

17 day?

18     MR. WHITE: Those are listed in her

19 answers to interrogatories where she included --

20     MR. SHERROD: I'm just asking. Thank you

21 for instructing -- you know, I've been trying to

22 ignore you Lenn --

23     MR. WHITE: It's in the interrogatories.

Page 82

1      MR. SHERROD: Yeah, but this is called a

2  speaking objection and it's improper and, you know,

3  I was hoping it would stop, but I'm going the ask

4  you please to let the witness answer and --

5      MR. WHITE: I'll repeat her answers for

6  the record.

7      MR. SHERROD: It's not proper for you to

8  repeat her answers. That's called coaching the

9  witness.

10     MR. WHITE: And asking the same questions

11 already answered is redundant.

12 Q. (By Mr. Sherrod) Ms. Woodruff, do you

13 contend he committed any other crime that day other

14 than refusing to produce his driver's license, under

15 that code section; disorderly conduct by getting in

16 your physical space, in your face, and resisting

17 arrest when --

18 A. Actually yes. Attempted first degree assault

19 on Officer Rhodes.

20 Q. Okay. Any others?

21 A. I can't think of any.

22 Q. I mean, your lawyer was suggesting maybe

23 obstructing governmental operations by refusing your

Page 83

1  command --

2  A. Obstructing governmental operations by

3  standing in front of the tag preventing me from

4  doing my job.

5  Q. Okay. So --

6  A. Yeah. That too.

7  Q. Now, at the time that you were getting his

8  tag, you were detaining him; right?

9  A. Yes.

10 Q. So was it your expectation then that the

11 course of events was going to be that whatever

12 officer came for backup at your direction would be

13 arresting Mr. Lawrence?

14     MR. WHITE: Object to the form.

15 A. At which point? At the -- towards the end

16 when my backup got there? I felt, yes, he was

17 going -- he was going to jail.

18 Q. Did you make any decision that you -- that --

19 you kept saying he was detained. You never said --

20 referenced any crime or stated that she was going to

21 be placed under arrest. My real question is --

22     MR. WHITE: I object to form. She

23 testified that she told him that yes, he had

Page 84

1  committed a crime.

2  Q. Okay. I don't remember --

3      MR. WHITE: It's on tape.

4  Q. Let me -- let me be clear. I'm not asking --

5  I didn't hear the "yes" in response to that

6  question. It may be on the recording.

7  A. It is.

8  Q. I don't remember hearing it. I'm not really

9  trying to get into that conversation. What I'm

10 specifically asking --

11     MR. WHITE: Well, I mean, I'm going to

12 object to form of the question if it

13 mischaracterizes the facts.

14     MR. SHERROD: I'm not trying to

15 characterize any -- I'm asking a completely

16 different question. So if you quit interrupting,

17 Lenn, it will all become clear.

18 Q. (By Mr. Sherrod) So I'm not asking you --

19     MR. WHITE: It's what we're after.

20     MR. SHERROD: Excuse me?

21     MR. WHITE: It's what we're after.

22     MR. SHERROD: Will you please stop

23 interrupting me, Lenn.

Page 85

1      MR. WHITE:  Sure.
2    Q.  So I'm not asking you about that conversation
3  or what was said by you and between him.  I'm asking
4  you, in your head if you had the intention, if you
5  can recall, to have the backup officer arrest
6  Mr. Lawrence?
7      MR. WHITE:  Object to the form.
8    A.  I would be object- -- I would be arresting
9  him.  I witnessed the crimes.  It would be my
10  arrest.
11    Q.  But you physically were -- I mean, you were
12  afraid to try to arrest him?
13    A.  Absolutely.
14    Q.  So you were going to count on another officer
15  to do the physical work to arresting Mr. Lawrence?
16    A.  To help me, yes.
17    Q.  I understand you were going to make the
18  decision to arrest but I -- so was it your -- did
19  you make the decision that you were going to have
20  Officer, Rhodes or whoever came, arrest --
21  physically put Mr. Lawrence in custody?
22    A.  Yes.
23      MR. WHITE:  Object to the form.

Page 86

1    Q.  Do you recall when you made that decision?
2    A.  When he was threatening and in my face.
3  Again, and again, and again I told him to get out of
4  my face and he kept at me in a threatening manner to
5  me.  I knew I couldn't fight him.  I had to wait for
6  backup.  I was stalling for my backup to get there
7  so that he could be cuffed and --
8    Q.  So to be clear, Mr. Lawrence never threatened
9  you by word; right?
10    A.  No, it was his behavior.
11    Q.  He never threatened you by gestures?
12    A.  He threatened to sue me already, early on.
13    Q.  Okay.  You're not claiming that he was
14  subject to arrest because he threatened to sue you;
15  right?
16    A.  No, of course not.
17    Q.  He never threatened your physical person;
18  right?
19    A.  Correct.
20    Q.  He never made a gesture that even hinted that
21  he wanted to harm your physical person?
22    A.  That can be construed as yes.
23    Q.  Well you considered him a threat to your

Page 87

1  physical person; right?
2    A.  Absolutely.
3    Q.  You were scared; right?
4    A.  Yes.
5    Q.  But he didn't actually do anything,
6  objectively, other than behave in a manner that you
7  didn't like, to threaten?
8      MR. WHITE:  Object to the form.
9    A.  It's not a matter of whether or not -- it's
10  not that I didn't -- he did something I didn't like.
11  It's that he overtly kept coming toward me, yelling.
12  And that's -- I had to keep backing up to get away
13  from him.
14    Q.  He came towards you to get his paperwork
15  back; right?
16    A.  He wasn't reaching for his paperwork.
17    Q.  He was asking for his paperwork back.
18    A.  He had several times asked for his paperwork
19  back.
20    Q.  You were refusing to give his paperwork back?
21    A.  That's correct.
22    Q.  Well, isn't it true that you actually got
23  more in his face that day than he ever got in yours?

Page 88

1    A.  No.
2    Q.  Do you recall the part where you raised your
3  voice and you stepped toward him on his video?
4    A.  When he was in his car?
5    Q.  No, when -- when you're claiming that -- do
6  you remember the part in the video where you say
7  that he's in your face and he says that he's six and
8  a half feet from you; do you recall that?
9    A.  That's getting too close.  That's not a
10  comfort zone for a police officer.
11    Q.  Well, the law doesn't say that police
12  officers are all just entitled to their comfort;
13  right?
14    A.  You keep a safe distance.  A reactionary
15  distance.
16    Q.  But it's not a crime for a citizen to make
17  you uncomfortable; right?
18    A.  No.  But when they do, you take action.
19    Q.  Now, during the entire incident, Mr. Lawrence
20  never made any threat to anybody's physical safety;
21  right?  Verbally?
22    A.  Verbally.
23    Q.  Verbally.

Page 89

1   A. His actions spoke loudly.
2   Q. We can talk just verbal -- during the entire
3 incident -- even while he's in there being
4 manhandled by Officer Rhodes; right?
5   A. I don't know that "manhandled" is the proper
6 word but --
7   Q. Well, I mean, Officer Rhodes was
8 substantially larger than Mr. Lawrence.
9       MR. WHITE: Object to the form.
10  Q. Right?
11  A. He wasn't stronger.
12  Q. How do you know that?
13  A. Because Alan was losing the fight.
14  Q. So did Alan tell you that?
15  A. No.
16  Q. Ever?
17  A. No.
18  Q. Did he ever ask for your help?
19  A. No, he didn't have to.
20  Q. Did he ever say, I'm tired?
21  A. He doesn't have to. He doesn't have to ask
22 for help.
23  Q. Maybe he did or maybe he didn't. You know,

Page 90

1 I'm just asking you, yes or no, did he ever ask --
2 state any words that indicated he was tired?
3   A. Officer Rhodes?
4   Q. Officer Rhodes.
5   A. Not until it was all over. He said he was
6 exhausted.
7   Q. Did he ever state any words indicating that
8 he felt like his safety was in danger?
9   A. He was mostly talking to Mr. Lawrence.
10  Q. Did he state --
11  A. I didn't hear -- I didn't hear that, no.
12  Q. He didn't state any words to you, did he?
13  A. Yeah. Yes. "Take it, take it, take it."
14  Q. Take the shot?
15  A. Yes, sir.
16  Q. And he told you --
17  A. Take the Taser out of his hand.
18  Q. Take the Taser. So he didn't tell you to
19 shoot him?
20  A. No.
21  Q. Now, you didn't warn Mr. Lawrence that he
22 would be shot if he didn't let go of the Taser;
23 right?

Page 91

1   A. No.
2   Q. You didn't even warn Officer Rhodes about the
3 gun?
4   A. No.
5   Q. Didn't warn Officer Skipper about the gun?
6   A. No.
7   Q. You just pulled and shot.
8       MR. WHITE: Object to the form.
9   A. I didn't even know that Officer Skipper was
10 there.
11  Q. Was that -- she wasn't --
12  A. She was on the sidewalk after I saw the
13 video.
14  Q. Was that --
15  A. She grabbed -- she grabbed it.
16  Q. Let me ask the question. Is that not her in
17 the white coat --
18  A. Yes.
19  Q. -- that's on the video?
20  A. Yes.
21  Q. That's right there with you?
22  A. Yes, but I didn't realize it was her. My
23 concentration was on Officer Rhodes and

Page 92

1 Mr. Lawrence.
2   Q. She -- did you see -- we haven't pulled the
3 video, but my recollection is she's right there with
4 you with her hands on Mr. Lawrence's, you know, at
5 least -- y'all are all right there around the Taser,
6 both of you; right?
7   A. Officer Skipper grabbed the Taser.
8   Q. And you knew she was there, right?
9   A. I didn't know it was her. All I saw was the
10 hands out of the corner of eye. I had my focus on
11 Officer Rhodes and --
12  Q. You knew it was somebody that was trying to
13 help you; right?
14  A. Not necessarily.
15  Q. Well, you didn't shoot them.
16      MR. WHITE: Object to the form.
17  Q. Are you claiming you did not know that that
18 was somebody trying to help you with the Taser and
19 Mr. Lawrence?
20  A. Correct.
21  Q. So you thought that was somebody coming there
22 to help Mr. Lawrence?
23  A. I did not know.

Page 93

1    Q.  Well isn't that something -- would be
2  important for an officer who's dealing with the
3  situation to know whether it's two on -- two now
4  instead of three on one?
5    A.  Are you asking a question or making a
6  statement?
7    Q.  Well, I mean, Officer, you're trained to, you
8  know, be aware of threats; right?
9    A.  My biggest threat --
10   Q.  Question:  You're trained to be aware of
11 threats; right?
12   A.  You asked me something and then you don't let
13 me answer the question.  You have to let me answer.
14   Q.  The question is, are you trained to be -- are
15 you trained to be generally aware of the other
16 threats in the area of a conflict?
17   A.  Yes.
18   Q.  In fact you need to know whether or not
19 there's some bystander or supporter or whoever who
20 might come and support the person you're trying to
21 arrest; right?
22   A.  Correct.
23   Q.  You knew that everybody around there was on

Page 94

1  your team; right?
2    A.  Yes.
3    Q.  So you knew that whoever it was that was
4  there pulling on the Taser, whether it was
5  Ms. Skipper or somebody else, was somebody trying to
6  help; right?
7    A.  Was probably somebody trying to help.
8    Q.  You didn't have to look at them because you
9  knew that they were there to help you; right?
10   A.  I felt like that when they were grabbing the
11 Taser.
12   Q.  Now, in front of you is the -- I assume the
13 actual X26 that was used in this incident; is that
14 right?  Or at least a similar model, the same model?
15       MR. WHITE:  The same Taser.
16   Q.  Same Taser, okay.  And as I mentioned to you
17 before we got started, I purchased a training Taser
18 which has the cartridge on the end and the rubber
19 model.
20   A.  Right.
21   Q.  Except for the cartridge on the end those are
22 in the same shape; right?
23   A.  Yes.

Page 95

1    Q.  Now, the -- if you pick them up both you'll
2  feel that the training is heavier, a little heavier;
3  right?
4    A.  Yeah.  It's a lot heavier.
5    Q.  Now, how did Mr. Lawrence -- so, if I
6  understand correctly -- I'm going by what I observed
7  on the video as much as anything else.  You were
8  Drive Stunning Mr. Lawrence; right?
9    A.  Yes.
10   Q.  And that's a specific term for the use of the
11 Taser to inflict pain; right?
12   A.  Drive Stunning is without the cartridge
13 attached to the front.
14   Q.  Right.  But it's a pain -- it's a pain --
15   A.  Pain control.
16   Q.  Pain control.  It does not -- it's not the
17 same as with the prongs; right?
18   A.  Correct.
19   Q.  When the prongs go -- assuming it works -- if
20 it makes the correct connection then there's what's
21 called neuromuscular incapacitation; right?
22   A.  Correct.
23   Q.  And, you know, that means a person just can't

Page 96

1  do anything, they're completely defenseless,
2  essentially, for roughly five seconds; right?
3        MR. WHITE:  Object to the form.
4    A.  That's the idea, yes.
5    Q.  That's the idea.  Now the prongs, probably
6  because they hit on Mr. Lawrence's coat, did not
7  achieve the effect, initially, when Officer Rhodes
8  used it; right?
9    A.  Correct.
10   Q.  And -- did Officer Rhodes then put his Taser
11 back in his holster?
12   A.  No.
13   Q.  Okay.  Did he hand it to you?
14   A.  I got it.  I took it from him.  That's when
15 he said, "take it, take it."
16   Q.  Did he have it in his hand?
17   A.  Yes.
18   Q.  Did you remove the cartridge from the end of
19 the Taser?
20   A.  Yes, sir.
21   Q.  So you removed the cartridge in order to use
22 it in Drive Stun mode; right?
23   A.  That's correct.

Page 97

1    Q.  And then did -- when you used it, did you
2  ever accidentally use it on Officer Rhodes?
3    A.  No, sir.
4    Q.  I saw a picture of some sort of mark on
5  Officer Rhodes.  Have you seen that picture?
6    A.  No.
7    Q.  Okay.  So you don't know how he would have
8  gotten that mark?
9    A.  No.
10   Q.  Okay.
11   A.  I don't know what mark you're talking about.
12   Q.  Now, when Mr. Lawrence grabbed the Taser, how
13  did he grab the Taser?  I mean you were holding the
14  Taser with your finger on the trigger; right?
15   A.  Yes.
16   Q.  And then he grabbed the barrel end of the
17  Taser; right?
18   A.  I can't remember exactly how he grabbed it,
19  but he grabbed it and he twisted it.  And I'm not
20  even sure which way he twisted it.
21   Q.  Right.  But then he --
22   A.  But then he did it and he had control -- he
23  gained control of it in his left hand.

Page 98

1    Q.  So you're claiming that he grabbed the Taser
2  with what hand?
3    A.  His left hand.
4    Q.  So did he ever touch the Taser with any hand
5  other than his left hand?
6    A.  I don't -- I don't recall him doing that.
7    Q.  So when he first grabbed the Taser you were
8  gripping it with your finger on the trigger; right?
9    A.  Probably -- yes, sir.  As best as I can
10  remember.
11   Q.  I mean you've got a handle that's there, you
12  know, designed to be gripped firmly and used by
13  police officers on the bodies of resisting suspects;
14  right?
15   A.  Yes, sir.
16   Q.  Did you have any problem gripping?
17   A.  They're short.  They're kind of hard to hang
18  on to -- well, no.  No.
19   Q.  And so he grabbed -- the barrel end was the
20  only thing available for him to grab; right?
21        MR. WHITE:  Object to the form.
22   A.  Like I said, I don't remember exactly how he
23  got it.

Page 99

1    Q.  Did he grab -- I mean, did he just grab your
2  wrist?
3    A.  He may have.  All I know is it was twisted
4  and he had it.
5    Q.  So here's what -- so here's what I'm -- I'm
6  one hand, how did he remove the Taser from your hand
7  and reposition it -- so you claim that he took it,
8  like, grabbed it from you somehow and then got his
9  finger on the handle -- his hand on the handle with
10  his finger on the trigger?
11   A.  Yes, sir.
12   Q.  And he did that while -- with you --
13   A.  And I was pushing against his arm once he had
14  the -- once he had it in his hand.
15   Q.  Is this based on your memory?
16   A.  Yes.
17   Q.  Is this -- do you see this in the video?
18   A.  No.
19   Q.  Okay.  In your memory, he actually gets the
20  Taser in his hand where he can pull the trigger and
21  cause pain to you or Mr. -- or Officer Rhodes;
22  right?
23   A.  Correct.

Page 100

1    Q.  Do you see how with one hand it would be
2  difficult to -- one, to both get it away from you
3  and then get it into a way it could be shot?
4    A.  Do I think that would be difficult?
5    Q.  Yeah.
6    A.  Not necessarily.
7    Q.  So this is one of the reasons I wanted a
8  videographer here, frankly but, you know, I think
9  it -- the words should make it clear.  Somehow using
10  his left hand only you say he ripped the Taser from
11  your hand --
12   A.  He twisted it out of my hand.
13   Q.  Twisted it out your hand, then got his finger
14  into the trigger and gripped the Taser in a
15  threatening manner?
16   A.  He started shoving it towards Officer Rhodes.
17   Q.  While gripping it in the way you would grip
18  it?
19   A.  Yes.
20   Q.  So the gun -- the Taser went from you holding
21  it in your hand to apply it to somebody, to
22  Mr. Lawrence holding it in his hand to apply to it
23  somebody; right?

Page 101

1    A.  Yes, he kept trying to grab it.

2    Q.  I'm going to take baby steps.  Okay.  You --

3  you let go of the Taser, didn't you?

4    A.  He twisted it out of my hand, pain

5  compliance, sure.  It hurt.  He was twisting my

6  wrist and it hurt badly.  He got the Taser away from

7  me.

8    Q.  You -- as soon as you let go, you went and

9  reached for your gun, didn't you?

10    A.  No, I was pushing his arm back that had the

11  Taser in it.

12    Q.  You don't see that on the video either, do

13  you?

14         MR. WHITE:  Object to the form.

15    A.  I'm not sure.  You may.

16    Q.  Have you gone back to the video?

17    A.  Yeah, we've seen it.  You may see my arm in

18  there.

19    Q.  Now, did Mr. Lawrence ever apply the Taser to

20  you or Officer Rhodes?

21    A.  Officer Rhodes told me afterwards that he

22  felt the tingling down his pant leg.

23    Q.  Yes, but do you know whether or not that was

Page 102

1  from you -- what you did or from what Mr. Lawrence

2  did?

3    A.  It wasn't from what I did.  That's not where

4  I tased Mr. Lawrence.

5    Q.  Well, I mean, you started applying the Taser

6  to Mr. Lawrence; right?

7    A.  Right.

8    Q.  While Officer Rhodes had him pinned up

9  against the car; right?

10    A.  His back was against the car.

11    Q.  Yeah.  Had him bear-hugged pinned against the

12  car; right?

13    A.  Right.

14    Q.  Mr. Lawrence was unarmed; right?

15    A.  Right.  Well, I didn't know.

16    Q.  You had no information that he was armed, did

17  you?

18    A.  No.  He said he had it in the car.  I didn't

19  know if he got the gun out or not.

20    Q.  So did you shoot him because you were afraid

21  there might be -- he might have a gun?

22    A.  No.

23    Q.  Okay.  Then --

Page 103

1         MR. WHITE:  Object to the form.

2    Q.  That didn't have anything to do with the

3  shooting, did it?

4    A.  Correct.

5    Q.  Your position consistently has been, you shot

6  him because he had the Taser gripped with his finger

7  on the trigger in Drive Stun mode; right?

8    A.  And was trying to tase Officer Rhodes.

9    Q.  And was trying to Tase Officer Rhodes?

10    A.  Right.

11    Q.  And you shot him for that reason and that

12  reason only; right?

13    A.  Yes.  I was afraid that Officer Rhodes would

14  be incapacitated, which would leave me --

15    Q.  But, you know, that there were numerous

16  people there to help; right?

17    A.  No, I don't know that.

18    Q.  You knew Officer Skipper was there in the

19  parking lot, didn't you?

20    A.  No.

21    Q.  You --

22    A.  I didn't -- I didn't know that those were

23  even her hands that came in.  I knew she was

Page 104

1  somewhere.

2    Q.  You knew you had other people in the parking

3  lot there available to help you, didn't you?

4    A.  No, I didn't.

5    Q.  Did you look?

6    A.  No, I was concentrating on the fight at hand.

7    Q.  And during that fight did Mr. Lawrence ever

8  throw a single punch?

9    A.  Not at me.

10    Q.  Did you ever see him throw a punch at Officer

11  Rhodes?

12    A.  No, I remember Officer Rhodes asking him at

13  one point, "Have you had enough?"  And he said, "No,

14  I'm not done."

15    Q.  Did -- now, can we agree that what

16  Mr. Lawrence did was try to protect himself from

17  getting tased by you?

18         MR. WHITE:  Object to the form.

19    A.  I don't know what he was thinking.

20    Q.  Well, I mean he was trying to push -- the

21  Taser hurts; right?

22    A.  Sure.

23    Q.  And you burned him with that Taser multiple

Page 105

1 times; right?
2    A. I fired twice.
3    Q. Right, but it keeps having multiple contacts
4 so you're going -- you understand that's ten seconds
5 of electricity; right?
6    A. That's correct.
7    Q. And so if you -- during that ten seconds you
8 push into the skin five times, the person is going
9 to feel five jolts of pain; right?
10       MR. WHITE: Object to the form.
11    A. Under ideal conditions, yes.
12    Q. And so you were causing him pain, you
13 thought; right?
14    A. Correct.
15    Q. And in response to your causing him pain with
16 the Taser, he grabbed the Taser; right?
17    A. And the Taser had no effect on him.
18    Q. He grabbed the Taser in response to what you
19 did; right?
20       MR. WHITE: Object to the form.
21    A. I don't know why he did it. I can't --
22    Q. You --
23    A. -- say what he was thinking.

Page 106

1    Q. Common sense.
2       MR. WHITE: Object. I'm going to object.
3 I mean, to make her answer based upon his mental
4 operations, she said she can't.
5    Q. So you think he just might have been grabbing
6 the Taser -- well, can we agree that he wouldn't
7 have an opportunity to grab the Taser if you hadn't
8 stuck it in him?
9       MR. WHITE: Object to the form.
10    A. I was following our protocol. I was trying
11 to stop him.
12    Q. And you stopped him, didn't you?
13    A. I did stop him.
14    Q. You couldn't stop him with a Taser, so you
15 stopped him with a gun; right?
16    A. I stopped him -- I shot him after he gained
17 control of the Taser.
18    Q. If he'd gotten control of the Taser, he would
19 have just -- it would have just hurt; right?
20    A. It incapacitates you.
21    Q. It does not incapacitate --
22       MR. WHITE: Wait. Object --
23    Q. Ms. Woodruff, you know it doesn't

Page 107

1 incapacitate you in Drive Stun mode, don't you?
2    A. That's true unless you hold it there.
3    Q. Right. And so you were not -- there was no
4 real danger of incapacitation from -- even if
5 Mr. Lawrence had gotten the Taser; right?
6    A. I don't know. Have you ever had your
7 testicles tased?
8    Q. Well, I mean, it's not like -- assuming he
9 really had the Taser, y'all were defenseless; right?
10    A. I'm not sure I understand that.
11    Q. I mean, have you been trained to punch,
12 strike?
13    A. Strike with weapons not -- not brawling, no.
14    Q. You haven't been trained -- you know that if
15 you need hit somebody you can hit them.
16    A. No.
17    Q. You can't? You think you would -- your first
18 call is to shoot them rather than use some other
19 force?
20    A. That's ridiculous.
21    Q. It is ridiculous. So I'm saying you can use
22 other force to --
23    A. That's correct.

Page 108

1    Q. You could -- you know, like, you and
2 Ms. Skipper together could have taken the Taser away
3 from Mr. --
4       MR. WHITE: Object to the form.
5    Q. -- Lawrence; right?
6    A. Would've, could've. You're asking me to
7 predict something that might have happened had
8 circumstances been different. I can't do that. I
9 can't answer that question.
10    Q. Can't happen if you don't try to; right?
11       MR. WHITE: Object to the form. She
12 answered the question.
13    A. I can't answer that.
14    Q. You didn't try to take the Taser away from
15 Mr. Lawrence, did you?
16    A. I tried -- he immediately tried to tase
17 Officer Rhodes. I tried to push his arm away from
18 Officer Rhodes.
19    Q. And then you went for your gun.
20    A. I couldn't hold his arm any longer.
21    Q. Well, did you try to get leverage, for
22 example, you know, by putting your arm under his or
23 using two hands?

Page 109

1   A. I needed one hand clear.
2   Q. Because you wanted to be able to draw your
3 gun and shoot?
4   A. I needed my hand clear in case that had
5 happened, yes. If he kept -- continued, yes. He
6 escalated the force. I escalated the force.
7   Q. So what would have happened, in your mind, if
8 Mr. -- Officer Rhodes had gotten tased in the
9 testicles?
10      MR. WHITE: Object to the form.
11   A. That's an if, I can't say it -- I -- I feel
12 like Officer Rhodes would have gone down.
13   Q. You think that somebody would go down because
14 they get a Taser in the testicles?
15   A. I got a live Taser, we'll try it. I don't
16 know. I would think so. I would think that on such
17 a tender body part that that would be devastating
18 pain -- pain-wise.
19   Q. So if I kick somebody, a police officer, in
20 the balls, do you get to shoot me in the head?
21      MR. WHITE: Object to the form. I
22 instruct the witness not the answer to such a
23 ridiculous question.

Page 110

1   Q. No, seriously, if I --
2      MR. WHITE: I'm telling her to say no --
3   Q. I'm going to ask you -- I'm going to ask --
4      MR. WHITE: No, you rephrase or she's not
5 answering.
6   Q. I'm going to ask somebody --
7      MR. WHITE: You rephrase --
8      MR. SHERROD: I am.
9      MR. WHITE: -- Or she's not going to
10 answer.
11   Q. (By Mr. Sherrod) So if I -- let me -- let's
12 just take this to its full limits, Officer Woodruff.
13 Are you saying that if I get in a good -- like, a
14 good hit on an officer in a fight. Even though I
15 don't have a gun, even though, you know, I haven't
16 tried to get anybody else's gun, that you can
17 execute that person?
18      MR. WHITE: Object to the form.
19   A. I don't think "execute" is a proper word.
20   Q. Shoot them?
21   A. It depends on the damage that's done.
22 Whether or not the officer has become incapacitated.
23   Q. Right. You could have waited -- if there had

Page 111

1 been an incapacitation, you could have then shot
2 Mr. Lawrence; right?
3   A. I don't follow.
4   Q. You could have stepped back, for example,
5 seen what happened and shot Mr. Lawrence if
6 something actually happened; right?
7   A. He was let go at one point and tased and his
8 response was, "Is that all you got?"
9   Q. He didn't say, Please kill me, did he?
10      MR. WHITE: Object to the form.
11   A. This is ridiculous.
12   Q. No, seriously, Ms. Woodruff, he didn't say
13 anything to indicate that, you know, that he wanted
14 to die; right?
15   A. That's correct.
16   Q. And he wasn't warned that this was actually a
17 risk he was taking by resisting arrest?
18   A. When a police officer gives you a command,
19 it's generally acceptable to obey that command.
20   Q. And if you don't, what?
21   A. You don't know.
22   Q. You may get shot?
23   A. Depends on the circumstances.

Page 112

1   Q. You may get shot?
2   A. Yes, you may get shot.
3   Q. Can we agree that there was no -- it was a
4 multistep process before there would have been any
5 incapacitation?
6      MR. WHITE: Object to the form.
7   A. Any incapacitation on --
8   Q. Well, if I understand correctly, your
9 incapacitation theory is that --
10      MR. WHITE: Object to the form.
11   Q. Your incapacitation fear was that
12 Mr. Lawrence, now gripping the Taser, would --
13 despite your efforts and the assistance of Officer
14 Skipper -- would be able to get that -- and Officer
15 Rhodes, he would be able to get that Taser between
16 Officer Rhodes's legs; right?
17   A. He already had it there.
18   Q. And that, as a result, Officer Rhodes would
19 become incapacitated due to the pain to his tender
20 testicles?
21   A. He may drop. If he dropped -- if he dropped
22 down, now he's giving another weapon to
23 Mr. Lawrence.

Page 113

1    Q. What weapon is that?

2    A. His -- Officer Rhodes's duty weapon.

3    Q. That was -- ultimately the only way you were

4 in fear of serious bodily injury from Mr. Lawrence

5 was if Officer Rhodes was incapacitated and then

6 Mr. Lawrence was unable to get his duty weapon?

7    A. No.

8    Q. Well, I mean, pain -- the pain --

9    A. During which part?

10    Q. Excuse me, the pain from a Taser in Drive

11 Stun mode does not cause serious bodily injury, does

12 it?

13    A. Well, people will say that -- people --

14 people will say that a half a second of it hurts

15 like hell.

16    Q. I certainly believe that it hurts like the

17 devil. But hurting like the devil, it doesn't leave

18 any permanent injury, does it?

19    A. No, I don't guess it does.

20    Q. Shooting somebody has a -- causes serious

21 bodily injury; right?

22    A. Yes.

23    Q. It can cause death; right?

Page 114

1    A. It can.

2    Q. So the only -- there was no risk to you or to

3 Officer Rhodes or Officer Skipper of serious bodily

4 injury or death just from that Taser, was there?

5    A. Wrong.

6    Q. How?

7    A. You're talking about looking ahead. We have

8 to be able to anticipate. Mr. Lawrence's actions

9 did not seem rational. His statements weren't

10 rational. He made comments that triggered something

11 about a class that I had taken. About

12 sovereign citizens. When he handed me his affidavit

13 of identity, that made me pretty sure that's

14 probably what he was.

15       Through my training, I was taught that these

16 people are -- they don't recognize authority.

17 They're dangerous. They don't -- particularly

18 towards law enforcement.

19    Q. You were already in fear of your life because

20 you believed he was a sovereign citizen?

21    A. I felt there was a threat -- a possible

22 threat there.

23    Q. You were on -- so, but -- just going back

Page 115

1 to finish this up and we can take a lunch break. I

2 see Lenn getting his coat on.

3       MR. WHITE: I'm just cold.

4    Q. But can we agree that it's speculative to say

5 that Mr. Lawrence would have been able to cause

6 enough pain to cause Officer Rhodes to drop and then

7 would have been able to take advantage of that

8 enough to get Officer Rhodes's duty weapon?

9    A. He could have.

10    Q. But that's speculation; can we agree to that?

11    A. He could have.

12    Q. Can we agree that that's speculation?

13       MR. WHITE: Object to form. She's

14 answered. She said he could have.

15    Q. Say no. Can you agree that that's

16 speculative?

17    A. No.

18    Q. That's the reason you feared for your life

19 because you feared that Mr. Lawrence -- everything

20 you knew about him -- he would get Officer Rhodes's

21 duty weapon; right?

22       MR. WHITE: Object to the form.

23    A. Or another weapon. I didn't know where his

Page 116

1 gun was.

2    Q. But that wasn't a rational fear, was it?

3       MR. WHITE: Object to the form. She said

4 that's what she feared.

5    Q. Fear is often irrational isn't it --

6       MR. WHITE: He said he had it.

7    A. He said he had one; I just didn't know where

8 it was.

9    Q. Ms. Woodruff, you know it was in the car;

10 right?

11    A. Yeah, but he had been in the car and back out

12 again, I didn't know if he got it.

13    Q. I thought we already -- are you back to --

14 are you saying you shot him because you thought he

15 might have a gun?

16    A. No, sir.

17    Q. Okay. So let's stick with the objective

18 facts that are related --

19       MR. WHITE: Object to the form. In the

20 classification it's objective fact that he -- your

21 decedent, said he had a gun.

22    Q. Officer Woodruff?

23    A. Yes, sir.

Page 117

1    Q.  We can agree that the danger, immediate
2  danger, from the Taser -- even assuming that it was
3  in Mr. Lawrence's hand equipped for him to fire --
4  was pain; right?
5    A.  Extreme pain.
6    Q.  Yup.  You were causing -- Mr. Lawrence was
7  surrounded by at least three officers; right?
8    A.  I didn't know Renee was standing there.
9    Q.  There were two there; right?
10   A.  There were two?
11   Q.  You could have -- you had a number of options
12  available to you in this situation with Mr. Lawrence
13  other than shooting him; right?
14   A.  No.
15   Q.  You could have kept fighting with him over
16  the Taser; right?
17   A.  No.  I lost that fight.
18   Q.  Right, but you could fight to get it back.  I
19  mean, he's there -- the Taser's there to grab again;
20  right?
21   A.  Yes, and Officer Skipper did grab it again.
22   Q.  Right.  And you could have helped grab it
23  again; right?

Page 118

1    A.  I didn't know whose hands they were.
2    Q.  You knew it was Officer Skipper's or somebody
3  like her to help you; right?
4    A.  I figured it was somebody to help me.  I
5  didn't know it was Officer Skipper.
6    Q.  And so you could have worked with them to
7  take the Taser away before shooting him; right?
8    A.  I could have called in sick that day.
9    Q.  You could have physically tried to assist
10  Officer Rhodes; right?
11   A.  I was.  I did.
12   Q.  Well, I mean, I believe all you did was apply
13  the Drive Stun --
14       MR. WHITE:  I'm going to object to
15  arguing and debating with the witness.  You may ask
16  the question.
17       MR. SHERROD:  I'm asking.
18       MR. WHITE:  No, you didn't ask.  You told
19  her what she did.
20       MR. SHERROD:  It's called
21  cross-examination.
22       MR. WHITE:  No, it's not.  It's called
23  testifying.  It's called not asking a question.

Page 119

1  We're here for you to ask questions and that's all.
2    Q.  Ms. Woodruff?
3    A.  Yes, sir.
4    Q.  Did you ever try to physically assist Officer
5  Rhodes?
6    A.  Yes.
7    Q.  How?
8    A.  By getting ahold of an arm and pulling an arm
9  out to help Officer Rhodes get his arms behind his
10  back.
11   Q.  Okay.  And when was that in the incident?
12   A.  When Officer Rhodes and Mr. Lawrence were
13  against the car the first time.
14   Q.  Before --
15   A.  Yeah.
16   Q.  So at the time they're at the car before --
17  in the moments before you shot Mr. Lawrence, once
18  he's pinned up against the car in a bear hug by
19  Officer Rhodes, did you do anything to physically
20  assist Officer Rhodes?
21   A.  I tased him.
22   Q.  Okay.  Anything else?
23   A.  No.

Page 120

1    Q.  Have you been trained to apply, like, use
2  leverage, you know, on people's arms?
3    A.  Yes.
4    Q.  To -- to --
5    A.  But you have to have the whole arm to do it.
6    Q.  And if you let go of the arm then you can't;
7  right?
8    A.  Officer Rhodes had him -- had him at the
9  upper arms.
10   Q.  Well that really limited what Mr. Lawrence
11  could possibly do; right?
12   A.  Yeah, it was enough to try to reach out and
13  try to grab the Taser away from me repeatedly.
14   Q.  The only part of Mr. Lawrence that Officer
15  Rhodes didn't have under control, I guess, was his
16  lower arms.
17   A.  It was just the tops of his arms.  I think it
18  was wrapped up better on Mr. Lawrence's right side
19  than he was his left.
20   Q.  So basically Mr. Lawrence had his lower left
21  arm --
22   A.  It was free.  It was free.
23   Q.  That was free; right?

Page 121

1   A. Yes.
2   Q. And you put a Taser on him; right?
3   A. I did.
4   Q. And he used that free arm to grab the Taser;
5   right?
6   A. Yes.
7   Q. Officer Skipper came in to help you -- help
8   get the Taser away from him; right?
9   A. Yes.
10   Q. You then took your hand away and drew your
11   gun and shot him; right?
12   A. Yes.
13       MR. WHITE: You ready?
14       MR. SHERROD: This is as good a time as
15   any. It's 12:00, almost on the nose if I'm reading
16   my computer correct.
17       (Lunch break taken.)
18   Q. (By Mr. Sherrod) Who is the psychiatrist
19   that prescribed your medication right now?
20   A. John Chris Strunk.
21   Q. And where is he?
22   A. He is on Belmont. He is at
23   Wiregrass Wellness clinic.

Page 122

1   Q. And how long have you been seeing him?
2   A. Shortly after the incident I started seeing
3   him.
4   Q. Have you seen any other psychiatrist other
5   than him and the police psychiatrist? That may be
6   the wrong characterization, but the person who
7   evaluates police officers?
8   A. Yes.
9   Q. Who else have you seen?
10   A. Leona Graham.
11   Q. And when did you see her?
12   A. I saw her before I started seeing
13   Chris Strunk. So it was close to right after the --
14   right after the shooting. I saw her first.
15   Q. Any other psychiatrist that you've seen?
16   A. No.
17   Q. Okay. So you saw the two you just named and
18   then the police person who saw you once?
19   A. The psychologist.
20   Q. The psychologist. So you -- two
21   psychiatrists, one psychologist, and you named your
22   counselor -- therapist?
23   A. Yes.

Page 123

1   Q. Have you seen anybody else related to your
2   trauma from this incident?
3   A. No.
4   Q. How is your, I guess, progress in recovering
5   from your PTSD going?
6   A. It was going better until this came up.
7   Q. Has the lawsuit exacerbated it?
8   A. Yes.
9   Q. I'm sorry about that.
10   A. Thank you.
11   Q. Who was the first person that you talked to
12   about what happened, you know, outside of the
13   immediate aftermath? So I want to -- I think
14   there's some discussion with Officer Rhodes. I'm
15   sure there's maybe some other statements by you that
16   are recorded, maybe not. I'm sure you had brief
17   conversations with people, you know, that day on the
18   scene and we may go back to those. But let's just
19   say after the immediacy and all the -- when was --
20   who was the next person you talked to? Like maybe
21   you sat down in an office with, in a conference room
22   with?
23   A. My lawyer -- the lawyer.

Page 124

1   Q. Did somebody in your chain of command suggest
2   that you contact a lawyer?
3   A. No.
4   Q. Did anybody?
5   A. Yes.
6   Q. Who did?
7   A. One of the guys in the police union.
8   Q. So at some point you contacted the police
9   union person?
10   A. Yes.
11   Q. Who was that?
12   A. I think I contacted Chris -- what is
13   Chris's -- this is terrible. What is his last name?
14   He works traffic. I can't remember his last name.
15   It's terrible. Two and a half years and I can't
16   remember the guys I worked with.
17   Q. He's a police officer too?
18   A. Yes.
19   Q. So what's the union?
20   A. It is basically for things like this.
21   Q. Is it something you have to sign up for?
22   A. Yes.
23   Q. Is it FOP?

Page 125

1   A. No.

2   Q. Okay. So, I mean, do you have, like, a -- is

3   there a union contract with the City?

4   A. Not -- not with the City. Because the City

5   doesn't really recognize it, I don't think.

6   Q. So what benefits do you get from this union?

7   A. Legal assistance when needed.

8   Q. Do you pay a fee?

9   A. You pay dues.

10   Q. And I don't know if it's a same outfit or

11   not, but there's at least one where you would -- you

12   might get a card and it gives you a number to

13   contact if you're -- there's any --

14   A. I don't remember if they gave me a card or

15   not. It's been so many years.

16   Q. Oh, before I forget, do you have any tattoos?

17   A. Yes.

18   Q. I think one -- at least one showed on the

19   video, but what tattoos do you have?

20   A. I have an American flag on my right arm. I

21   have the Latin words, "auribus tenere" on my right

22   arm. I have a dragon --

23   Q. Let me stop you. What do those mean, words

Page 126

1   mean?

2   A. There's really no direct translation, but it

3   is basically, living your life by your actions and

4   not by your words.

5   Q. So I think there's an English saying of some

6   sort like, "Actions speak louder than words." This

7   would be akin to that?

8   A. It's akin to it, yes.

9   Q. And then you were going -- a dragon you said?

10   A. I have a dragon and a castle.

11   Q. And where are those?

12   A. On my upper right arm.

13   Q. And what significance are those to you?

14   A. I like dragons.

15   Q. Don't we all. I like dragons. Do you watch

16   Game of Thrones?

17   A. Absolutely.

18   Q. Okay. We could probably connect on dogs and

19   Game of Thrones.

20        MR. WHITE: I'm going to Dragon Con on

21   Saturday.

22        MR. SHERROD. If it was here I'd be

23   taking my 15-year-old.

Page 127

1        MR. WHITE: I'm taking my daughter.

2        MR. SHERROD: If it was where I lived I'd

3   be taking my 15-year-old. But anyway.

4   A. Now we have an ice dragon.

5   Q. An ice dragon? Yeah, that's crazy.

6        Now, so what about the castle?

7   A. Yeah, I have a castle.

8   Q. Does the castle have any particular

9   significance to you?

10   A. No, it just goes with the dragon.

11   Q. Do you do any role-playing games, like,

12   computer stuff?

13   A. No.

14   Q. World of Warcraft, anything like that?

15   A. No.

16   Q. Read fantasy novels and stuff?

17   A. No.

18   Q. Just like dragons and castles?

19   A. Just like dragons and castles.

20   Q. Good deal.

21   A. And I have a great white shark on my left

22   forearm and I have a pirate up here.

23   Q. On your upper left arm?

Page 128

1   A. Yes.

2   Q. What significance are those to you?

3   A. Just the sea. The ocean.

4   Q. I mean, pirates are somewhat symbols of, I

5   guess, antiauthority, I would think.

6   A. It was just in fun. I mean, this wasn't

7   expressing an opinion. It was just -- just a

8   pirate.

9   Q. Well, you're obviously --

10   A. I was at Panama City at one time and --

11   Q. And alcohol was involved?

12   A. No.

13   Q. No, okay. Well, any others?

14   A. That does it. Oh, I have Harley Davidson --

15   I have Harley Davidson wings. It's like Harley

16   Davidson right back here.

17   Q. And how many motorcycles do you have?

18   A. One.

19   Q. And I assume it's a Harley?

20   A. Yes.

21   Q. And what kind of Harley?

22   A. Softail Custom.

23   Q. I'd be lying if I said -- if I really knew --

Page 129

1 said I really knew what that meant, but Chris knows
2 I bet.
3    A.  Yeah, it's Custom.  Doesn't mean it was
4 custom built.  That's actually the name of the bike.
5    Q.  Gotcha.  So have you been -- had your
6 performance reviewed on a roughly annual basis since
7 you've been a police officer?
8    A.  Oh, yes.
9    Q.  Were there ever any documented issues with --
10 I don't have your performance reviews right now.
11 Until I get them I can't really question in detail,
12 but do you recall any documented performance issues?
13    A.  Performance -- performance, no.
14    Q.  So what was documented that you don't
15 consider performance but apparently might be
16 considered negative, if anything?
17    A.  Negative.  I was written up, which was just a
18 verbal -- basically a verbal warning, but it was in
19 writing.  But it was a very minor -- minor incident
20 they referred to it.  And it was about making a
21 comment about a coworker.  And I was suspended for a
22 Facebook violation.  Wrote something on Facebook I
23 shouldn't have.  For a day -- suspended for one day.

Page 130

1 And --
2    Q.  Was that the same write-up or two different
3 write-ups?
4    A.  Those were two different write-ups.
5    Q.  So I want to put aside write-ups.  And they,
6 may be mentioned in your performance review but, I
7 guess, do you recall anything negative being
8 documented in your performance evaluations, let's
9 just say, in the last decade, I don't know --
10    A.  No.  No, I had -- I had very good
11 evaluations.
12    Q.  Nobody ever expressed any concern about your
13 physical ability to handle the job?  For example,
14 related to some of these complaints you've made
15 about your various medical ailments?
16    A.  No.
17    Q.  You never communicated to anybody that you
18 were concerned about your ability to do the job due
19 to those medical conditions?
20    A.  No.
21    Q.  So would it be fair to say that your medical
22 retirement was really because of the PTSD?
23    A.  It was based on that and my other physical

Page 131

1 problems.  It was just a conglomeration of all of
2 it.
3    Q.  So in terms of write-ups, what was the
4 Facebook write-up about?  Like, what did you post to
5 Facebook?
6    A.  I posted -- you remember I told you the
7 phones at the shelter were acting up that day of the
8 shooting, we were having problems with our phones.
9 And I made a comment about -- I repeated something
10 that someone from IT had said on there.  And I
11 shouldn't have.  It was -- you know, it was
12 derogatory towards the City and, well, it was an
13 embarrassment for the City and derogatory towards
14 the employee.  So I shouldn't have done it.
15    Q.  When did you post that?  Was that before you
16 after the incident?
17    A.  It was before.
18    Q.  How long before?
19    A.  A couple months.
20    Q.  So what did you say about a coworker that got
21 some sort of verbal warning written up?
22    A.  One of my friends owns a -- it was another
23 police officer -- he doesn't work here now.  His

Page 132

1 family owns a store here in Dothan, and this
2 employee's husband had written a bad check and I
3 mentioned it.
4    Q.  Okay.  I can't keep that -- so you mentioned
5 the bad check by the husband, to who?
6    A.  To some staff in the jail.
7    Q.  Was it, like, mentioned in a derogatory way
8 about the person?
9    A.  Yes.
10    Q.  Is that what you got in trouble for?
11    A.  Yeah.  Yes, sir.
12    Q.  And it was about a co-worker's husband?
13    A.  Yes.
14    Q.  And to whom did you make this comment?
15    A.  I can't remember who it was that was in the
16 jail at the time.
17    Q.  Was there a particular reason why you were,
18 you know, motivated to say something about this
19 co-worker's husband?
20    A.  I just didn't like him.
21    Q.  And who's the coworker?
22    A.  Judge Rose Gordon.
23    Q.  Is this person a judge?

Page 133

1   A. Yes, sir.
2   Q. This is the --
3   A. City judge.
4   Q. City judge?
5   A. Yes.
6   Q. So this is the city judge's husband?
7   A. Yes.
8   Q. Any other negative items in your personnel
9  history with the City other than the Facebook and
10  the comment regarding Judge Rose Gordan's husband's
11  bad check?
12   A. I can't remember if there's anything else.
13   Q. So as far as you can recall you've never
14  received any kind of negative personnel action, even
15  a verbal, for anything related to your work as a
16  police officer as opposed to personal conduct?
17   A. Oh, no.
18   Q. Have you shot anybody else?
19   A. No, sir.
20   Q. Have you ever drawn your weapon, your service
21  weapon before?
22   A. Yes, sir.
23   Q. Have you ever fired it?

Page 134

1   A. No, sir.
2   Q. Have you -- strike that -- so do you know if
3  there was a shooting review board evaluation
4  conducted in this case?
5   A. A review board?
6   Q. The policy, that I see, mentions some kind of
7  shooting review board. I mean, I -- do you know if
8  there is such a thing?
9   A. I don't know.
10   Q. Have you been involved in any other lawsuits?
11   A. Yes, sir.
12   Q. What lawsuits have you been involved in?
13   A. I was sued by a deaf guy for not calling in
14  an interpreter.
15   Q. And what happened with that?
16   A. I'm not sure what the outcome was. I think
17  it was dismissed.
18   Q. And was this -- what's the timing of that
19  incident?
20   A. Oh my, it was early 90's, I think.
21   Q. Okay. Any other lawsuits that you have been
22  a party to?
23   A. I gave deposition in a case that they ended

Page 135

1  up withdrawing their suit.
2   Q. What type of case?
3   A. Def- -- some -- defamation -- wrongful
4  arrest -- wrongful arrest is what I think it was.
5   Q. Were you accused of wrongfully arresting the
6  person?
7   A. Yes.
8   Q. And when was this lawsuit?
9   A. That again was sometime back --
10   Q. Back how far?
11   A. Oh, probably before 2000. Yes, it was
12  before -- it was before. No, it was between 2000
13  and 2003. I was working in CID.
14   Q. Do you know the name of the person who sued
15  you?
16   A. I can't remember his name.
17   Q. Any other lawsuits that you have been a party
18  to?
19   A. No, sir.
20   Q. Did you give depositions in any cases other
21  than the one you mentioned?
22   A. I gave depositions in both of those.
23   Q. Any others?

Page 136

1   A. I've given depositions for traffic accidents.
2  Simple stuff.
3   Q. Anything other than traffic accident-type
4  situation and those two cases where you've given
5  depositions?
6   A. No, sir.
7   Q. When was the last time you physically took
8  somebody into custody?
9   A. It was before I went to the shelter. When I
10  was still on the street. I went to the shelter in
11  2010.
12   Q. Since you went to the shelter in 2010, have
13  you been involved in any physical incidents of any
14  kind as a police officer before Mr. Lawrence was --
15  you shot him?
16   A. No, sir.
17   Q. How common is it for you to have -- was it
18  for you to have to call for somebody as backup at
19  the animal control?
20   A. Never.
21   Q. So there have never been any other incidents
22  like this one?
23   A. No, sir.

# TAB 44-4

Page 137

1    Q. Not even a milder version of it?
2    A. I mean, people get mad when their dogs get
3 picked up but nothing like this.  Nothing.
4    Q. Well have you ever called for backup for
5 somebody to come arrest somebody?
6    A. No, sir.
7    Q. So when did you receive training about
8 sovereign citizens?
9    A. I can't remember the date, but it's been a
10 number of years.
11   Q. Do you know who the training was by?
12   A. No.
13   Q. Have you looked at your personnel file?
14   A. Recently, no.
15   Q. When was the last time you looked at your
16 personnel file?
17   A. From the personnel department or are you
18 talking about my training?
19   Q. Either one.
20   A. Before -- long before -- I don't think I've
21 ever looked at my personnel file in the personnel
22 department.  Training file we went through probably
23 a couple years before I retired.  They were trying

Page 138

1 to clean out some of the junk that was in there.
2    Q. Do you know if this sovereign citizen
3 training is reflected in your training file?
4    A. I don't think it is.  I don't remember seeing
5 a piece of paper that was in there.  It was just a
6 class.  We don't get certificates for all classes
7 you attend.
8    Q. All right.  I assume you have to qualify with
9 your weapon on a yearly basis?
10   A. Twice a year.
11   Q. Twice a year.  So when did you last qualify
12 with your weapon before the incident?
13   A. A few months.  A couple months.  They usually
14 do it in spring and fall.  So it was probably around
15 October.
16   Q. So it was before 2010 the last time you drew
17 your weapon; right?  In the line of duty?
18   A. Yes.
19   Q. It was before 2010 the last time you were in
20 a physical arrest situation?
21   A. Yes.
22   Q. It was before 2010 the last time you carried
23 a Taser?

Page 139

1    A. I started out carrying one when I went to the
2 shelter, but then I stopped.  Now, if I can -- I
3 have to back up here.  I made an arrest off-duty and
4 I think that was after 2010.
5    Q. What were the circumstances of an off-duty
6 arrest?
7    A. I knew -- I knew her and I knew that there
8 was a warrant for her arrest out of Dale County, and
9 I saw her and I detained her until they could come
10 and pick her up.  But I handcuffed her and sat her
11 down on the curb.
12   Q. Do you carry your weapon now?
13   A. Some --
14   Q. Like on a --
15   A. Sometimes.
16   Q. I mean, do you open carry?
17   A. No.
18   Q. Do you have a concealed permit?
19   A. No.
20   Q. Are guns part of your hobbies?
21   A. No.
22   Q. Like, have you shot your gun since you went
23 on medical retirement?

Page 140

1    A. No.
2    Q. It is your personal gun though at your home I
3 assume?
4    A. Yes.
5    Q. Do you own any other guns?
6    A. Yes.
7    Q. What other guns do you own?
8    A. I have a 9-millimeter handgun.
9    Q. Any others?
10   A. No.
11   Q. Did the off-duty arrest involve any kind of
12 physical fight or confrontation?
13   A. No.
14   Q. Before 2010 -- let me ask this:  Have you
15 ever been injured on the job?
16   A. Yes.
17   Q. How have you been injured on the job?
18   A. I got in a big fight that -- the lawsuit --
19 the one lawsuit came out of with the deaf man.  I
20 was injured there.
21   Q. Injured by who?
22   A. Him.
23   Q. So what happened with the deaf man?

Page 141

1   A. Which part? Start to finish? Or --
2   Q. I guess, just a brief summary.
3   A. They were actually -- both of them were deaf.
4 The two men that had the dispute and I was called to
5 the restaurant. And when I got there the
6 complainant told me that the other guy, that was
7 Douglas McCray, that Mr. McCray pulled into the
8 restaurant, and his kid opened the car door into his
9 antique Corvette and chipped the paint. That's what
10 he had called the police for. And I went over and
11 tried to talk to him. Explain to him why we were --
12 why we were there, the other guy called us and he
13 went, like -- and so I started writing notes and
14 he'd write back. And he went -- so he had his
15 children with him, and his little girl said, "He can
16 talk". And I said, "Why won't he talk to me?" "I
17 don't know, but he can talk." I asked him if he
18 would stand up and come outside per my supervisor.
19 And as soon as I put my hand on him the fight was
20 on.
21   Q. You put your hand on him why?
22   A. My supervisor told me to bring him outside.
23   Q. Did that case result in a published opinion,

Page 142

1 like, I think there's a McCray City of Dothan case?
2   A. I think.
3   Q. Is that a yes?
4   A. I believe so.
5   Q. I mean, you know, some of the facts ring a
6 bell. I don't remember all the details. So what --
7 how were you injured in that fight?
8   A. Douglas threw me on top of a table that I
9 broke. He picked me up again and he threw me into
10 the salad bar. I was transported to the hospital in
11 an ambulance.
12   Q. Okay.
13   A. Yes, I've been hurt -- I mean, that's -- you
14 know, you get hurt.
15   Q. Any other incidents where you'd been hurt in,
16 you know, by a -- somebody that you were dealing
17 with, you know, as a police officer? Like, I'm not
18 interested if you had a car wreck. I'm asking if
19 you --
20   A. Yeah. You get bumped and banged up all the
21 time when you're on the street and people resisting
22 and struggling and -- you get hurt. But it's -- I
23 was -- I was beaten badly by one woman in the early

Page 143

1 90's. So sure. I'm not afraid to get hurt. That's
2 part of the job.
3   Q. So you're sent to the hospital by Mr. McCray?
4   A. Yes.
5   Q. You -- were you sent to the hospital by the
6 woman who beat you up?
7   A. Yes.
8   Q. McCray City of Dothan. The decision is in
9 2001 so the incident must have been in the 1990's,
10 I'm guessing, the incident; is that right?
11   A. Probably. Yes, I was still on the street.
12 Probably in CID.
13   Q. 1997 it says.
14   A. Okay.
15   Q. And, roughly, when were you beaten up by this
16 woman?
17   A. It was in the early 90's.
18   Q. And how did that happen?
19   A. Domestic dispute between she and her mother.
20   Q. I think I asked this, but I didn't listen to
21 the answer. Did you go to the hospital when the
22 woman beat you up?
23   A. Yes.

Page 144

1   Q. And what were your injuries?
2   A. Contusions all over my face.
3   Q. Did you take the woman into custody?
4   A. My backup ended up coming in the house and
5 cuffing her.
6   Q. Did you take Mr. McCray into custody or did
7 your backup?
8   A. My backup. I went to the hospital.
9   Q. Any other incidents where you have been
10 injured?
11   A. Like I said, police officers get --
12   Q. Any significant -- memorable -- I mean,
13 obviously, you get beaten up by a woman you go to
14 the hospital, memorable. Mr. McCray, you broke a
15 table, threw the salad bar and there's a lawsuit,
16 memorable. Anything significant like that?
17   A. I got in a fight when I was in plain clothes
18 when I was working in CID. I got in a fight with a
19 shoplifter at CVS Pharmacy at the corner of Main and
20 Park. I was with my partner, Joe Johnson.
21   Q. Did he take her into custody?
22   A. Him.
23   Q. Him into custody?

Page 145

1  A. Yes.
2  Q. Were you hurt in that fight?
3  A. I went to the hospital, yes.
4  Q. Just bruises and stuff again?
5  A. Yes, I had recently had neck surgery.
6  Q. When did you have neck surgery?
7  A. I've had two. Had one in 2000 and one in
8  2001.
9  Q. Since -- did you have -- was the neck surgery
10  related to what happened to you in the McCray
11  incident?
12  A. I felt like it was but there was, you know,
13  no proof at the time.
14  Q. Would it be fair to say that since 2000 you
15  really haven't been in a serious physical
16  confrontation with anybody since your first neck
17  surgery?
18  A. I don't know if that's a fair assessment or
19  not.
20  Q. Well, I'm asking -- I don't mean to, you
21  know --
22  A. I'm not sure.
23  Q. I was thinking that somebody might naturally

Page 146

1  try to avoid situations --
2  A. I'm not -- I'm not sure.
3  Q. Was your -- after your neck surgeries, were
4  you put into a position where you wouldn't have to
5  work on the street?
6  A. No, they fixed it.
7  Q. So when were you in CID?
8  A. 2000 until 2003.
9  Q. And why did you leave CID?
10  A. Burned out.
11  Q. Why do you think you burned out in CID?
12  A. Too big a case load.
13  Q. Did your medical retirement, at 24 and a half
14  years, did that -- would you have gotten more if you
15  made it to 25 years?
16  A. I don't know.
17  Q. Well, most people in my experience that are
18  on the State retirement pay attention to certain
19  years because you get into another bracket of
20  payment. Is that not the case in your retirement?
21  A. I'm not sure. I just know that they said I
22  needed -- I needed to go. My doctors.
23  Q. So you had --

Page 147

1  A. The doctor that examined me physically and my
2  psychiatrist.
3  Q. You didn't -- I mean, did you want to go?
4  A. I was ready, yes.
5  Q. What doctor evaluated your physical
6  condition?
7  A. I can't remember his name. Social security
8  sent me there.
9  Q. So this was after you applied for social
10  security?
11  A. Yes.
12  Q. So you applied for social security before you
13  applied for medical retirement -- took medical
14  retirement with the City?
15  A. I kind of did them both at the same time. I
16  think it's Nathanael Medical Center something on
17  Main Street. It's the one that social security
18  uses.
19  Q. So who has been your treating physicians in
20  the last five years?
21  A. Fiona Masters and Dr. Spedale, Tony Spedale.
22  Q. And what do they treat you for, those
23  doctors?

Page 148

1  A. Just basic stuff. They're internists.
2  Q. Are they in a practice together?
3  A. No.
4  Q. So how do you know whether to go to one or
5  the other?
6  A. I went to Dr. Spedale until he started a new
7  program that you had to pay so much per year just to
8  retain him as a physician. So I looked for another
9  doctor.
10  Q. On December 30, 2014, were you on any
11  medications? That would be the date of the
12  incident.
13  A. Yes. Yes.
14  Q. What medications were you taking?
15  A. If I remember that far back. Toprol, been
16  taking that for years.
17  Q. Anti-inflammatory?
18  A. No, it's a --
19  Q. Blood pressure?
20  A. It's a beta blocker.
21  Q. Beta blocker, yeah.
22  A. Lipitor, aspirin, I take a baby aspirin every
23  day. Mirapex, I've been taking that one for years.

Page 149

1  That's for restless leg syndrome.  I can't remember
2  what the others -- I may have been on one stomach
3  medicine or another.  I have a lot of stomach
4  issues.
5      Q.  Did you consider yourself to be in good,
6  fair, poor, what health in December 2014?
7      A.  Good.  Despite my problems, I still felt
8  good.
9      Q.  You ever have any injuries to your wrists or
10  hands or anything?
11     A.  Yes.
12     Q.  When?
13     A.  2008.  Motorcycle wreck.
14     Q.  What happened to your -- what injuries did
15  you have?
16     A.  Smashed my wrist.
17     Q.  Your left wrist?
18     A.  Yes.
19     Q.  To your right hand -- were you -- are you
20  right-handed or left-handed?
21     A.  Both.
22     Q.  So you're ambidextrous?
23     A.  Sort of.  I do different things with

Page 150

1  different hands.
2      Q.  Which hand did you use to fire the Taser?
3      A.  My right hand.
4      Q.  So have you had any injuries to your right
5  hand?
6      A.  No.
7      Q.  Any issues with your grip strength in your
8  right hand on December 30, 2014?
9      A.  No.  I have had carpal tunnel on both --
10  carpal tunnel release on both hands.
11     Q.  You have had that; right?
12     A.  Yes.
13     Q.  And that was effective; right?
14     A.  Oh, yes, sir.
15     Q.  So there were no problems with your grip
16  strength or --
17     A.  No.
18     Q.  -- with your right hand on December 30, 2014?
19     A.  Right.
20     Q.  In fact I would think that good hand strength
21  is required to work on motorcycle; is that correct?
22     A.  It is.
23     Q.  Would you say that you have above average

Page 151

1  hand strength for a woman?
2      A.  Probably.  I'm the one that gets to open the
3  pickle jars.
4      Q.  That is what inevitably happens.  I broke my
5  right wrist.  I'm off jar-opening duty.
6      A.  Yeah.
7      Q.  So other than the fight with the woman, the
8  McCray fight, and the fight with the shoplifter,
9  have you been in any other significant fights as a
10  police officer in the -- you know, any others that
11  you can recall?
12     A.  I remember a pretty bad fight over at McCray
13  Homes, rolling around on the railroad tracks.  A guy
14  was trying to shoot me.
15     Q.  And what happened with that?
16     A.  I got him under control.  When I stood him up
17  the gun fell out of his sleeve.
18     Q.  So you never knew that he tried -- that he
19  had a gun until afterward?
20     A.  Right.
21     Q.  And he didn't actually point the gun at you?
22     A.  He kept trying to reach up his sleeve.
23     Q.  Any others?

Page 152

1      A.  No, sir.  Not that I can think of.
2      Q.  Would you agree that the most significant
3  physical incidents that you participated in were the
4  McCray incident and the incident where the woman
5  beat you up?
6      A.  And Mr. Lawrence.
7      Q.  And Mr. Lawrence.  But the two most
8  significant incidents before Mr. Lawrence were
9  Mr. McCray in 1997; right?
10     A.  Right.
11     Q.  And the woman who beat you up was a little
12  earlier or --
13     A.  Yeah, it was earlier.  Probably somewhere
14  around 1994.  '93, '94.
15     Q.  You went to -- what led you to go into CID?
16     A.  I requested it.
17     Q.  What were you doing in the -- so -- you were
18  working patrol in 1997 when the McCray incident
19  happened?
20     A.  Yes.
21     Q.  And did you return to patrol after that?
22     A.  Not immediately, no.
23     Q.  How long was it before you returned to

Page 153

1 patrol?

2    A.  About a year.

3    Q.  Were you -- was that because of how the
4 incident impacted you?

5    A.  No.

6    Q.  Why -- why did you -- what was it -- did it
7 take you a year to go back to your role on patrol?

8    A.  I had been transferred to the court liaison
9 and warrants.  The workload was tremendous and I was
10 answering to Judge Gordon, which didn't seem like a
11 real good thing to do.

12    Q.  So what are your issues with Judge Gordon?

13    A.  That was the check issue with her husband.

14    Q.  Right.  So you didn't like her before that
15 so --

16    A.  No, I just -- personality conflict.

17    Q.  She mistreated you?

18    A.  No.

19    Q.  What didn't you like about her?

20    A.  I don't -- she just struck me wrong.  I just
21 didn't like her.

22    Q.  Did you ever have to -- did she ever
23 criticize your work as a police officer or question

Page 154

1 your integrity as a police officer when you were in
2 her court?

3    A.  Not mine.

4    Q.  Did she question other officers?

5    A.  Yeah.

6    Q.  Was that part of the --

7    A.  Yes.

8    Q.  -- reason that you had an issue with her?

9    A.  Possibly.

10    Q.  You thought she didn't respect law
11 enforcement enough?

12    A.  I don't know if that was it or not.  I'm not
13 sure.

14    Q.  So you asked for a transfer out of the court
15 liaison?

16    A.  Correct.

17    Q.  Where did -- did you request any particular
18 transfer?

19    A.  I asked to go back to patrol.  I missed it.

20    Q.  And you went back to patrol.  And any changes
21 after you went back to patrol before you went to CID
22 in 2000?

23    A.  No.  That was after 2000.  I went to CID in

Page 155

1 2000 to 2003.  Came out, went to court liaison, and
2 then went back to the street.

3    Q.  Okay.  I was trying to go from the McCray
4 incident in 1997 -- between 1997 and CID in 2000 --

5    A.  I was on the street.

6    Q.  So after McCray --

7    A.  I was still on the street.

8    Q.  You said it took a year.  That's why I was
9 confused.

10    A.  I was in the traffic division.  Traffic
11 homicide investigator.

12    Q.  When?

13    A.  During that period.  I attended a class at
14 IPTM in Tampa.

15    Q.  Was there any change in your duty assignment
16 related to the -- sort of the trauma of the McCray
17 incident?

18    A.  No.

19    Q.  Okay.  So what -- what was your duty
20 assignment at the time of McCray?  Was there a
21 particular patrol assignment?

22    A.  I was assigned to traffic.

23    Q.  Day shift?

Page 156

1    A.  Nights -- evenings.

2    Q.  And then afterwards you stayed in the same
3 assignment?

4    A.  I worked traffic for five years and was
5 promoted the sergeant.

6    Q.  So when were you promoted to sergeant?

7    A.  January 2nd of 2000.

8    Q.  Then --

9    A.  Immediately was transferred to CID.

10    Q.  You weren't --

11    A.  Because I wanted it.

12    Q.  Did you have a particular assignment in the
13 criminal investigation division?

14    A.  I did.

15    Q.  What was that?

16    A.  White collar crime.  Checks, fraud, that kind
17 of thing.

18    Q.  And then you went to court liaison after
19 that?

20    A.  Yes.

21    Q.  And then you came out of court liaison and
22 back to regular patrol?

23    A.  Yes, but the court liaison encompassed

Page 157

1 several duties. It encompassed the warrant
2 division. It encompassed the records division. I
3 did it all. A lot of work. Too much for me.
4    Q. So what was your assignment when you went
5 back on patrol?
6    A. I was patrol supervisor.
7    Q. So as patrol supervisor what were -- was that
8 primarily a desk job or --
9    A. No. No. On the street. Responding when
10 officers needed a supervisor.
11    Q. You're not -- you're basically maintaining --
12 making yourself available to go when a supervisor is
13 needed; right?
14    A. Correct.
15    Q. And you stayed as a patrol supervisor on what
16 shift?
17    A. Day shift.
18    Q. Until you went to the animal shelter?
19    A. Correct.
20    Q. Were there any incidents -- significant
21 incidents while you were a patrol supervisor?
22    A. Not that I remember, no.
23    Q. Were there any significant incidents while

Page 158

1 you were a court liaison officer?
2    A. No.
3    Q. Other than the fight with the shoplifter,
4 were there any significant incidents while you were
5 in CID?
6    A. No.
7    Q. Would it be fair to say that at least in the
8 last 15, 20 years, that you have had to rely on
9 others to do any physical confrontation with the
10 suspects?
11       MR. WHITE: Object to the form.
12    A. Did I have to have somebody else do my dirty
13 work for me?
14    Q. If I understand correctly, the shoplifter was
15 taken into custody by Doug Johnson, and you went to
16 the hospital; right?
17    A. That's correct.
18    Q. The backup officer with McCray took the
19 person into custody and you went to the hospital;
20 right?
21    A. Yes.
22    Q. The woman that beat you up was taken into
23 custody by the backup officer and you went to the

Page 159

1 hospital; right?
2    A. Correct. How many fights have I been in in
3 the 23 and half years?
4    Q. But hasn't that shaken your confidence?
5    A. Dozens. No. No. I get in fights all the
6 time. DUI's, drunks don't like being arrested.
7    Q. When was the last time you were arresting a
8 DUI drunk?
9    A. Let's see --
10    Q. 'Cause I heard it -- let me just tell you, I
11 heard it CID in 2000 to 2003, court liaison for a
12 year after that, patrol supervisor after that, and
13 then animal control after that. All positions where
14 you don't have to do the physical part of the job.
15 Do you know something -- do you recall something
16 different?
17    A. Yeah, the whole time I was working in patrol
18 as a patrol officer.
19    Q. In the 90's?
20    A. All through the 90's.
21    Q. But since the 90's you haven't been involved
22 in that part of job?
23    A. It happens, yes. I have helped, yes. If I

Page 160

1 am closer than a backup officer I will jump in every
2 time.
3    Q. But you haven't had to jump in since the
4 1990's; right?
5    A. You're asking about bad ones. You're talking
6 about major incidents.
7    Q. I'm now going -- you know, taking it -- I'm
8 going a step further. Since the 1990's have you
9 been required to do the physical part of taking
10 somebody into custody?
11    A. Yes.
12    Q. When?
13    A. I can't remember every one of them.
14    Q. Any of them?
15    A. I've arrested a lot of people.
16    Q. But where there was a physical confrontation
17 as part of it?
18    A. That's a great deal -- that's a great many of
19 them.
20    Q. Well, there were none while you were an
21 animal control officer.
22    A. Well there were some --
23    Q. I just want to make sure we got our facts,

Page 161

1 that's fine.  So there were none while you were an
2 animal control officer; right?
3    A.  You're not -- you're not getting your facts.
4    Q.  I want to make sure --
5    A.  Go pull my arrest stats from the police
6 department --
7    Q.  I'm asking you about animal control.  You
8 said you can't recall any time having to be
9 physically involved in an arrest as the animal
10 control officer; right?
11    A.  No, people don't act like -- generally, act
12 like Mr. Lawrence did when they come into the animal
13 shelter.
14    Q.  And as the patrol supervisor, you're called
15 after the fact, typically, when the supervisor is
16 needed; right?
17    A.  Generally.
18    Q.  And if to the extent you participated in
19 the -- in any physical confrontation with anyone
20 since the 1990's, it's been rare; right?
21    A.  I wouldn't say rare.
22    Q.  Well, you were working white collar in CID;
23 right?

Page 162

1    A.  Correct.
2    Q.  It was rare to have any physical
3 confrontation with people anybody doing that; right?
4    A.  Depends on if you had to run them down or not
5 when you're trying to find them.
6    Q.  Have you ever injured anybody in your work as
7 a police officer other than -- you know, seriously
8 injured anybody other than Mr. Lawrence?
9    A.  No.
10    Q.  Ever used a Taser on somebody?
11    A.  Yes.
12    Q.  What circumstances can you recall using a
13 Taser on somebody?
14    A.  The guy that was in jail and wouldn't comply
15 with the jailers.  The jailers called the police in,
16 and he was swinging at them, trying to hit them with
17 his fists, and I tased him.
18    Q.  And then the -- they took him into custody?
19    A.  Correct.
20    Q.  Any other times other than the --
21 Mr. Lawrence.  Let me back up.  Have you ever used
22 the Taser in Drive Stun mode other than with
23 Mr. Lawrence?

Page 163

1    A.  I'm not sure.
2    Q.  Have you ever used the Taser in cartridge
3 mode other than the one at the jail, as far as you
4 can recall?
5    A.  I'm not sure.
6    Q.  Have you ever carried pepper spray?
7    A.  Yes.
8    Q.  Have you ever used pepper spray on anyone?
9    A.  Yes.
10    Q.  Do you recall the last time you used pepper
11 spray on somebody?
12    A.  The last time, no.
13    Q.  Would it have been in the 90's?
14    A.  I don't know.  It was -- after we got the
15 Tasers we didn't -- pretty much didn't use the
16 pepper spray anymore.
17       MR. SHERROD:  Let's take a break.
18       (Brief recess taken.)
19    Q.  (By Mr. Sherrod)  Ms. Woodruff, will there be
20 anything in your personnel records -- are you aware
21 of anything in your personnel records that would
22 indicate any concern about your fitness for duty
23 before December 30, 2014, except due to, you know,

Page 164

1 maybe some temporary medical restriction?
2    A.  No.
3    Q.  Any of your supervisors or folks in your
4 chain of command express any concern about, you
5 know, what happened in either McCray or the woman
6 who beat you up?
7    A.  No.
8    Q.  Anybody ever question your ability to, you
9 know, make good decisions regarding your safety?
10    A.  No.
11    Q.  Anybody ever criticize you for hesitating to
12 act in any incident before December 30, 2014?
13    A.  No.
14    Q.  How many women sergeants were there when you
15 become a sergeant?
16    A.  Trying to count.  I'm thinking there was only
17 one other one.
18    Q.  Who was the other female sergeant?
19    A.  Della Williamson.
20    Q.  Is she still with the department?
21    A.  No, sir, she's retired.
22    Q.  When did she retire?
23    A.  Before I did.  I don't know.

Page 165

1    Q. So in the 90's when you were working patrol,
2 how many women patrol officers were there?
3    A. I'm not sure of the count.
4    Q. More or less than five?
5    A. You talking about throughout the department?
6    Q. Yeah.
7    A. More, I would think. Yeah.
8    Q. What position was -- was it Della Williamson?
9    A. Yes.
10    Q. What position was she in when you were
11 promoted to sergeant?
12    A. She was also in CID and worked white collar
13 crime.
14    Q. So the two women supervisors worked white
15 collar crime in CID?
16    A. Yes.
17    Q. Were there any woman sergeant, or above,
18 other than the two of y'all?
19    A. No.
20    Q. Now, as of in December 2014 were there any
21 other female sergeants or above?
22    A. Yes.
23    Q. And who were they?

Page 166

1    A. Della Williamson had been promoted to
2 lieutenant.
3    Q. Okay.
4    A. I can't remember any other female sergeants.
5 Oh, Rachel David, she may have been a sergeant then.
6 I think she was.
7    Q. Any others? Talking about just without --
8 any others that you can recall ever being a sergeant
9 or above other than --
10    A. Not that I can remember.
11    Q. -- you, Rachel David, and Della Williamson,
12 are those the only three?
13    A. Yes, that's the ones I can think of.
14    Q. So currently is there any lieutenant,
15 captain --
16    A. I don't know what's over there now.
17    Q. As of when you retired those are the only
18 three that you're aware of?
19    A. Yeah, the ones that I can think of.
20    Q. Have you ever complained about sex
21 discrimination on the job?
22    A. Yes.
23    Q. When did you complain about sex

Page 167

1 discrimination on the job?
2    A. Trying to think. You want the year?
3    Q. Yup.
4    A. Oh, my goodness. I can't remember the year.
5 I was a sergeant. I know who was promoted off that
6 list. But I can't --
7    Q. How long had you been seeking to become a
8 sergeant before you were made one?
9    A. That was my first test.
10    Q. How long had Della Williamson been a
11 sergeant?
12    A. I'm not sure.
13    Q. Had she been one very long before you were?
14    A. Yeah, a pretty good time.
15    Q. Do you know if there was any issue going on
16 in the late 90's, 2000 about, you know, women in the
17 Dothan Police Department?
18        MR. WHITE: Object to the form.
19    A. I'm not following, I don't think.
20    Q. I don't know, were there any complaints being
21 made or made about the failure to promote woman, for
22 example, prior to your getting your sergeant
23 position?

Page 168

1        MR. WHITE: Object to the form.
2    A. No.
3    Q. When did you complain of sex discrimination?
4    A. I can't think of the year.
5    Q. What position were you in?
6    A. Let's see, I think I was in court, but I'm
7 not positive.
8    Q. And what was the complaint?
9    A. That a white male had been promoted over me.
10    Q. To what position?
11    A. Lieutenant.
12    Q. And did you file an EFC charge?
13    A. I did.
14    Q. Did you hire a lawyer?
15    A. No.
16    Q. Did you get any relief related to that?
17    A. No.
18    Q. Who was the white male?
19    A. Skip Westberry.
20    Q. What position was he promoted to?
21    A. Lieutenant.
22    Q. Any particular lieutenant position?
23    A. I can't remember.

Page 169

1    Q. What did you claim regarding that your
2  qualifications compared to him?
3    A. That over time my evaluations had been higher
4  than his. He had been in more trouble, a lot more.
5  And that prior to his promotion the majority of the
6  department was saying that he was going to be
7  promoted regardless of where he came in on the list.
8    Q. What was the reason he was being favored, if
9  any, other than his gender? Like, did he have --
10  was it a good 'ole boy situation or --
11    A. Well, Chief John Powell liked him a lot.
12    Q. What kind of trouble had he been in?
13    A. Well, a lot of things. It's just different
14  things. One of them was spending a ton of money on
15  the --
16        MR. WHITE: When he got shot --
17    A. The Peanut Festival.
18        MR. WHITE: -- with his own gun?
19    A. Yeah, he got shot with his own gun.
20    Q. Did he ever get in trouble for mistreating a
21  citizen?
22    A. No.
23    Q. Are you aware of any Dothan police officer

Page 170

1  for getting in trouble for mistreating a citizen?
2    A. Yes.
3    Q. What are you aware of in that regard?
4    A. David Darby.
5    Q. Who?
6    A. David Darby.
7    Q. Anybody else? Let's get a list of names.
8  Are you aware of anybody else that got in trouble of
9  any kind for mistreating a citizen?
10    A. No.
11    Q. Did they --
12    A. Greg Benton.
13    Q. I'm sorry, what?
14    A. That was strictly rumor. That's not fact.
15    Q. I want rumor. I'm going to investigate
16  these. Whatever was the rumor?
17    A. Greg Benton.
18    Q. Greg Benton, the police chief?
19    A. Yup.
20    Q. Anybody else?
21    A. Nope.
22    Q. You were speaking pretty quietly. So the two
23  names are David Darby, Greg Benton, did I miss one?

Page 171

1    A. No.
2    Q. What did you -- what was the rumor about Greg
3  Benton?
4        MR. WHITE: Object to the form.
5    A. It was strictly rumor.
6    Q. What was the strictly rumor?
7        MR. WHITE: Same objection.
8    A. That he got into a fight on the golf course
9  with an old guy.
10    Q. And that he hurt him?
11    A. Yeah, and that nothing was done.
12    Q. Did you believe the rumor?
13        MR. WHITE: Object to the form.
14    A. It's a rumor.
15    Q. When did you hear the rumor?
16    A. Years ago. Greg was still, I think, a
17  corporal at the time I heard it.
18    Q. And of course after that he got promoted up
19  to eventually become chief; right?
20    A. Correct.
21    Q. Anybody else -- what about David Darby, what
22  are you aware of?
23    A. A traffic stop. And he did a leg sweep on

Page 172

1  the guy, and the man hit the pavement face-first.
2  He was fired.
3    Q. Are you aware of any police officers that
4  have ever been fired for anything like that other
5  than Mr. Darby?
6    A. No.
7    Q. When was that with Mr. Darby?
8    A. It was several years before I retired.
9    Q. Before or after you were at animal control?
10    A. May have been during. It was while I was
11  there, I think. I'm not sure. I'm not sure.
12    Q. Have you ever reported a fellow officer for
13  any possible misconduct?
14    A. No.
15    Q. Has anybody, to your knowledge, fellow
16  officer or otherwise, ever reported you for any
17  misconduct?
18    A. No.
19    Q. How big is the internal affairs division of
20  the police department?
21    A. Three people, I think.
22    Q. You work under the -- you did work under the
23  lieutenant over in internal affairs?

Page 173

1  A. No.
2  Q. I thought Lieutenant Eskess [sic] was --
3  A. Etress?
4  Q. Etress was internal affairs?
5  A. He may be now, but at the time he was over
6  docket and animal control.
7  Q. Will's been kind enough to pull up an article
8  from the Dothan Eagle online about Mr. Darby.  It
9  says there were two -- potentially, two traffic
10  stops involving excessive force.  Did you hear about
11  anything other than the one?
12  A. No.
13  Q. Did you know David Darby?
14  A. Yes.
15  Q. Other than David Darby, are you aware of any
16  officer who has ever received any kind of
17  discipline, of any kind, for excessive force?
18  A. No.  Let me think.  No, I can't think of any.
19  Q. Did you ever receive any training about use
20  of force policies or constitutional law about use of
21  force?
22  A. Yes.
23  Q. When?

Page 174

1  A. They trained -- they changed the training
2  over to computer and you had to read it, and then it
3  asked questions to make sure that you had read it.
4  And I probably did that, maybe, three months maybe,
5  at the most -- maybe, probably -- probably before
6  the shooting.
7  Q. What did it involve -- were you trained on
8  the City's use of force general order?  That I will
9  show you it's been marked as Plaintiff's Exhibit 4.
10  And if you will hand that to Lenn for me.
11  (Plaintiff's Exhibit No. 4 was marked for
12  identification.)
13  A. Yes.
14  Q. Would you turn in Plaintiff's Exhibit 4 with
15  me.  We'll start on the first page.  You certainly
16  understand that deadly force includes firing a gun
17  into somebody; right?
18  A. Oh, yes.
19  Q. Now -- so let's turn to the second page.  I
20  want you to look at eminent danger.  So follow with
21  me, it says:
22  (Reading) Eminent danger includes the
23  attacker's apparent intent to cause great bodily

Page 175

1  injury or death; the device used by the attacker to
2  cause great bodily injury or death; and the
3  attacker's opportunity and ability to use the means
4  to cause great bodily injury or death.
5  And I corrected a couple of typos as I read
6  it, but did I read that correctly, except for
7  correcting the typos?
8  A. Yes.
9  Q. We can agree, can't we, that a Taser in Drive
10  Stun mode does not cause great bodily injury?
11  MR. WHITE:  Object to the form.
12  A. Yes, it can.
13  Q. How?
14  A. It causes a great deal of pain.
15  Q. Okay.  Other than that -- do you consider
16  great bodily injury to mean mere pain?
17  MR. WHITE:  Object to the form.
18  A. No.
19  Q. That's what I'm asking.  I'm just trying to
20  focus on -- do you contend that a Taser in Drive
21  Stun mode causes great bodily injury?
22  A. I think it can, yes.
23  Q. And that's because you say pain can be great

Page 176

1  bodily injury?
2  A. No. It can burn them.  It can put their eye
3  out.  It can fry anything that it's touching.  It's
4  a lot of electricity.
5  Q. Okay.  If it was applied to the eye it can
6  cause -- maybe, it can cause great bodily injury;
7  right?
8  A. So then it can cause great bodily injury.
9  Q. Maybe.
10  MR. WHITE:  Object to the form.
11  Q. Other than applied to the eye, can we agree a
12  mere burn from a -- let's go with this a different
13  way.  There's a term, non-lethal, less lethal force,
14  you see that?
15  (Reading) A use of force option which is
16  highly unlikely to cause serious injury to a suspect
17  when properly applied by a law enforcement officer.
18  Did I read that correctly?
19  A. You did.
20  Q. Okay.  Then going down to Advanced Taser MX
21  and X26, that's the device that issued -- that you
22  used in this case; right?
23  A. Correct.

Page 177

1    Q.  And it describes it as a less lethal
2  conductive energy weapon.  Do you see that?
3    A.  Right, less lethal.
4    Q.  So would you agree that a Taser is highly
5  unlikely to cause death or serious injury?
6    A.  I disagree with that statement.
7        MR. WHITE:  Object to the form.
8    Q.  How can a Taser in Drive Stun mode, in your
9  view, other than a direct application to the eye,
10  cause great bodily injury or even serious injury?
11        MR. WHITE:  Object to the form.
12    A.  I've heard about people with heart issues
13  that have died after being tased.
14    Q.  That is not with Drive Stun mode, is it?
15    A.  I don't know.
16    Q.  I would tell you that it --
17    A.  How long -- how long --
18        MR. WHITE:  Object to the -- I'm going to
19  object to the -- no.  And I move to strike any
20  statement regarding -- from Counsel offering
21  scientific evidence of which he has no
22  qualifications to do.
23    Q.  (By Mr. Sherrod)  Ms. Woodruff other than a

Page 178

1  possible heart attack, will a Taser -- are you aware
2  of any way that a Taser in Drive Stun mode can cause
3  serious bodily injury other than direct application
4  to the eye?
5    A.  (Reading)  The Advanced Taser sends up
6  short-duration high voltage electrical waves that
7  overpowers a nominal electrical signals within the
8  nerve fibers, does not rely solely on pain to
9  achieve compliance.
10    Q.  In Drive Stun mode --
11    A.  You're skipping -- you're skipping over half
12  of it.
13    Q.  I'm not trying to read over all that.  I
14  asked you --
15    A.  I know, you're skipping over half of it.
16    Q.  I'm not skipping over any of it, I'm just not
17  asking a question about it.  In Drive Stun mode,
18  other than by application to the -- directly to the
19  eye --
20    A.  I don't know.  I'm not a doctor.  I don't
21  know which sensitive parts of the body that high
22  electricity will affect.  I can tell you this; my
23  heart doctor told me not to go through Taser

Page 179

1  training.
2    Q.  Other than heart issues and direct
3  application to the eye --
4    A.  Well --
5    Q.  -- are you aware of --
6    A.  I'm not aware of any of that.  I'm not a
7  doctor and I'm not one of those people.  So I can't
8  answer that.  I'm not qualified.
9    Q.  Okay.  Let's turn to page 3.  Section title,
10  Legal Responsibilities of a Peace Officer, and I
11  want to direct your attention to No. 4.
12        (Reading)  The deadly -- the use of deadly
13  force upon another person is justified by a law
14  enforcement officer when, A, it is necessary to
15  defend themselves or a third party from what he/she
16  believes to be the eminent use of deadly physical
17  force.
18        Did I read that correctly?
19    A.  You did.
20    Q.  Now there's also a B that makes a reference
21  to a Class A felony.  B is not applicable here;
22  right?
23        MR. WHITE:  Object to the form.

Page 180

1    Q.  And do you contend Mr. Lawrence committed a
2  Class A felony?
3        MR. WHITE:  Object to the form.
4    A.  I'm reading it.  Standby.  Did I feel like he
5  was a dangerous person?  Yes.
6    Q.  So you felt under 4B if he escaped he
7  would -- his escape would have placed innocent lives
8  in danger?
9    A.  I'm saying his behavior was erratic and
10  unreasonable.
11    Q.  I'm just asking about the policy.  4B says,
12  first it's -- you know, it's referring to deadly
13  force.  It talks about being necessary to effect a
14  Class A felony arrest.  So do you contend this was a
15  Class A felony arrest?
16    A.  If he tased Alan, yes.
17    Q.  Okay.  Then the next sentence says,.
18        (Reading) The officer must have a reasonable
19  belief that the suspect's escape will place innocent
20  lives in danger.
21        Do you claim that if Mr. Lawrence had escaped
22  that innocent lives were in danger?
23    A.  I can't tell you what was going through his

Page 181

1 head. But I do feel that anybody that would try to
2 harm a police officer like that is capable of doing
3 a lot of other things.
4    Q. Do you have any understanding whether your
5 feelings are relevant in a use of force situation?
6    A. I'm not going to answer that.
7    Q. I mean, do you think your feelings can
8 justify shooting somebody?
9    A. No.
10    Q. Okay. So I want to talk about the facts.
11 Are there any facts that would have given you any
12 kind of reasonable belief that Mr. Lawrence, if he
13 got away, he would have placed innocent lives in
14 danger?
15    A. I don't know.
16    Q. You're not aware of any facts; right?
17    A. No, no facts.
18    Q. He never threatened anybody; right?
19       MR. WHITE: Object to the form.
20    Q. Right. Ms. Woodruff?
21       MR. WHITE: You mean verbally?
22    A. Verbally?
23    Q. Period. He didn't threaten anybody.

Page 182

1    A. His fighting was threatening.
2    Q. He didn't --
3    A. His behavior towards me -- are you -- now
4 you're arguing. You asked me a question. Do you
5 want an answer or do you want to argue with me?
6    Q. I'll go either way.
7       MR. WHITE: I object.
8    A. I'll just sit here.
9       MR. SHERROD: She can fight. Listen,
10 Lenn, obviously I'm not going to argue with her, but
11 you know she's not supposed to --
12       MR. WHITE: Well, it's not obvious to me.
13       THE WITNESS: He just said he would.
14       MR. WHITE: You just admitted on record.
15    A. On record that you would argue with me.
16       MR. WHITE: All day.
17       MR. SHERROD: It was a rhetorical device.
18 I was trying to make a point but maybe ineffective
19 in that regard.
20       MR. WHITE: Out of line I would say.
21    Q. Well, to the extent I was out of line I
22 apologize, but I want to stick to objective facts
23 and not mere feelings; okay? He resisted your

Page 183

1 application of a Taser to him, didn't he?
2    A. He resisted our trying to arrest him.
3    Q. Correct.
4    A. Violently.
5    Q. Violently. Okay. Let's see, so who did --
6 how many times did he hit you?
7    A. How many times did I get knocked around?
8    Q. How many times did he hit you?
9    A. He didn't.
10    Q. How many times did he try to hit you?
11    A. I don't know. His arms were bound.
12    Q. How badly were you hurt?
13    A. I was banged up a little bit.
14    Q. You got bruised. Did you go to the hospital?
15    A. No.
16    Q. Did you go see a doctor?
17    A. No.
18    Q. Did you go get evaluated, medically, in any
19 way?
20    A. Well, not for bruises, no.
21    Q. You didn't get tased?
22    A. Me? No.
23    Q. Didn't suffer any kind of wrist injury?

Page 184

1    A. No.
2    Q. You didn't get your wrist sprained or even a
3 scratch?
4    A. I may have had some scratches.
5    Q. Not sure if you got any scratches?
6    A. Not sure.
7    Q. Do you understand what the word "eminent"
8 means?
9    A. I do.
10    Q. Can we agree that at most the only thing that
11 was eminent was the Taser in Drive Stun mode coming
12 in contact with Officer Rhodes?
13    A. That's correct.
14    Q. Part B, safe alternatives, would you look at
15 that please.
16       (Reading) If a safe alterative to use of
17 deadly force is likely to achieve the purpose of
18 averting an eminent danger, deadly force is not
19 necessary.
20       Did I read that correctly?
21    A. You did. He had been tased three times up to
22 that point and it had no effect.
23    Q. You're not saying that it didn't hurt him,

Page 185

1  are you?
2    A.  No.  I'm saying --
3    Q.  No, excuse me, have you seen the autopsy
4  report?
5    A.  No.
6    Q.  I mean, do you know whether there were any
7  burn marks on him?
8    A.  No, I don't.  I just said that I hadn't seen
9  the report.
10   Q.  Well, didn't you put in your use of force
11 report that there were -- didn't you do a diagram, I
12 think it's Plaintiff's Exhibit 1, maybe not.  It
13 shows that there were -- you wrote Taser and put --
14 marked it on the -- his person, didn't you?
15   A.  On which paper is that?
16   Q.  Plaintiff's Exhibit 1, page 4.
17   A.  Let me see.  That's not correct.
18   Q.  What?
19       MR. MORRIS:  She said it's not correct.
20   Q.  The diagram isn't correct?
21   A.  No, sir.
22   Q.  Who did the diagram?
23   A.  I didn't.  I don't know.

Page 186

1    Q.  You signed off on the diagram, didn't you?
2    A.  I did.  I sure did.
3    Q.  Are you saying that you shouldn't have signed
4  off on the diagram?
5    A.  Probably not.
6    Q.  So somebody else prepared your use of force
7  report?
8    A.  I don't know.  It's been two and a half
9  years.  I don't remember every detail.
10   Q.  Well, I would just assume you wouldn't sign
11 off on a report you don't approve of.
12   A.  I don't -- I usually don't.
13   Q.  You think you did here though?
14   A.  It's possible.  Because it's showing tased --
15 that I tased him three times and I didn't.  I only
16 tased him twice.
17   Q.  Okay.  Would it have been correct if they
18 only put two Taser marks?
19   A.  Then it would be correct.
20   Q.  Okay.
21   A.  But they're not in the right spots.
22   Q.  Now, if you'll turn to, I guess, Plaintiff's
23 Exhibit 2, the deadly force report, to the second

Page 187

1  page.  You had --
2    A.  Let me see --
3    Q.  At the bottom you had checked or X'd eminent
4  threat of physical injury?  I need you to say yes.
5    A.  Yes.  I'm sorry.
6    Q.  Next page, you say there's a threat against
7  another person and the officers.  Who were the other
8  persons?
9    A.  Whoever was standing on the sidewalk and my
10 secretary inside.
11   Q.  So you considered them to be an eminent
12 threat of serious physical injury if you didn't kill
13 Mr. --
14   A.  It says threat against.  It doesn't say
15 eminent.
16   Q.  It's in the -- right below the part where it
17 says eminent threat of serious physical injuries --
18   A.  No, it's under the part that says "offender
19 suspect, offender actions."
20   Q.  Who do you contend there was an eminent
21 threat of serious --
22       MR. WHITE:  Objection.
23   Q.  -- physical injury against?

Page 188

1        MR. WHITE:  She's already answered.
2    Q.  Forget the report.  So that was to you;
3  right?
4    A.  I am the officer.
5    Q.  What?
6    A.  I am the officer.
7    Q.  You thought there was an eminent threat of
8  serious bodily injury to you?
9    A.  To anybody -- yes, to me and to Officer
10 Rhodes.
11   Q.  Now, page 4, you say you were not injured;
12 right?
13   A.  Yup.  Yes.
14   Q.  So, I guess, you -- do you still think you
15 may have been scratched?
16   A.  Bumps and bruises are nothing.  They don't
17 mean anything to us.  That's not considered -- we
18 don't consider that an injury.  You bump your head
19 getting out of the car; that doesn't mean you're
20 injured.
21   Q.  So according to you, in this statement at the
22 bottom, the justification you wrote,
23       (Reading) The suspect armed himself with the

Page 189

1  officer's Taser and tried to use it on officers.
2      Is that correct?
3  A. That's what it says.
4  Q. That's what you're saying here today, isn't
5  it?
6  A. Yes.
7  Q. And then you say,
8      (Reading) The incapacitation of the officer
9  would have given the suspect opportunity to gain
10 control of his firearm and escalate the situation to
11 deadly force on the officers.
12     Did I read that correctly?
13 A. Yes.
14 Q. Is that what you contend today?
15 A. I do.
16 Q. Continuing,.
17     (Reading) In order to prevent the suspect
18 from rendering one or both of the officers
19 incapacitated, it was necessary to neutralize the
20 threat.
21     Is that correct?
22 A. Yes.
23 Q. That's what you contend today?

Page 190

1  A. I do.
2  Q. Now, incapacitation would seem to imply that
3  Mr. Lawrence was using the Taser with the prongs;
4  right?
5          MR. WHITE:  Object to the form.
6  Q. There's no mention in this report -- is
7  there? -- that the Taser was in Drive Stun mode?
8  A. There is in my report.
9  Q. What?
10 A. There is in my report.
11 Q. Which report?
12 A. And it's on the video.
13 Q. I know it's on the video.  I'm talking in
14 your written report.
15 A. It should be in my other report.
16 Q. Your Plaintiff's Exhibit 1?
17 A. I don't know.
18 Q. Well, I'm just -- let's work on this one.  On
19 this one, do you see it -- it's not in the
20 description, is it?
21 A. What -- what isn't?
22 Q. That is Taser is in Drive Stun mode.  It's
23 not mentioned in this report, is it?

Page 191

1  A. It is not.  I don't see it.
2  Q. It uses the word "incapacitation"; right?
3  A. Yup.
4  Q. Incapacitation is a term that's used in
5  connection with the Taser mode where you fire the
6  prongs; right?
7  A. That's not necessarily so.
8  Q. But that is the -- I mean, that is the term,
9  neuromuscular incapacitation; right?
10         MR. WHITE:  Objection.  She's answered
11 the question plain as day.
12 Q. That is a term that's used regarding Tasers;
13 right?  Neuromuscular incapacitation?
14 A. That is a term used to describe Tasers.
15 Q. That is  not a term that is used with the
16 Taser in Drive Stun mode, is it?
17         MR. WHITE:  Objection.  She's answered
18 that already.
19 A. It's not necessarily true.  If I hold that
20 Taser on you, it's going to continue to fire for
21 five seconds.  And whether it's got two prongs that
22 are sticking in your skin or it's irking directly on
23 you, it doesn't matter.

Page 192

1  Q. So you're saying that Drive Stun mode
2  versus --
3  A. Drive Stun mode is generally used for just a
4  second or two at a time.  Can it be used longer?
5  Absolutely.  Because it's still willing to fire for
6  five seconds, period.
7  Q. But that doesn't turn it into a device for
8  neuromuscular incapacitation?
9  A. Yes, it does because it goes for five seconds
10 and if you make direct contact for five seconds it's
11 going to do that.
12 Q. Where --
13 A. More or less.
14 Q. Where have you heard that?
15 A. Training.
16 Q. So you were taught in training that in Drive
17 Stun mode if you are able to keep it on their skin
18 for five seconds that you will -- it will have the
19 same affect as the prongs?
20 A. Pretty much, yup.
21 Q. So how --
22 A. It's still a lot of voltage going through
23 there.

Page 193

1    Q. And the -- you were concerned then that
2 Mr. Lawrence, who had the Taser gripped in his hand
3 with the finger on the trigger, was going to apply
4 it for five seconds on someone?
5    A. Yes.
6    Q. And then that person, Officer Rhodes, would
7 have fallen out and then Mr. Lawrence could have
8 taken his gun; right?
9    A. Correct.
10   Q. And then you could have shot him; right?
11       MR. WHITE: Object to the form.
12   A. Then he could have shot me.
13   Q. If he had gone for the gun but --
14       MR. WHITE: That's your question.
15   A. That's the question you just asked.
16   Q. But I'm just saying you -- you shot him
17 before any of that -- so we got, first, he has to
18 incapacitate Officer Rhodes; right?
19   A. Would you rather me wait for him to shoot me
20 before I try to shoot back?
21   Q. Actually, I'd rather you wait until he
22 incapacitates someone or actually gets the Taser in
23 his grip but --

Page 194

1    A. It's a little late by then.  I'd be late for
2 dinner, forever.
3    Q. So Mr. -- first, he has to incapacitate
4 before he can go for the gun; right?
5        MR. WHITE: Object to the form.
6    A. No, if he's got that Taser against him he can
7 pretty much do what he wants to do.
8    Q. Well, you had the Taser against him.  Why
9 didn't you just do what you wanted to do?
10   A. I kept breaking contact.  It had no effect on
11 him.
12   Q. Why did you keep breaking contact?
13   A. It had no effect on him.
14   Q. You can't say whether it did or didn't have
15 any effect on him, can you?
16       MR. WHITE: Object.  I'm going to object
17 to you arguing with her and telling her what
18 happened when you don't know.
19   Q. How can you say the Taser had no -- he didn't
20 feel the Taser?
21       MR. WHITE: Now -- whoa, whoa.  Now we
22 need to read this back to see what she said?  She
23 didn't say, "Didn't feel." She said, "It had no

Page 195

1 effect."
2        MR. SHERROD: I don't know what the --
3        MR. WHITE: Which is plain from the
4 video.
5        MR. SHERROD: Lenn, thank you --
6        MR. WHITE: She never said feel.
7        MR. SHERROD: Thank you for your
8 testimony.  She maybe used --
9        MR. WHITE: This is an remonstrance.
10 This is not a testimony.
11       MR. SHERROD: This is improper, but
12 regardless.
13   Q. (By Mr. Sherrod)  So, Ms. Woodruff, do you
14 agree then that he felt the sting, the pain, of the
15 Taser in Drive Stun mode that you applied to him?
16   A. I don't know what he felt.
17   Q. You know that he did not suddenly give up and
18 allow himself to be cuffed; right?
19   A. Correct.
20   Q. And when you say it wasn't effective, it
21 wasn't effective in making him comply; right?
22   A. Correct.
23   Q. But that doesn't entitle you to kill him;

Page 196

1 right?
2    A. When he tried to --
3    Q. Non-compliance is not a license --
4        MR. WHITE: Whoa.  Whoa.  Let her answer.
5        MR. SHERROD: No, that's my question.
6        THE WITNESS: He's doing it -- he keeps
7 doing it --
8        MR. WHITE: You let her answer before you
9 ask your next question.
10       THE WITNESS: I'll let him ask and
11 answer.  I'll leave the room.
12   Q. You understand his mere non-compliance was
13 not a basis for shooting; right?
14   A. Yes.
15   Q. You're supposed to be trying to cuff him;
16 right?
17   A. I'm trying to get him under control and keep
18 my backup officer from being injured.
19   Q. You're supposed to be keeping him -- getting
20 him in control; right?
21       MR. WHITE: Let's go off the record for
22 just a second.
23       MR. SHERROD: I'm not going off the

Page 197

1 record.
2          MR. WHITE: Okay. We don't -- I'll go
3 back on the record and say I want you to stop
4 badgering this witness.
5      Q. (By Mr. Sherrod) Ms. Woodruff, you
6 understand the goal is to take Mr. Lawrence into
7 custody; right?
8      A. Yes.
9      Q. And the goal should be to take Mr. Lawrence
10 into custody without unnecessarily injuring him;
11 right?
12     A. Yes.
13     Q. And that once you go to a gun then -- let's
14 go back. Nobody was seriously injured in this
15 incident until you shot Mr. Lawrence; right?
16     A. I stopped it before it happened.
17     Q. And if you apply that principle to law
18 enforcement work, there may be a lot of people who
19 die that don't need to --
20         MR. WHITE: Object to the form.
21     Q. -- right, Ms. Woodruff?
22     A. You're testifying -- what -- what's the
23 question?

Page 198

1      Q. If you preemptively shoot people because you
2 are afraid of a chain of events that might happen,
3 then a lot more people will die; right?
4          MR. WHITE: Object to the form.
5      A. I think that's -- that question makes no
6 sense whatsoever. It's more rhetorical --
7      Q. No, seriously, if we go up and you say, you
8 know -- every time an officer is using force on
9 somebody, mostly, they -- they have their gun in
10 their holster; right?
11     A. Correct.
12     Q. Theoretically, every time an officer
13 physically uses force -- hands on somebody they
14 could grab for the gun; right?
15     A. No.
16     Q. They can't? They couldn't theoretically?
17 Possibly?
18     A. No.
19     Q. Why not?
20     A. It's not policy.
21     Q. The suspect doesn't follow policy. I'm
22 saying the suspect could grab for the gun. That
23 could happen?

Page 199

1      A. Now you've changed subjects.
2      Q. No, I think you may have misunderstood me.
3 There may have been a miscommunication. Anytime
4 somebody has hands on a suspect, a subject, that
5 subject could go for the officer's gun; right?
6      A. Yes.
7      Q. Now you don't shoot the person because you
8 think they might go for the officer's gun; right?
9      A. Right.
10     Q. Can we agree to that?
11     A. Sure.
12     Q. We only -- there has to be an eminence;
13 right? There has to be an eminent threat of serious
14 bodily injury or death?
15     A. An overt action.
16     Q. An overreaction of what?
17     A. An overt action.
18     Q. That presents --
19     A. They do something that would show up.
20     Q. Do you know if the video of this incident is
21 being used to train Dothan police officers?
22     A. I have no idea.
23     Q. As far as you know does everybody in the

Page 200

1 department know what happened?
2      A. I have no idea.
3      Q. None of your -- in all of your therapy work,
4 whatever, talking to your friends, have you never
5 explored what you might have done differently,
6 Ms. Woodruff, other than shoot Mr. Lawrence?
7          MR. WHITE: Object to the form.
8      A. I would do exactly the same thing that I did
9 the first time.
10     Q. Have you ever asked yourself that question
11 what you could have done differently to avoid
12 shooting Mr. Lawrence?
13     A. Sure, and it always comes back to the same
14 conclusion.
15     Q. And that's premised on Mr. Lawrence having
16 the gun gripped in his hand and using it against
17 officers; right?
18     A. Correct.
19     Q. If Mr. Lawrence didn't have the gun in his
20 hand gripped, trying to use it on the officers, then
21 there is no -- even in your version --
22     A. His violent tendencies.
23     Q. But that -- would that -- his violent

Page 201

1  tendencies would be a basis for killing?
2  A. Fighting -- no, I didn't say that.
3  Q. Let me finish my question and that is where I
4  was headed.
5  A. Well, you don't let me finish my answer.
6  Q. Ms. Woodruff, if Mr. Lawrence never had the
7  Taser gripped in a way he could use it, can we agree
8  there was no basis for shooting him?
9  MR. WHITE: Object to the form.
10  A. It depends on the circumstances.
11  Q. He only had the Taser gripped by the barrel.
12  If that's true, if a jury believes that is true,
13  would you agree that it was unlawful --
14  A. He didn't.
15  Q. -- it was wrong for you to shoot him?
16  A. He didn't have it gripped by the barrel.
17  Q. I believe there will be different testimony
18  so -- that's why I'm asking you. If he only had the
19  Taser gripped by the barrel, can we agree --
20  A. That's speculating.
21  Q. Not speculating; it's a fact we intend to
22  prove at trial. If Mr. Lawrence only had the Taser
23  gripped by the barrel, can we agree it would have

Page 202

1  been unnecessary to shoot him?
2  MR. WHITE: Object to the form.
3  A. I can't answer that. Because I don't -- I'm
4  telling you what happened.
5  Q. If Mr. Lawrence was not using a Taser against
6  you --
7  A. And you're making up stories.
8  Q. The reason you say you were entitled to shoot
9  him is because you were gripping the Taser and using
10  it against the officers; right?
11  A. Correct.
12  Q. You say he was about to use it on Officer
13  Rhodes; right?
14  A. He did use it on Officer Rhodes. It just
15  didn't make good contact, but you'll have to ask
16  Officer Rhodes about that.
17  Q. Certainly. If Mr. Lawrence didn't even have
18  the Taser with his finger on the trigger, I mean,
19  how can you say that he would -- it would have been
20  justified to shoot him?
21  A. Where was his gun?
22  Q. In his glove department.
23  A. Did I know that?

Page 203

1  Q. You do now. I'm asking you. So you're
2  saying -- are you saying you shot him because he had
3  an empty holster on his waist now?
4  A. No.
5  Q. Okay. I want to go with the facts -- at
6  least working with the facts that --
7  A. Well, I didn't know at the time.
8  Q. Does that entitle you to shoot him?
9  A. I'm not going to answer that.
10  Q. Well, you keep bringing it up. Do you think
11  the death of Mr. Lawrence is justified because you
12  were worried about his gun?
13  A. No. Because he was trying to hurt my partner
14  and God knows who else.
15  Q. Ms. Woodruff, I really need an answer to this
16  question. If Mr. Cantu -- excuse me, Mr. Lawrence,
17  only had his hand gripping the barrel, can we agree
18  that he would not have been -- even in your version
19  of events -- an eminent threat of serious bodily
20  harm to you or Officer Rhodes?
21  MR. WHITE: Object to the form.
22  A. I can't answer that.
23  Q. Why can't you answer that?

Page 204

1  A. Because I don't know. I don't know what else
2  he might have done.
3  Q. No, I'm saying if that's -- if when you shot
4  him he was gripping the Taser by the barrel and let
5  go of the Taser --
6  A. No, Renee took the Taser.
7  Q. Then Renee was the one in danger of getting
8  Tased, wasn't she?
9  A. You're asking me questions that I can't
10  answer because you're speculating.
11  Q. How can Mr. Lawrence be subject to deadly
12  force by you if he's only gripping the barrel of the
13  Taser to get it away from himself?
14  A. He wasn't gripping the barrel of the Taser.
15  Q. Right. According to you he gripped it, took
16  it from your hand, and got it in his own hand all in
17  one motion with one hand; right?
18  A. I didn't say all in one motion.
19  Q. With one hand.
20  A. With one hand.
21  Q. Can you demonstrate how that could be done?
22  A. I can't.
23  Q. You know it's impossible; right?

Page 205

1   A.  No.
2   Q.  Can you even explain somehow, you know,
3   with -- how that could be done?  And that would be
4   shown clearly on the video; right?
5   A.  No.
6   Q.  Well, that's the left hand; right?
7   A.  That's the left hand.
8   Q.  That's the side that was presented towards
9   the video camera; right?
10  A.  Sort of.  It's kind of at an angle.
11  Q.  Do you see anything on that -- the video
12  that's anything like what you just demonstrated for
13  me?
14  A.  That's hard to tell.  It's not a very good
15  video.
16  Q.  Was it that easy to get the Taser away from
17  you, Officer Woodruff?
18  A.  No.
19  Q.  I mean, you got a guy with his arms -- upper
20  arms --
21  A.  He twisted it.
22  Q.  Yeah, so he's got his upper arms being
23  restrained by Officer Rhodes, and you've got the

Page 206

1   Taser gripped in your uninjured
2   above-average-strength right hand; right?
3   A.  That's correct.
4   Q.  And he's able to not only get it out of your
5   hand without you doing anything about it.  Was able
6   to do a maneuver on his stomach or some other
7   maneuver to twist that around to where he has his
8   finger on the trigger all without you doing
9   anything; right?
10  A.  He also jerked it away from Officer Skipper
11  who had both hands on it.
12  Q.  I don't think that's what the video shows
13  but --
14      MR. WHITE:  Object.  Whoa.  Whoa.  That's
15  out of line.
16  Q.  So are you saying that you see him --
17      MR. WHITE:  Object.  She said that's what
18  happened.
19  Q.  No, he got it -- he did this maneuver, not
20  only while you were there, but while Officer Skipper
21  was there too; right?
22  A.  Renee hadn't stepped in yet.
23  Q.  Can we agree that the only way, you know,

Page 207

1   that he could have an opportunity to put his finger
2   in the Taser trigger would be if you let him?
3       MR. WHITE:  Object to the form.
4   A.  No.
5   Q.  Well, if you were fighting with him for
6   control of the Taser after he ripped it out of your
7   hand, don't you think you could have kept him from
8   getting it gripped --
9   A.  I wasn't fighting for control; I was pushing
10  his arm.  I told you that.
11  Q.  Well why would you -- why would you just push
12  his arm instead of fighting for control of this
13  Taser?
14  A.  Because he had it twisted around pointed
15  towards Alan's groin.  I was trying to push his arm
16  away from Alan's groin.  I didn't want him to grab
17  the end of the Taser and then tase me.  That would
18  have been stupid.
19  Q.  You understand that a 40-caliber bullet fired
20  from close range will pass through a human body
21  unless it hits -- and possibly even if it hits a
22  bone?
23  A.  I was not aware of that.  I found that out --

Page 208

1   I found out later that it had.
2   Q.  But you certainly knew a 40-caliber bullet
3   can go through a human body; right?
4   A.  Depends on the circumstances.
5   Q.  Right.  In general you know that a
6   40-caliber --
7   A.  You're putting words in my mouth.  You're
8   asking -- tell me, you know that.
9   Q.  You can disagree.  Don't you know that
10  40-caliber bullet passes through human beings?
11  A.  It can.
12  Q.  You knew that before this incident; right?
13  A.  Yes.
14  Q.  And you knew that right behind Mr. Lawrence
15  were kids; right?
16  A.  Yes, in the car?
17  Q.  Yeah, three kids and a girlfriend; right?
18  A.  I wasn't sure where -- where they all were at
19  that point.
20  Q.  You knew there were kids and a girlfriend --
21  A.  I knew there were kids and a girlfriend that
22  were there with him.
23  Q.  Yeah.  And you knew that by firing a gun that

Page 209

1 could place them at risk as well.
2    A.  My concern was not to hit Officer Rhodes.
3    Q.  Right.  You weren't concerned about the kids
4 or the girlfriend, were you?
5    A.  If I fired the way I fired -- I fired it up
6 close, tight, in case it went through him it
7 wouldn't hit Officer Rhodes or anybody on that side,
8 that backside.
9    Q.  Officer Rhodes was on the front side.
10    A.  No.
11    Q.  Towards the front of the car.  He was on
12 Mr. Lawrence's right --
13        MR. WHITE:  I'm going to object to you
14 telling her --
15        MR. SHERROD:  It's a question.  It's a
16 leading question.  It's a leading question.
17        MR. WHITE:  It's not a question.  You can
18 lead all day long.
19        MR. SHERROD:  At the end I will say,
20 right?  If you would not interrupt.
21    Q.  (By Mr. Sherrod)  Officer Rhodes was on
22 Mr. Lawrence's right side, wasn't he?
23    A.  But he was behind him.

Page 210

1    Q.  Who was behind who?
2    A.  Officer Rhodes was behind Mr. Lawrence.
3    Q.  Right.  On Mr. Lawrence's -- behind him on
4 his right side.
5    A.  Over towards his right side.
6    Q.  Yeah.  And so you shot away from Officer
7 Rhodes --
8    A.  And away from the car.
9    Q.  Do you know if the bullet struck the car?
10    A.  It did not.
11    Q.  How do you know that?
12    A.  Because they told me right afterwards it fell
13 out of his jacket when they picked his jacket up.
14    Q.  Can we agree that incapacitation from the
15 Drive Stun was highly unlikely?
16        MR. WHITE:  Object to the form.
17    A.  No.
18    Q.  Your understanding was that if it went for
19 five continuous seconds that it could incapacitate;
20 right?
21    A.  Correct.
22    Q.  Being able to hold a -- the Drive Stun
23 against Officer Rhodes -- strike that -- even

Page 211

1 assuming Mr. Lawrence had the Taser in Drive Stun
2 mode it would have been highly difficult for him to
3 be able to hold it in place for five continuous
4 seconds with three officers surrounding him; right?
5        MR. WHITE:  Object to the form.
6    A.  There were only two offers that were on top
7 of him.  One was me, one was Officer Rhodes.
8    Q.  Officer Skipper was there too.
9    A.  She was back somewhere.  I didn't even know
10 where she was back there.
11    Q.  By the time the Taser was an issue, she had
12 come to help though; right?
13    A.  You will have to ask her that.
14    Q.  Well you saw her.
15    A.  When she came -- no, I didn't.
16    Q.  You felt her presence to your right.
17        MR. WHITE:  Object to the form.
18    A.  I feel my dead mother's presence in my house
19 too.
20    Q.  You saw her hands on the Taser, didn't you?
21    A.  I told you I don't know whose hands those
22 were.
23    Q.  Okay.  You saw somebody -- somebody's hands

Page 212

1 there to help you; right?
2    A.  In hopes that they were there to help, yup.
3    Q.  So you had -- maybe you were ignorant.  You
4 had two people you were aware of --
5    A.  Don't --
6    Q.  Two officers --
7    A.  Don't call me ignorant.  Don't call me names,
8 please.
9    Q.  No, I mean, you may have been ignorant of
10 Officer -- I'm not calling you ignorant.  Forgive me
11 if it sounds like that.  I'm just saying, even if
12 you were ignorant of -- unaware of Officer
13 Skipper's -- that it was her, specifically, you
14 generally were treating this person, whoever it was,
15 as a third person on the scene to help you; right?
16    A.  Yeah, when I saw that -- yes.
17    Q.  So there were three people available to deal
18 with Mr. Lawrence if -- with this Taser if he
19 actually got it; right?
20    A.  At the same split second, yeah.
21    Q.  And you chose instead of fighting for the
22 Taser to end it all with a gunshot.
23        MR. WHITE:  Was that a question?

Page 213

1   Q.  Didn't you?

2   A.  He pulled the Taser away.

3   Q.  You chose instead of continuing to fight for

4 the Taser --

5   A.  From Officer Skipper.

6   Q.  You chose --

7        MR. WHITE:  Testimony was he had it and

8 he wasn't fighting over it anymore; he got it.

9   Q.  No, I'm saying, you chose not to fight

10 Mr. Lawrence, assuming he had the Taser like you

11 say, you chose not to help Officer Skipper fight for

12 the Taser, didn't you?

13   A.  No, it was not something that came to mind,

14 that I'll fight -- let's fight him some more.

15 That's not -- it's not a thought that went through

16 my mind.

17   Q.  Your mind -- what went through your mind was,

18 I can just end it all with a gunshot?

19   A.  No, it was, The man is not going to give up.

20 He's made it very clear that he's not going to give

21 up.  He's too much for Officer Rhodes and I to

22 handle.  He's trying to hurt Officer Rhodes.  He's

23 not rational.  Everything is bad.  He's going to

Page 214

1 hurt somebody.  No, I'm going to end the situation.

2 When he pulled that Taser and tried to

3 tase Officer Rhodes, I stepped up my use of force.

4   Q.  You killed him.

5   A.  I killed him.

6   Q.  But you --

7   A.  I shot him.

8   Q.  But you did that instead of using your

9 force -- your hands, your physicality, your body

10 to --

11   A.  Well, I could have also --

12   Q.  -- take the Taser.

13   A.  -- let him go and get in his car and drive

14 off right then too, couldn't I?

15   Q.  So the options were just let him go or kill

16 him, in your mind?

17   A.  Stop twisting my words.

18   Q.  You could have warned him that you were going

19 to shoot him if he didn't let go of the Taser;

20 right?

21   A.  There was no time to say or do anything when

22 somebody is doing what he was doing.

23   Q.  You could have stepped away -- you stepped

Page 215

1 away from Mr. Lawrence; right?  Stepped back to draw

2 your gun?

3   A.  Yes, I believe I did.

4   Q.  You could have stepped back even further and

5 trained your gun on Mr. Lawrence and told him that

6 if he did not stop it you were going to shoot him?

7   A.  He already said --

8   Q.  You could have done that; right?

9   A.  I'm not going to answer anymore.

10        MR. WHITE:  Just go ahead and answer the

11 way you want to answer.

12   A.  No.

13   Q.  You could not have done that?  If the concern

14 was that Mr. Lawrence might incapacitate Mr. Rhodes,

15 you could have drawn your gun, stepped back, given

16 warnings and waited to see if --

17   A.  We gave him warnings to stop so we could

18 handcuff him.  We gave him warnings that he was

19 going to be Tased.

20   Q.  He did not know --

21   A.  We gave him warnings to stop struggling.

22   Q.  He did not know those were --

23   A.  He failed to comply.

Page 216

1   Q.  He didn't know that if he didn't comply his

2 price was his life.

3   A.  He didn't?  What did he think the price was?

4   Q.  Is that what you think the --

5   A.  I'm asking you.  You seem to have all the

6 answers.

7   Q.  Did you think he had any understanding that

8 you were going to end his life if he didn't let you

9 cuff him?

10        MR. WHITE:  Object to the form.

11   A.  I don't know.  I don't know what he was

12 thinking.

13   Q.  How would we have -- how would he have known

14 that you were going to kill him if he didn't submit?

15   A.  You ever watch COPS on TV?

16   Q.  Is that what cops on TV do?

17   A.  Do they?  Do you ever watch it?  Have you

18 ever seen it?

19   Q.  I see police misconduct videos that show

20 things like that, but not usually, you know, cop TV

21 shows.

22   A.  You should know the law.  Ignorance of the

23 law is not an excuse.

Page 217

1 Q. What is the law you think I'm ignorant of?

2 A. I didn't say you were ignorant.

3 Q. What do you think is the law that Mr.

4 Lawrence was ignorant of?

5 A. To obey the direct command of a police

6 officer --

7 Q. Penalty --

8 A. Or bad things might happen.

9 Q. Because that officer might be afraid about

10 doing something other than shooting; right?

11 A. What?

12 Q. The safest thing for an officer to do in any

13 situation is just to kill the person; right?

14 A. Wrong.

15 Q. If you killed the person -- if you shoot the

16 person, there is no -- you don't have to risk what

17 else might happen; right? You might get hit by

18 Mr. Lawrence; right?

19 A. He's a lot bigger guy than I was. I wasn't

20 going to let him hit me. He kept getting up in my

21 face, again, and again, and again. He was very

22 threatening. He was very scary. I was waiting for

23 my backup to get there. I mean, in my face. Do you

Page 218

1 understand? You're ignoring me. He's up in my

2 face.

3 Q. And that is what --

4 A. In my face.

5 Q. -- how far, six inches?

6 A. Yes, at times, six inches.

7 Q. That's how it felt to you wasn't it --

8 A. That's how it was.

9 Q. You felt like you didn't have any --

10 A. I would back up and tell him to get out of my

11 face.

12 Q. You were so afraid at the end that you

13 couldn't think of anything to do other than to shoot

14 Mr. Lawrence; right?

15 A. Those are my only options left, I thought.

16 Q. Options? That was just one option; right?

17 A. That was my only option left.

18 Q. Okay. So you say you couldn't have stepped

19 back and issued a warning while you trained your gun

20 on Mr. Lawrence?

21 A. There was no time.

22 Q. Why wasn't --

23 A. He was trying to tase Alan. There was no

Page 219

1 time.

2 Q. Is that -- so you --

3 A. These things happen in milliseconds.

4 Q. Would you agree that it's important for a

5 police officer to respect the -- not only her own

6 life and the lives of her fellow officers but also

7 the lives of citizens?

8 A. Absolutely.

9 Q. And that includes the citizens who are due to

10 be arrested?

11 A. Absolutely.

12 Q. Like -- if you look at the -- I mean, you're

13 supposed to be out there, you know, protecting and

14 serving the public; right?

15 A. That's correct.

16 Q. And if you go out doing the job where your

17 only primary concern is protecting yourself from any

18 possible danger, that could lead to bad things,

19 couldn't it?

20     MR. WHITE: Object to the form.

21 A. It depends on how the --

22 Q. Can we agree that a fearful officer is

23 potentially a dangerous officer?

Page 220

1     MR. WHITE: Object to the form.

2 A. No.

3 Q. And if the officer is always afraid of

4 something that is going to happen to her -- him or

5 her that they're a danger to act to protect their

6 fear?

7     MR. WHITE: Object to the form.

8 A. No. I'm not always --

9 Q. You were afraid of -- of what might happen

10 with the Taser; right?

11 A. What was happening with the Taser.

12 Q. But what -- but what might happen if it went

13 on further; right? I mean, you wrote in your

14 report -- we've been through it -- you're afraid

15 that he could incapacitate Mr. Rhodes and get his

16 gun; right?

17 A. That's correct.

18 Q. And because of your fears, you shot and

19 killed Mr. Lawrence; right?

20 A. There were a lot -- there were a lot of

21 things in there --

22 Q. And because of your --

23 A. -- that I took in --

Page 221

1   Q.  Because of your fear --
2   A.  No, because of my 23-and-a-half years'
3   experience on the job as a law enforcement officer.
4   Q.  Your 23 and a half years, most of which has
5   not been spent putting, you know, your life on the
6   line --
7   A.  That's not true.
8   Q.  Right?  Your primary experience in physical
9   conflicts has been that you get hurt; right?
10  A.  No.  I've arrested hundreds of people and
11  never had a problem.
12  Q.  Right.  But when there is physical
13  conflict --
14  A.  And mostly I don't have a problem.
15  Q.  Right.  But when there's a physical conflict
16  you're afraid that you could see what happened in
17  the past happen again; right?
18  A.  I'm not sure I understand that question.
19  Q.  When you see -- saw Mr. Lawrence you saw
20  the -- you see the woman who beat you up and Mr.
21  McCray, couldn't you?
22  A.  No.
23  Q.  You had two big incidents before this one;

Page 222

1   right?  You said those two?
2   A.  Yeah, those were pretty big.  Pretty big
3   fights.
4   Q.  And you got beat up in those two; right?
5   A.  Well, I got beat up in the first one.
6   Q.  And you got thrown into a table and against a
7   salad bar in the second?
8   A.  Yes.
9   Q.  Went to the hospital in both?
10  A.  Correct.
11  Q.  And both -- both times that happened when you
12  went hands-on with somebody; right?
13  A.  I've been hands-on a lot.
14  Q.  Both of those times happened when you went
15  hands-on with somebody --
16  A.  Correct.
17  Q.  Right, Ms. Woodruff?
18  A.  Correct.
19  Q.  And you were afraid to go hands-on with
20  Mr. Lawrence, weren't you?
21  A.  Absolutely.
22  Q.  And because you're afraid to go hands-on with
23  Mr. Lawrence, you really didn't have very many

Page 223

1   options, did you?
2   A.  To wait for my backup to get there.
3   Q.  No, I'm talking about in the final moments of
4   this incident?
5   A.  By backup was there.
6   Q.  Right.  And at that point you were afraid --
7   A.  And we were hands-on.
8   Q.  But you were afraid to go -- your hands on
9   Mr. Lawrence, get in the fight --
10  A.  I was in the fight.
11  Q.  You were sticking a Taser in from the side
12  weren't you?
13  A.  You're testifying -- no, well -- at the end.
14  Q.  Yeah.  And then when the Taser didn't work
15  you didn't go any further hands-on, did you?
16  A.  There was no point.  He was -- how many times
17  do we have to do this?  He had control of the Taser.
18  Q.  Right.  So --
19  A.  Would you want me to grab the Taser?  You
20  tell me.
21  Q.  Absolutely.  Absolutely.
22  A.  Oh, I get tased and he doesn't?
23  Q.  And you -- and everybody lives.  This way you

Page 224

1   don't even have to get tased and he dies; right?
2   A.  I would get tased.
3   Q.  Oh my gosh, and you'd rather have
4   Mr. Lawrence die to keep you from possibly getting
5   tased; right?
6   A.  I'm not going to answer that.  That's a
7   ridiculous question.
8   Q.  Isn't that what you just said?  You might
9   have gotten tased if you grabbed the Taser; right?
10      THE WITNESS:  You want to read it back?
11  Q.  Ms. Woodruff, if you had grabbed the Taser,
12  you might have gotten tased; right?
13  A.  Sure.
14  Q.  And in order -- because you were afraid of
15  possibly getting tased yourself, you killed
16  Mr. Lawrence; right?
17  A.  No.
18  Q.  Is that not part of what you were afraid of?
19  Weren't you afraid to grab the Taser?
20  A.  I'm not going to grab this end of the Taser.
21  Q.  Right.  So you were afraid that you might
22  come into contact with that end if you grabbed in
23  there; right?

Page 225

1    A.  And then I'm no good.

2    Q.  And the only way to protect yourself is --

3  from having to do anything further is shoot

4  Mr. Lawrence; right?

5    A.  Wrong.  I can't help to say but you're

6  just -- you're beating a dead horse here.  You're

7  asking me the same questions over and over again in

8  a different form.  I don't know what you want from

9  me.

10        MR. SHERROD:  Let's take a break and

11  we'll wrap up when I get back.

12        (Brief recess taken.)

13    Q.  I don't think we covered a couple of things.

14  Now, I think there's -- you contend -- if I

15  understand you, Ms. Woodruff, that there was two

16  times where you were at the back of the car getting

17  the tag?

18    A.  Yes.

19    Q.  Okay.  So tell me what happened inside the --

20    A.  Inside of the shelter?

21    Q.  -- animal control.  Yup.

22    A.  I was back in my office working and I heard a

23  male voice out front.  It was a little bit -- little

Page 226

1  bit loud sounding.  A little angry.  And about that

2  time, my secretary stuck her head in my door and

3  said, "Got a guy out here from Geneva wanting to

4  turn a dog in, but he's saying -- when I told him we

5  didn't take it he said he found it north side

6  WalMart."  And I said, "Well, just go ahead and take

7  it.  It came from our city limits.  We'll just take

8  it."  And she went back out there and I heard her

9  tell him -- we have a form we call an intake

10  sheet -- and I heard her tell him, "I need your ID

11  and, you know, just fill out this."  And he said he

12  wasn't going to give an ID.  He didn't have to give

13  an ID.  And she said, "ID is required."  And about

14  that -- I think it was about that time I came out of

15  my office because his voice was raised even more and

16  I thought maybe I could quiet things down a bit.

17  And he said he didn't have an ID and he wasn't

18  filling out the piece of paper, that it was a

19  violation of his privacy rights and he didn't have

20  to fill it out.

21        And then he started quoting federal and state

22  statutes by number and that -- that -- that went on

23  and I tried to explain to him why -- why number one,

Page 227

1  we don't take dogs' from out of county.  Somebody

2  has to pay for the dogs upkeep and staff --

3  staffing.  Hoping that that would quiet him down

4  some.  And he just got more agitated.  So I said,

5  "I'll tell you what, just sign the paper.  Forget

6  the ID, just sign the paper and we'll take the dog."

7  It just seemed easier to just go on and get him out

8  of here.  And he refused to even provide a

9  signature.  And that's when he said, "I'll do" -- he

10  was just going to dump the dog at the end -- dump

11  the damn dog at the end of the road.  And he reached

12  down and picked the dog up by the scruff of the neck

13  and I said, "You don't do that either."  I told him

14  to dump the dog was illegal.  When he picked the dog

15  up by the scruff of the neck I said, "We don't do

16  that either."  And he said, "What?"  And I said,

17  "Pick dogs up by the scruff of the neck.  It's a

18  grown dog."  And he turned to leave.  And he said,

19  "I'm just going to dump the damn dog at the end of

20  the road."  Out he went.  That's what happened

21  inside.

22    Q.  Anything -- anything else happen inside that

23  you heard or saw other than that?

Page 228

1    A.  No.

2    Q.  And on the way out he -- you asked him if he

3  had a gun?

4    A.  On the way out I reached for a piece of paper

5  and a pen off the counter so that I could write his

6  tag number down.  If he was going to dump the dog I

7  would have a place to start looking.  And when I got

8  immediately behind him going out the front door of

9  the shelter and when he raised his arm to open the

10  door, that's when I saw the bottom of the holster

11  and was asking him, as he was exiting, if he had a

12  gun.  We have a sign on our front door that no

13  weapons are allowed.  And he kept walking, he said,

14  "It's in the car.  I never carry it in.  It's in the

15  car."

16    Q.  Which is what you would expect since all you

17  saw was a holster without a gun in it; right?

18    A.  I couldn't tell if there was a gun in it or

19  not.  All I saw was the bottom of the holster.

20    Q.  But when you reported it -- you never

21  reported him as being armed, did you?

22    A.  No.

23    Q.  In fact if you listen to the radio traffic

Page 229

1 there's nothing about any warning to any officers
2 that's he's armed; right?
3    A. No, I don't think so.  No.
4    Q. Which you would have done if you had any
5 concern that he was armed?
6    A. If I had seen it for sure.
7    Q. Or even believed that he was likely armed;
8 right?
9    A. I don't know.  I don't know what I would have
10 said.
11    Q. Well, for the officers' safety, wouldn't you
12 have let other officers know?
13    A. Yes, absolutely.  Yeah, I would have.  I
14 would would have.
15    Q. So the reason you didn't say anything to
16 Officer Rhodes or anybody else is because you had no
17 belief that Mr. Lawrence was armed; right?
18    A. Because he told me he left it in the car.
19 But I was going to get the tag number anyway.
20    Q. He went and sat in the passenger -- in the
21 driver's seat; right?
22    A. Yes, the car was running.
23    Q. And you followed him; right?

Page 230

1    A. I followed him.
2    Q. And he immediately told the girlfriend to
3 start videoing; right?
4    A. "This is going to be a good one."
5    Q. And then you saw her hold up the video, the
6 phone; right?
7    A. I did not see her do that.
8    Q. It would surprise you that that's what she
9 did; right?
10    A. No, it wouldn't surprise me.
11    Q. You watched the video that she took, at least
12 in part she took; right?
13    A. Yes.
14    Q. In fact she -- it started with her and then
15 he gets out of the car; right?
16    A. Yes.
17    Q. And she hands him the -- the phone; right?
18 Do you recall that?
19    A. I don't recall --
20    Q. But you remember he comes up to you with the
21 phone after that; right?
22    A. I'm not sure about that.  That sounds right.
23 I'm not sure.

Page 231

1    Q. Well, you remember that -- you told me
2 that you took the phone from him to put up for the
3 girlfriend?
4    A. Yes, he had the phone.  I didn't know if they
5 had two phones.  Most people have their own cell
6 phone.
7    Q. Now, you were using a mobile phone; right?
8    A. Yes.
9    Q. Your mobile phone's on what service?
10    A. It was going through Verizon --
11    Q. It was a Verizon cell phone; right?
12    A. It -- well, yeah, but -- it was and it
13 wasn't.  It was -- trying to go through the City
14 system.  IT had come out, I told you --
15    Q. Let me ask you, seriously --
16    A. You're interrupting.
17    Q. Was it a Verizon cell phone?  Did it use the
18 Verizon --
19    A. It wasn't -- what I had was not a cell phone.
20 It was a portable phone.
21    Q. So it was -- you're saying you didn't have a
22 cell phone?  You were calling from a wireless phone
23 that was connected back to, like, a base back

Page 232

1 inside?
2    A. It was connected at the sewage plant.
3    Q. How?
4    A. It had the little antenna back there at the
5 sewage plant.
6    Q. So did you have a speed dial on there to
7 contact --
8    A. No.
9    Q. I mean, you had to dial the number?
10    A. Yes.
11    Q. And did you keep trying to dial the number
12 until you were able to get through?
13    A. Yes.
14    Q. So there wasn't, like, a big break between
15 when you first starting dialing and when you
16 actually got through; right?
17    A. It was several minutes.
18    Q. It took you several minutes of --
19    A. To get through.
20    Q. So did you -- how did that work?
21    A. How did what work?
22    Q. How did that happen?  You know -- I don't
23 really understand, frankly, how, you know,

Page 233

1 mechanically this works with this particular phone
2 that I don't really understand.  Like, you're,
3 saying, like, you would enter numbers in and it just
4 wouldn't connect?
5   A.  Correct.
6   Q.  So explain to me -- did you just keep
7 redialing?
8   A.  I'd hang up and dial again.
9   Q.  So how many times did you dial?
10   A.  I can't remember how many times.
11   Q.  I mean, more or less than ten?
12   A.  Less.
13   Q.  More or less than five?
14   A.  Possibly more or about.  I'm not sure.
15   Q.  Did you make any complaint about the -- the
16 phone issue after this incident?
17   A.  Yes.
18   Q.  Okay.  Who did you make a complaint to?
19   A.  I can't remember.  I made complaints before
20 and after.
21   Q.  And you just didn't have, like, a regular old
22 radio, walkie-talkie?
23   A.  No.

Page 234

1   Q.  Like the type -- there is a type that patrol
2 officers wear; right?
3   A.  There is.  Mine was in my pickup truck.
4   Q.  Not something you used in your work?
5   A.  I rarely used it.  When I'd go out
6 occasionally on calls.
7   Q.  So once you got through and you called in --
8 well what was -- maybe we just need to listen to
9 the --
10   A.  The county dug up our lines.
11   Q.  So this is identified as the third call, the
12 file name, at least one version of it.  So you
13 called -- do you remember calling to see a warrant
14 check?
15      (Audiotape playing.)
16   Q.  So when this call is going, does that mean
17 you have his papers?
18   A.  Yes.
19   Q.  I'm going to the call that's labeled  Call
20 No. 2.
21      (Audiotape playing.)
22   Q.  What does that mean, the second call, the
23 signal 41?

Page 235

1   A.  Backup.
2   Q.  Going to call -- when you had already --
3 hadn't you already -- this is Call 1.
4      (Audiotape playing.)
5   Q.  So you told somebody at the office to call
6 for you a backup?
7   A.  Yes, that was Pat Holly, my secretary.
8   Q.  I'm going back to Recording 3.
9      (Audiotape playing.)
10   Q.  So you're calling and Mr. Lawrence is out
11 with you?
12   A.  That's him yelling in the background.
13   Q.  That's him that says that you're unlawfully
14 detaining him?
15   A.  Correct.
16   Q.  And that it's all on film?
17   A.  Yes.
18   Q.  So he had been filming you up into this point
19 where you call in; right?
20   A.  I don't know where he -- I don't know.
21      (Audiotape playing.)
22   Q.  So you learned that he was negative on
23 warrants; right?

Page 236

1   A.  Correct.  By that name.
2      (Audiotape playing.)
3   Q.  So when you first came, you went to try and
4 get Mr. Lawrence's tag after you first came out; is
5 that your recollection?
6   A.  I may have asked for his driver's license,
7 too.  As I went by I told him I wanted his driver's
8 license.  But, yes, my intent was to get his tag
9 number.
10   Q.  But I'm just recalling he got into the car
11 and then you went around to his tag and then he got
12 out; right?
13   A.  That's right.  That's right.
14   Q.  And that's when you couldn't get through on
15 the phone; right?
16   A.  Yes.
17   Q.  So you couldn't call in the tag at that time
18 because the phone wasn't working; right?
19   A.  And I kept trying to.  Right.
20   Q.  And so you stepped backed and kept trying to
21 call on the phone until you were eventually able to
22 get them; right?
23   A.  Yes.

Page 237

1  Q. And then --
2  A. But I had also asked for his driver's license
3  and that pause -- in one of those pauses I had asked
4  for his driver's -- DL.
5  Q. Has he given his paperwork to you?
6  A. Not at first, no. Not when I asked for his
7  driver's license.
8  Q. When did he give you the paperwork?
9  A. When he told me he was going to get in his
10  car and leave. And I told him he wasn't going
11  anywhere without a driver's license. He told me
12  that was my law, not his, and he didn't need it.
13  And he went to get in the car. He got in the car.
14  I thought he was leaving.
15       (Videotape playing.)
16  Q. Would you agree that we can, to some extent,
17  take the video from Mr. Lawrence's girlfriend's cell
18  phone and match it up with this recording by
19  matching what you can hear each of you say?
20  A. I'm not -- I'm not sure that they were done
21  at the same time. Because he gave me the paper --
22  Q. If they match up though, like, identically,
23  we would be able to see where they overlap --

Page 238

1  A. Right.
2  Q. If they do; right?
3  A. Yeah, if they do.
4       (Videotape playing.)
5  Q. Now I'm playing the first of three videos
6  from his -- her cell phone. I say it was the first.
7  I'm not sure it's the first but --
8  A. Oh, that. Yeah.
9  Q. How many of the cell phone videos did you
10  see?
11  A. There was something about a little kid that
12  was playing on there and I thought that was odd.
13  Q. So you definitely saw the one with that sound
14  in it?
15  A. Yeah.
16       (Videotape playing.)
17  Q. Okay. Do you remember him talking about
18  that, getting the news crew out?
19  A. Vaguely.
20  Q. Your blue is visible. I think, it's your
21  blue --
22  A. Yeah, it's me standing there.
23  Q. Okay. When is this recording from?

Page 239

1  A. That's -- that's when he was getting the
2  paper.
3  Q. Is that at the beginning? Like, where does
4  this fit in the timeline you recall?
5  A. Before I had the comm center on the phone and
6  with an open line. It was before that.
7       (Videotape playing.)
8  Q. Okay. Do you remember this language being on
9  the comm center? The language about --
10  A. No.
11  Q. -- where he admitted that he in fact --
12  A. Yes, because I asked him if he had lied.
13  Q. Yup, and he basically admitted to you that he
14  lied about Geneva County; right?
15  A. He lied about where he lived.
16  Q. But he essentially admitted that he lied to
17  you about Geneva County and then told you that it
18  didn't matter; right?
19  A. Right.
20  Q. And that is caught on the recording that you
21  had; right?
22  A. Yes.
23  Q. And your recording, just to be clear,

Page 240

1  continues up until Officer Rhodes arrives; right?
2  A. Correct.
3  Q. But some part of it is harder to hear his
4  part; right?
5  A. I kept backing up from him.
6  Q. Well, he's in his car -- I could just pull
7  the video --
8  A. No. That's fine.
9  Q. Initially he's in his car; right?
10  A. Right.
11       (Videotape playing.)
12  Q. So to the extent -- and I believe this
13  recording continues all the way through until it
14  gets handed to you and then it goes off. Do you
15  recall --
16  A. The phone?
17  Q. -- the phone recording.
18  A. He -- I remember him holding it up in his
19  hand -- one of his hands -- and saying, "Watch my
20  phone, watch my phone" and I took it out of his hand
21  and handed to the woman inside the car so it
22  wouldn't get broken.
23  Q. Yeah, but I'm saying this recording -- this

Page 241

1  video recording of her and then him matches up with
2  your last call to the comm center?
3      A. To the comm center.
4      Q. Right?
5      A. It sounds like it.
6         (Videotape playing.)
7      Q. Now, and you can actually -- if you look, you
8  can actually see you on -- with the phone up to your
9  ear, do you know -- I can show you this, do you
10  know -- I don't think it's particularly material,
11  but I just wanted you -- what are the papers that
12  you got in your hand in that -- in that video there?
13      A. One of them is the piece of paper that I got
14  to write the tag number down and the other one is --
15  what I'm looking at there is the one that he handed
16  me. The affidavit of identity.
17      Q. So how -- did you get the affidavit of
18  identity from him while he was sitting in the car?
19      A. Yeah, he went to the car to get it.
20      Q. Is that what he was going to get when he left
21  the building?
22      A. Yeah, I didn't know -- yeah, I didn't know --
23  I thought he was leaving the premises.

Page 242

1      Q. So basically what happened? He left, went
2  through the door, you followed, he got his affidavit
3  of identity and handed it to you; right?
4      A. Not immediately.
5      Q. Did y'all discuss --
6      A. Because we were at the back of the car
7  trying -- I was trying to get the tag and him
8  stepping in front of the tag. That came first. He
9  got out of the car and came back there and told me I
10  didn't have the right to get his tag.
11      Q. Was that before or after he had given you the
12  affidavit of identity?
13      A. Before.
14      Q. And was there any reason you needed his tag
15  at that point in the incident?
16      A. Yes.
17      Q. Why?
18      A. Because he had threatened to dump the dog at
19  the end of the road, and I needed a place to start
20  tracking down. And tags were good.
21         (Videotape playing.)
22      A. Wait a minute, what did she say? I didn't
23  quite catch it.

Page 243

1         MR. WHITE: He's not asking any
2  questions. I mean, if you want to ask a question
3  about what it is. Then --
4         MR. SHERROD: I'm just letting her listen
5  and then I'll -- yeah, absolutely, I'm not going to
6  ask a question about that, but she's welcome to hear
7  it.
8         MR. WHITE: Okay.
9         (Videotape playing.)
10      A. "Back with us"?
11      Q. Now, was there any further -- at any time was
12  there any discussion of the dog?
13      A. They called it by name.
14      Q. Is that on any of the recording?
15      A. No.
16      Q. When did they call it by name?
17      A. The woman called by name after he had been
18  shot and it was running around loose and she said,
19  "Snoopy. Snoopy. Come here, Snoopy."
20      Q. There were two dogs in the car, weren't
21  there?
22      A. No, that one, the other one was still in the
23  car. But that's the one she was calling.

Page 244

1      Q. So the time you claim that she referred to it
2  as Snoopy was after the shooting?
3      A. Yes.
4      Q. Okay.
5      A. Because then, I think, both of the dogs ended
6  up getting out of the car because she left the door
7  open.
8      Q. So that's why I was confused. I thought you
9  just said that only one of them got out of the car?
10      A. One got out originally and that's the one she
11  was hollering after.
12         (Videotape playing.)
13      Q. Was it unprofessional for you to refer to the
14  teeth in his mouth?
15         MR. WHITE: Object to the form.
16      A. Yes.
17      Q. Would that indicate -- how did he respond to
18  that?
19      A. He told me he made $1,600 an hour.
20      Q. Not then. He didn't do that just then.
21         MR. WHITE: Objection.
22      A. After.
23         MR. WHITE: Whoa. Whoa. You wait for a

Page 245

1  question.
2    Q.  Ms. Woodruff, he didn't say about the 16- --
3  the whatever dollars an hour in response to the
4  teeth, did he?
5    A.  Not to the teeth.
6    Q.  No, so I'm just talking about the teeth.  So
7  he actually responded quite reasonably saying, you
8  know, that's, you know -- I don't remember his exact
9  words, but he was critical of you for having gone
10  there; right?
11    A.  Yes.
12    Q.  You didn't apologize, did you?
13    A.  No.
14    Q.  Would you agree that between the two of you,
15  at that moment anyway, he was the one that was more
16  in the control of his emotions?
17    A.  No.
18    Q.  Would you agree that the -- on multiple
19  occasions demeaning somebody regarding their teeth
20  and their wealth and then their psychiatric state
21  would indicate that you were not in good control of
22  your emotions?
23        MR. WHITE:  Object to the form.

Page 246

1    A.  Try me one more time.
2    Q.  Yeah.  It's unprofessional to ask somebody if
3  they're off their meds; right?
4    A.  No.
5    Q.  After you've asked them about -- criticized
6  their teeth and their wealth, didn't you think it
7  might sound a little bit as an attack to ask them if
8  they're off their meds?
9    A.  I deal with a lot of people --
10    Q.  Are you --
11    A.  Do you want me to answer?
12    Q.  I understand that theoretically people can be
13  off their meds.  My question is, are you claiming
14  that you were just concerned with asking about
15  whether he was not taking his regular prescription
16  medications?
17    A.  Yes.
18    Q.  Okay.  And is that why --
19    A.  Or psychiatric medications.
20    Q.  Psychiatric medications are prescription
21  medications, aren't they, Ms. Woodruff?
22    A.  Yes.
23    Q.  Okay.  But you take -- what -- but

Page 247

1  regardless, you're saying that was a professional
2  question to ask somebody?
3    A.  It's asked a lot, yes.
4    Q.  To people that you've asked them about
5  their -- demean them about their teeth and their
6  income?
7    A.  I don't think I've ever asked that before.
8    Q.  So why were you --
9    A.  I might have.  I don't know.
10    Q.  Why did you speak that way to Mr. Lawrence
11  that day?
12    A.  I can't answer that.  I don't know.
13    Q.  Were you having a bad day?
14    A.  No, I was having a good day.
15    Q.  I mean, is it -- you saw Mr. Lawrence as less
16  than a regular person; right?
17    A.  No.
18    Q.  He was a sovereign citizen; right?
19    A.  He was -- that only clued me into him being
20  dangerous.
21    Q.  He didn't deserve any respect from you is the
22  way you took it; right?
23    A.  Wrong.

Page 248

1    Q.  Because of his crazy beliefs?
2    A.  Wrong.
3    Q.  Well you treated him in a demeaning manner --
4  unprofessional manner; right?
5    A.  No.
6    Q.  I thought you said that it was -- would you
7  not agree that the teeth and the wealth comments
8  were demeaning?
9    A.  No, the wealth comment was in response to him
10  telling me that he makes $1,600 an hour talking to
11  people like me.
12    Q.  He didn't say that's what he made.  He said
13  that what his rates were.
14        MR. WHITE:  Objection.  Now you're not --
15  now you're not -- whoa, just hold on.  You're not
16  asking questions and she's not going to answer
17  something or respond to your statement.
18    Q.  Ms. Woodruff, were --
19    A.  I need to use the ladies' room.
20    Q.  Can we agree that you were not treating
21  Mr. Lawrence with respect during the encounter?
22    A.  No, we can't agree to that.
23    Q.  Can we agree that you did -- if somebody said

Page 249

1 something personal like that to you that you would
2 consider -- you know, it might be taken and
3 understood as indicating lack of respect?
4    A. As a police officer, I've listened to a lot
5 and it doesn't bother me.
6    Q. But you didn't listen to anything personally
7 demeaning like that from Mr. Lawrence, did you?
8    A. That's not what I'm asking you.
9    Q. Well, I didn't -- I'm asking you a different
10 question. You're -- whatever other people have said
11 to you is not an excuse for how you get to treat
12 Mr. Lawrence, is it?
13    A. I try to treat everybody the same.
14    Q. So have you treated other people like you
15 treated Mr. Lawrence, don't you?
16    A. Depends on the circumstances.
17    Q. If you are -- if they get you --
18    A. I've never had circumstances like these
19 before.
20    Q. If somebody makes you angry, you will use
21 your wit and your words to demean them, won't you?
22    A. No.
23        MR. WHITE: Object to the form.

Page 250

1    Q. I thought you said you treated him like you
2 treated everybody. I mean, was this an exception or
3 was this the rule is what I'm asking?
4    A. It was -- I told you I've never had a
5 situation like this before.
6    Q. You've never had a situation where somebody
7 didn't obey your commands?
8    A. The totality of the circumstances. I have
9 never run into anybody that behaved like this or
10 just -- behaved like this. And if you don't mind, I
11 need a quick bathroom break.
12        MR. SHERROD: Sure.
13        (Brief recess taken.)
14    Q. (By Mr. Sherrod) Now, I could show you but
15 he's in his car during --
16    A. That part.
17    Q. -- this entire part of the conversation;
18 right?
19    A. Okay.
20    Q. I can show you he's still in the car --
21    A. Still in the car.
22    Q. -- at four minutes. I think, is that -- now,
23 you've had an opportunity at this point to get his

Page 251

1 tag if you wanted to; right?
2    A. Yeah, and I probably had. I was trying to
3 keep my eyes on him. I don't know.
4        (Videotape playing.)
5    Q. Okay. There's a -- I guess there's a guy in
6 a black sweatshirt that walks by like he's going in
7 the animal shelter. Do you know who that was?
8    A. No.
9    Q. I'll show you. It may just be a random --
10 it's probably not important. I hadn't even noticed
11 it before. So that's the guy, you don't really get
12 a great look at him. Seems like a young guy.
13    A. I think that's just a customer.
14    Q. Just a customer? I figured. Okay.
15    A. I don't recognize him.
16        (Videotape playing.)
17    A. That's where I was running the tag.
18    Q. You hear him. That's when he said, "That's
19 private property"?
20    A. That's when I was running the tag.
21    Q. Right. And that's when he comes back and
22 stands in your way; right?
23    A. It appears that way.

Page 252

1    Q. Yeah and this is at -- on the cell phone
2 video at 4:39.
3    A. Well, everybody's clocks are different.
4    Q. A time, not the time. At 4:39 into the
5 video. He's standing there, you're on the phone --
6 you've been the phone the whole time; right? We can
7 go back to the audio, but we can hear you call in
8 the tag; right?
9    A. Yes, I called the tag in. I think that was
10 the second call, wasn't it?
11    Q. He mentions private property; right? And he
12 goes back there between you and the tag; right? I
13 need you to answer out loud.
14    A. Yes. I'm sorry.
15    Q. It's okay.
16        (Videotape playing.)
17    Q. And then he walks back; right?
18    A. Right.
19    Q. Now, who is that standing with you right
20 there?
21    A. Officer Skipper.
22    Q. And you knew that Officer Skipper was out
23 there the entire time. Didn't you?

Page 253

1   A.   No.

2   Q.   Did you not see her when you're walking and
3   you're right there within a few feet of her?

4   A.   My back is to her.  I may have noticed her
5   then.  I don't remember now.  You're asking if I
6   remember somebody standing behind me two and a half
7   years ago.  I don't remember.

8   Q.   I'm actually -- you were trying claim that
9   wasn't Officer Skipper helping you with the gun, so
10  I'm just --

11  A.   That's right.

12  Q.   And I'm going to tell you she's in some other
13  video footage I'm just saying, do you claim you
14  didn't even know she was out there with you?

15  A.   Well, I knew she was out there at different
16  points.

17  Q.   You knew she was out there with you during
18  the incident; right?

19  A.   She wasn't there the whole time.

20  Q.   So you're saying she went inside?

21  A.   She went inside at one point to get a
22  different phone because that one she had wasn't
23  working.

Page 254

1   Q.   Okay.  But at this point she's out there for
2   the rest of the incident.  Isn't she?

3   A.   I don't know.  I wasn't looking at Officer
4   Skipper.

5   Q.   You didn't need to look at Officer Skipper
6   because you knew she was there; right?  You see
7   y'all are standing -- she's there with you.  She's
8   in your peripheral vision; right?

9   A.   Correct.

10        (Videotape playing.)

11  Q.   So he asked for his paperwork back; right?

12  A.   He's screaming for it, yup.

13  Q.   Okay.  He's got his hand in the video; right?

14  A.   Yup.

15  Q.   You're holding the paperwork behind your
16  back; right?

17  A.   I'm just holding it.  It's the way I'm
18  standing, yeah.

19  Q.   But paperwork is behind your back?

20  A.   Correct.

21  Q.   And do you contend that this distance is in
22  your face?

23  A.   It's hard to tell what distance -- no, this

Page 255

1   is in my face.

2   Q.   Do you contend that he was in your face on
3   this moment in this video at time 5 minutes and
4   29 seconds?

5   A.   Play it all.  Not just his hand.

6   Q.   No, I'm just asking at this second.  I am
7   going to play it all; I'm just asking, do you
8   contend that this was in your face?

9   A.   I can't say.

10  Q.   Okay.  I want to ask you if anything in
11  here -- at any time -- you tell me stop, if you say,
12  "That's when he was in my face" like you discussed
13  earlier.

14        (Videotape playing.)

15  Q.   Now, did you answer yes to that question when
16  he asked if he had committed a crime?

17  A.   I did not.

18  Q.   Okay.  When you told him to --

19  A.   He started toward me.

20  Q.   But was he in your face when you said that?

21  A.   At that point?

22  Q.   Yeah.

23  A.   You can't tell, no.  It doesn't appear to be.

Page 256

1   Q.   Was he in your face when you said, "Get out
2   of my face" that time?

3   A.   I can't tell.

4   Q.   You were saying --

5   A.   If you're in my reactionary space I can't get
6   away from you.

7   Q.   You didn't try to get away from him, did you?

8   A.   I backed up.  Watch, I moved.  I kept moving
9   away from him.  Keep watching.

10  Q.   You said he was in your face for the
11  recording; right?

12  A.   I'm moving away.  I'm moving away.

13        (Videotape playing.)

14  Q.   Now you stepped towards him.

15  A.   I did.

16  Q.   Yeah, you made --

17  A.   You're making my point, yes.

18  Q.   You got in his face, didn't you?

19  A.   No.  You don't consider it in your face when
20  he's that close to me.

21  Q.   Well --

22  A.   But it is when I'm that close to him?

23  Q.   I mean, the closest that anybody came to

Page 257

1  getting in anybody's face is when you stepped
2  forward as shown in this video; right?
3        (Videotape playing.)
4    A. Keep going. He's following me. He's
5  following me. He was very, very close. I wasn't
6  talking to him.
7    Q. Yeah, you said that --
8    A. I was talking to the comm center.
9    Q. Exactly. You weren't asking him if he was
10  off his meds; you were making a comment about him to
11  the comm center; right?
12    A. That he might be off his meds. I don't know
13  if he's off his meds or what.
14    Q. Did you also call him crazy?
15    A. I don't know, did I?
16    Q. I'm not sure. I had a note on my piece of
17  paper, but I'm not going to represent --
18    A. Nuts. I may have said that.
19    Q. I don't -- it may have been in one of your
20  video interviews and not in the comm.
21        (Videotape playing.)
22    A. Yeah, he's back out of his car again. He got
23  in his car and back out of his car again.

Page 258

1    Q. Did he ever get in your face?
2    A. Yeah, he was too close to me.
3    Q. Okay. You're saying he's in your face as
4  long as he's too close --
5    A. Too close. Too close. That's my face.
6  Too close.
7    Q. So anytime you think it's too close, you
8  consider that to be in your face?
9    A. No, that's through our training. You have to
10  leave a reactionary space, a gap, so that we can
11  react if they do something.
12    Q. Ms. Woodruff, what do you think would have
13  happened if you would have given Mr. Lawrence his
14  paperwork and let him leave?
15    A. That wasn't going to happen.
16    Q. What do you think would have happened if --
17        MR. WHITE: Object to the form.
18    A. You're asking me to speculate on the future.
19  I don't know.
20    Q. But weren't you -- you were willing to
21  speculate on the future if you didn't shoot
22  Mr. Lawrence; right?
23    A. I think he would have driven off, how's that?

Page 259

1  Does that suit you?
2    Q. And he wouldn't be dead; right? That day.
3    A. He had ample opportunities to do exactly
4  that.
5    Q. And his kids wouldn't have to witness their
6  father shot right in front of them; right?
7    A. Oh, the kids that he used the F word in front
8  of?
9    Q. Do you compare the kids having -- that was
10  the girlfriend by the way -- but the kids --
11    A. No, it wasn't. It was him.
12    Q. Well, maybe I misheard -- but whether -- do
13  you consider using the F word to mean, you know, as
14  it doesn't matter if you shoot a guy in front of his
15  kids?
16    A. Now that's ridiculous. That's a ridiculous
17  question.
18    Q. Why would you bring that up, Ms. Woodruff, as
19  a defense of killing this man in front of his kids?
20  Like he didn't deserve the life to be a father
21  because, you know, he supposedly cursed in front of
22  his kids? I mean, surely you don't mean that;
23  right? I mean, you can't mean that. You don't

Page 260

1  think somebody loses their -- the fact that they
2  said the F word is relevant to the trauma that is
3  inflicted when you kill somebody in front of
4  their --
5    A. No.
6    Q. Somebody's parents --
7    A. No.
8    Q. -- right in front of them. I mean, you
9  didn't form the opinion that these kids were better
10  off without daddy, did you?
11    A. That's a ridiculous question.
12    Q. I mean, I assume you didn't. So it just
13  isn't relevant whether a curse word was said; right?
14        MR. WHITE: Relevant to what?
15    Q. To --
16        MR. WHITE: Whether she did or didn't?
17  Yes it is.
18        MR. SHERROD: How it relevant, Lenn?
19        MR. WHITE: If the question is whether
20  she did or she didn't, it's relevant to whether she
21  did or didn't.
22    Q. (By Mr. Sherrod) Who have you talked to in
23  detail about the incident other than your attorney

Page 261

1 and of course the two recorded -- your attorneys and
2 the two recorded statements?
3   A. A friend.
4   Q. Which friend?
5   A. And my therapist.
6   Q. Which friend? Laurie?
7   A. Yes.
8   Q. Any friends other than Laurie that you have
9 talked to?
10   A. Not in detail, no.
11   Q. Who have you told that you have PTSD because
12 you shot and killed Mr. Lawrence?
13   A. Several.
14       MR. WHITE: Object to the form.
15   A. Several people.
16   Q. Again other than lawyers what -- who have --
17 who are those several people that you have told that
18 you now have PTSD as a result of shooting and
19 killing -- shooting and kill Mr. Lawrence?
20       MR. WHITE: Same objection.
21   A. My doctor -- doctors.
22   Q. Which doctors?
23   A. All of them. I have many doctors.

Page 262

1   Q. Okay. I guess I'm going to -- so who are all
2 your many doctors since this incident?
3   A. Well they were there before the incident.
4   Q. But who have you seen -- who are the many
5 doctors that you have seen since this incident?
6   A. Raji Talk.
7   Q. And who's that? What type of doctor is he or
8 she?
9   A. He's an neurosurgeon.
10   Q. Who else?
11   A. Saeeda Malik.
12   Q. Okay. What kind of doctor?
13   A. She's a neurologist. Then Spedale.
14   Q. Who?
15   A. Tony Spedale, you have him.
16   Q. Okay. Yup.
17   A. Let me think. The social security doctor. I
18 guess that's it.
19   Q. Friends other than --
20   A. Oh no, Dr. Jackson.
21   Q. Who's Dr. Jackson?
22   A. Daniel Jackson. He is my gastro doctor.
23   Q. Do you have flashbacks to shooting

Page 263

1 Mr. Lawrence?
2   A. Yes, I do.
3   Q. Do you have flashbacks to his kids coming out
4 of the car?
5   A. No.
6   Q. Any flashbacks that involve his children?
7   A. I remember them crying.
8   Q. And excluding your lawyers, have you ever
9 expressed remorse or regret for shooting -- killing
10 Mr. Lawrence?
11   A. To my psychologist that did the testing,
12 right off the bat. It's not easy to take a human
13 life. And it's sad that I was forced into it.
14   Q. It would be even sadder if you weren't,
15 wouldn't it?
16       MR. WHITE: Object to the form.
17   A. I'm not going to answer that. It's a
18 ridiculous question.
19   Q. Regardless of fault, it's normal to be sad
20 that -- to take a human life; right?
21   A. I wouldn't be human if I didn't feel
22 something.
23   Q. Something might hit somebody a lot harder if

Page 264

1 they knew deep in their heart that the person didn't
2 need to die.
3       MR. WHITE: I object to this form. These
4 insinuations are totally out of line and
5 unprofessional. And I just object on the grounds
6 that she's already said she had no choice and for
7 you to imply otherwise is pointless.
8       MR. SHERROD: This whole case -- it may
9 be pointless, but it is the premise of this case.
10   Q. So I'm going to ask you one time -- one more
11 time, a question I don't ever got a straight answer
12 to, I don't think. If Mr. Cantu -- excuse me -- if
13 Mr. Lawrence never wielded the Taser, never had it
14 except by the barrel, can we agree that you had an
15 option other than shooting him?
16   A. I don't know what his other actions would
17 have been.
18   Q. Based solely on that, that being the -- at
19 that point you -- can we agree that it is not
20 appropriate to use deadly force?
21       MR. WHITE: If you can address a
22 hypothetical.
23       THE WITNESS: A hypothetical question.

Page 265

1    Q.  Hypothetically, absolutely, yes; right?  Is
2  what you said?
3    A.  Hypothetically?
4    Q.  Yes.
5    A.  Yeah.
6    Q.  And your defense to deadly force in this case
7  is that he had the Taser and could wield it to
8  incapacitate; right?
9         MR. SHERROD:  That's all.  Thank you.  I
10  want to say I want to reserve -- I hope I won't need
11  to because I got a lot of background, but I am
12  reserving after I get the personnel records and
13  review -- eventually, I hope -- to coming back.  But
14  I certainly --
15         MR. WHITE:  We'll reserve our objection.
16         MR. SHERROD:  I assumed you would.
17         (Deposition concluded at 4:45 p.m.)
18
19
20
21
22
23

Page 266

1         REPORTER'S CERTIFICATE
2  STATE OF ALABAMA
   DALE COUNTY
3
4    I, Kathryn Mills, Certified Court Reporter,
5  Commissioner for the State of Alabama at Large,
6  hereby certify that on Friday, August 25, 2017, I
7  reported the deposition of ADRIANNE WOODRUFF, who
8  was first duly sworn or affirmed to speak the truth
9  in the matter of the foregoing cause and that pages
10  4 through 265 contain a true and accurate
11  transcription of the examination of said witness by
12  counsel for the parties set out herein.
13    I further certify that I am neither of kin nor of
14  counsel to any of the parties to said cause, nor in
15  any manner interested in the results thereof.
16
17
18         /s/Kathryn Mills
           KATHRYN MILLS,
19         Certified Court Reporter
           Commissioner for the
20         State of Alabama at Large
           ABCR# 644, Expires 09/30/18
21         MY COMMISSION EXPIRES:  10/31/2020
22
23

# TAB 65

# UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA SOUTHERN DIVISION

| | | |
|---|---|---|
| **CHRISTOPHER CANTU,** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.:  1:16-cv-1003** |
| | ) | |
| **CITY OF DOTHAN, ALABAMA,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **DEFENDANT.** | ) | |

## DEFENDANTS' NARRATIVE SUMMARY OF FACTS

Come Now the Defendants, City of Dothan, Alabama, Greg Benton, Chris Summerlin and Adrianne Woodruff, by and through the undersigned attorney of record, and submit this Narrative Summary of Undisputed Facts in support of their contemporaneously filed Motion for Summary Judgement.

## The Parties

1.     Plaintiff Christopher Cantu is the personal representative of the estate of Robert Earl Lawrence.  (Doc. 28, p. 1, paragraph 1).  According to the autopsy report, Robert Earl Lawrence at the time of his death on December 30, 2014 was 6 feet, 1 inch tall and weighed 200 pounds.  The cause of death was a "gunshot wound to the abdomen according to the report.  (Affidavit of Benton, Defendants'

Exh. D-6).

2.      Defendant Greg Benton ("Chief Benton") is now retired from his duties as of May 1, 2015 as City of Dothan Police Chief.  Chief Benton worked for the Dothan Police Department for 26 years.  (Id.).

3.      Defendant Chris Summerlin ("Officer Summerlin") is a police officer with the City of Dothan Police Department where he has been employed for five years.  (Affidavit of Summerlin, Defendants' Exh. F).

4.      Defendant Adrianne Woodruff ("Sgt. Woodruff") is a retired sergeant from the Dothan Police Department.  She retired on November 1, 2015 after 24 years of service.  (Affidavit of Woodruff, Defendants' Exh. A).

5.      Defendant City of Dothan ("the City") was the Employer of Defendants, Benton, Summerlin & Woodruff in the City of Dothan Police Department.  (Affidavit of Woodruff, Defendants' Exh. A; Affidavit of Benton, Defendants' Exh. D; Affidavit of Summerlin, Defendants' Exh. F).

6.      Sgt. Woodruff, at all times during her career with the Dothan Police Department, maintained her Alabama Peace Officers Training Commission (APOST) certification as a police officer.  Sgt. Woodruff received extensive training following graduation from the police academy in the Dothan Police Department Field Training Program.  (Affidavit of Woodruff, Defendants' Exh. A; Affidavit of Penn, Defendants' Exh. G).  Dothan Police Officers, including Sgt.

Woodruff, are required to receive 32 hours of continuing law enforcement education annually compared to the 12 hour requirement of APOST.  (Affidvit of Penn, Defendants' Exh. G).  This training includes use of force, sidearms and Tasers.  (Id.).  Sgt. Woodruff completed qualifications for sidearms and Tasers for each year of her employment with the Dothan Police Department.  (Id.).  All Dothan police officers, including Sgt. Woodruff attend in-service training twice a year and complete annual firearms qualification.  (Id.)  Sgt. Woodruff, as well as all Dothan police officers, received training in conducting <u>Terry</u> stops, probable cause, use of force, state and federal law.  (Id.).

**<u>Events Inside the Dothan Animal Shelter</u>**

7.     On December 30, 2014 Lt. Adrianne Woodruff was on duty as supervisor at the Dothan Animal Shelter, 295 Jerry Drive, Dothan, Alabama. (Affidavit of Woodruff, Defendants' Exh. A).

8.     Also working at the shelter that day were Patricia Holley, the receptionist and Renee Skipper, Chief Animal Services Officer.  (Affidavit of Woodruff, Defendants' Exh. A).

9.     At approximately 12:20 p.m., Robert Lawrence entered the animal shelter reception area with a dog he wanted to leave there.  (Inside animal shelter

video, Defendants' Exh. J).[1]

10.     The majority of the sequence of events from Lawrence's arrival through his shooting are video recorded on four different recordings.  The first is the closed circuit camera recording without sound inside the office.  (Id.).  The second and third video recordings are from Lawrence's girlfriend, Priscilla Grissett's cell phone camera.  (Grissett's video, no. 1, Defendants' Exh. K; Grissett video no. 2, Defendants' Exh. L).  The fourth video is from Officer Alan Rhodes' dash mounted camera.  (Rhodes' video, Defendants' Exh. M).  There are also audio recordings of three telephone calls from the animal shelter to Dothan Police dispatch.  (Dothan Police Department phone call no. 1, Defendants' Exh. N; Police Department phone call no. 2, Defendants' Exh. O; Police Department phone call no. 3, Defendants' Exh. P; Police radio traffic recording, Defendants' Exh. Q).

11.     When Lawrence told Holley that he was from Geneva County, Holley advised the shelter only took dogs from Houston County, but Holley agreed to proceed when Lawrence said he found the dog at Wal-Mart in Dothan.  (Affidavit of Woodruff, Defendants' Exh. A).

12.     Sgt. Adrianne Woodruff came in from an adjoining office when she heard Lawrence become upset and loud when he was asked for identification.  She

---

[1] The closed circuit video inside the animal shelter did not record audio.

was wearing a City of Dothan Class C police uniform with the Dothan Police badge in gold embroidery on the chest. (Affidavit of Woodruff, Defendants' Exh. A; Inside animal shelter video, Defendants' Exh. J).

13.     Lawrence became agitated and began quoting federal law that asking for his name, address and identification was an invasion of privacy.  (Affidavit of Woodruff, Defendants' Exh. A).

14.     In order to de-escalate the situation, Sgt. Woodruff agreed to take the dog if Lawrence would sign a routine animal intake form.  (Affidavit of Woodruff, Defendants' Exh. A).

15.     Lawrence angrily refused and threatened to dump the dog at the end of the road.  (Affidavit of Woodruff, Defendants' Exh. A).

16.     When Sgt. Woodruff told him that would be a crime, Lawrence demanded she show him that law in a loud voice.  (Affidavit of Woodruff, Defendants' Exh. A).

17.     Lawrence cited federal law that his rights were being violated and jerked the dog off the floor by the nape of the neck.  (Affidavit of Woodruff, Defendants' Exh. A).

18.     Sgt. Woodruff told Lawrence not to mistreat the dog and asked to see his identification.  (Affidavit of Woodruff, Defendants' Exh. A).

19.     Lawrence refused and again responded to her request by saying that

was a violation of his rights.  He continued quoting federal law as he left the office.  (Affidavit of Woodruff, Defendants' Exh. A).

20.     Based upon her training, Sgt. Woodruff believed Lawrence's behavior was consistent with the actions and beliefs of the anti-government extremist group known as Sovereign Citizens.  (Affidavit of Woodruff, Defendants' Exh. A).

21.     When Lawrence turned to exit the building with the dog, Sgt. Woodruff asked again for identification because of his threat of what he would do with the dog.  (Affidavit of Woodruff, Defendants' Exh. A).

22.     As Lawrence pushed the door open to leave, Sgt. Woodruff saw the bottom part of a pistol holster on Lawrence's hip.  (Affidavit of Woodruff, Defendants' Exh. A; Grissett video no. 1, Defendants' Exh. K).

23.     When she asked if he had a gun, he replied that it was in the car.  Before she followed Lawrence outside, Sgt. Woodruff had Holley call police communications to send back-up.  (Dothan Police Department call no. 1 at 00:02, Defendants' Exh. N; Affidavit of Woodruff, Defendants' Exh. A).

**Lawrence's Refusals of Sgt. Woodruff's Requests for Driver's License and Woodruff's Calls for Backup Officer**

24.     Lawrence became louder when Sgt. Woodruff asked for his driver's license as he walked to the driver's door of a silver Lexus sedan.  (Affidavit of

Woodruff, Defendants' Exh. A).

25.     Lawrence shouted to a female in the front passenger seat to get the video camera because this was going to be a good one.  (Affidavit of Woodruff, Defendants' Exh. A).

26.     Lawrence sat in the driver's seat and Sgt. Woodruff asked him for his identification which he refused.  Woodruff went to the rear of the vehicle and began copying his vehicle tag number.  (Affidavit of Woodruff, Defendants' Exh. A).

27.     Copying his tag number caused Lawrence to become more infuriated and he exited his vehicle.  He approached Sgt. Woodruff in a belligerent and threatening manner demanding she had no right to do so.  He then stood in front of his license tag to block it from her view.  (Affidavit of Woodruff, Defendants' Exh. A).

28.     Sgt. Woodruff called police dispatch to request her back-up "ASAP" because she feared a physical confrontation with the much larger and stronger Lawrence.  Lawrence was 6'1", 200lbs and approximately 30 years younger than Woodruff who was 5'3" and 120lbs.  (Dothan Police Department telephone call no. 2, Defendants' Exh. O; Affidavit of Woodruff, Defendants' Exh. A; Affidavit of Benton, Defendants' Exh. D-7).

29.     Lawrence told Sgt. Woodruff he was leaving and got back into the driver's seat.  (Affidavit of Woodruff, Defendants' Exh. A; Grissett video no. 1, at

00:01, Defendants' Exh. K).

30.   Sgt. Woodruff told Lawrence he could not leave without showing her a driver's license.  (Affidavit of Woodruff, Defendants' Exh. A; Grissett video no. 2, at 00:42, Defendants' Exh. L).

31.   Lawrence produced a piece of paper from his notebook purporting to be an, "AFFIDAVIT OF IDENTITY."  (Affidavit of Woodruff, Defendants' Exh. A-1; Grissett video no. 1 at 00:18, Defendants' Exh. K).

32.   This document purportedly, "duly affirmed upon oath and full commercial liability" Lawrence's name, his "current post" and "Date of origin."  It also purported him "to be the Flesh and blood living Man" along with his thumb print and photograph.  (Affidavit of Woodruff, Defendants' Exh. A-1).

33.   Lawrence soon demanded his identification paper back.  (Grissett video no. 1 at 00.28, Defendants' Exh. A-5).

34.   Sgt. Woodruff said she would first call police dispatch to request a warrant check for Lawrence.  (Telephone call no. 3 at 00:04, Defendants' Exh. P; Affidavit of Woodruff, Defendants' Exh. A; Grissett video no. 1 at 00:35, Defendants' Exh. K).

35.   Lawrence told Woodruff "no," that she had no right or authority.  (Id., at 00:38).

36.   Skipper brought Woodruff a portable telephone.  (Affidavit of

Woodruff, Defendants' Exh. A; Grissett video no. 1 at 00:46, Defendants' Exh. K).

37.     Sgt. Woodruff again asked for a driver's license.  Lawrence responded that he did not need a driver's license.  Woodruff explained that in order to drive in the State of Alabama he must have a driver's license.  (Id., at 00:44).

38.     The warrant check was negative for Lawrence and no information was provided for his extensive violent criminal history, including making a terrorist threat.  (Telephone call no. 3 at 01:01, Defendants' Exh. P; Affidavit of Woodruff, Defendants' Exh. A; ABI Report, Defendants' Exh. D-3).

39.     Sgt. Woodruff requested dispatch to record the call and to leave the line open because of Lawrence's belligerent conduct.  (Telephone call no. 3 at 01:15, Defendants' Exh. P; Affidavit of Woodruff, Defendants' Exh. A).

40.     Sgt. Woodruff asked the dispatcher if she could hear Lawrence and if she understood what he was, an implied reference to Sovereign Citizens.  (Id).

41.     Lawrence continued to demand his paper back because he was leaving.  He also argued that "under the rights of the Supreme Court" he had the right to walk away.  (Telephone call no. 3 at 2:56, Defendants' Exh. P).

42.     Sgt. Woodruff told him he did not have the right to drive without a driver's license.  (Id., at 3:02).

43.     Sgt. Woodruff again told the dispatcher that she really needed backup.  (Id., at 3:12).

44.    Lawrence told Woodruff that he knew his legal rights and he knew her "legal parameters" and she was "well outside her legal parameters."  (Id., at 3:42; Grissett Video no. 2 at 01:56, Defendants' Exh. L).

45.    Lawrence stated, "This is unlawful detainer."  (Dothan dispatch phone call no. 3 at 04:13, Defendants' Exh. P; Grissett Video no. 2 at 02:25, Defendants' Exh. L).

46.    Sgt. Woodruff responded that, "The unlawful part sir was when you told me you were going to drive down the road and dump it."  (Phone call no. 3 at 04:35, Defendants' Exh. P; Grissett Video no. 2 at 02:47, Defendants' Exh. L).

47.    Lawrence admitted to Grissett on camera that he told Sgt. Woodruff that he would take him (the dog) down the road and drop him off and that Woodruff told him that would be against the law.  (Grissett Video no. 2 at 02:35, Defendants' Exh. L).

48.    Lawrence asked Sgt. Woodruff, "Are you talking about the statutory and corporate code that you are supposed to abide by?" (Grissett Video no. 2 at 03:02:41, Defendants' Exh. L; Dispatch phone call no. 3 at 04:46, Defendants' Exh. P).

49.    Sgt. Woodruff continued to wait before arresting Lawrence until arrival of a back-up officer.  (Telephone call no. 3 at 01:25 – 10:25, Defendants' Exh. P; Affidavit of Woodruff, Defendants' Exh. A).

50.     Lawrence repeatedly said Woodruff had no right to detain him and that he was leaving.  (Telephone call no. 3 at 01:05 – 03:50, Defendants' Exh. P; Affidavit of Woodruff, Defendants' Exh. A).

51.     Sgt. Woodruff told Lawrence that she was waiting for him to produce a driver's license and told him four more times he could not drive without a driver's license.  (Telephone call no. 3, Defendants' Exh. P; Affidavit of Woodruff, Defendants' Exh. A).

52.     Lawrence repeatedly denied that he needed a driver's license to drive and said he had a constitutional right to travel.  (Telephone call no. 3, Defendants' Exh. P; Affidavit of Woodruff, Defendants' Exh. A; Grissett video no. 1, Defendants' Exh. K).

53.     Sgt. Woodruff returned to the rear of the vehicle and requested dispatch to run the vehicle's license number.  (Telephone call no. 3 at 06:10, Defendants' Exh. P; Affidavit of Woodruff, Defendants' Exh. A).[2]

54.     This angered Lawrence further, causing him to exit his vehicle and approach Woodruff again, insisting she had no right to his license tag number because it was private property.  (Grissett video no. 2 at 04:33, Defendants' Exh. L; Affidavit of Woodruff, Defendants' Exh. A).

---

[2] Grissett Video 2 (Defendants' Exh. L) and phone call 3 (Defendants' Exh. P) begin to overlap at 02:00 of phone call 3.

55.     Lawrence went back to the open driver's door and took Grissett's cell phone.  He continued to record as he returned to Sgt. Woodruff and repeated his demands.  (Id).

56.     Sgt. Woodruff ordered Lawrence back into his car at least seven times and gave him numerous other commands to either "back off" or "get out of my face."  (Id., at 6:25-9:45; Affidavit of Woodruff, Defendants' Exh. A).

57.     Lawrence angrily protested, "this is unlawful detainer" and demanded Sgt. Woodruff produce the law that said he needed a driver's license.  (Telephone call no. 3 at 8:00, Defendants' Exh. P).

58.     Sgt. Woodruff repeated to dispatch her need for back-up while Lawrence angrily insisted that he did not need a driver's license.  (Id., at 8:30).

59.     Lawrence told Woodruff it didn't matter who they sent because he would charge them with a federal offense if they violated their oath of office.  (Id., at 8:32).

60.     Lawrence's aggressive behavior, dazed look, loud and irrational speech caused Woodruff to ask if he had been drinking.  Subsequent lab tests indicated Lawrence was positive for Tetrahydrocannabinol (THC).  (Affidavit of Woodruff, Defendants' Exh. A; Telephone call no. 3 at 08:36, Defendants' Exh. P; Affidavit of Benton, Defendants' Exh. D-6).

61.     Lawrence told Sgt. Woodruff, "Don't even try me."  Lawrence

became angrier after he heard Woodruff telling dispatch he was "off his meds."

(Telephone call no. 3, at 8:35-10:35, Defendants' Exh. P).

62.    Lawrence repeatedly demanded his paperwork so he could leave.  (Id.,

at 9:00).

63.    The dispatcher advised Sgt. Woodruff that her back-up, Officer

Rhodes was pulling up.  (Id., at 10:25).


**Arrival of Officer Rhodes and Lawrence's Active Resistance to Arrest**

64.    Officer Alan Rhodes (806) had been dispatched to the Dothan Animal

Shelter at 295 Jerry Drive, Dothan as back-up to a disorderly conduct (Signal 26)

call from the receptionist, Patricia Holley.  (Telephone call no. 1, Defendants' Exh.

K; Affidavit of Rhodes, Defendants' Exh. B; Radio traffic at 00:31, Defendants'

Exh. Q).

65.    Officer Rhodes was and continues to be, an APOST certified police

officer with the Dothan Police Department.  Officer Rhodes received extensive

training at the police academy and the Dothan Police Department, including use of

force, firearms and Taser.  (Affidavit of Rhodes, Defendants' Exh. B).  Rhodes is

an was then qualified for sidearms and Tasers.  (Affidavit of Penn, Defendants'

Exh. G).  Officer Rhodes also received training in <u>Terry</u> stops, probable cause, state

and federal law.

13

66.     Rhodes was advised by dispatch in route that the Signal 26 call

(disorderly person) had been elevated to an extremely disorderly person.  (Radio

traffic at 11:00, Defendants' Exh. Q).

67.     Dispatch further advised him Sgt. Woodruff (372) had requested

dispatch stay on the telephone with her until back-up arrived on the scene.

(Affidavit of Rhodes, Defendants' Exh. B; Radio traffic at 11:00, Defendants' Exh.

Q).

68.     Upon Rhodes' arrival he parked behind Lawrence's vehicle and got

out to speak with Sgt. Woodruff.  (Rhodes' dash-cam video at 00:20, Defendants'

Exh. M; Affidavit of Woodruff, Defendants' Exh. A; Affidavit of Rhodes,

Defendants' Exh. B).

69.     Lawrence was standing by the driver's door and Woodruff was

approximately fifteen feet behind his vehicle.  (Rhodes' dash-cam video at 00:20,

Defendants' Exh. M).

70.     As Rhodes went to Sgt. Woodruff, Lawrence approached complaining

what "this woman" had done.  (Rhodes' dash cam video at 00:30, Defendants' Exh.

M; Affidavit of Woodruff, Defendants' Exh. A; Affidavit of Rhodes, Defendants'

Exh. B).

71.     Officer Rhodes told Lawrence to go back to his car and Rhodes could

be with him in a second.  (Rhodes' dash-cam video at 00:32, Defendants' Exh. M;

Affidavit of Woodruff, Defendants' Exh. A; Affidavit of Rhodes, Defendants' Exh.

B).

72.    Rhodes saw a pistol holster on Lawrence's hip.  (Affidavit of Rhodes,

Defendants' Exh. B).

73.    When Lawrence retreated, Sgt. Woodruff advised Rhodes that

Lawrence had not obeyed her like that.  (Rhodes' dash cam video at 00:37,

Defendants' Exh. M; Affidavit of Woodruff, Defendants' Exh. A).

74.    Lawrence soon approached the officers again and Rhodes asked if he

had been told to stay back.  (Rhodes' dash cam video at 00:48, Defendants' Exh.

M; Affidavit of Woodruff, Defendants' Exh. A; Affidavit of Rhodes, Defendants'

Exh. B).

75.    Lawrence argued that he was utilizing his rights and questioned

Rhodes' authority to tell him where to stand.  Lawrence continued to argue with

Rhodes after Rhodes told him he could utilize his rights where Rhodes told him to

stand or he would go to jail.  (Rhodes' dash-cam at 00:51, Defendants' Exh. M;

Affidavit of Woodruff, Defendants' Exh. A; Affidavit of Rhodes, Defendants' Exh.

B).

76.    Officer Rhodes was faced with a disorderly suspect who was possibly

armed and did not recognize his authority as a police officer.  For safety reasons

Rhodes approached Lawrence and ordered him to turn around to be handcuffed.

(Rhodes' dash-cam at 01:05, Defendants' Exh. M; Affidavit of Woodruff,

Defendants' Exh. A; Affidavit of Rhodes, Defendants' Exh. B).

77.     Officer Rhodes took Lawrence's arm and Lawrence began yelling,

"Don't touch me" and pulling away from Rhodes back toward the open driver's

door.  (Rhodes' dash cam video at 01:19, Defendants' Exh. M).

78.     Officer Rhodes then grabbed both of Lawrence's arms and repeatedly

told him to turn around but Lawrence refused.  (Id., at 1:12).

79.     Officer Rhodes pushed Lawrence against the rear passenger door.

Sgt. Woodruff tried to assist in controlling him while Lawrence violently struggled

against them.  (Id., at 1:13).

80.     Officer Rhodes keyed his radio mic and called "Signal 37."  (Officer

in distress).  (Id., at 02:00).

81.     Sgt. Woodruff was not wearing a Taser and unsuccessfully tried to

pull Rhodes' Taser off his utility belt while Rhodes fought with Lawrence.  (Id., at

02:08.).

82.     Lawrence struggled violently to break away from Officer Rhodes until

he managed to do so and ran around the front of the car.  (Id., at 02:18.).


**Officer Rhodes' and Sgt. Woodruff's Tasing of Lawrence**

83.     Officer Rhodes pulled his Taser as he pursued Lawrence.  (Id., at

02:20.).

84.     Officer Rhodes fired his Taser hitting Lawrence as he went back to the open driver's door but the Taser had no effect due to his coat.  (Id., 02:25; Affidavit of Rhodes, Defendants' Exh. B; Affidavit of Benton, Defendants' Exh. D-5).

85.     Lawrence then asked Rhodes, "Is that all you got?"  (Affidavit of Woodruff, Defendants' Exh. A).

86.     Lawrence retreated around the front of the vehicle as Rhodes again tried to grab him.  (Rhodes' dash-cam video at 02:31, Defendants' Exh. M).

87.     Officer Rhodes told Woodruff to take his Taser while he struggled to subdue Lawrence.  (Id., at 02:40).

88.     Sgt. Woodruff took the Taser from Officer Rhodes and removed the spent cartridge.  (Id., at 02:47).

89.     Lawrence got away from Rhodes again and headed back to the open driver's door.  (Id., at 02:45).

90.     Officer Rhodes again caught Lawrence who furiously resisted Rhodes' efforts to control him.  (Id.).

91.     Officer Rhodes got behind him and put his arm across Lawrence's right shoulder but left Lawrence's right arm free.  (Id., at 02:50.).

92.     For approximately the next 20 seconds, while Rhodes and Lawrence

17

grappled standing next to the driver's door, Sgt. Woodruff attempted to find an

opening to drive stun Lawrence with the Taser while he tried to block it.  (Id.).

93.    Sgt. Woodruff successfully tased Lawrence twice in his abdomen area

with no visible effect.  (Id., at 02:54-03:06.).

94.    Officer Rhodes asked Lawrence if he was ready to comply but

Lawrence said "no."  (Id., at 02:56; Affidavit of Rhodes, Defendants' Exh. B).


**Lawrence's Taking the Taser Away From Sgt. Woodruff and Her Use of
Deadly Force in Response to the Threat**

95.    Officer Rhodes was tiring as Lawrence kept resisting him and fighting

off Sgt. Woodruff's Taser with his right hand.  (Affidavit of Rhodes, Defendants'

Exh. B; Rhodes' dash cam video at 02:58, Defendants' Exh. M).

96.    With his right hand, Lawrence grabbed Woodruff's right hand, then

the Taser when she tried to use it again against him.  (Rhodes' dash cam at 03:10-

03:12, Defendants' Exh. M; Affidavit of Woodruff, Defendants' Exh. A).

97.    Lawrence pulled the Taser toward Rhodes' leg until he pulled it out of

Woodruff's right hand.  (Rhodes dash-cam video at 03:09-03:13, Defendants' Exh.

M; Affidavit of Skipper, Defendants' Exh. C; Affidavit of Woodruff, Defendants'

Exh. A).

98.    Skipper reached into the fray to grab the Taser from Lawrence but

could not control it.  (Rhodes' dash-cam video at 03:14, Defendant's Exh. M;

Affidavit of Skipper, Defendants' Exh. C).

99.     Within three to five seconds after Lawrence took her Taser, Sgt.

Woodruff pulled her handgun with her right hand, placed it close to Lawrence's

abdomen and fired once, causing him to fall to the ground.  (Rhodes' dash-cam

video at 03:14, Defendants' Exh. M).


**Training of City of Dothan Police Officers and Policies on Use of Force, Tasers and Firearms**

100.    The Dothan Police Department maintains procedural General Orders

for its sworn police officers.  (Affidavit of Benton, Defendants' Exh. D).  Each

officer is issued a copy of these General Orders and are expected to be

knowledgeable about them.  These General Orders are strictly enforced.  (Id.).

101.    On November 30, 2014 the City of Dothan Police Department was

certified by the Commission on Accreditation for Law Enforcement Agencies

(CALEA).

102.    City of Dothan Police Department officers who are issued Tasers are

required to maintain annual qualification.  (Affidavit of Penn, Defendants' Exh.

G).  All Dothan police officers who carry a firearm are required to be proficient

and qualified for its use according to APOST requirements.  (Id.).

103.   The Dothan Police Department Procedural General Orders do not

prohibit the use of a Taser to aid in the arrest of a person who resists arrest or when

it is deemed appropriate by the arresting officers based upon the suspect's

behavior.  (Affidavit of Penn, p. 11, Defendants' Exh. G-1).  Officers are advised

that improper use of less lethal force, including Tasers, could cause death or

serious injury and may be interpreted as unauthorized use of lethal force.

(Affidavit of Penn, p. 13, Defendants' Exh. G).

104.   The General Orders authorize a Dothan police officer's use of deadly

force when it is necessary to defend themselves or a third party from what he or

she reasonably believes to be the use of deadly physical force.  (Id.).

105.   The Dothan Police Department Procedural General Orders require the

Dothan Police Department to investigate all citizen complaints.  (Affidavit of

Benton, Defendants' Exh. D-1).  The incident involving the shooting of Mr.

Lawrence was investigated by both the Alabama Bureau of Investigation and the

Dothan Police Department Professional Standards Division (Internal Affairs).

(Affidavit of Benton, Defendants' Exh. D).  The completed ABI investigation was

given to the Houston County District Attorney who presented the case to a grand

jury which declined to indict any Dothan police officer involved in the incident.

(Id.).  Pursuant to Dothan Police Procedural General Orders a Deadly Force

Review Board was convened to evaluate the facts surrounding the shooting of

Robert Earl Lawrence by Sgt. Adrianne Woodruff.  (Affidavit of Parrish, Defendants' Exh. E-2).  The Board members unanimously found the shooting to be within Dothan Police Department policy.  (Id.).  Chief Steve Parrish then reviewed the evidence in the case and determined that Sgt. Woodruff's actions were within Dothan Police Department policy.  (Affidavit of Parrish, Defendants' Exh. E).

106.   The Dothan Police Department training exceeds the minimum standards of 12 hours continuing education annually required by the Alabama Peace Officers' Standards and Training Commission (APOST), which by statute sets the minimum standards applicable to law enforcement officers in the State of Alabama, including the training required for those officers.  (Affidavit of Penn, Defendants' Exh. G).  The Dothan Police Department requires 32 hours of annual continuing education.  (Id.).  Sgt. Woodruff and Officer Summerlin were both APOST certified police officers on the date of this incident (Id.).  Both officers were qualified, including Officer Rhodes for both Taser and sidearms.  (Id.).

107.   Dothan Police officers also receive training on criminal, motor vehicles and traffic laws of the State of Alabama and provisions of the Constitution of the United States related to law enforcement.  (Affidavit of Penn, Defendants' Exh. G).  Officers receive both hands-on and classroom training in the use of force, and in dealing with persons resisting arrest.  (Id.).

Dated this the 19th day of April, 2018.

s/F. Lenton White
F. LENTON WHITE (WHI035)
lwhite@dothan.org
Attorney for Defendants City of
Dothan, Alabama, Greg Benton &
Chris Summerlin

OF COUNSEL:
Office of the City Attorney
126 N. St. Andrews Street
Dothan, Alabama 36303
Telephone: (334) 615-3130
Facsimile: (334) 615-3139

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of April, 2018, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF System and by placing

the same in the U.S. Mail postage prepaid to the following:

*Henry F. (Hank) Sherrod, III*
*HENRY F. SHERROD III, P.C.*
*119 South Court Street*
*P.O. Box 606*
*Florence, Alabama 35631-0606*

*William S. Morris*
*MORRIS CARY ANDREWS TALMADGE*
*& DRIGGERS, LLC*
*3334 Ross Clark Circle*
*Dothan, Alabama 36303*

s/F. Lenton White
Of Counsel

# TAB 73

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **CHRISTOPHER CANTU, as the** | ) | |
| **Administrator of the Estate of** | ) | |
| **Robert Earl Lawrence,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:16-cv-1003-MHT-DAB** |
| | ) | |
| **CITY OF DOTHAN, ALABAMA,** | ) | |
| ***et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## REPORT AND RECOMMENDATION

Plaintiff, Christopher Cantu, as Administrator of the Estate of Robert Earl Lawrence, alleges constitutional violations due to the use of excessive force and state law claims of assault and battery against Defendants, City of Dothan, Alabama; Greg Benton, Chris Summerlin, and Adrienne Woodruff, arising out of the fatal shooting of Robert Earl Lawrence. (Doc. 28).

Before the Court are the parties' cross motions for summary judgment: Plaintiff's Motion for Partial Summary Judgment and Brief in Support (Doc. 43) and Defendants' City of Dothan, Alabama, Benton, Summerlin, and Woodruff's Motion for Summary Judgment (Doc. 63). The parties have been afforded an opportunity to fully brief the matters, and the court heard argument on January 25 and May 24, 2018. For the reasons stated herein, it is the **RECOMMENDATION** of the

undersigned that the Plaintiff's Motion for Partial Summary Judgment (Doc. 43) be

**denied**; and Defendants' Motion for Summary Judgment (Doc. 63) be **granted in**

**part** and **denied in part** as set forth below.

## I.   JURISDICTION

Subject matter jurisdiction is conferred by 28 U.S.C. § 1343(a)(3) as to

Plaintiff's § 1983 federal cause of action, and the court has supplemental jurisdiction

over the state law claims pursuant to 28 U.S.C. § 1367(a).  The parties do not contest

personal jurisdiction or venue, and the court finds sufficient information of record

to support both.  *See* 28 U.S.C. § 1391.  On January 3, 2017, this matter was referred

to the undersigned by the Honorable Myron H. Thompson for disposition or

recommendation on all pretrial matters. (Doc. 4); *see also* 28 U.S.C. § 636(b); Rule

72, Fed. R. Civ. P.; *United States v. Raddatz,* 447 U.S. 667 (1980); *Jeffrey S. v. State*

*Bd. of Educ. of State of Georgia,* 896 F.2d 507 (11th Cir. 1990).

## II.   STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment,

the Court construes the facts and all reasonable inferences therefrom in the light most

favorable to the nonmoving party.  *Reeves v. Sanderson Plumbing Prods., Inc*., 530

U.S. 133, 150 (2000).  However, when faced with a "properly supported motion for

summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc*., 131 F.3d 995, 999 (11th Cir. 1997).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Southwest Airlines Co*., 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250–51 (1986)).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sawyer*, 243 F. Supp. 2d at 1263 (quoting *Anderson*, 477 U.S. at 251–52).

## III.   PROCEDURAL AND FACTUAL BACKGROUND

Plaintiff Christopher Cantu is the personal representative of the Estate of Robert Earl Lawrence who was fatally shot by Defendant Adrianne Woodruff, a Dothan Police Department sergeant. (Doc. 29 at 1–3). The parties agree the facts

are mostly undisputed as the shooting and the events leading up to it are captured on multiple video and/or audio recordings.[1]  (Docs. 43 at 7; 64 at 10; 70 at 9, 12). The first is the closed circuit camera recording (without sound) inside the office of the Dothan County Animal Shelter.  The second and third video recordings are from Lawrence's girlfriend, Priscilla Grissett's cell phone camera.  The fourth video is from Officer Alan Rhodes' dash-mounted camera.  There are also audio recordings of three telephone calls from the animal shelter to Dothan Police dispatch.  *See* Docs. 43 at 7; 64 at 10.

The incident began when Lawrence tried to turn a dog in at the Dothan Animal Shelter.  (Doc. 69-3 at 74).  Midday on December 30, 2014, Lawrence entered the Dothan County Animal Shelter reception area with a dog he wanted to drop off. (Docs. 65, ¶ 9; 64-25).[2]  Woodruff was the sergeant on duty assigned to supervise the animal shelter.  (Doc. 64-1 at 3).  Receptionist Patricia Holley and Chief Animal Services Officer Renee Skipper were also working at the shelter that day.  *Id.* at 3–4.  Lawrence told Holley he was from Geneva County, and she advised that they only take dogs from Houston County.  *Id.* at 3.  Lawrence told her he found the dog

---

[1] Of course, audio and video recordings, however instructive, are often not definitive. Cameras and microphones are subject to many limitations, *e.g.,* duration, angles and perspectives, quality and clarity, synchronicity, framing. In addition, some potentially legally significant items, such as purpose, motive and intent, intensity of action and dissimulation, generally are not apparent in recordings.

[2] Defendants cite to the animal shelter video to support this fact.  Plaintiff does not dispute it.  *See* Doc. 70 at 12.

4

at a Dothan Wal-Mart. *Id.* Woodruff came in from the adjoining office when she heard Lawrence getting upset about being asked for identification. *Id.* Lawrence refused to produce identification, citing federal law and claiming invasion of privacy. *Id.* Woodruff agreed to take the dog without his producing identification as long as he would sign a routine intake form. *Id.* Lawrence refused to sign the form and threatened to dump the dog at the end of the road. *Id.* Woodruff told him that would be a crime. *Id.* In her deposition, Woodruff acknowledged that Lawrence's threat to dump the dog at some point in the future was not a basis to arrest him. (Doc. 69-3 at 77). Lawrence complained his rights were being violated, and he picked the dog up to leave. (Doc. 64-1 at 3). Woodruff asked him for identification, which Lawrence again refused, stating it was a violation of his rights. *Id.*

Skipper testified that people threaten to leave a dog off at the road two to three times per month. (Doc. 69-7 at 32). When such a threat is made, the procedure is to go out and write down the tag number of the person's vehicle in the event the dog is later found. *Id.* at 32–34.

As Lawrence was leaving the shelter with the dog, Woodruff followed him with the intention to write down the tag number of Lawrence's vehicle. (Doc. 69-4 at 228). As Woodruff followed Lawrence, she observed a holster on his hip. *Id.* She asked Lawrence about the gun, and he told her it was in his car. *Id.* Woodruff asked her assistant to call for back-up. (Doc. 69-3 at 65).

5

Lawrence walked toward his car and called out to his girlfriend in the car: "Get the video. This is going to be a good one." *Id.* at 64; Doc. 69-4 at 230. Lawrence sat in the driver's seat of the car which was still running. (Doc. 69-3 at 66, 68; Doc. 69-4 at 229). Woodruff thought he was intending to leave, but he was getting his "affidavit of identity". (Doc. 69-4 at 241). Woodruff went to the rear of the vehicle to copy the tag number, but Lawrence got out of his car and attempted to block her view of the tag; she ultimately got the tag number. (Doc. 69-3 at 68–71).[3] Woodruff called police dispatch to request her back-up. (Doc. 69-4 at 234–35). Lawrence told Woodruff he was leaving, but she told Lawrence he could not leave without showing her a driver's license. *Id.* at 237. Lawrence produced a piece of paper titled an "AFFIDAVIT OF IDENTITY." *Id.* at 241. *See* Doc. 48-2. The document, "duly affirmed upon oath and full commercial liability" Lawrence's name, his "current post" and "Date of origin." (Doc. 48-2). The Affidavit purported to be proof of his description, picture, right thumb print, and signature. *Id.* Based on her training, Woodruff believed Lawrence to be a Sovereign Citizen.[4] (Doc. 64-1 at 3–4; Doc. 70, ¶ 20).

---

[3] Woodruff also testified that she could not communicate the tag number initially to dispatch because she could not get through on the telephone. (Doc. 69-4 at 233–36).

[4] "The sovereign citizens are a loosely affiliated group who believe that the state and federal governments lack constitutional legitimacy and therefore have no authority to regulate their behavior." *United States v. Ulloa*, 511 F. App'x 105, 107, n.1 (2d Cir. 2013). The hallmark of the sovereign citizen movement is the belief that even though an individual was born and resides in the United States, he is his own sovereign and is therefore not a United States citizen. *Gravatt v. United States,* 100 Fed. Cl. 279, 282 (2011). The Eleventh Circuit has noted that individuals who refer to themselves as "sovereign citizens" believe they are not subject to the jurisdiction of the

Lawrence demanded his identification paper back. (Doc. 48-6; Grissett video). Woodruff said she would first call police dispatch to request a warrant check for Lawrence. *Id.* Lawrence told Woodruff that she had no right or authority. *Id.* Lawrence requested his paperwork back several times, but Woodruff refused. (Doc. 69-3 at 87). Skipper brought Woodruff a portable telephone, and Woodruff called to verify there were no warrants for Lawrence. (Doc. 48-6). The warrant check was negative. (Doc. 70, ¶¶ 15, 17; Doc. 64-31). After confirming there were no warrants, Woodruff stayed on the call with dispatch and the exchange between Lawrence and Woodruff was recorded. (Doc. 64-31). After Woodruff ran the tag for his vehicle, the tag came back registered to a silver Lexus which was the color and model car Lawrence was in. *Id.* Lawrence repeatedly requested for his paperwork back so he could leave, asserting that his rights were being violated. *Id.*

Back-up officer Alan Rhodes arrived and parked his vehicle behind Lawrence's car. (Doc. 70, ¶ 24). Rhodes is 5'10" and weighs 275 pounds. (Doc. 69-5 at 5). When Rhodes arrived, he did not observe any confrontation going on. *Id.* at 34. Woodruff began explaining to Rhodes what was going on, and Lawrence approached Rhodes. *Id.* at 34–35. Rhodes requested Lawrence to step back while Rhodes figured out what was happening. *Id.* at 35. Lawrence continued to step toward Rhodes. *Id.* at 37–40. After Lawrence refused to remain by his vehicle as

---

courts. *United States v. Sterling,* 738 F.3d 228, 233 n.1 (11th Cir.2013), cert. denied, 134 S.Ct. 2682 (2014).

instructed by Rhodes, Rhodes tried to detain Lawrence by handcuffing him.  *Id.* at 43.  According to Rhodes, what ensued was a "wrestling match" between Rhodes and Lawrence.  *Id.* at 44.  Skipper described it as a "struggle."  (Doc. 69-7 at 41).  Woodruff, Rhodes, and Skipper testified that, during the struggle, no punches were thrown and no abusive language was used.  (Docs. 69-3 at 104; 69-6 at 45; 69-7 at 42).  Because no punches were thrown, Rhodes "was doing everything non-lethal at that point in time."  (Doc. 69-6 at 45).  Lawrence refused to put his hands behind his back.  (Docs. 70, ¶33; 64-28).  Rhodes was attempting to turn Lawrence around to handcuff him. *Id.*

Lawrence eventually escaped Rhodes' grasp and ran around his car.  (Doc. 69-6 at 47). Rhodes followed, drew his Taser, and shot it at Lawrence. *Id.* The Taser was not effective.  *Id.* at 49. Rhodes continued to pursue Lawrence, and the two wrestled again. *Id.* at 47.   Rhodes handed Woodruff the Taser to drive stun[5] Lawrence.  *Id.* at 51–52.   While Rhodes tried to hold Lawrence against the car, Woodruff removed the cartridge off the Taser and attempted to drive stun Lawrence.

---

[5] "Tasers can be used in two modes, one is dart or prong mode in which a barbed point makes contact with the skin and the other is drive or dry stun mode in which the electrified tips of the Taser are touched to the skin directly." *Callwood v. Phenix City, Ala.*, No. 2:15CV182-WHA, 2016 WL 6661158, at *2 n.3 (M.D. Ala. Nov. 10, 2016), aff'd sub nom. *Callwood v. Jones*, 727 F. App'x 552 (11th Cir. 2018) (citing *Hoyt v. Cooks*, 672 F.3d 972, 980 (11th Cir. 2012)).  "Drive-stun mode causes pain to a subject, but it generally leaves little lasting damage beyond a burn mark. In this way, it is a less serious use of force than the Taser" in probe or prong mode. *Andrews v. Williams*, No. 2:13CV136-MHT, 2015 WL 5735652, at *6 (M.D. Ala. Sept. 30, 2015).

*Id.* at 55–56.  Initially, Lawrence used his free hand and attempted to push the Taser away from his body.  (Docs. 70, ¶ 38; 64-28).

At this point factual disputes arise.  According to Defendants, Lawrence took the Taser out of Woodruff's hand.  (Doc. 65, ¶¶ 96, 97, 99). Plaintiff contends that Lawrence grabbed the barrel of the Taser but did not pull the Taser out of Woodruff's hand.  (Doc. 70, ¶ 40).  Skipper grabbed the Taser too and pulled it toward her.  *Id.* Plaintiff claims Woodruff let go of the Taser in order to access her service weapon. *Id.*, ¶ 41.  Defendant states Skipper could not control the Taser.  (Doc. 65, ¶ 98). Plaintiff disagrees, stating Skipper still had hold of Lawrence's arm when Woodruff shot Lawrence.   (Doc. 70, ¶ 41).

Woodruff shot Lawrence in the abdomen with her service weapon while Skipper was still holding Lawrence's arm.  (Doc. 70, ¶ 41).  Woodruff did not verbally warn Lawrence that she was going to shoot him.  (Doc. 69-3 at 90–91). According to the autopsy report, Lawrence was 6 feet, 1 inch tall and weighed 200 pounds at the time of his death.  (Doc. 63-12). The cause of death on the report was listed as a "gunshot wound to the abdomen." *Id.*

Defendant Adrianne Woodruff is now a retired sergeant from the Dothan County Police Department.  (Doc. 65, ¶ 4). She retired on November 1, 2015 after 24 years of service. *Id.*, *see also* Doc. 64-1 at 2.  At all material times, Defendant

City of Dothan was the employer of Defendants, Benton, Summerlin, and Woodruff in the City of Dothan Police Department.  (Docs. 63-1; 63-5; 63-16).

In December 2016, Plaintiff filed suit against Defendants.  (Doc. 1).  In a two-count amended complaint, Plaintiff sued the City of Dothan, Greg Benton, Chris Summerlin, and Adrienne Woodruff for alleged violation of Lawrence's Fourth Amendment rights pursuant to 42 U.S.C. § 1983.  (Doc. 28).  In count two, he alleged Alabama state law claims of assault and battery against the City, Summerlin, and Woodruff.  *Id.*  Plaintiff has moved for partial summary judgment on the excessive force claims against Woodruff arguing no reasonable jury could find Woodruff's decision to use deadly force to be a reasonable one and Woodruff had fair warning that her use of deadly force was unconstitutional. (Doc. 43).  Defendants filed a motion for summary judgment against Plaintiff on the basis that there was no constitutional violation against Lawrence, and even if there was, Defendants are entitled to qualified immunity for their actions.  (Doc. 63).  On the state law claims of assault and battery, Defendants assert that officers may lawfully use the degree of force reasonably necessary to defend themselves, and in any event, Woodruff would be entitled to peace officer immunity under Alabama law.  *Id.*

## IV.   ANALYSIS

   A.   *Defendants' City of Dothan, Greg Benton, and Chris Summerlin's
        Motion for Summary Judgment (Doc. 63)*

10

In his response to Defendants' motion for summary judgment, Plaintiff states he "does not oppose the dismissal of Benton, Summerlin, and the City of Dothan." (Doc. 70 at 11). **Accordingly, Defendants' motion for summary judgment (Doc. 63) is due to be granted in part as to Defendants Greg Benton, Chris Summerlin, and the City of Dothan.**

B.    *Defendant Woodruff's Motion for Summary Judgment (Doc. 63)*

1.    Section 1983 Claim

Woodruff moves for summary judgment on Count I arguing there was no constitutional violation of Lawrence's rights. She submits that requesting to see Lawrence's driver's license was lawful, probable cause existed to support Lawrence's arrest, and the force used by Woodruff was objectively reasonable. (Doc. 64). Therefore, she claims she is entitled to summary judgment on Plaintiff's § 1983 claim against her. *Id.* Even if Plaintiff is able to demonstrate a constitutional violation, Woodruff argues she is entitled to qualified immunity. *Id.*

Qualified immunity completely "protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Dalrymple v. Reno*, 334 F.3d 991, 994 (11th Cir. 2003) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). The essence of a qualified immunity analysis is an officer's objective reasonableness. *See Harlow v.*

*Fitzgerald*, 457 U.S. 800, 819 (1962); *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002).  If reasonable officers could differ on the lawfulness of the defendant's actions, the defendant is entitled to immunity. *Storck v. City of Coral Springs*, 354 F.3d 1307, 1314 (11th Cir. 2003). Qualified immunity gives ample room for mistaken judgments but does not protect "the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 343 (1986).

"The qualified immunity inquiry involves three steps: (1) the alleged conduct must fall within the scope of the discretionary authority of the actor; (2) if it does, we must then determine whether that conduct violates a constitutional right; (3) if so, we must inquire whether the asserted right was clearly established at the time of the alleged violation." *Tinker v. Beasley*, 429 F.3d 1324, 1326 (11th Cir. 2005).

The qualified immunity analysis first requires an officer "prove that '[s]he was acting within the scope of [her] discretionary authority when the allegedly wrongful acts occurred.'"  *Lee*, 284 F.3d at 1194 (quoting *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991) (quoting *Rich v. Dollar*, 841 F.2d 1558, 1563 (11th Cir. 1988)).  In determining whether an official is acting within the scope of her discretionary authority, courts consider "whether the acts the official undertook 'are of a type that fell within the employee's job responsibilities.'"  *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004) (citations omitted).  Here, Sergeant Woodruff was on duty assigned to supervise the Dothan Animal Shelter

12

when she encountered Lawrence who was threatening to abandon a dog at the end

of the road.  Woodruff's questioning of Lawrence about the dog would certainly be

a duty that fell within her job responsibilities as Animal Services Supervisor, and

therefore she was acting within her discretionary authority.  Plaintiff does not appear

to dispute this.  (Doc. 70 at 29).

Once a defendant officer successfully shows that she was acting within her

discretionary authority, courts use a two-part test to determine whether qualified

immunity applies.  In *Saucier v. Katz*, the Supreme Court directed courts to first

determine whether there was a constitutional violation and to second determine

whether the constitutional right in question was clearly established. 533 U.S. 194,

201 (2001).  The Court subsequently held, however, that courts need not adhere to

*Saucier's* rigid two-step inquiry, and courts can decide the second question without

reaching the first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

> On reconsidering the procedure required in *Saucier*, we conclude
> that, while the sequence set forth there is often appropriate, it should
> no longer be regarded as mandatory.  The judges of the district
> courts and the courts of appeals should be permitted to exercise
> their sound discretion in deciding which of the two prongs of the
> qualified immunity analysis should be addressed first in light of the
> circumstances in the particular case at hand.

*Id.*

a.   <u>*Terry* Stop</u>

Plaintiff argues that Woodruff violated the Constitution and clearly

established law in seizing Lawrence in order to force him to produce his driver's

license.  (Doc. 70 at 36–39).  Defendants claim that Woodruff had reasonable suspicion to conduct an investigatory stop because of Lawrence's threats to abandon the dog on the road.  (Doc. 64 at 31).  Alabama law authorizes an officer to stop a person "whom he reasonably suspects is committing, has committed or is about to commit a felony or other public offense and may demand of him his name, address, and an explanation of his actions."  ALA. CODE § 15-5-30.  As pointed out by Plaintiff, however, a vague threat to commit a crime at some point in the future does not constitute an imminent threat that a crime is about to be committed.  Even Woodruff testified that Lawrence's threat to dump the dog at some point in the future was not a basis to arrest him. Shelter personnel acknowledged that such threats are made monthly, but no one has abandoned a dog after leaving the shelter.

As explained by Skipper, the standard practice at the Dothan Animal Shelter is to record the tag number of the person's vehicle so the person can be located in the unlikely event a dog is abandoned.  Woodruff wrote down Lawrence's tag number. Considering Woodruff's subsequent actions and the totality of the circumstances, the court finds questions of fact preclude a finding that the continued seizure of Lawrence after that point was reasonable.  As explained by the Supreme Court, "[t]he scope of the search must be 'strictly tied to and justified by' the circumstance which rendered its initiation permissible." *Terry v. Ohio*, 392 U.S. 1, 19 (1968) (citations omitted).  "[A]n investigative detention must be temporary and

last no longer than is necessary to effectuate the purpose of the stop," *Florida v. Royer*, 460 U.S. 491, 500 (1983), and the seizure must "cease once … suspicions [have been] allayed," *Croom v. Balkwill*, 645 F.3d 1240, 1251 n.15 (11th Cir. 2011) (citing *Royer*, 460 U.S. at 500).   Although Woodruff makes reference to Lawrence blocking the view of the license tag number, she was able to successfully obtain the information and call it in.   Once Woodruff's initial purpose or mission was complete, continued detention beyond that must be supported by reasonable suspicion.  *See United States v. Hernandez*, 418 F.3d 1206, 1209, n.3 (11th Cir. 2005).   The tag number matched the vehicle.   She had the information she needed in the event the dog was "dumped" on the road at some point later. Reasonable suspicion may have supported this initial investigatory stop, but the court finds that questions of fact exist as to whether Woodruff had objective legal grounds to continue to detain Lawrence after obtaining the tag number.

While it is true that Lawrence subsequently refused to provide his driver's license, Lawrence was not driving at the time.  *See* ALA. CODE § 32-6-9 ("Every licensee shall have his or her license in his or her immediate possession at all times *when driving* a motor vehicle and shall display the same, upon demand of … a peace officer.") (emphasis added).   And it is undisputed, Lawrence identified himself, albeit not by providing any official documentation.   Lawrence's refusal to produce a driver's license in the face of an unlawful detention cannot form the basis of a

reasonable suspicion that he did not possess a valid driver's license in an effort to create a basis to detain him.  "[A] refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Fla. v. Bostick*, 501 U.S. 429, 437 (1991).

An officer is entitled to qualified immunity if he has "arguable" reasonable suspicion for a *Terry* seizure.  *Jackson v. Sauls*, 206 F.3d 1156, 1166 (11th Cir. 2000).  Viewing the facts and all reasonable inferences in a light most favorable to Plaintiff, there was no reasonable basis for the continued seizure of Lawrence after Woodruff had obtained Lawrence's tag number.  Accordingly, a jury could conclude that a constitutional violation occurred in Woodruff's continued seizure of Lawrence, and therefore qualified immunity would not preclude Plaintiff's claim.

b.    Excessive Force

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Lee*, 284 F.3d at 1197 (citing *Graham v. Connor*, 490 U.S. 386, 394–95 (1989)). The Supreme Court has held that "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under" a reasonableness standard. *Graham*, 490 U.S. at 395.  As a general rule, an officer has the power to use a reasonable amount of force, or threat thereof, in making an arrest

16

or investigatory stop. *Id.* at 396 (citing *Terry*, 392 U.S. at 22–27). When a plaintiff claims an officer used excessive force, courts utilize an objective test to determine the reasonableness of the officer's actions in light of the totality of the circumstances. *Id.*

Courts will find an officer's use of force to be excessive under the Fourth Amendment, and therefore a constitutional violation, if the use of force was "objectively [un]reasonable in light of the facts and circumstances confronting" the officer. *Graham*, 490 U.S. at 397 (quotation omitted). The amount of force used will be found reasonable only if it was "necessary in the situation at hand." *Lee*, 284 F.3d at 1197 (quotation omitted). The Supreme Court has identified several factors courts should consider in evaluating whether force was constitutionally necessary: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *see also Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002) ("To balance the necessity of the use of force used against the arrestee's constitutional rights, a court must evaluate [the *Graham*] factors.").

In considering these factors, Defendants argue no constitutional violation occurred. (Doc. 64 at 42–43). On the first factor, Defendants acknowledge the crime was not severe, but contend that Lawrence's resistance had the potential to escalate

into a serious crime.  *Id.*  On the second factor, Defendants argue Lawrence posed

an immediate threat of serious bodily harm because he took the Taser from

Woodruff's hand.  However, the facts are disputed on this point.  Plaintiff argues

that Woodruff released the Taser to access her gun, and her subjective belief that she

or the other officers were in danger is irrelevant.  Plaintiff submits under the

applicable objective standard, no objective reasonable officer would have perceived

that deadly force was warranted.  On the third factor, although Lawrence attempted

to evade Rhodes' grasp, there is no evidence Lawrence was attempting to flee the

scene.

Plaintiff relies on *Tennessee v. Garner*, 471 U.S. 1, 11 (1985), for the clearly

established right at the time of the alleged violation that a fleeing felon should be

given some warning about the possibility that deadly force will be used.  It is

undisputed that Woodruff gave no warning before shooting Lawrence.  "*Garner*

clearly established that [the decedent] had a right to be free from deadly force when

he was not threatening the officers, was merely suspected of misdemeanor offenses,

and was attempting to escape."[6]  *Smith v. LePage*, 834 F.3d 1285, 1297 (11th Cir.

2016).  The alleged offenses here were certainly minor (or non-existent).  Woodruff

acknowledges that Lawrence did not verbally or physically threaten her, but his

---

[6] Plaintiff notes the Supreme Court recently held that the general rules set forth in *Garner* and *Graham* can constitute clearly established law, but only in obvious cases, which Plaintiff urges is present here.  (Doc. 70 at 44) (citing *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018)).

mannerisms of "getting in her face" and coming too close to her made her uncomfortable. Plaintiff argues that Woodruff released the Taser. Woodruff acknowledged that a Taser in stun gun mode will cause extreme pain, but not incapacitation. (Doc. 69-3 at 95). Defendants' expert agrees generally that a Taser in drive stun mode does not ordinarily justify deadly force because it only causes pain and is not likely to cause serious injury. (Doc. 69-13 at 102–04). In a light most favorable to Plaintiff, a jury could conclude that Lawrence did not pose a serious threat of harm to the officers to warrant the use of deadly force by Woodruff.

With regard to Woodruff's claim of qualified immunity, the Eleventh Circuit has recently provided additional guidance.

> In an excessive-force case, where qualified immunity has been pled, "[o]ur circuit uses two methods to determine whether a reasonable officer would know that his conduct is unconstitutional" under the Fourth Amendment. *Fils v. City of Aventura*, 647 F.3d 1288, 1291 (11th Cir. 1991). The first considers "the relevant case law at the time of the violation; the right is clearly established if a concrete factual context exists so as to make it obvious to a reasonable government actor that his actions violate federal law." *Id.* (citation, internal quotation marks, and alteration omitted). "This method does not require that the case law be 'materially similar' to the officer's conduct;" "[b]ut, where the law is stated in broad propositions, 'a very high degree of prior factual particularity may be necessary.'" *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 740-41, 122 S. Ct. 2508, 2516, 153 L.Ed.2d 666 (2002)).
>
> The second method looks "not at case law, but at the officer's conduct, and inquires whether that conduct 'lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the officer, notwithstanding the lack of fact-specific case law.'" *Id.* (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1355 (11th Cir. 2002)) (alteration omitted) (emphasis added). The cases

fitting this method are known as "obvious clarity," *id*. (quoting *Vinyard*, 311 F.3d at 1355), "a 'narrow exception' to the normal rule that only case law and specific factual scenarios can clearly establish a violation," *id*. (quoting *Lee*, 284 F.3d at 1198–99).

> In considering an excessive-force case, a court should determine whether an officer's conduct in making an arrest is objectively reasonable or if it is an over-reactive, disproportionate action for the situation relative to the response of the apprehended person. The latter is the sort of unconstitutional conduct that deprives an officer of qualified-immunity protection in an obvious-clarity case.

*Stephens v. DeGiovanni*, 852 F.3d 1298, 1315–16 (11th Cir. 2017).

Plaintiff argues that viewing the facts in a light most favorable to him, the evidence shows Lawrence grabbed the Taser as an act of self-protection, that he never possessed the Taser, and that he never came close to having the ability to use the Taser as a weapon. Lawrence was restrained the entire time by Rhodes who was as big, if not bigger, than Lawrence. Woodruff had the assistance of Skipper who had hold of Lawrence's arm. Nothing about the situation warranted the use of deadly force, and Woodruff should have given some type of warning before shooting Lawrence. Rhodes and Skipper did not even realize initially it was Woodruff who had fired the gun.

The Eleventh Circuit explains,

> Even at the summary judgment stage, not all defendants entitled to the protection of the qualified immunity defense will get it. The ones who should be given that protection at the summary judgment stage are those who establish that there is no genuine issue of material fact preventing them from being entitled to qualified immunity. And that will include defendants in a case

> where there is some dispute about the facts, but even viewing the
> evidence most favorably to the plaintiff the law applicable to that
> set of facts was not already clearly enough settled to make the
> defendants' conduct clearly unlawful. But if the evidence at the
> summary judgment stage, viewed in the light most favorable to the
> plaintiff, shows there are facts that are inconsistent with qualified
> immunity being granted, the case and the qualified immunity issue
> along with it will proceed to trial.

*Johnson v. Breeden*, 280 F.3d 1308, 1317 (11th Cir. 2002).  Because the court finds

disputed issues of material fact are inconsistent with qualified immunity being

granted, Woodruff's motion for summary judgment is due to be **denied**.

### 2.   State Law Claims of Assault and Battery

In response to the state law claims of assault and battery asserted against her

in Count II, Woodruff seeks summary judgment in her favor on the basis of peace

officer/state agent immunity under ALA. CODE § 6-5-338(a).[7]  Under § 6-5-338(a), a

state agent "shall have immunity from tort liability arising out of his or her conduct

---

[7] "Every peace officer and tactical medic, except constables, who is employed or appointed pursuant to the Constitution or statutes of this state, whether appointed or employed as a peace officer or tactical medic by the state or a county or municipality thereof, or by an agency or institution, corporate or otherwise, created pursuant to the Constitution or laws of this state and authorized by the Constitution or laws to appoint or employ police officers or other peace officers or tactical medics, and whose duties prescribed by law, or by the lawful terms of their employment or appointment, include the enforcement of, or the investigation and reporting of violations of, the criminal laws of this state, and who is empowered by the laws of this state to execute warrants, to arrest and to take into custody persons who violate, or who are lawfully charged by warrant, indictment, or other lawful process, with violations of, the criminal laws of this state, shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties."

Ala. Code § 6-5-338(a).

in performance of any discretionary function within the line and scope of his or her law enforcement duties." ALA. CODE § 6-5-338(a).

Woodruff asserts that her decision to use deadly force to stop Lawrence in these circumstances was authorized by ALA. CODE §13A-3-27, which provides in pertinent part that "a sworn officer is justified in using force upon another person when and to the extent that [s]he reasonably believes is necessary … [t]o defend themselves or a third party from what he/she reasonably believe to be the use or imminent use of physical force while attempting to effect an arrest or while attempting to prevent an escape." The statute further provides that the use of deadly force is justified by a law enforcement officer when "[i]t is necessary to defend themselves or a third party from what he/she reasonably believes to be the use or imminent use of deadly physical force." *Id.* (Doc. 64 at 52).

"Whether a qualified peace officer is due § 6–5–338(a) immunity is now judged by the restatement of State-agent immunity articulated by *Ex parte Cranman*, 792 So.2d 392 (Ala. 2000)." *Hollis v. City of Brighton*, 950 So. 2d 300, 308 (Ala. 2006) (citations omitted).

> By enacting [§ 6–5–338], the Legislature intended to afford municipal law-enforcement officials the immunity enjoyed by their state counterparts. *Sheth v. Webster*, 145 F.3d 1231, 1237 (11th Cir. 1998). Indeed, "[t]his statute, by its terms, extends state-agent immunity to peace officers performing discretionary functions within the line and scope of their law-enforcement duties." *Moore v. Crocker*, 852 So.2d 89, 90 (Ala. 2002) (emphasis added).

In *Ex parte Cranman*, *supra*, this Court "restated the law of state-agent immunity in Alabama." *Moore*, 852 So.2d at 90. Since *Cranman*, we analyze immunity issues in terms of "State-agent" immunity, rather than "under the dichotomy of ministerial versus discretionary functions." *Ex parte Hudson*, 866 So.2d 1115, 1117 (Ala. 2003). *See also Giambrone v. Douglas*, 874 So.2d 1046, 1052 (Ala. 2003); *Ex parte Turner*, 840 So.2d 132, 134 n. 1 (Ala. 2002). Thus, we will address the applicability of peace-officer immunity under the principles set forth in *Cranman*. *See Moore*, *supra*; *Ex parte Duvall*, 782 So.2d 244 (Ala. 2000).

*Id.* (quoting *Howard v. City of Atmore*, 887 So.2d 201, 203 (Ala. 2003)).

The party claiming immunity bears the initial burden of "demonstrating that the plaintiff's claims arise from a function that would entitle the state agent to immunity." *Hollis*, 950 So. 2d at 309. If the required showing is made by the defendant, the burden shifts to the plaintiff to show that the state agent "acted willfully, maliciously, fraudulent, in bad faith, or beyond his or her authority." *Id.*

As discussed above, questions of material fact exist as to why Woodruff used deadly force in this situation which appeared to be a non-deadly force situation. There is adequate evidence to suggest that Woodruff's frustration with Lawrence's attitude of confrontation and non-cooperation (including her knowledge that he espoused "sovereign citizen" rhetoric) impaired her judgment as a law enforcement officer, to the point that a jury could find she was then acting maliciously or in bad faith. These factual disputes preclude a finding that qualified immunity applies, and therefore it is recommended that Woodruff's motion for summary judgment as to Plaintiff's state law claims be **denied**.

C.    *Plaintiff's Motion for Partial Summary Judgment (Doc. 43)*

Plaintiff seeks partial summary judgment against Woodruff on the excessive force claims pursuant to 42 U.S.C. § 1983.  (Doc. 43).  As discussed above, material factual disputes exist regarding Woodruff's entitlement to qualified immunity.  In a light favorable to Woodruff, these factual disputes preclude summary judgment in Plaintiff's favor because Plaintiff is unable to satisfy his burden of proof—as it relates to Woodruff—whether there was a constitutional violation and whether the constitutional right in question was clearly established at the time of the alleged conduct.  Accordingly, Plaintiff's Motion for Partial Summary Judgment (Doc. 43) is due to be **denied**.

## V.    RECOMMENDATION

Accordingly, for the reasons as stated, it is respectfully **RECOMMENDED** that:

1. Plaintiff's Motion for Partial Summary Judgment (Doc. 43) be **denied**; and

2. Defendants' Motion for Summary Judgment on behalf of the City of Dothan, Alabama; Greg Benton, and Chris Summerlin (Doc. 63) be **granted** and final summary judgment be entered in these Defendants' favor, and Defendants' Motion for Summary Judgment as to Adrienne Woodruff (Doc. 63) be **denied**.

## VI.    NOTICE TO PARTIES

24

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. Accordingly, it is hereby **ORDERED** that any objections to the Report and Recommendation shall be filed on or before **August 8, 2018**. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1; see also 28 U.S.C. § 636(b)(1).

**Respectfully recommended** this 25th day of July, 2018.

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

# TAB 82

# IN THE UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **CHRISTOPHER CANTU, as the** | ) | |
| **Administrator of the Estate of** | ) | |
| **Robert Earl Lawrence,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:16-cv-1003-ECM-DAB** |
| | ) | |
| **CITY OF DOTHAN, ALABAMA,** | ) | |
| ***et al.,*** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORDANDUM OPINION AND ORDER

This cause comes before the Court on the parties' cross motions for summary judgment: Plaintiff's Motion for Partial Summary Judgment (Doc. 43) and Defendants' City of Dothan, Alabama, Benton, Summerlin, and Woodruff's Motion for Summary Judgment (Doc. 63).  The Magistrate Judge, after considering these motions, submitted a Report and Recommendation (Doc. 73) recommending Plaintiff's Motion for Partial Summary Judgment (Doc. 43) be denied; and Defendants' Motion for Summary Judgment on behalf of the City of Dothan, Alabama; Greg Benton, and Chris Summerlin (Doc. 63) be granted and final summary judgment be entered in these Defendants' favor, and Defendants' Motion for Summary Judgment as to Adrienne Woodruff (Doc. 63) be denied. Based on an independent review of the record and for the reasons discussed below, the Report

1

and Recommendation will be ADOPTED IN PART and REJECTED IN PART. It will be ADOPTED as to the Magistrate Judge's recommendation that summary judgment is due to be granted as to Defendants Greg Benton, Chris Summerlin, and the City of Dothan.   However, the Court will reject the Magistrate Judge's recommendation on summary judgment to deny Woodruff qualified immunity.

## I.      JURISDICTION AND VENUE

The court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331. The parties do not contest personal jurisdiction or venue.

## II.     STANDARD OF REVIEW

A district court judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 18 U.S.C. § 636(b)(1). The court reviews the Recommendation using the same summary judgment standard applied by the Magistrate Judge. (*See* Doc. # 209, at 4–6.) Summary judgment is appropriate when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.    BACKGROUND

Plaintiff Christopher Cantu is the personal representative of the Estate of Robert Earl Lawrence who was fatally shot by Defendant Adrianne Woodruff, a Dothan Police Department sergeant. The material facts are largely undisputed. The shooting and the events leading up to it are captured on multiple video and audio recordings, including a video from inside the office of the Dothan County Animal Shelter, a cell-phone video recorded by Lawrence's girlfriend and himself, and the dash-mounted camera in Officer Alan Rhodes' patrol car. There are also audio recordings of three telephone calls from the animal shelter to Dothan Police dispatch.

On December 30, 2014, Lawrence entered the Dothan County Animal Shelter reception area with a dog he wanted to surrender. Woodruff was the sergeant on duty assigned to supervise the animal shelter. Receptionist Patricia Holley and Chief Animal Services Officer Renee Skipper were also working at the shelter that day. Lawrence told Holley he was from Geneva County, and she advised that the shelter only accepted animals from Houston County. Lawrence stated that he found the dog at a Wal-Mart in Dothan, Alabama. Woodruff walked in from the adjoining office after she heard Lawrence getting upset about being asked for identification. Lawrence refused to produce identification, purporting to cite federal law and claiming invasion of privacy. Woodruff agreed to accept the dog without Lawrence producing identification if he would sign a routine intake form. Lawrence refused to sign the form and threatened to abandon the dog at the end of the road. Woodruff

told him that abandoning the animal would be a crime.  Lawrence complained that his rights were being violated and picked the dog up to leave. Woodruff asked him for identification, which Lawrence again refused, stating it was a violation of his rights.

Skipper testified that when people threaten to abandon a dog outside the shelter, the procedure is to write down the tag number of the person's vehicle in the event the dog is later found.  As Lawrence was leaving the shelter with the dog, Woodruff followed him to write down the tag number of Lawrence's vehicle.  As Woodruff followed Lawrence, she observed an empty gun holster on his hip.  She asked Lawrence about the gun, and he told her that it was in his car.  Woodruff asked her assistant to call for back-up.

Lawrence walked toward his car and called out to his girlfriend in the car: "Get the video. This is going to be a good one."  Lawrence sat in the driver's seat of the car which was still running.  Woodruff went to the rear of the vehicle to copy the tag number, but Lawrence got out of his car and attempted to block her view of the tag; she ultimately got the tag number.  Woodruff also testified that she could not communicate the tag number initially to dispatch because she could not get through on the telephone.  Woodruff called police dispatch to request her back-up.  Lawrence told Woodruff he was leaving, but she told Lawrence he could not leave without showing her a driver's license.  Lawrence argued with Woodruff, stating that he did

4

not have a drivers license or need one because she had not seen him driving and further demanded that Woodruff tell him the statutory definition of "driving." Lawrence produced a piece of paper titled an "AFFIDAVIT OF IDENTITY." The document stated that it was "duly affirmed upon oath and full commercial liability" and included Lawrence's name, his "current post" and "Date of origin." The Affidavit purported to be proof of his description, picture, right thumb print, and signature. Based on her training, Woodruff believed Lawrence to be a "Sovereign Citizen."

Lawrence demanded that Woodruff return his identification paper. Woodruff said she would first call police dispatch to request a warrant check for Lawrence. Lawrence told Woodruff that she had "no right or authority" and repeatedly demanded that Woodruff return his paper. Skipper brought Woodruff a portable telephone, and Woodruff called to verify that there were no warrants for Lawrence. After confirming that Lawrence had no outstanding warrants, Woodruff stayed on the call with dispatch, and the exchange between Lawrence and Woodruff was recorded. After Woodruff ran the tag for his vehicle, the tag came back registered to a silver Lexus, which was the color and model of the car that Lawrence was in.

The dashboard camera in Rhodes's patrol car shows that he arrived at shelter and parked his patrol car behind Lawrence's car at 12:41:13 PM. The video shows Woodruff on a telephone and holding papers behind and to the driver's side of the

silver Lexus, and Lawrence standing beside the open driver's door of the car while lighting a cigarette and holding a cell phone to record the incident.  At 12:41:20 PM, the video shows Woodruff hang up the phone and Lawrence begin to approach Rhodes's patrol car, holding a cell phone in his right hand recording the incident.  At 12:41:24 PM, Rhodes comes into the left frame of the video, and as he points to the silver Lexus he can be heard telling Lawrence, "Hey, don't even start. Stand over there with the car, and I'll be with you in a second."  Lawrence backs up and stands at the bumper of the silver Lexus at 12:41:33 PM.  Woodruff begins to explain the events to Rhodes.  Less than ten seconds after backing up to the silver Lexus, Lawrence again begins to walk toward Woodruff and Rhodes.  Rhodes points at Lawrence and says, "Did I tell you to stand over there? You need to stand by the car where I tell you to or you're going to jail now!"  Lawrence can be heard in the background arguing with Rhodes saying "Yes sir, I'm utilizing my First Amendment right for free speech." Rhodes responded, "You can stand by the car where I tell you to or you can go to jail now."  Lawrence backed up but continued to argue with Rhodes about "utilizing his rights," and Rhodes responded that "You can utilize it where I tell you to stand."  Lawrence responds "Ok, where's that … can you tell me where you … I'm not arguing with you sir, I'm trying to figure out the back side of this."  Lawrence and Rhodes continued to speak over each other, and at 12:41:53

PM in the video, Rhodes approaches Lawrence as he says, "Do you want to argue with me more? Turn around. Turn around."

Rhodes and Woodruff both pinned Lawrence against the Silver Lexus as he repeated "Oh, no no no no … Don't touch me!" and resisted their efforts.  Lawrence waved the cellphone in his right hand away from the officers as he yelled for his girlfriend to "get this … get this … look at this … look at this" and continued to resist arrest as he shouted "I'm a peaceful man … stop! Get off me, get off me." Rhodes asks Lawrence, "Are you going to turn around for me?" and Lawrence yells back, "No, I'm not!" The three continued to struggle, and Lawrence continued to yell and demand that the officers stop as he protested that his arrest was an "unlawful detainer." After physically resisting arrest for over a minute, Lawrence breaks away from the officers' grasp at 12:43:12 PM on the video and begins to run around the car fleeing from the officers.  Rhodes deploys his Taser at Lawrence at 12:43:19 PM on the video, but Lawrence, who was wearing a thick jacket, shows no signs that the Taser had any effect on him.  Rhodes continued to attempt to physically restrain Lawrence, and Lawrence continued to physically resist while yelling, "Stop!" repeatedly.  Neither the video nor audio indicate that Lawrence ever stopped actively resisting arrest, and he continued to wrestle with the officers.  At 12:44:02 PM, the video shows Woodruff attempting to use the Taser in drive stun mode as Rhodes repeatedly tells Lawrence to "Turn around!"  Four seconds later, Lawrence can be

7

heard yelling, "Don't do it! Stop!" as he reaches and grabs the Taser. Plaintiff admits that "Woodruff held the Taser with her finger on the trigger" and that "Lawrence grabbed Woodruff's Taser." (Doc. 43 at ¶¶ 26-27).[1]  The Taser can be heard briefly firing, and then Skipper reached in and pulled Lawrence's arm away from the scrum while both he and Woodruff were holding the Taser. One second later, Woodruff can be seen removing her pistol from the holster on her belt and discharging it by Lawrence's side. Woodruff shot Lawrence in the abdomen with her service weapon while Lawrence continued to hold the Taser and struggle against Skipper and Rhodes. Lawrence did not release his grasp on the Taser until after Woodruff discharged her gun. Woodruff did not verbally warn Lawrence that she was going to shoot him. Lawrence died as a result of the gunshot wound.

At all material times, Defendant City of Dothan was the employer of Defendants Benton, Summerlin, and Woodruff in the City of Dothan Police Department. (Docs. 63-1; 63-5; 63-16).

In December 2016, Plaintiff filed suit against Defendants. (Doc. 1). In a two-count amended complaint, Plaintiff sued the City of Dothan, Greg Benton, Chris Summerlin, and Adrienne Woodruff for alleged violation of Lawrence's Fourth

---

[1] Plaintiff further alleges that during this altercation in which Rhodes and Woodruff were trying to subdue Lawrence, "Officer Skipper grabbed Lawrence's arm and pulled it toward her (with Woodruff still holding the Taser and Lawrence holding it as well but not by the grip)." *Id.* at ¶ 28. However, after thoroughly and repeatedly viewing all available video of the incident that has been submitted as exhibits in support of the parties' respective motions, this Court finds that there is insufficient clarity in any view to determine which part of the Taser Lawrence was grasping.

Amendment rights pursuant to 42 U.S.C. § 1983.  (Doc. 28).  In Count II, Plaintiff alleged Alabama state law claims of assault and battery against the City, Summerlin, and Woodruff. *Id.*  Plaintiff has moved for partial summary judgment on the excessive force claims against Woodruff, arguing that no reasonable jury could find Woodruff's decision to use deadly force to be a reasonable one and that Woodruff had fair warning that her use of deadly force was unconstitutional. (Doc. 43). Defendants filed a motion for summary judgment against Plaintiff on the basis that there was no constitutional violation against Lawrence, and even if there was, Defendants are entitled to qualified immunity for their actions. (Doc. 63).  On the state law claims of assault and battery/excessive force in Count II, Defendants assert that officers may lawfully use the degree of force reasonably necessary to defend themselves, and in any event, Woodruff would be entitled to peace officer immunity under Alabama law. *Id.*

## IV.  DISCUSSION

### A. Defendants City of Dothan, Greg Benton, and Chris Summerlin

Plaintiff did "not oppose the dismissal of Benton, Summerlin, and the City of Dothan" in his briefs to this Court (Doc. 70 at 11) and did not object to the Magistrate Judge's recommendation to grant summary judgment in favor of those parties. (Doc. 78).  Accordingly, the recommendation is adopted in part to the extent that the Magistrate Judge recommended that "Defendants' motion for summary judgment

(Doc. 63) is due to be granted in part as to Defendants Greg Benton, Chris Summerlin, and the City of Dothan." (Doc. 73 at 11).

## B. Defendant Woodruff

### 1. Count I – Excessive Force

Plaintiff's first claim is that "Woodruff, acting under color of law within the meaning of 42 U.S.C. § 1983, used deadly force on Lawrence, thereby depriving Lawrence of his rights under the Fourth and Fourteenth Amendments to the Constitution of the United States in violation of 42 U.S.C. § 1983. Specifically, she violated Lawrence's right to be free from excessive force." (Doc. 28 at ¶ 65).

"[T]he question we ask is whether, under [the plaintiff's] version of the facts, [the officer] behaved reasonably in the light of the circumstances before him." *Galvez v. Bruce*, 552 F.3d 1238, 1243 (11th Cir. 2008)(citation and internal quotation marks omitted). The excessive-force "area is one in which the result depends very much on the facts of each case." *Brosseau v. Haugen*, 543 U.S. 194, 201, 125 S. Ct. 596, 600, 160 L. Ed. 2d 583 (2004). Excessive-force claims are fact-specific; whether the force an officer uses is *reasonable* "requires careful attention to the facts and circumstances of each particular case." *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 1872, 104 L.Ed. 2d 443 (1989).

> "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*,

490 U.S. at 396–97, 109 S.Ct. 1865. We make this inquiry without regard to the officer's underlying intent or motivation. *Id.* at 397, 109 S.Ct. 1865.

*Wate v. Kubler*, 839 F.3d 1012, 1019–20 (11th Cir. 2016).

> Courts must examine "the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance the risk of bodily [or psychological] harm to the suspect against the gravity of the threat the officer sought to eliminate." *McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009) (citing *Scott v. Harris*, 550 U.S. 372, 383, 127 S.Ct. 1769, 1778, 167 L.Ed.2d 686 (2007)).

*Stephens v. DeGiovanni*, 852 F.3d 1298, 1318 (11th Cir. 2017).   The Eleventh

Circuit has further held that

> "The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force *in the course of an arrest*." *Lee*, 284 F.3d at 1197 (emphasis added). The *Graham* objective-reasonableness standard governs judicial determination of claims of official use of excessive force. "[T]o determine whether the amount of force used by a police officer was proper, a court must ask whether a reasonable officer would believe that this level of force is necessary in the situation at hand." *Id.* (citation and internal quotation marks omitted). In deciding whether an officer is entitled to summary judgment based on qualified immunity, the question of whether the force used by the officer in the course of an arrest is excessive is a "'pure question of law,'" decided by the court. *Myers v. Bowman*, 713 F.3d 1319, 1328 (11th Cir. 2013) (quoting *Scott*, 550 U.S. at 381 n.8, 127 S.Ct. at 1776 n.8).

> To determine "whether the force used to effect a particular seizure is 'reasonable,'" the *Graham* Court noted three nonexclusive factors for evaluating an officer's necessity for using force against an arrestee's Fourth Amendment rights: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety

of the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight."

*Stephens*, 852 F.3d at 1321 (emphasis in original).

### a. Probable Cause

Plaintiff initially conceded in his motion for summary judgment that "[Lawrence] at most had committed a minor crime and was resisting an arrest he believed was unlawful." (Doc. 43 at 23). Plaintiff confirmed this position in his reply brief in support of his motion: "Defendant spends most of her brief arguing that Woodruff and Rhodes were justified in detaining and arresting Lawrence and justified in using the Taser on Lawrence, matters not disputed by plaintiff for the purposes of his motion." (Doc. 52 at 1). Woodruff argues that her "request to see Lawrence's driver's license was lawful because he had just threatened to commit a crime, then sat behind the wheel of a car to drive away. Furthermore, probable cause existed to support his arrest for obstructing government operations, refusing a lawful order to present a driver's license, refusing a lawful order to back away, resisting arrest, disorderly conduct, harassment of a police officer, menacing, attempted assault of a police officer with a dangerous instrument and taking a police officer's weapon." (Doc. 64 at 28). However, Plaintiff changed course in responding to Defendants' motion for summary judgment, newly arguing that "Woodruff's admonishment to Lawrence not to dump the dog and writing down his tag should have been the limit of her assertion of authority." (Doc. 70 at 36).

Plaintiff appears to argue that Woodruff lacked reasonable suspicion to detain Lawrence after he exited the shelter.  Plaintiff does not dispute that Lawrence threatened "to abandon the dog down the road" (Doc. 70 at 36) or that doing so would have been a criminal offense. *See* § 13A-11-14(a)(2), Ala. Code 1975 ("A person commits the crime of cruelty to animals if, except at otherwise authorized by law, he or she recklessly or with criminal negligence … subjects any animal in his or her custody to cruel neglect....").  Moreover, Plaintiff acknowledges that under Alabama law, Woodruff, as a law enforcement officer, was authorized to "stop any person abroad in a public place whom [s]he reasonably suspects is committing, has committed or is about to commit a felony or other public offense and may demand of him his name, address and an explanation of his actions." § 15-5-30.  Plaintiff argues, however, that "[a] threat to commit a crime in the future is far from being caught "about to commit" a crime." (Doc. 70 at 36).

This Court must view "the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts…." *McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009).   In this case, Lawrence attempted to leave the dog with the shelter but refused to cooperate with the most basic of protocols for doing so and left with the dog while threatening to abandon the dog at the end of the road.  In the cellphone video recorded by Lawrence's girlfriend, his girlfriend can be heard saying, "Just take the damned dog

back with us." Lawrence can be seen and heard replying to her "Well, that's what I said; I'll just take him down the damn road and drop him off." The question is not, as Plaintiff suggests, whether "persons regularly make such statements" or whether "no one has ever been found to have dumped a dog after leaving the shelter," (Doc. 70 at 36) or even whether "Lawrence's threat to dump the dog at some point in the future was … a basis to arrest him," (Doc. 73 at 14), but whether a reasonable officer having witnessed Lawrence's demeanor, behavior, and threats had probable cause to detain Lawrence and at the minimum write down the tag number on his car, which she did. It would be far less reasonable for an officer to suspect that Lawrence would make a return trip to the same shelter from another county at some distant point in the future for the sole purpose of abandoning an animal to avoid producing identification. There is no evidence before the Court to suggest that Woodruff or Rhodes initiated the arrest of Lawrence due to his threat to abandon the dog.

Moreover, in the cellphone video recorded by Lawrence's girlfriend, Lawrence exited the silver Lexus and said to Woodruff, "That's private property. You have no right to copy down…" and then stood between her and the rear of the vehicle in an attempt to block her view of the license plate on the car. On that same video, Lawrence argued with Woodruff, repeatedly asserting that she was interfering with his "right to travel," that he did not need a driver's license, and that she had not seen him driving. However, he was clearly in the driver's seat of the silver Lexus

with the key in the ignition demanding return of his identification paperwork so he could "leave."  The situation was not simply, as Plaintiff has suggested, that once Woodruff had written down the license plate number from the silver Lexus that probable cause ceased to exist.    On the contrary, the video evidence is incontrovertible that Lawrence was the only person seen in the driver's seat of the silver Lexus, the key was in the ignition, three small children were seated in the back of the car, Lawrence was increasingly agitated and argumentative toward Woodruff, and he was clearly stating that he intended to "leave" and "travel" and refused to show her a driver's license.

Plaintiff argues that Woodruff's demand for Lawrence to produce his driver's license "was beyond her authority" (Doc. 70 at 36) and cites *United States v. Brown*, 731 F.2d 1491, 1494 (11th Cir.), *on reh'g,* 743 F.2d 1505 (11th Cir. 1984), for the proposition "that persons can lawfully refuse to provide a driver's license in this situation." (Doc. 70 at 37-38).  However, the relevant holding in *Brown* was that a Georgia statute prohibited

> only actual lies in order to avoid an unconstitutional construction. The defendants' refusal to furnish identification—which they were entitled to do if indeed this was a *Terry* stop, as the government must contend— may have created suspicion that they had actually used false names, but falls far short of probable cause.

*Brown*, 731 F.2d 1494.  *Brown* did not involve a traffic stop, and the opinion does not reference or involve driver's licenses.[2]

Alabama law defines a "driver" as "[e]very person who drives or is in actual physical control of a vehicle." § 32-1-1.1(14), Ala. Code, 1975.  Alabama law provides that:

> Every licensee shall have his or her license in his or her immediate possession at all times when driving a motor vehicle and shall display the same, upon demand of a judge of any court, a peace officer, or a state trooper. However, no person charged with violating this section shall be convicted if he or she produces in court or the office of the arresting officer a driver's license theretofore issued to him or her and valid at the time of his or her arrest.

Section 32-6-9(a), Ala. Code, 1975.  Concerning the production of a license upon demand, the Alabama Court of Criminal Appeals has held:

> Observing a violation of the state traffic and vehicle safety regulations, the State Trooper had a statutory right to request and inspect the driver's operating license. *See Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 1398, 59 L.Ed.2d 660 (1979). The trooper had a right to "request" or "demand" the defendant's driver's license. The driver had a statutory duty to "display the same." Alabama Code 1975, Section 32-6-9.

---

[2] In fact, *Brown* only mentions automobiles once, and that is used in contrast to the search of an actual person. "Consensual access to another's body as a place of concealment is so unlikely to be casual, unlike access to a car or house, that a more particularized examination of the defendant's dominion and efforts to guarantee privacy, of the kind undertaken in cases involving cars or houses, would not be helpful." *Brown*, 731 F.2d at 1496.

16

*Sly v. State*, 387 So. 2d 913, 916 (Ala. Crim. App.), *writ denied sub nom. Ex parte Sly*, 387 So. 2d 917 (Ala. 1980).  As to probable cause "if the person was not observed actually driving," the Alabama Court of Criminal Appeals has stated "that circumstantial evidence may be used to show that the defendant was driving." *McLaney v. City of Montgomery*, 570 So. 2d 881, 882 (Ala. 1990).

It is beyond dispute that Lawrence was "in actual physical control of a vehicle," and therefore met the statutory definition of a driver.  Moreover, the cell phone video clearly indicates that Lawrence told Woodruff no fewer than four times that he was leaving while she was attempting to verify his identity and before she appears in the video behind the silver Lexus copying the license plate number.

During his protestations, Lawrence leaned out of the window of the silver Lexus and said to Woodruff: "Ok, you're enforcing a statutory code. Do you know the legal definition of that statutory code? Do you know what the definition of 'driving' is under Black's Law Dictionary which is the statutory writing for that code?"  As Woodruff walked behind the silver Lexus, Lawrence got out of the car and stated, "This officer is withholding us. She is blocking our vehicle from leaving." Based on the video evidence in this case, it is clear that while Woodruff was lawfully detaining Lawrence for the purpose of copying the license plate information from the silver Lexus, Lawrence repeatedly protested that he was leaving and had no intent of producing a driver's license.  Lawrence's agitated,

17

obstructive behavior regarding whether he had a driver's license and whether Woodruff knew the legal definition of "driving" gave rise to probable cause for Woodruff to reasonably suspect that Lawrence did not have a driver's license and was about to drive without a license. *See* § 15-5-30.   Accordingly, Woodruff had statutory authority to demand that Lawrence produce a driver's license, and he had a statutory duty to comply. *See* § 32-6-9(a).

### b. The Arrest

Plaintiff argues that "Lawrence's arrest was a direct result of Woodruff's unlawful detention.  Of course, because the detention was unlawful, Lawrence's arrest was also unlawful." (Doc. 70 at 40). The Eleventh Circuit has held:

> Plainly, an arrest without probable cause violates the right to be free from an unreasonable search under the Fourth Amendment. *See Redd v. City of Enterprise,* 140 F.3d 1378, 1382 (11th Cir. 1998) ("[A]n arrest made without probable cause violates the Fourth Amendment."). Under federal law, probable cause to arrest exists "when an arrest is 'objectively reasonable based on the totality of the circumstances.'" *McCormick v. City of Fort Lauderdale,* 333 F.3d 1234, 1243 (11th Cir. 2003) (quoting *Ferraro,* 284 F.3d at 1195). "This standard is met when the facts and circumstances within the *officer's knowledge,* of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Id.* (internal citation and quotation marks omitted). "Although probable cause requires more than suspicion, it 'does not require convincing proof,' and 'need not reach the [same] standard of conclusiveness and probability as the facts necessary to support a conviction.'" *Ferraro,* 284 F.3d at 1195 (internal citations omitted).

*Durruthy v. Pastor*, 351 F.3d 1080, 1088 (11th Cir. 2003)(emphasis in original).

Upon Lawrence's agitated, confrontational refusal to produce a driver's license, Woodruff had reasonably trustworthy information that would lead a prudent officer to believe that Lawrence was about to commit an offense, i.e., driving without a license. Accordingly, she was authorized to execute a lawful arrest of Lawrence. The United States Supreme Court as well as the Alabama Court of Criminal Appeals have allowed the collective knowledge of the investigating officers to be imputed to each participating officer. *See United States v. Hensley,* 469 U.S. 221, 232, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); *Shute v. State,* 469 So. 2d 670, 673 (Ala. Crim. App. 1984)("The knowledge of all the officers involved in a police situation may be evaluated collectively in assessing whether that knowledge constituted probable cause as is constitutionally required."). Accordingly, Woodruff's knowledge of Lawrence's refusal to produce a driver's license upon demand while he was in actual physical control of a vehicle may also be imputed to Rhodes in his subsequent arrest of Lawrence.[3]

### b. Deadly Force During the Arrest

In the context of deadly force, the Supreme Court has set out examples of factors that justify the use of such force:

> "Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to

---

[3] Additionally, Lawrence's refusal to remain at a safe distance by his car while Rhodes and Woodruff spoke after Rhodes arrived on the scene would have been probable cause for an arrest based on violation of Alabama's statute prohibiting obstruction of governmental operations. § 13A-10-2, Ala. Code, 1975.

the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon ... deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given."

*Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 1701, 85 L.Ed. 2d 1 (1985). *Garner* says something about deadly force but not everything, especially when facts vastly different from *Garner* are presented. The Supreme Court has cautioned that "*Garner* did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force.' " *Scott v. Harris,* 550 U.S. 372, 127 S.Ct. 1769, 1777, 167 L.Ed. 2d 686 (2007).

Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," *Graham,* 109 S.Ct. at 1872 (quoting *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed. 2d 447 (1979)) (alteration in original), we must "slosh our way through the factbound morass of 'reasonableness.' " *Scott,* 127 S.Ct. at 1778. Therefore, determining whether "the use of a particular type of force in a particular situation" is "reasonable" in the constitutional sense requires a court to "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Scott,* 127 S.Ct. at 1777, 1778 (quoting *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 2642, 77 L.Ed. 2d 110 (1983)).

In examining whether an officer's use of deadly force is reasonable, we recognize that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham,* 109 S.Ct. at 1872. So "[w]e are loath to second-guess the decisions made by police officers in the field." *Vaughan v. Cox,* 343 F.3d 1323, 1331 (11th Cir.2003).

*Long v. Slaton*, 508 F.3d 576, 580–81 (11th Cir. 2007) (footnote omitted).

Turning to the undisputed facts and video evidence in this case, Lawrence was consistently confrontational, uncooperative, and at times belligerent during his encounter with Woodruff and Rhodes. Aside from producing a homemade affidavit of identity and admitting that he was from Geneva County, Lawrence was antagonistic or actively resistant to every request and command Woodruff and Rhodes directed to him. Lawrence did not merely resist arrest. He actively resisted despite three officers simultaneously attempting to apprehend him. The deployment of a Taser in both prong and drive stun modes had no apparent effect on Lawrence. Lawrence continued to physically struggle, escaped from Rhodes, and led officers on a chase around the silver Lexus in which his girlfriend and three small children were present. He continued his struggle despite the threat his actions posed to the arresting officers and to his own loved ones, who can be heard throughout the struggle.

Plaintiff does not specifically argue that the use of the Taser against Lawrence was excessive force, but Plaintiff argues that the arrest was unlawful and "he was legally entitled to [resist]…" (Doc. 70 at 49). As to Lawrence's behavior leading up to Rhodes's use of the Taser against him, the Eleventh Circuit has found the use of a Taser reasonable under closely similar circumstances. In *Hoyt v. Cooks*, 672 F.3d 972, 979 (11th Cir. 2012), the decedent "resisted during the entire time that [two officers] tried to handcuff him. He spread his arms apart to prevent being handcuffed,

and he rolled around to keep his arms from being pulled behind his back. Even after repeatedly using their Tasers, [the two officers] had considerable difficulty in effecting the arrest."   The Eleventh Circuit held that the two defendant officers "could not wait indefinitely for Allen to stop resisting or for his strange behavior to subside. Allen could not be safely transported until he was restrained. We cannot conclude that clearly established law prevented [the officers] from using their Tasers in the manner used here. Other alternatives, e.g. brute physical force, also presented dangers both to Allen and the officers." *Hoyt*, 672 F.3d at 980.  Similarly, Lawrence can be clearly seen on video resisting arrest, stretching out his arms, shouting at the officers, attempting to escape, running away, and showing no visible effect from the Taser bring deployed against him.   Brute force and a nonlethal Taser showed no signs of subduing Lawrence or dissuading him from continuing this struggle inches from his small children.   Woodruff and Rhodes could not wait indefinitely for Lawrence to stop resisting arrest or merely hope that Lawrence would tire out before they did. *See Callwood v. Jones*, 727 F. App'x 552, 560–61 (11th Cir. 2018), *cert. denied,* No. 17-1569, 2018 WL 2303441 (U.S. Oct. 1, 2018)("Throughout the incident, Illidge resisted all of the officers' attempts to subdue him and ignored their repeated requests to calm down. A reasonable officer could have believed that Illidge continued to resist arrest and that he posed a danger to the officers and himself by resisting.").

22

The Eleventh Circuit has recognized that when dealing with a traffic stop in which the arrestee failed to comply with documentary requests, "acted in a confrontational and agitated manner," and repeatedly refused to comply with reasonable instructions, even a simple "verbal arrest command accompanied by attempted physical handcuffing" can escalate "a tense and difficult situation into a serious physical struggle in which either [officer or arrestee] would be seriously hurt." *Draper v. Reynolds*, 369 F.3d 1270, 1276-78 (11th Cir. 2004).   Even construing the evidence in this case in the light most favorable to Plaintiff, it is beyond dispute that Lawrence refused to comply with requests, was confrontational, agitated, resistant to verbal commands, and that this tense and difficult situation devolved into a serious physical struggle specifically because Lawrence resisted an attempted physical handcuffing.

Plaintiff argues that "Lawrence was not a threat of serious physical harm to the officers at the time he was shot, and no warning was given despite an ample opportunity to give one." (Doc. 70 at 49).  Plaintiff's argument that "Lawrence was not a threat of serious physical harm to the officers at the time he was shot" fails on several grounds.  Plaintiff's argument assumes that "Lawrence [was trying] to keep Woodruff from hurting him with the Taser," but that Lawrence being in possession of the Taser "was not a threat of serious physical harm to the officers…" (Doc. 70 at 49).  How the Taser could be so seriously painful to Lawrence that he would risk

unlawfully taking the weapon away from a law enforcement officer, yet that same Taser be "not a threat" to the officers with whom he was wrestling is simply untenable.  Plaintiff argues that "Lawrence grabbed the Taser by the body as an act of self protection, that he never possessed the Taser, and that he was not even close to having the ability to use the Taser as a weapon." (Doc. 70 at 45).  In light of the video evidence from Rhodes's patrol vehicle camera, Plaintiff's argument is speculative at best and illogical at worst, i.e. that Lawrence could somehow "grab" the Taser yet not "possess" it.  The video is not clear enough to determine what specific part of the Taser was in Lawrence's hand, but it is clear that he possessed the Taser and continued to possess it until Woodruff shot him, at which point he can be seen dropping the Taser.  By Plaintiff's own argument, it is impossible that anyone else had possession of the Taser when he was shot, because Woodruff had reached for her gun, Skipper was holding "Lawrence's arm out from his body," and Rhodes was using his body to restrain Lawrence. (Doc. 70 at 45-46). Moreover, the standard is not whether Lawrence "was not a threat of serious physical harm to the officers…" (Doc. 70 at 49), but whether Woodruff had "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others…" *Smith*, 834 F.3d at 1295.  It is not Lawrence's subjective intent imposed by hindsight, but the officer's objective probable cause to believe a threat of serious physical harm is present in the split-second situation that guides the Court's decision.

24

Whether Lawrence was holding the Taser by the "body" or had the ability to pull the trigger is not discernible in the video evidence, nor is it the standard by which deadly force cases are analyzed.  "Although we view the facts in the light most favorable to the non-moving party," the court must view that evidence as "it would appear to a reasonable officer at the scene." *Zivojinovich v. Barner*, 525 F.3d 1059, 1073 (11th Cir. 2008).  "In analyzing whether excessive force was used, courts must look at the totality of the circumstances: not just a small slice of the acts that happened at the tail of the story." *Garrett v. Athens-Clarke Cty., Ga.*, 378 F.3d 1274, 1280 (11th Cir. 2004).  "And an officer need not wait until he is attacked physically before determining reasonably that he is in imminent danger of serious injury. *Cf. Long v. Slaton*, 508 F.3d 576, 583 (11th Cir. 2007) (concluding the use of deadly force was reasonable, even though other less-lethal means of preventing the suspect's escape may have existed, because 'the police need not have taken that chance and hoped for the best.')." *Wilson v. Miller*, 650 F. App'x 676, 680 (11th Cir. 2016).

The Eleventh Circuit recently affirmed summary judgment in favor of an officer who shot a suspect who "charged at [the officer] while holding a stick that was five and one-half feet long," even though the suspect had not raised or swung the stick because "'[t]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect.'" *Wilson v. Parker*, No. 17-15294, 2018 WL 3954222, at *3 (11th Cir. Aug.

17, 2018)(quoting *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (alteration omitted)(quoting in turn *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007) ).   Lawrence had already shown himself willing and powerful enough to escape from at least two officers attempting to effect an arrest.   The law did not require Woodruff to "hope for the best" after Lawrence took possession of the Taser or even that she hope that Skipper would be able to restrain Lawrence's arm after having seen him escape from Rhodes moments earlier. *See also Wells for Chambers v. Talton*, 695 F. App'x 439, 445 n.2 (11th Cir. 2017)("The fact that [the police officer] was later found to be mistaken about [the suspect] having the gun as he ran away does not defeat qualified immunity. *See Penley* [*v. Eslinger*], 605 F.3d [843,] 854[, (11th Cir. 2010)] (finding that officer's use of deadly force was reasonable where suspect held a toy gun modified to look like a real gun).").

As to Woodruff's failure to give a warning to Lawrence prior to the use of deadly force, the Eleventh Circuit has stated that

> The mere failure to give a warning, however, does not preclude summary judgment where the facts otherwise indicate that the officer's use of force was reasonable. *See Penley v. Eslinger*, 605 F.3d 843, 854 n.6 (11th Cir. 2010); *see also Scott v. Harris*, 550 U.S. 372, 382, 127 S.Ct. 1769, 1777, 167 L.Ed.2d 686 (2007) ("*Garner* did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force.'").

*Talton*, 695 F. App'x at 444.   Video evidence from Rhodes's patrol vehicle camera further shows several instances in which Woodruff approached Lawrence to apply

the Taser in drive stun mode, and Lawrence can be seen reaching toward the Taser.

Even in the less intense "drive stun" mode, the Taser is a weapon capable of

inflicting sufficient pain to impose compliance over another during a struggle.  In

the moments that Lawrence reached for and ultimately gained possession of the

Taser from Woodruff, any reasonable officer could believe that Lawrence intended

to use the Taser against officers to cause them severe pain in order to effect an

escape.  Specifically in this case, a reasonable office would know that after a

prolonged and physical resistance to arrest and continuous efforts to escape,

Lawrence continued to struggle for over two minutes despite three persons being

involved in an increasingly futile effort to restrain him.  Lawrence was seemingly

unaffected by commands and Taser shocks, and had somehow managed to take the

Taser away from one of the arresting officers, all within feet and even inches from

the arrestee's girlfriend and three small children.  Although the offense that triggered

the arrest was relatively minor, Lawrence's belligerent, defiant behavior needlessly

escalated the severity of the encounter.  The Eleventh Circuit has held that "a person

acting unpredictably could present an increased threat to others" such that pausing

to give a warning that an officer intends to use deadly force is not feasible. *Wilson*,

2018 WL 3954222, at *3.  Wrestling the Taser away from Woodruff presented an

immediate threat to the arresting officers, obviating the opportunity for Woodruff to

issue a warning prior to using deadly force.  Lawrence had shown himself

impervious to verbal and physical restraint and showed no signs of being subdued by use of the Taser. Having armed himself with the Taser, Lawrence presented an immediate threat to all the officers such that it was reasonable for Woodruff to use deadly force without further warning, all the more so in the face of Lawrence's demonstrated imperviousness to all verbal commands, physical restraint, or repeated application of the Taser.

Lawrence actively resisted arrest and attempted to escape and evade arrest throughout the encounter. Lawrence's shooting death is a tragedy. However, it was not objectively unreasonable under the Fourth Amendment. *See Martinez v. City of Pembroke Pines*, 648 F. App'x 888, 893 (11th Cir. 2016)("Plaintiff was unresponsive to all commands and gestures, impervious to the taser, and otherwise unable to be restrained."). "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. Because Woodruff was faced with the split-second decision regarding the force necessary to prevent a physically resistant arrestee from turning a weapon on the officers attempting to secure his arrest, her actions were not objectively unreasonable.

### c. Qualified Immunity

Even if Woodruff's use of deadly force was excessive under the Fourth Amendment, she is alternatively entitled to qualified immunity because she violated

28

no clearly established right.  *See Long*, 508 F.3d at 583-4.  Qualified immunity

protects government officials from suit if they are "performing discretionary

functions" and "their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." *Harlow v.*

*Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified

immunity is an entitlement not to stand trial or face the other burdens of litigation.

*Mitchell v. Forsyth*, 472 U.S. 511, 525–26, 105 S. Ct. 2806, 2815, 86 L. Ed. 2d 411

(1985). It balances the need to hold the government accountable with the need to

protect officers from the distractions of litigation. *Pearson v. Callahan*, 555 U.S.

223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

> "We have said many times that if case law, in factual terms, has not
> staked out a bright line, qualified immunity almost always protects the
> defendant." *Priester v. City of Riviera Beach,* 208 F.3d 919, 926 (11th
> Cir. 2000) (quotations omitted). In determining whether a right is
> clearly established, we look to the precedent of the Supreme Court of
> the United States, of this Court, and of the relevant state's highest court.
> *McClish v. Nugent,* 483 F.3d 1231, 1237 (11th Cir. 2007).

*Hoyt*, 672 F.3d at 977.

> In resolving questions of qualified immunity at summary
> judgment, courts engage in a two-pronged inquiry. The first asks
> whether the facts, "[t]aken in the light most favorable to the party
> asserting the injury, ... show the officer's conduct violated a [federal]
> right [.]" *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150
> L.Ed.2d 272 (2001). When a plaintiff alleges excessive force during an
> investigation or arrest, the federal right at issue is the Fourth
> Amendment right against unreasonable seizures. *Graham v. Connor,*
> 490 U.S. 386, 394, 109 S. Ct. 1865, 104 L.Ed.2d 443 (1989). The
> inquiry into whether this right was violated requires a balancing of "'the

nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Tennessee v. Garner,* 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985); see *Graham, supra,* at 396, 109 S.Ct. 1865.

The second prong of the qualified-immunity analysis asks whether the right in question was "clearly established" at the time of the violation. *Hope v. Pelzer,* 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). Governmental actors are "shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Ibid.* "[T]he salient question ... is whether the state of the law" at the time of an incident provided "fair warning" to the defendants "that their alleged [conduct] was unconstitutional." *Id.,* at 741, 122 S.Ct. 2508.

*Tolan v. Cotton*, 572 U.S. 650, 134 S. Ct. 1861, 1865–66, 188 L. Ed. 2d 895 (2014)(footnote omitted).

Plaintiff does not dispute that Woodruff was performing a discretionary function when she encountered Lawrence. (Doc. 43 at 21).  Thus, the burden is on Plaintiff to prove that Woodruff is not entitled to qualified immunity. *Dalrymple v. Reno*, 334 F.3d 991, 995 (11th Cir. 2003) ("Once the government official has established that she was acting within her discretionary authority, the burden shifts to the plaintiffs to show that qualified immunity is not appropriate").

"The salient question" is whether the law gave Defendant "fair warning" that his conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 740–41, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). There are three ways for Plaintiff to prove that a right is clearly established: "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional

right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1291–92 (11th Cir. 2009) (citations omitted).

*Mighty v. Miami-Dade Cty.*, 728 F. App'x 974, 978 (11th Cir. 2018). Plaintiff does not clearly designate which of the three methods he intends to invoke to establish that Woodruff violated a clearly established constitutional right enjoyed by Lawrence. However, Plaintiff relies on two cases for the proposition that Woodruff was on notice: *Tennessee v. Garner*, 471 U.S. 1, 11–12, 105 S. Ct. 1694, 1701, 85 L. Ed. 2d 1 (1985)( "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given."); and *Mercado v. City of Orlando*, 407 F.3d 1152, 1159–60 (11th Cir. 2005) ("Mercado, however, relies on the principle that deadly force cannot be employed in a situation that requires less-than-lethal force."). Specifically, Plaintiff argues that "Garner makes clear that even fleeing felons have a right not to be seized by deadly force and that deadly force is only intended to be used to stop dangerous persons who refuse to submit to arrest. Certainly, Lawrence's rights are greater than such persons." (Doc. 43 at 20).

In *Mercado*, the Eleventh Circuit held:

Officer Padilla should not have needed case law to know that by intentionally shooting Mercado in the head, he was violating Mercado's Fourth Amendment rights. When the officers entered the apartment, they found Mercado crying on the floor of his kitchen with a loose cord around his neck and a kitchen knife placed up to, but not poking into, his chest. From a distance of about six feet away, Padilla twice shouted for Mercado to drop his knife, and then discharged the Sage Launcher, [4] hitting Mercado in the head from short range. Assuming that Padilla was aiming at Mercado's head intentionally, his use of force was clearly excessive.

*Mercado*, 407 F.3d at 1160–61.  The facts of *Mercado* are materially distinguishable

from this case.  Mercado was not physically struggling with officers, resisting arrest,

or attempting to take control of a weapon being held by a law enforcement officer.

Further, no broad statement of principle from *Mercado* is readily applicable to this

case, specifically because that holding was based on the third method of determining

"fair warning" of a constitutional violation:

this is one of the cases that lie "so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law." *Ferraro,* 284 F.3d at 1199 (internal quotation and citation omitted). The facts in this case are also "so far beyond the hazy border

---

[4] The Eleventh Circuit noted that:

The Sage Launcher is a "less lethal" munition that fires a polyurethane baton that is 1.5 inches wide, travels approximately 240 feet per second, and delivers a force of 154 foot/pounds of energy-approximately the energy of a professionally-thrown baseball. The Sage Launcher was designed to be used to protect persons from self-inflicted injury, especially when using a night stick or baton would be unsafe or impractical. The projectile is not designed to penetrate the body, but only to leave bruises.

*Mercado*, 407 F.3d at 1155.

between excessive and acceptable force that [the official] had to know he was violating the Constitution even without caselaw on point." *Willingham,* 321 F.3d at 1303.

*Mercado*, 407 F.3d at 1160.

Turning to the facts in *Garner*, Edward Garner was a burglary suspect fleeing from officers in Memphis, Tennessee.

Garner, stopped at a 6-feet-high chain link fence at the edge of [a] yard. With the aid of a flashlight, [police officer] Hymon was able to see Garner's face and hands. He saw no sign of a weapon, and, though not certain, was "reasonably sure" and "figured" that Garner was unarmed. App. 41, 56; Record 219. He thought Garner was 17 or 18 years old and about 5′5″ or 5′7″ tall. While Garner was crouched at the base of the fence, Hymon called out "police, halt" and took a few steps toward him. Garner then began to climb over the fence. Convinced that if Garner made it over the fence he would elude capture, Hymon shot him. The bullet hit Garner in the back of the head. Garner was taken by ambulance to a hospital, where he died on the operating table.

*Garner*, 471 U.S. at 3–4 (footnotes omitted).   On those facts, the Supreme Court held:

Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. It is no doubt unfortunate when a suspect who is in sight escapes, but the fact that the police arrive a little late or are a little slower afoot does not always justify killing the suspect. A police officer may not seize an unarmed, nondangerous suspect by shooting him dead. The Tennessee statute is unconstitutional insofar as it authorizes the use of deadly force against such fleeing suspects.

It is not, however, unconstitutional on its face. Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the

> suspect threatens the officer with a weapon or there is probable cause
> to believe that he has committed a crime involving the infliction or
> threatened infliction of serious physical harm, deadly force may be used
> if necessary to prevent escape, and if, where feasible, some warning has
> been given.

*Garner*, 471 U.S. at 11–12.   Again, as in *Mercado*, Garner was not physically struggling with officers, actively resisting arrest, or attempting to and/or taking control of a weapon being held by a law enforcement officer.  Further, Woodruff did not aim for or shoot Lawrence in the head as officers did in both *Garner* and *Mercado*.

Mercado and *Garner* are both factually distinguishable,[5] and the broad general principles announced in those cases are inapposite to this case. *See Garner*, 471 U.S. at 11 (1985) ("Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force."); *Mercado*, 407 F.3d at 1160 ("Officer Padilla should not have needed case law to

---

[5] Plaintiff appears to concede that *Garner* is factually distinguishable. "Though this is not a fleeing felon case, the law established in *Garner* provides an important frame of reference for consideration of plaintiff's claim." (Doc. 43 at 19).  The Supreme Court has declined to expand the application of *Garner* beyond the fact-specific constraints of that decision. *See Scott v. Harris*, 550 U.S. 372, 382–83, 127 S. Ct. 1769, 1777, 167 L. Ed. 2d 686 (2007) ("*Garner* was simply an application of the Fourth Amendment's 'reasonableness' test, *Graham, supra,* at 388, 109 S.Ct. 1865, to the use of a particular type of force in a particular situation. *Garner* held that it was unreasonable to kill a 'young, slight, and unarmed burglary suspect, 471 U.S., at 21, 105 S.Ct. 1694, by shooting him 'in the back of the head' while he was running away on foot, *id.,* at 4, 105 S.Ct. 1694, and when the officer 'could not reasonably have believed that [the suspect] ... posed any threat,' and 'never attempted to justify his actions on any basis other than the need to prevent an escape,' *id.*, at 21, 105 S.Ct. 1694.").

know that by intentionally shooting Mercado in the head, he was violating Mercado's Fourth Amendment rights."). Although the facts of this case are tragic and disturbing, they are not so egregious as to present a violation of constitutional law in the absence of precedent. Lawrence was visibly and vocally resistant throughout the incident. His refusal to abide by the most basic of lawful commands from Woodward and Rhodes needlessly escalated the encounter from detention to arrest to a struggle that lasted longer than two minutes culminating in Lawrence having possession of the very weapon law enforcement had ineffectually used in the effort to subdue him and take him into custody without resort to deadly force. Even construing the evidence in the light most favorable to the Plaintiff, the video evidence inescapably demonstrates that Woodruff had probable cause to believe that Lawrence, in possession of the Taser, posed a serious threat of physical harm to herself, Rhodes, and Skipper.

> Again, we must look at the situation not with hindsight, but with the eye of the objectively reasonable officer on the scene. From the scene, we have a man who for a considerable time has consistently put his life and the lives of others in danger and who has shown that he has every intention of fighting and forcibly escaping arrest if possible. We cannot say the defendants' acts were beyond the outside borders of objective reasonableness given all the circumstances.

*Garrett v. Athens-Clarke Cty., Ga.*, 378 F.3d 1274, 1281 (11th Cir. 2004).

The Supreme Court recently held in favor of qualified immunity for a police officer a case in which a suspect who had engaged in erratic behavior "was armed

with a large knife; was within striking distance of [a bystander]; ignored the officers' orders to drop the weapon; and the situation unfolded in less than a minute. *Kisela v. Hughes*, 138 S. Ct. 1148, 1154, 200 L. Ed. 2d 449 (2018).   In this case, Lawrence displayed agitated, confrontational behavior, armed himself by taking possession of an officer's weapon, was within striking distance to two officers, had ignored almost every command leading up to that moment, and the situation unfolded in a very brief period of time.   Woodruff reasonably believed, even if perhaps mistakenly, that Lawrence was an immediate threat to others.

> Where constitutional guidelines seem inapplicable or too remote, it does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness. An officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard,* 572 U.S. ——, ——, 134 S.Ct. 2012, 2023, 188 L.Ed.2d 1056 (2014).

*Kisela*, 138 S. Ct. at 1153, 200 L. Ed. 2d 449 (2018).   In this case, a reasonable officer, confronted with a physically and verbally resistant arrestee who had managed to take control over an officer's weapon in the course of an ongoing struggle with those officers, could have reasonably believed that Lawrence presented an immediate threat of serious physical harm to her and the other officers present. There is no sufficiently definite existing precedent that squarely governs the specific facts at issue.   Accordingly, Woodruff is entitled to qualified immunity.

### 2.  Count II – State Law Claims

In the Complaint, Plaintiff alleged a state law claim of "Assault and Battery/Excessive Force," specifically arguing that "Woodruff shot and killed Lawrence … in violation of clear City policy regarding when deadly force is permissible." (Doc. 1 at ¶¶ 71-72).  In her motion for summary judgment, Woodruff argues that she is "entitled to peace officer/state agent immunity under § 6-5-338(a), Ala. Code 1975 and *Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000)." (Doc. 64 at 53).  Plaintiff also moved for summary judgment as to Count II of the Complaint. (Doc. 43 at 28)("[T]his Court should grant plaintiff's motion and enter judgment for plaintiff as to liability regarding plaintiff's excessive force claim against defendant Woodruff.").  In response to Woodruff's invocation of state agent and peace officer immunity, Plaintiff argues that Woodruff is not entitled to immunity because "a reasonable jury can conclude that Woodruff lacked arguable reasonable suspicion for a *Terry* stop and that Woodruff used excessive force on Lawrence, in violation of U.S. Constitution and § 1983. A reasonable jury can also conclude, therefore, that Woodruff acted contrary to the Constitution and also willfully, maliciously, in bad faith, and beyond her authority." (Doc. 70 at 50).  Plaintiff raised no other argument in reference to peace officer or state agent immunity in any brief or objection before this Court.

Under Alabama law, "[s]tate-agent immunity protects state employees, as agents of the State, in the exercise of their judgment in

37

executing their work responsibilities." *Ex parte Hayles,* 852 So.2d 117, 122 (Ala.2002). In *Ex parte Cranman,* 792 So.2d 392 (Ala.2000), a plurality of the Alabama Supreme Court restated and clarified the scope of Alabama's state-agent immunity doctrine, which bars suit against law enforcement officers effecting arrests, except to the extent the officer acted willfully, maliciously, fraudulently, in bad faith, beyond his legal authority, or under a mistaken interpretation of law, or if the Constitution or laws of the United States or Alabama require otherwise. *Id.* at 405.

There is also statutory, discretionary-function immunity in Alabama. Specifically, § 6–5–338 of the Alabama Code contains a provision immunizing law enforcement officers from tort liability for conduct within the scope of their discretionary law enforcement duties. Ala. Code § 6–5–338(a) (1994) ("Every peace officer ... shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties."). *Cranman*'s test for state-agent immunity governs whether law enforcement officers are entitled to statutory, discretionary-function immunity under § 6–5–338(a). *Ex parte City of Tuskegee,* 932 So. 2d 895, 904 (Ala. 2005) ("The restatement of State-agent immunity as set out in *Cranman,* 792 So. 2d at 405, now governs the determination of whether a peace officer is entitled to immunity under § 6–5–338(a)."). So for our purposes, the question of whether … police officers … receive immunity for Plaintiffs' state-law claims depends on application of *Cranman*'s state-agent immunity test.

The Alabama Supreme Court established a burden-shifting framework for application of the state-agent immunity test. A defendant initially bears the burden of demonstrating that he was acting in a function that would entitle the agent to immunity. *Ex parte Estate of Reynolds,* 946 So.2d 450, 452 (Ala. 2006). "If the State agent makes such a showing, the burden then shifts to the plaintiff to show that the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority." *Id.*

*Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 740–41 (11th Cir. 2010).

Turning to Plaintiff's claim against Woodruff, Plaintiff appears to dispute that Woodruff was acting within the scope of her discretionary functions as law enforcement officer because, he argues, "a reasonable jury can conclude that Woodruff lacked arguable reasonable suspicion for a *Terry* stop and that Woodruff used excessive force on Lawrence, in violation of U.S. Constitution and § 1983." (Doc. 70 at 50). However, Plaintiff's argument is inconsistent with his earlier statement in his Motion for Partial Summary Judgment that "[i]n qualified immunity analysis, once a public official has shown he or she was acting within the scope of his or his discretionary authority, *which defendant has here*, the burden shifts to the plaintiff to show the official's conduct violated clearly established law." (Doc. 43 at 21)(emphasis added).

> The Alabama Supreme Court has applied the same "arguable probable cause" standard utilized in this Court's federal qualified immunity cases for determining whether a city police officer receives state-agent immunity for his role in an arrest. *Borders v. City of Huntsville,* 875 So.2d 1168, 1180 (Ala.2003) ("If ... a jury question exists as to whether [the officer] acted with arguable probable cause, [then] the summary judgment [to the officer] must be reversed.").

*Brown*, 608 F.3d at 741. Regardless of Plaintiff's conflicting arguments regarding discretionary function, as discussed above Woodruff is entitled to receive qualified immunity for her conduct in arresting Lawrence because the facts, construed in the light most favorable to the Plaintiff, show that Woodruff had probable cause to arrest

Lawrence.  That same analysis applies to determining whether Woodruff receives state-agent immunity for her role in the arrest.  Plaintiff thus bears the burden of showing that Woodruff acted willfully, maliciously, fraudulently, in bad faith, beyond her legal authority, or under a mistaken interpretation of the law.

As to Plaintiff's state law claim of assault and battery/excessive force, he has not carried his burden to show facts supporting willful, malicious, fraudulent, bad faith, or legally unauthorized actions by Woodruff against Lawrence.  As noted above, Plaintiff's entire argument as to this issue is that "a reasonable jury can also conclude, therefore, that Woodruff acted contrary to the Constitution and also willfully, maliciously, in bad faith, and beyond her authority." (Doc. 70 at 50). Plaintiff has argued a bare, unadorned legal conclusion that is simply insufficient to meet this burden.  Woodruff's "use of force against [Lawrence] does not constitute a constitutional violation, and neither does it show the required willfulness, maliciousness, fraud, or bad faith necessary to deny [Woodruff] state-agent and statutory, discretionary-function immunity." *Brown*, 608 F.3d at 742.  Accordingly, Woodruff's motion for summary judgment as to Count II of the Complaint is due to be granted.

## V.    CONCLUSION

After an independent and de novo review of the record, the court concludes that the magistrate judge's recommendation should be adopted in part and rejected in part. Accordingly and for the reasons herein stated, it is

**ORDERED** that Plaintiff's Motion for Partial Summary Judgment (Doc. 43) be and is **DENIED**. It is further

**ORDERED** that Defendants' City of Dothan, Alabama, Benton, and Summerlin's Motion for Summary Judgment (Doc. 63) be and is **GRANTED**. It is further

**ORDERED** that Defendant Woodruff's objection (Doc. 77) is **SUSTAINED** and that her Motion for Summary Judgment (Doc. 63) be and is **GRANTED.**

A final judgment will be entered separately.

**DONE** and **ORDERED** this 8th day of November 2018.


_____/s/ Emily C. Marks_____
EMILY C. MARKS
UNITED STATES DISTRICT JUDGE

# TAB 83

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **CHRISTOPHER CANTU, as the** | ) | |
| **Administrator of the Estate of** | ) | |
| **Robert Earl Lawrence,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:16-cv-1003-ECM-DAB** |
| | ) | |
| **CITY OF DOTHAN, ALABAMA,** | ) | |
| *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## FINAL JUDGMENT

In accordance with the order entered on this date adopting in part and rejecting in part the Report and Recommendation of the Magistrate Judge, it is the ORDER, JUDGMENT and DECREE of the Court that this case is DISMISSED with prejudice.

The Clerk is DIRECTED to enter this document on the civil docket as a Final Judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure.

Done this 8th day of November, 2018.


                                    /s/Emily C. Marks
                                    EMILY C. MARKS
                                    UNITED STATES DISTRICT JUDGE

USCA11 Case: 18-11507  Document: 19-2  Date Filed: 02/15/2019  Page: 240 of 247

A copy of this checklist is available on the website for the USCA, 11th Circuit at www.ca11.uscourts.gov
Effective on December 1, 2013, the fee to file an appeal is $505.00

## CIVIL APPEALS JURISDICTION CHECKLIST

1.  **Appealable Orders:** Courts of Appeals have jurisdiction conferred and strictly limited by statute:

    (a)  **Appeals from final orders pursuant to 28 U.S.C. § 1291:** Final orders and judgments of district courts, or final orders of bankruptcy courts which have been appealed to and fully resolved by a district court under 28 U.S.C. § 158, generally are appealable. A final decision is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Pitney Bowes, Inc. v. Mestre*, 701 F.2d 1365, 1368 (11th Cir. 1983) (citing *Catlin v. United States*, 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945)). A magistrate judge's report and recommendation is not final and appealable until judgment thereon is entered by a district court judge. 28 U.S.C. § 636(b); *Perez-Priego v. Alachua County Clerk of Court*, 148 F.3d 1272 (11th Cir. 1998). However, under 28 U.S.C. § 636(c)(3), the Courts of Appeals have jurisdiction over an appeal from a final judgment entered by a magistrate judge, but only if the parties consented to the magistrate's jurisdiction. *McNab v. J & J Marine, Inc.*, 240 F.3d 1326, 1327-28 (11th Cir. 2001).

    (b)  **In cases involving multiple parties or multiple claims**, a judgment as to fewer than all parties or all claims is not a final, appealable decision unless the district court has certified the judgment for immediate review under Fed.R.Civ.P. 54(b). *Williams v. Bishop*, 732 F.2d 885, 885-86 (11th Cir. 1984). A judgment which resolves all issues except matters, such as attorneys' fees and costs, that are collateral to the merits, is immediately appealable. *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 201, 108 S.Ct. 1717, 1721-22, 100 L.Ed.2d 178 (1988); *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 837 (11th Cir. 1998).

    (c)  **Appeals pursuant to 28 U.S.C. § 1292(a):** Under this section, appeals are permitted from the following types of orders:
       i.  Orders granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions; However, interlocutory appeals from orders denying temporary restraining orders are not permitted. *McDougald v. Jenson*, 786 F.2d 1465, 1472-73 (11th Cir. 1986).
       ii.  Orders appointing receivers or refusing to wind up receiverships; and
       iii.  Orders determining the rights and liabilities of parties in admiralty cases.

    (d)  **Appeals pursuant to 28 U.S.C. § 1292(b) and Fed.R.App.P. 5:** The certification specified in 28 U.S.C. § 1292(b) must be obtained before a petition for permission to appeal is filed in the Court of Appeals. The district court's denial of a motion for certification is not itself appealable.

    (e)  **Appeals pursuant to judicially created exceptions to the finality rule:** Limited exceptions are discussed in cases including, but not limited to: *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546, 69 S.Ct. 1221, 1225-26, 93

L.Ed. 1528 (1949); *Atlantic Fed. Sav. & Loan Ass'n v. Blythe Eastman Paine Webber, Inc.*, 890 F.2d 371, 376 (11th Cir. 1989); *Gillespie v. United States Steel Corp.*, 379 U.S. 148, 157, 85 S.Ct. 308, 312, 13 L.Ed.2d 199 (1964).

2.  **Time for Filing:** The timely filing of a notice of appeal is mandatory and jurisdictional. *Rinaldo v. Corbett*, 256 F.3d 1276, 1278 (11th Cir. 2001). In civil cases, Fed.R.App.P. 4(a) and (c) set the following time limits:

(a)  **Fed.R.App.P. 4(a)(1):** A notice of appeal in compliance with the requirements set forth in Fed.R.App.P. 3 must be filed in the district court within 30 days after the order or judgment appealed from is entered. However, if the United States or an officer or agency thereof is a party, the notice of appeal must be filed in the district court within 60 days after such entry. **THE NOTICE MUST BE RECEIVED AND FILED IN THE DISTRICT COURT NO LATER THAN THE LAST DAY OF THE APPEAL PERIOD – no additional days are provided for mailing.** Special filing provisions for inmates are discussed below.

(b)  **Fed.R.App.P. 4(a)(3):** "If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later."

(c)  **Fed.R.App.P. 4(a)(4):** If any party makes a timely motion in the district court under the Federal Rules of Civil Procedure of a type specified in this rule, the time for appeal for all parties runs from the date of entry of the order disposing of the last such timely filed motion.

(d)  **Fed.R.App.P. 4(a)(5) and 4(a)(6):** Under certain limited circumstances, the district court may extend or reopen the time to file a notice of appeal. Under Rule 4(a)(5), the time may be extended if a motion for an extension is filed within 30 days after expiration of the time otherwise provided to file a notice of appeal, upon a showing of excusable neglect or good cause. Under Rule 4(a)(6), the time to file an appeal may be reopened if the district court finds, upon motion, that the following conditions are satisfied: the moving party did not receive notice of the entry of the judgment or order within 21 days after entry; the motion is filed within 180 days after the judgment or order is entered or within 14 days after the moving party receives notice, whichever is earlier; and no party would be prejudiced by the reopening.

(e)  **Fed.R.App.P. 4(c):** If an inmate confined to an institution files a notice of appeal in either a civil case or a criminal case, the notice of appeal is timely if it is deposited in the institution's internal mail system on or before the last day for filing. Timely filing may be shown by a declaration in compliance with 28 U.S.C. § 1746 or a notarized statement, either of which must set forth the date of deposit and state that first-class postage has been prepaid.

**3.**     <u>**Format of the notice of appeal**</u>: Form 1, Appendix of Forms to the Federal Rules of Appellate Procedure, is a suitable format.  *See also* Fed.R.App.P. 3(c).  A *pro se* notice of appeal must be signed by the appellant.

**4.**     <u>**Effect of a notice of appeal:**</u> A district court lacks jurisdiction, *i.e.*, authority, to act after the filing of a timely notice of appeal, except for actions in aid of appellate jurisdiction or to rule on a timely motion of the type specified in Fed.R.App.P. 4(a)(4).

Rev.: 3/2011

# TAB 84

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

CHRISTOPHER CANTU, as the
Administrator of the Estate of
Robert Earl Lawrence,                          )
                                               )
      Plaintiff                        )
                                               )
v.                                             )   CASE NO. 1:16-CV-1003-ECM-DAB
                                               )
CITY OF DOTHAN, ALABAMA;                       )
et al.,                                        )
                                               )
      Defendants.                      )

## NOTICE OF APPEAL

Notice is hereby given that plaintiff hereby appeals to the United States Court

of Appeals for the Eleventh Circuit from the final judgments entered in this action on

the 8th day of November, 2018, in favor of defendants.


                           s/ Henry F. (Hank) Sherrod III
                           Henry F. (Hank) Sherrod III
                           No. ASB-1200-D63H
                           HENRY F. SHERROD III, P.C.
                           119 South Court Street
                           Florence, Alabama 35630
                           Phone: 256-764-4141
                           Fax: 877-684-0802
                           Email: hank@alcivilrights.com

                           Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on December 7, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record.


s/ Henry F. (Hank) Sherrod III

2

# **TAB B**

## CERTIFICATE OF SERVICE

I certify that on February 15, 2019, the Appellant's Appendix was served on

all parties or their counsel of record through the CM/ECF system.


/s/ Tillman J. Breckenridge
Tillman J. Breckenridge
PIERCE BAINBRIDGE BECK
PRICE & HECHT LLP
One Thomas Circle NW
Suite 700
Washington, D.C. 20005
213-262-9333
tjb@piercebainbridge.com