## DOCKET NO. 18-15071

# United States Court of Appeals

*for the*

# Eleventh Circuit

CHRISTOPHER CANTU,

*Plaintiff/Appellant,*

*v.*

CITY OF DOTHAN, et al.,

*Defendants/Appellees.*

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
CASE NO: 1:16-CV-01003-ECM-DAB

## APPELLEE ADRIANNE WOODRUFF'S PETITION FOR PANEL REHEARING AND REHEARING *EN BANC*

F. Lenton White
Ala. Bar No.: ASB-8223-E68F
126 N. St. Andrews Street
Dothan, Alabama 36303
Phone (334) 615-3130
lwhite@dothan.org

*Counsel for Appellee*

No. 18-15071

*Cantu v. City of Dothan, et al.*

### Certificate of Interested Persons and Corporate Disclosure Statement

Appellee Adrianne Woodruff submits this Certificate of Interested Parties and

Corporate Disclosure Statement. *See* Fed. R. App. P. 26.1; 11th Cir. R. 26.1-1. The

following entities and persons have an interest in the outcome of this case on appeal:

- Alabama Municipal Insurance Corporation (AMIC): Insurer for appellees/defendants. AMIC is a mutual insurance company organized under the laws of the State of Alabama and owned by its participating Alabama member municipalities.

- Baker, David A., United States Magistrate Judge

- Benton, Greg, Former Defendant

- Breckenridge, Tillman J., Counsel for Appellant

- Cantu, Christopher, Appellant

- City of Dothan, Alabama, Former Defendant

- Marks, Emily C., United States District Court Judge

- Morris, William S., Counsel for Appellant

- Morris, Cary, Andrews, Talmadge & Driggers, LLC, Counsel for Appellant

- Pierce Bainbridge Beck Price & Hecht, LLP, Counsel for Appellant

- Sherrod III, Henry F., Counsel for Appellant

- Summerlin, Chris, Former Defendant

- White II, Freddie L., Dothan City Attorney's Office

C-1 of 2

No. 18-15071

*Cantu v. City of Dothan, et al*.

- William & Mary Law School

- Woodruff, Adrianne, Appellee

No entity listed above is either a nongovernmental corporation or has 10% or more of its stock owned by a public held corporation.

/s/ F. Lenton White
Attorney for Appellee
Adrianne Woodruff

**Certificate of Counsel of Circumstances Warranting *En Banc* Review**

I express a belief, based on a reasoned and studied professional judgment, that the panel decision is contrary to the following decision(s) of the Supreme Court of the United States or the precedents of this circuit and that consideration by the full court is necessary to secure and maintain uniformity of decisions in this Court: Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018) ("Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue . . . Where constitutional guidelines seem inapplicable or too remote, it does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness.") (internal quotations and citations omitted); City of Escondido v. Emmons, 139 S. Ct. 500, 503 (2019) ("The Court of Appeals should have asked whether clearly established law prohibited the officers from stopping and taking down a man in these circumstances. Instead, the Court of Appeals defined the clearly established right at a high level of generality. . . ."); Hinson v. Bias, 927 F.3d 1103, 1119 (11th Cir. 2019) ("[I]n evaluating the Officers' actions, we must accept as true all evidence the Officers

have submitted that Hinson does not contest and that Hinson's evidence – the video recording and medical records – does not contradict.").

Undersigned counsel further expresses a belief, based on a reasoned and studied professional judgment, that this appeal involves one or more questions of exceptional importance:

I.      Whether the panel's decision to apply the "obvious clarity" exception to a deadly force case involving rapidly-changing circumstances and an active struggle with a subject over a weapon – contrary to non-binding federal precedent involving similar facts – unduly expands the "obvious clarity" exception in a manner inconsistent with Supreme Court and prior panel precedent?

II.     Whether the panel's decision to eschew undisputed testimony from eyewitness officers in favor of drawing inferences from grainy and ambiguous video evidence departed from Circuit precedent, which permits reliance on video evidence to avoid summary judgment only where an actual contradiction can be shown?

III.    Whether the panel's rejection of State-agent immunity for Sergeant Woodruff must be overturned in view of its misapplication of the doctrine of qualified immunity, which the panel held was coextensive with State-agent immunity?

*/s/ F. Lenton White*
Counsel of Record for Appellee
Adrianne Woodruff

# **Table of Contents**

Certificate of Interested Persons and Corporate Disclosure Statement ..................... 1

Certificate of Counsel of Circumstances Warranting En Banc Review ..................... i

Table of Contents ............................................................................................... iv

Table of Citations ............................................................................................... v

Issues for En Banc Consideration ....................................................................... 1

Course of Proceedings and Factual Summary ..................................................... 1

Argument and Citations of Authority .................................................................. 5

    I.     The Panel Misapplied the "Obvious Clarity" Doctrine ........................... 5

    II.    The Panel Contradicted Hinson v. Bias ................................................. 14

    III.   The Panel Erroneously Denied State-Agent Immunity .......................... 16

Conclusion ........................................................................................................ 17

Certificate of Service ......................................................................................... 19

iv

## Table of Citations

### Cases

Ashcroft v. al-Kidd,
    563 U.S. 731 (2011).................................................................. 5, 10

City of Escondido v. Emmons,
    139 S. Ct. 500 (2019)................................................................ i, 10

Gaines v. Wardynski,
    871 F.3d 1203 (11th Cir. 2017) ....................................................... 5

Gates v. Collier,
    501 F.2d 1291 (5th Cir.1974) ......................................................... 8

Graham v. Connor,
    490 U.S. 386 (1989)............................................................. 5, 11, 12

Haynes v. Richmond Cty. Sheriff Office,
    749 F. App'x 935 (11th Cir. 2018) ................................................... 6

Henderson v. Inabinett,
    No. 2:05-CV-00064-WKW, 2006 WL 2547435 (M.D. Ala. Sept. 1, 2006).. 6

Hinson v. Bias,
    927 F.3d 1103 (11th Cir. 2019) ....................................... i, 2, 14, 16

Hinson v. Bias,
    No. 16-14112, recording at 15:00-23:18 ...................................... 15

Hope v. Pelzer,
    536 U.S. 730 (2002)............................................................. 7, 8, 9

Hunter v. City of Leeds,
    941 F.3d 1265 (11th Cir. 2019) ................................................... 16

Jensen v. Burnsides,
    No. CV-06-2356-PHX-GMS, 2008 WL 4700020 (D. Ariz. Oct. 23, 2008).. 6

Jordan v. Morris,
    No. 14-2539-JWL, 2016 WL 5871717 (D. Kan. Oct. 7, 2016) ................... 13

Kisela v. Hughes,
    138 S. Ct. 1148 (2018)...................................................................................... i

Lee v. Ferraro,
    284 F.3d 1188 (11th Cir. 2002) ....................................................................... 9

Long v. Slaton,
    508 F.3d 576 (11th Cir. 2007) ....................................................................... 13

Martinez v. City of Pembroke Pines,
    648 F. App'x 888 (11th Cir. 2016) ........................................................... 7, 11

McCormick v. City of Fort Lauderdale,
    333 F.3d 1234 (11th Cir. 2003) ........................................................... 9, 10, 11

Menuel v. City of Atlanta,
    25 F.3d 990 (11th Cir. 1994) ........................................................................ 12

Mercado v. City of Orlando,
    407 F.3d 1152 (11th Cir. 2005) .................................................................... 10

Mitchell v. City of Mobile,
    No. CV 15-0360-CG-C, 2017 WL 1740364 (S.D. Ala. May 3, 2017) .......... 6

Moore v. Pederson,
    806 F.3d 1036 (11th Cir. 2015) .................................................................... 12

Oliver v. Fiorino,
    586 F.3d 898 (11th Cir. 2009) ...................................................................... 10

Ort v. White,
    813 F.2d 318 (11th Cir. 1987) ........................................................ 8

Pace v. Capobianco,
    283 F.3d 1275 (11th Cir. 2002) ................................................... 12

Parker v. Wal-Mart Stores E., LP,
    769 F. App'x 875 (11th Cir. 2019) .............................................. 15

Pearson v. Callahan,
    555 U.S. 223 (2009) ........................................................................ 6

Penley v. Eslinger,
    605 F.3d 843 (11th Cir. 2010) ............................................... 13, 14

Perez v. Suszczynski,
    809 F. 3d 1213 (11th Cir. 2016) .................................................... 9

Smith v. City of Fairburn,
    679 F. App'x 916 (11th Cir. 2017) .............................................. 16

Spencer v. City of Orlando,
    725 F. App'x 928 (11th Cir. 2018) .............................................. 12

Taylor v. Taylor,
    649 F. App'x 737 (11th Cir. 2016) ................................................ 7

Tennessee v. Garner,
    471 U.S. 1 (1985) ........................................................................ 5, 8

Todd v. Grayson Cty.,
    No. 4:13-CV-574, 2014 WL 4129507 (E.D. Tex. Aug. 20, 2014) ............... 6

United States v. Hogan,
    986 F.2d 1364 (11th Cir. 1993) ................................................... 16

vii

Vinyard v. Wilson,
   311 F.3d 1340 (11th Cir. 2002) ........................................................ 9

White v. Pauly,
   137 S. Ct. 548 (2017) ....................................................................... 5

Wright v. United States,
   No. 1:19-CV-146-FDW, 2020 WL 1674557 (W.D.N.C. Apr. 6, 2020) ...... 13

Youmans v. Gagnon,
   626 F.3d 557 (11th Cir. 2010) ........................................................ 7

**Rules and Statutes**

42 U.S.C. § 1983 ................................................................................ 1

Ala. Code § 13A-1-2 ........................................................................ 11

Ala. Code § 13A-6-21 (1975) .......................................................... 11

**Other Authorities**

John C. Hall, FBI Training on the New Federal Deadly Force Policy, FBI Law
Enforcement Bulletin 25, 28 (April 1996), available at https://leb.fbi.gov/file-
repository/archives/april-1996.pdf/view ................................................. 9

viii

## Issues for *En Banc* Consideration

1.    Whether the panel misapplied the "obvious clarity" doctrine when the offender threatened an officer with a weapon and nine federal judges have upheld the use of deadly force in similar circumstances?

2.    Whether the panel's treatment of the video contradicts binding Circuit precedent?

3.    Whether the panel's errors on the § 1983 claim led it to erroneously deny State-agent immunity?

## Course of Proceedings and Factual Summary

Sergeant Adrianne Woodruff made a split-second decision to use deadly force when Robert Lawrence, a defiant "sovereign citizen," threatened an officer with a weapon during a lengthy physical struggle.  The struggle and the use of force are on video.  All parties agree that immediately before the shooting, "Lawrence grabbed the Taser" held by an officer. (Doc. 70 at 7, ¶ 93). Indeed, that is a direct quote from plaintiff's District Court brief.

In reversing the District Court's decision to grant Sergeant Woodruff qualified immunity, the panel opinion changed this undisputed fact in a critical (and erroneous) way.  The panel wrote that Lawrence merely "grabbed *at*" the Taser. (Op. at 25.)  At another point, the panel opinion suggests that Lawrence might have just "put his hand on the officer's wrist or hand that was holding the taser."  (Op. at

1

3.)  These views of the evidence contradict <u>Hinson v. Bias</u>, 927 F.3d 1103, 1119 (11th Cir. 2019) ("[I]n evaluating the Officers' actions, we must accept as true all evidence the Officers have submitted that Hinson does not contest and that Hinson's evidence – the video recording and medical records – does not contradict.").

The panel acknowledged that existing case law did not clearly establish that Sergeant Woodruff's shooting of Lawrence was excessive.  The panel opinion then applied "obvious clarity" analysis, a rare exception to the requirement for case law with materially similar facts.  This Court has never before applied the obvious clarity exception to a dynamic struggle involving a weapon.  The panel's application of the doctrine turned qualified immunity on its head.  Rather than viewing the facts as a reasonable officer on the scene would have, the panel essentially excused Lawrence's aggressive actions toward officers, and inferred that his grabbing of the Taser was merely "a defensive maneuver in an effort to prevent Woodruff from shocking him more with it."  (Op. at 25.)

The District Court rejected that gloss on the video, stating that any such argument would be "speculative at best and illogical at worst."  (Doc. 82 at 24.)  As the District Court properly held, from the video "it is clear that [Lawrence] possessed the Taser and continued to possess it until Woodruff shot him, at which point he can be seen dropping the Taser."  <u>Id.</u>  "Moreover," the District Court noted, "it is not Lawrence's subjective intent imposed by hindsight, but the officer's objective

2

probable cause to believe a threat of serious harm is present in the split-second situation that guides the Court's decision." Id.  And Sergeant Woodruff did not have the luxury to watch the slow-motion replay of the video and "freeze frame the images." (Op. 15.)

In the seconds preceding the shooting, Lawrence grabbed the Taser and pulled it toward the leg of Officer Rhodes (another officer who was engaged in the struggle with Lawrence), taking it out of Woodruff's hand.  (Doc. 64-1 at 6-7; Doc. 64-28, 03:09-03:13.)  Once Lawrence had grabbed the Taser, a third officer, Renee Skipper, reached into the fray and pulled Lawrence's right hand, which had the Taser, away from Officer Rhodes's leg.  (Doc. 64-4 at 5; Doc. 64-28, 03:14.)  As Lawrence and Skipper struggled over the Taser, Sergeant Woodruff drew her handgun and fired once, causing Lawrence to drop the Taser and fall to the ground.  (Doc. 64-28, 03:14.)

While Sergeant Woodruff's decision to utilize deadly force was made in an instant, it was informed and supported by events leading up to the shooting.  As the panel recognized, Sergeant Woodruff realized early in the encounter that Lawrence was a "sovereign citizen" who would not recognize commands of the police, and that he had a firearm, which he said was in the glove compartment of his vehicle. (Op. at 6-7.)

Lawrence was defiant from the beginning of the encounter. He "refused to put his hands behind his back as ordered, he struggled, and twice he temporarily freed himself from an officer's grip and ran around the car trying to get away." (Op. at 3.) Lawrence persisted in resisting even after Officer Rhodes fired his Taser striking Lawrence in his back as Lawrence ran toward the open driver's door, but the Taser had no effect. (Doc. 64-3 at 4; Doc. 64-28, 02:25.) Lawrence retorted, "Is that all you got?" (Doc. 64-1 at 6.)

Officer Rhodes chased Lawrence around the vehicle until he caught him again. Officer Rhodes told Sergeant Woodruff to take his Taser while he struggled with Lawrence. (Doc. 64-1 at 6; Doc. 64-3 at 4; Doc. 64-28, 02:40.) Sergeant Woodruff then Tased Lawrence twice in his abdomen in drive-stun mode, but again, with no visible effect. (Doc. 64-28, 02:54-03:06.) Officer Rhodes asked Lawrence if he had had enough, to which Lawrence yelled, "No!" (Doc. 64-3 at 4.) Almost immediately thereafter, Lawrence grabbed the Taser and brought it toward Officer Rhodes's leg. (Doc. 64-28, 03:05-03:13.) Skipper and Woodruff testified that Lawrence took the Taser out of Woodruff's hand. (Doc. 64-1, at 6; Doc. 64-4 at 5). Officer Skipper grabbed Lawrence's right wrist and pulled his arm and the Taser away from Rhodes. At that point, Sergeant Woodruff made the split-second decision to draw her handgun and shoot Lawrence, neutralizing the threat. (Doc. 64-28, 03:13-03:18.)

## Argument and Citations of Authority

## I.    The Panel Misapplied the "Obvious Clarity" Doctrine

The panel opinion defined clearly established law at the very highest level of generality.  The Supreme Court has repeatedly instructed circuit courts "not to define clearly established law at a high level of generality." Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011).  Recently, the Court reiterated that "Garner and Graham do not by themselves create clearly established law outside 'an obvious case.'" White v. Pauly, 137 S. Ct. 548, 552 (2017).  This is not an obvious clarity case.

Obvious clarity cases "exist where the words of the federal statute or constitutional provision at issue are so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful, or where case law that does exist is so clear and broad (and not tied to particularized facts) that every objectively reasonably governmental official facing the circumstances would know that the official's conduct did violate federal law when the official acted." Gaines v. Wardynski, 871 F.3d 1203, 1209 (11th Cir. 2017) (quotations omitted).  But the Supreme Court in Garner actually held that an officer may use deadly force "if the suspect threatens the officer with a weapon," Tennessee v. Garner, 471 U.S. 1, 11-12 (1985)., Thus, "Garner does not clearly establish a constitutional violation when the suspect has threatened the officer, and the officer reasonably believes that

the fleeing suspect is armed and poses a threat to the officer or others." <u>Haynes v. Richmond Cty. Sheriff Office</u>, 749 F. App'x 935, 940 (11th Cir. 2018).

Moreover, "[p]olice officers are entitled to rely on existing lower court cases without facing personal liability for their actions." <u>Pearson v. Callahan</u>, 555 U.S. 223, 244-45 (2009). Nine federal judges have upheld the use of deadly force against offenders armed with Tasers. In <u>Jensen v. Burnsides</u>, No. CV-06-2356-PHX-GMS, 2008 WL 4700020, at \*5 (D. Ariz. Oct. 23, 2008), the court held an officer used reasonable force when the offender "began to pry the Taser out of his hand." <u>Id</u>., <u>aff'd</u> 356 F. App'x 928, 929 (9th Cir. 2009) (3 judges voting to affirm). In <u>Henderson v. Inabinett</u>, No. 2:05-CV-00064-WKW, 2006 WL 2547435 (M.D. Ala. Sept. 1, 2006), the court held "the deadly force used here was objectively reasonable" when a deputy shot and killed a suspect armed with a Taser. According to the court, whether the Taser was in drive-stun mode was "a moot point." <u>Id</u>. at \*8, \*9. In <u>Todd v. Grayson Cty.</u>, No. 4:13-CV-574, 2014 WL 4129507 (E.D. Tex. Aug. 20, 2014), a district judge adopted the magistrate's holding that the officer "acted reasonably in shooting" the offender after the offender obtained a Taser. <u>Id</u>. at \* 15. In <u>Mitchell v. City of Mobile</u>, No. CV 15-0360-CG-C, 2017 WL 1740364, at \*16 (S.D. Ala. May 3, 2017), the court held the "use of deadly force did not amount to a constitutional violation" when an officer shot an offender armed with a Taser. "A reasonable officer would have feared having his or her handgun stripped

6

away while under the Taser's affect a second time." Id. at *14. Finally, the district judge here found no constitutional violation by Sergeant Woodruff. (Doc. 82 at 28.) That makes nine judges.

A rule cannot apply with obvious clarity when factually similar cases hold there is no such rule. See Taylor v. Taylor, 649 F. App'x 737, 747 (11th Cir. 2016) ("Given the similarity of Nolin, Ms. Taylor also cannot show that a broader, clearly established principle applies with 'obvious clarity' to the particular factual situation faced by Deputy Taylor, or that the conduct at issue so obviously violated the Constitution that existing case law is unnecessary."); Martinez v. City of Pembroke Pines, 648 F. App'x 888, 894 (11th Cir. 2016) ("[T]here is no case law that would have put King on notice that his conduct was unlawful. To the contrary, he would have concluded from the most closely analogous case that his use of deadly force was reasonable and thus constitutional given the situation he faced."). "We must not hold police officers to a higher standard of legal knowledge than that displayed by the federal courts in reasonable and reasoned decisions." Youmans v. Gagnon, 626 F.3d 557, 565 (11th Cir. 2010).

In Hope v. Pelzer, 536 U.S. 730, 741-42 (2002), the Supreme Court held that handcuffing a prisoner to a hitching post, without bathroom or water breaks for seven hours without the chance of relief if the prisoner agreed to return to work, was excessive based on obvious clarity. The Supreme Court based its obvious clarity

determination on three items that should have put the prison guards on notice. First, existing case law, though not directly on point, held that handcuffing a prisoner to a fence or a cell for long periods of time was excessive and reasoned that punishment after a prisoner agreed to comply would be excessive. Id. at 742-43 (citing Gates v. Collier, 501 F.2d 1291 (5th Cir.1974), and Ort v. White, 813 F.2d 318 (11th Cir. 1987)).   The panel opinion here cites no case finding that officers utilized excessive force in shooting a physically resisting, non-compliant suspect who grabs an officer's Taser, and Supreme Court precedent holds deadly force is permitted "if the suspect threatens the officer with a weapon." Tennessee v. Garner, 471 U.S. 1, 11-12 (1985).

Second, in Hope, 536 U.S. at 744, the Supreme Court found notice in a state regulation that provided use of the hitching post must allow bathroom and water breaks and must end with the prisoner becomes compliant.  Here, there is no state or other regulation barring deadly force when officers are in a physical struggle with a non-compliant suspect who grabs an officer's weapon.

Third, in Hope, 536 U.S. at 744-45, the Supreme Court relied on a Department of Justice study that informed the State of Alabama that its use of the hitching post was unconstitutional.  Here, the Department of Justice's deadly force policy as interpreted by the FBI defined the element of "imminent danger" that justifies deadly force to include when "[a] subject with the capability of . . . incapacitating agents

8

without a deadly weapon[ ] is demonstrating an intention to do so." John C. Hall, FBI Training on the New Federal Deadly Force Policy, FBI Law Enforcement Bulletin 25, 28 (April 1996), available at https://leb.fbi.gov/file-repository/archives/april-1996.pdf/view. The article features a scenario involving a person suspected of a several weeks old bank burglary (i.e., non-violent) who threatens to use pepper spray as he walks toward agents who are 20 feet away if they do not let him escape.[1] Id. at 30. The article advises agents that "[t]he use of deadly force is permitted" under these circumstances. Id. Lawrence was not walking toward the officers with the Taser from 20-feet away. He had already arrived and was in the middle of a wrestling match where his body, hand gripping the Taser, was in physical contact with the officers.

In Hope, the Supreme Court found obvious clarity by taking one small step from existing case law, a state regulation, and a DOJ study, which all put prison officials on notice that use of a hitching post without bathroom or water breaks or the opportunity to return to work was unconstitutional. By contrast, the panel opinion takes one giant leap (1) from cases where gratuitous force was applied after a suspect was secured, Perez v. Suszczynski, 809 F. 3d 1213, 1222-23 (11th Cir. 2016); Lee v. Ferraro, 284 F.3d 1188, 1199 (11th Cir. 2002)), Vinyard v. Wilson,

---

[1] Pepper spray is a "nonlethal weapon" that "ordinarily causes only temporary discomfort." McCormick, 333 F.3d at 1245.

311 F.3d 1340, 1355 (11th Cir. 2002), or where a suicidal suspect who was not struggling with police, <u>Mercado v. City of Orlando</u>, 407 F.3d 1152 (11th Cir. 2005), (2) from no regulation whatsoever, and (3) from a **DOJ policy that favors the use of deadly force** when there was a threat from a non-deadly weapon that could have made the officers vulnerable to lose their firearms. <u>See</u> Op. 34-35. If the FBI and nine federal judges did not conclude that it was obviously clear that the use of force was excessive in cases similar to this one, Sergeant Woodruff could not have done so either.

The panel opinion does not cite a single Taser-disarming case. <u>See</u> <u>City of Escondido v. Emmons</u>, 139 S. Ct. 500, 503 (2019) ("The Court of Appeals should have asked whether clearly established law prohibited the officers from stopping and taking down a man in these circumstances."). Instead, the panel invoked <u>Oliver v. Fiorino</u>, 586 F.3d 898 (11th Cir. 2009), where the person against whom the Taser was used was actually killed by the Taser. (Op. 32-33.) "[Sergeant Woodruff] must be forgiven for missing the parallel, which escapes us as well." <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 742 (2011).

This Court has upheld the use of deadly force in response to subjects threatening officers with walking sticks and a pair of loose handcuffs, both of which are less disabling than a Taser. <u>McCormick</u>, 333 F.3d at 1246 (authorizing deadly force where subject was advancing upon officer with a "walking stick," officer then

10

fell over a parking stone, and "was afraid that McCormick might have access to his firearm if McCormick was successful with his attack"); Martinez, 648 F. App'x at 895 (upholding use of deadly force on subject who "was armed with a pair of loose handcuffs, which he had already used to inflict a head injury on King").

Making matters worse, the panel misapplied the Graham analysis. First, the panel weighed the wrong offense, holding "the underlying crime for which he was being arrested was, at worst, driving without a license." (Op. at 36.) Lawrence was trying to commit a felony assault when he was shot. In Alabama:

> (a) A person commits the crime of assault in the second degree if the person does any of the following:
>
> . . .
>
> > (4) With intent to prevent a peace officer . . . from performing a lawful duty, he or she intends to cause physical injury and he or she causes physical injury to any person.
>
> . . .
>
> (b) Assault in the second degree is a Class C felony.

Ala. Code § 13A-6-21 (1975).

Alabama Code § 13A-1-2 defines "physical injury" as "[i]mpairment of physical condition *or substantial pain*." The panel acknowledged that a Taser in drive-stun mode "can be used in an attempt to obtain compliance by causing pain." (Op. at 11.)

The panel misunderstood the "severity of the crime" prong. The Supreme Court applies a "standard of reasonableness at the moment" the officer uses force. Graham v. Connor, 490 U.S. 386, 396 (1989). "Our precedent makes clear that under the first Graham factor – the severity of the crime at issue – we must assess the reasonableness of an officer's use of force by examining the circumstances **at the time of the officer's actions**, not the time of his initial encounter with the suspect." Spencer v. City of Orlando, 725 F. App'x 928, 931 (11th Cir. 2018) (emphasis added); see also Pace v. Capobianco, 283 F.3d 1275, 1282 (11th Cir. 2002) (identifying pertinent crime as aggravated assault that occurred during chase, not initial traffic infraction).

The panel inferred a subjective intent for Lawrence: "Viewing the video in the light most favorable to Cantu, Lawrence put his hand on the [T]aser, or grabbed it, as a defensive maneuver in an effort to prevent Woodruff from shocking him more with it." (Op. at 25.) But "there is no way for a reasonable officer to know what is inside the mind of another individual." Moore v. Pederson, 806 F.3d 1036, 1053 (11th Cir. 2015) (Rosenbaum, J.). "From the vantage of an officer whose life is jeopardized, a potential arrestee who is neither physically subdued nor compliantly yielding remains capable of generating surprise, aggression, and death." Menuel v. City of Atlanta, 25 F.3d 990, 995 (11th Cir. 1994).

The panel did not acknowledge the threat that sovereign citizens pose. "The sovereign citizen movement has been classified by the Federal Bureau of Investigations as a domestic terror threat because they are anti-government extremists." <u>Wright v. United States</u>, No. 1:19-CV-146-FDW, 2020 WL 1674557, at *3 (W.D.N.C. Apr. 6, 2020). "[T]he FBI had specifically warned law enforcement agencies about the danger that sovereign citizens potentially posed to law enforcement." <u>Jordan v. Morris</u>, No. 14-2539-JWL, 2016 WL 5871717, at *6 (D. Kan. Oct. 7, 2016).

The panel emphasized "the surprise of the other two officers" when Woodruff fired. (Op. at 16-17, 27.) But other officers' perspectives are irrelevant. <u>Penley v. Eslinger</u>, 605 F.3d 843, 852 (11th Cir. 2010) ("The Penleys' reliance on Sergeant Brubaker's statement that he did not feel threatened is misplaced. The relevant question is whether a reasonable officer in Lieutenant Weippert's shoes would have believed that Mr. Penley was gravely dangerous.").

The panel theorized that Sergeant Woodruff could have waited to see if Lawrence took Officer Rhodes's firearm before she fired, (Op. at 26-27), but "the law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect." <u>Long v. Slaton</u>, 508 F.3d 576, 581 (11th Cir. 2007).

13

The panel faulted Sergeant Woodruff for not warning Lawrence before she fired. (Op. at 27.) However, Lawrence was already within arm's reach of Officer Rhodes with the Taser. "We have declined to fashion an inflexible rule that, in order to avoid civil liability, an officer must always warn his suspect before firing – particularly where such a warning might easily have cost the officer his life." Penley v. Eslinger, 605 F.3d at 854 n.6.

Against this backdrop, obvious clarity cannot exist.

## II.    The Panel Contradicted Hinson v. Bias

By refusing to credit Officer Skipper's affidavit testimony that "he [Lawrence] took the Taser out of her [Woodruff's] hand and was about to tase Officer Rhodes," (Doc. 64-4, p. 5), the panel contradicted Judge Rosenbaum's opinion in Hinson v. Bias, 927 F.3d 1103 (11th Cir. 2019). In Hinson, the Court had two sources of evidence: the officers' version of events and an ambiguous video. Writing for a unanimous panel, Judge Rosenbaum concluded that, "in evaluating the Officers' actions, we must accept as true all evidence the Officers have submitted that Hinson does not contest and that Hinson's evidence – the video recording and medical records – does not contradict." Id. at 1119. Because the video was "not inconsistent with the officers' description of what occurred during the arrest," Judge

14

Rosenbaum held there was no genuine issue of material fact.  Id. at 1110.  During

the oral argument, Judge Rosenbaum elaborated:

> It seems to me that with respect to whether there was use of excessive
> force, *et cetera*, we have the officers' version of events, and we have
> the video, and that's all of the evidence there is on this issue.
>
> . . .
>
> If those are the only two sources we're looking at, then isn't it the case
> that either we have to find some kind of internal inconsistency in the
> officers' statements themselves or something in the video that
> contradicts, *affirmatively contradicts*, what the officers said?
>
> . . .
>
> So if you look at that part of the video, it seems, at least clear to me,
> that since he's being handcuffed at that point, that is consistent with
> what the officers say, or at least, it doesn't -- *the video doesn't
> contradict what they are saying*.

(Hinson v. Bias, No. 16-14112, recording at 15:00-23:18.); see also Parker v. Wal-

Mart Stores E., LP, 769 F. App'x 875, 878 (11th Cir. 2019) (crediting defendant's

employee's testimony because "[t]hough it is impossible to tell from the surveillance

video where Ezzard was looking at all times, the video does not contradict her

testimony that she was looking at the floor while zoning").

At oral argument, Judge Carnes pointed out – and Plaintiff's counsel agreed

– that without the video, there is no evidence to contradict the officers' testimony

that Lawrence grabbed the Taser and had control over it when he was shot.

(Recording at 02:24 to 03:23.)  Judge Carnes even told Plaintiff's counsel "but for

the video, you would not have a case."  (Recording at 03:19 to 03:23.)  But the panel

disregarded <u>Hinson</u>. The panel held the video's lack of clarity created an issue of fact even though a jury viewing the video "could reasonably credit [Sergeant Woodruff's] testimony." (Op. at 16.) The panel turned Judge Rosenbaum's rule on its head. An ambiguous video does not create an issue of fact when it does not "affirmatively contradict" the officers' testimony. The panel should have followed Judge Rosenbaum's binding opinion. <u>United States v. Hogan</u>, 986 F.2d 1364, 1369 (11th Cir. 1993).

Moreover, the panel did not credit Plaintiff's own admissions that Lawrence grabbed the Taser. In the District Court, Plaintiff wrote, "Lawrence grabbed the Taser that was hurting him" (Doc. 70 at 7, ¶ 93), and "Lawrence grabbed Woodruff's Taser." (Doc. 43 at 11, ¶ 27). These admissions are binding. <u>Smith v. City of Fairburn</u>, 679 F. App'x 916, 920 n.3 (11th Cir. 2017).

### III.    The Panel Erroneously Denied State-Agent Immunity

The panel denied state-agent immunity because the Alabama Supreme Court has essentially equated state-agent immunity with qualified immunity. (Op. at 38-39.) To the extent Sergeant Woodruff is entitled to qualified immunity, she is likewise entitled to state-agent immunity. <u>Hunter v. City of Leeds</u>, 941 F.3d 1265, 1284 (11th Cir. 2019) ("The Alabama Supreme Court has largely equated qualified immunity with discretionary-function immunity, and so the same facts which

establish an entitlement to qualified immunity may also establish that the officers are entitled to discretionary-function immunity.").

## Conclusion

This Court should grant this petition and affirm the District Court's order granting summary judgment in favor of Sergeant Woodruff.

*/s/F. Lenton White*

Attorney for Appellee
Adrianne Woodruff

Of Counsel:

F. Lenton White
126 N. St. Andrews Street
Dothan, Alabama 36303
Telephone (334) 615-3130
Email: lwhite@dothan.org

17

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 3,893 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) as counted by the word count function of the Microsoft Word 2016 word processing software.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using the Microsoft Word 2016 word processing software in 14-point Times New Roman font.

*/s/F. Lenton White*
Attorney for Appellee
Adrianne Woodruff


Of Counsel:

F. Lenton White
126 N. St. Andrews Street
Dothan, Alabama 36303
Telephone (334) 615-3130

Email: lwhite@dothan.org

## Certificate of Service

In accordance with Federal Rule of Appellate Procedure 25(c)(2) and 11th Cir. R. 25-3, I hereby certify that on this 24th day of September, 2020, I have filed the foregoing petition for rehearing using the Court's ECF system, which will electronically notify the following counsel of record who may then access this filing on the Court's ECF system:

TILLMAN J. BRECKENRIDGE
PIERCE BAINBRIDGE
BECK PRICE & HECHT, LLP
One Thomas Cir., NW, Suite 700
Washington, D.C. 20005
Telephone: 202-759-6925
Email: tjb@piercebainbridge.com

HENRY F. SHERROD III
HENRY F. SHERROD III, P.C.
119 South Court Street
Florence, AL 35630
Telephone: 256-764-4141

OF COUNSEL:
PATRICIA E. ROBERTS
KELLY A. RONDINELLI (A LAW STUDENT)
TESSA B. TILTON (A LAW STUDENT)
WILLIAM & MARY LAW
SCHOOL APPELLATE AND SUPREME
COURT CLINIC
P.O. Box 8795
Williamsburg, VA 23187
Telephone: 757-221-3821

Respectfully submitted,

*/s/ F. Lenton White*

Of Counsel

19

[PUBLISH]

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE ELEVENTH CIRCUIT

_____

No. 18-15071

_____

D.C. Docket No. 1:16-cv-01003-ECM-DAB

CHRISTOPHER CANTU,
as the Administrator of the Estate of Robert Earl Lawrence,

Plaintiff – Appellant,

versus

CITY OF DOTHAN, ALABAMA,
GREG BENTON,
in his individual capacity,
CHRIS SUMMERLIN,
in his individual capacity,
ADRIANNE WOODRUFF,
in her individual capacity,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

(September 3, 2020)

Before ROSENBAUM and ED CARNES, Circuit Judges, and VINSON,[*] District Judge.

ED CARNES, Circuit Judge:

When Rick Bragg wrote about "a gothic story" in which "you can see the bad luck tumbling, as if the devil himself had shaved the dice,"[1] he was talking about his father's tragic life, but those words could also describe Robert Earl Lawrence's effort to help a stray dog he found in a Walmart parking lot.

Around noon on the next to last day of the year, Robert Earl Lawrence took his girlfriend and three children to a Walmart in Dothan, Alabama. They saw a stray dog outside the store. Lawrence gathered up the dog, put it in the car, and drove to the local animal shelter where he hoped to leave it. An official at the shelter asked Lawrence to provide identification and fill out some paperwork, which he didn't think he should have to do. He just wanted to drop off the dog. Words were exchanged. Frustrated, Lawrence eventually said "fine," that he would just leave and let the dog out of the car at the end of the road that led to the shelter.

When people who are at the shelter threaten to abandon animals, an officer follows them out to their vehicle to write down the tag number, and an officer did

---

[*] Honorable C. Roger Vinson, United States District Judge for the Northern District of Florida, sitting by designation.

[1] Rick Bragg, The Prince of Frog Town 177 (Knopf 2008)

that when Lawrence left the shelter with the dog.  At the car the officer asked

Lawrence for his driver's license, and he refused, asserting that he didn't have to

show her one.  The officer detained Lawrence at his car for about ten minutes

while waiting for the backup officer to arrive.  During that time, she and Lawrence

argued.

When the backup officer arrived at the shelter parking lot, still more words

were exchanged.  That officer told Lawrence that if he didn't stop talking he was

going to jail.  Lawrence didn't stop talking and the backup officer, with the

assistance of the other two officers on the scene, attempted to arrest and handcuff

him.  Lawrence would not submit and resisted — not aggressively, but vigorously.

He refused to put his hands behind his back as ordered, he struggled, and twice he

temporarily freed himself from an officer's grip and ran around the car trying to

get away, but officers caught up with him.  In the last moments of the encounter,

while trying to get free from three officers again, he put his hand either on an

officer's taser, or on the officer's wrist or hand that was holding the taser.  In

response, an officer pulled her service weapon and without warning, and to the

surprise of the other two officers, shot Lawrence while he was being held.  He was

taken to a hospital where he died from the gunshot wound.

The executor of Lawrence's estate, Christopher Cantu, filed a 42 U.S.C.

§ 1983 lawsuit alleging excessive force in violation of Fourth Amendment and

3

asserting a state law claim for assault and battery. The district court granted

summary judgment to all of the defendants after concluding that there was no

constitutional or state law violation by Sergeant Woodruff — the officer who shot

Lawrence — and, even if there was, that violation was not clearly established,

which entitled her to qualified immunity on the federal claim and state agent

immunity on the state claim. This is Cantu's appeal from the grant of summary

judgment to Woodruff. (He doesn't question the grant of summary judgment to

the other officers he sued.)

## I. FACTUAL DETAILS

As the Supreme Court has observed, "this area is one in which the result

depends very much on the facts of each case." Brosseau v. Haugen, 543 U.S. 194,

201 (2004); see also Scott v. Harris, 550 U.S. 372, 383 (2007) ("[I]n the end we

must still slosh our way through the fact bound morass of reasonableness."). The

"facts" at the summary judgment stage are not necessarily the true, historical facts;

they may not be what a jury at trial would, or will, determine to be the facts. See

Perez v. Suszczynski, 809 F.3d 1213, 1217 (11th Cir. 2016).

Instead, the facts at this stage are what a reasonable jury could find from the

evidence viewed in the light most favorable to the non-moving party who was

opposing summary judgment, Cantu in this case. Scott v. United States, 825 F.3d

1275, 1278 (11th Cir. 2016); Swint v. City of Wadley, Ala., 51 F.3d 988, 992 (11th

4

Cir. 1995). As we have also put it, "where there are varying accounts of what happened, the proper standard requires us to adopt the account most favorable to the non-movant[]." Smith v. LePage, 834 F.3d 1285, 1296 (11th Cir. 2016) (quotation marks omitted). These "fact" defining rules are important in this case because some of what happened is disputed and unclear.

It was on December 30, 2014, that Lawrence found the stray dog in the parking lot of a Walmart in Dothan, which is in Houston County, Alabama. At the time, Lawrence had with him his nine-year-old son, his six-year-old daughter, his girlfriend, and her five-year-old son. He drove all of them along with the stray dog they had found to the Dothan Animal Shelter. The others stayed in the car while Lawrence took the dog into the shelter.

The receptionist told Lawrence that they accepted dogs only from residents of Houston County. He told her that he was from nearby Geneva County but had found the dog in Houston County. She agreed to take the dog but asked for his identification. He refused to provide it, claiming that being required to do so would violate his federal privacy rights.

Adrianne Woodruff, a City of Dothan police sergeant who was on duty at the animal shelter, entered the room and told Lawrence that the shelter would accept the dog if he signed an intake form. He became frustrated that he could not drop off the dog at the shelter without signing a form and said that he would just let

5

the dog out at the end of the road.  Woodruff told him that dumping the dog there would be a crime.  Lawrence left the shelter, carrying the dog with him.

Sergeant Woodruff followed him outside.  An average of two or three times a month someone who has come to the shelter threatens to dump animals at or near it, and the shelter had a policy for those situations.  Under the policy, someone from the shelter follows the person out into the parking lot and records the license plate number of the car in case the animal is later found abandoned.  While Woodruff was following Lawrence to the parking lot, she noticed an empty holster on his hip.  When she asked him about it, he said the gun was in his car.  (After the incident was over, officers would find his gun inside the glove compartment.)  Hearing that there was a gun in the car, Woodruff asked the receptionist to call for a backup officer.

When he got to his car, Lawrence told his girlfriend to start recording what was happening using her cell phone, saying: "You getting this on camera?"  She did, and the record includes two phone videos that she took recording the incident up to the point when Lawrence begins resisting arrest.  The remainder of the incident, which is the crucial part for purposes of this appeal, was recorded by a dashcam video camera in the backup officer's police car; that video is also in the record.

6

The video shows that as Lawrence was getting into his car and trying to leave, Sergeant Woodruff put her hands on his arm and back and said, "You're not leaving." Lawrence got into the car and sat down in the driver's seat anyway but did not try to drive away. Woodruff told Lawrence to "get out of the car." What followed was eight minutes of argument between the two.

Sitting in his car, Lawrence asked Sergeant Woodruff if she was accusing him of committing a crime. She said she was, without specifying what crime, and she asked for his identification. He gave her an "Affidavit of Identity" that declared him to be "Flesh and blood of living Man." She inferred from that document Lawrence was a sovereign citizen.[2] Woodruff then asked Lawrence for his driver's license. He refused to provide one, asserting that he didn't need a driver's license because he wasn't driving. When he said that, he was sitting in the driver's seat.

Officer Renee Skipper, another officer assigned to the shelter, brought Sergeant Woodruff a phone. Woodruff used it to call dispatch and ask for a

---

[2] This Court has noted that "so-called 'sovereign citizens'" often "believe they are not subject to the jurisdiction of the courts" but "[c]ourts have . . . summarily rejected their legal theories as frivolous." United States v. Sterling, 738 F.3d 228, 233 n.1 (11th Cir. 2013) (citing United States v. Benabe, 654 F.3d 753, 761−67 (7th Cir. 2011) (rejecting sovereign-citizen based arguments that the defendants were beyond the court's jurisdiction and collecting cases doing the same)).

warrant check and for backup. She learned that there were no outstanding warrants
and was told that a backup officer was on the way.

While Sergeant Woodruff was on the phone with dispatch she continued
arguing with Lawrence. She told him that he wasn't paying taxes to support the
shelter because he didn't live in Houston County.

Lawrence went back to the subject of whether he was driving without a
license, telling Woodruff that she needed to know the Black's Law Dictionary
definition of "driving" if she was going to be enforcing the driving without a
license statute. He also claimed that he was going to sue her for "unauthorized use
of force, unlawful detention, [and] violation of the federal code under Title 42
section 241 and 242."[3]

After more argument, Sergeant Woodruff asked Lawrence, "Do you know
how foolish you sound?" She also insulted him: "You're so smart, you got half
your teeth in your mouth." (Some of Lawrence's front teeth were missing.) He
responded, "Oh, so now you're going to humiliate me because of my poor hygiene
. . . ." And so the argument went.

At one point, while still on the phone with dispatch, Sergeant Woodruff
went to the back of Lawrence's car to call in his license plate number. He got out

---

[3] 42 U.S.C. § 241 regulates how the Secretary of Health and Human Services conducts
research and investigations while § 242 regulates how the Secretary conducts studies on the
misuse of narcotics. Obviously, neither provision applies to this situation.

of the car and followed her, claiming that she was unlawfully detaining him in violation of his Fourth and Fourteenth Amendment rights. Sergeant Woodruff backed up to about ten yards away from the car, but Lawrence followed her; he got within three feet of her with his phone in one hand, video-recording, and his other hand extended palm up, reaching for the "Affidavit of Identity" he had handed her earlier. Woodruff told him to get back in the car. When Lawrence didn't obey her, Woodruff raised her voice and approached him, yelling: "You're not driving out of here without a driver's license! Which part of that don't you understand?"

After more back and forth, Lawrence returned to his car and stood outside of it talking to one of the young boys, who was still sitting in the backseat with the other two children. Woodruff told the dispatcher that Lawrence was "off his meds." That upset Lawrence, and he left where he had been standing by the car, walked over to Woodruff who was about five feet away and started arguing with her again.

Eventually Lawrence returned to his car to light a cigarette, and Officer Alan Rhodes, the backup, finally arrived. Rhodes was 5'10" and 275 pounds. He was 75 pounds heavier than Lawrence, who was six feet tall and weighed 200 pounds. Sergeant Woodruff was 5'3" and weighed 120 pounds. The record does not disclose Officer Skipper's height and weight, but the video shows that she is not a large person.

Lawrence approached the newly arrived Officer Rhodes, who immediately said to him: "Don't even start. Stand over there at your car and I'll be with you in a second." Lawrence did as ordered, but only briefly. A few seconds later he took a few steps towards where Rhodes and Woodruff were standing and talking. Rhodes told him to go back. Proclaiming that he was utilizing his First Amendment right to free speech, Lawrence walked back to the car and leaned against the trunk of it. From there, he continued asserting that he was exercising his right to free speech.

Officer Rhodes yelled that Lawrence could utilize his rights where Rhodes told him to stand. Without moving towards the officers, Lawrence asked where he could stand. Rhodes responded: "Do you want to argue with me more?" After asking that rhetorical question, Rhodes walked toward Lawrence and ordered him to "Turn around, turn around, turn around." Lawrence backed up, put his hands up, and shouted "Don't touch me!" Rhodes grabbed Lawrence and tried to turn him around to handcuff him. They struggled and Rhodes put him in a chokehold.

Sergeant Woodruff joined in the tussle to assist Rhodes, and the two of them held Lawrence with his back pushed against the rear driver's side door of the car. Rhodes asked Lawrence if he was going to turn around so they could handcuff him. Lawrence said "No" and then yelled "No. I'm not!" and "Unlawful detainer!" And more to the same effect. The two officers wrestled with Lawrence, trying to get him to comply, and they slammed him against the car a few times. As

10

the struggle continued, Lawrence shouted: "No! Stop! Stop! Stop! Stop! Let go!

Stop! Stop! My children are in the car. You're hurting me!  Stop. . . . There ain't

nothing happened.  Ain't no crime been committed . . . Look at what you done to

my children" and so on.  The children, who were still inside the car, were

screaming.  Rhodes and Woodruff slammed Lawrence against the car two or three

times, but he managed to slip out of their grasp and attempted to evade them by

running around the car while yelling for them to stop.  They chased after him.

Trying to stop and subdue Lawrence, Rhodes shot at him with a taser.

We pause the narrative here to explain how tasers function.  They can be

used in two different modes.  In the "prong" mode, a taser fires small prongs that

are connected to the taser by thin wires. Oliver v. Fiorino, 586 F.3d 898, 903 (11th

Cir. 2009).  When the prongs contact the target's skin, the taser "transmits

electrical pulses along the wires and into the body of the target, through up to two

inches of clothing."  Id.  The usual result of being tased with the device in the

prong mode is temporary incapacitation and inability to move.  Id.  In a taser's

other mode, called the "drive stun mode," the prongs are not used; instead, the

taser is pressed directly against a person's skin.  Hoyt v. Cooks, 672 F.3d 972, 976

n.4 (11th Cir. 2012).  That mode can be used in an attempt to obtain compliance by

causing pain, but it generally does not incapacitate a person as the prong mode is

designed to do.  See id.  Drive stun mode tasing does not cause serious physical

injury. See Russo v. Cincinnati, 953 F.2d 1036, 1048 (6th Cir. 1992) (Wellford, J.,

concurring) ("It is clear that the taser was designed to be used in this type of

circumstance: to stun and to disable temporarily rather than to inflict more serious

or more permanent injury.").

When Rhodes tried to use his taser against Lawrence it was in prong mode,

but it was ineffective because Lawrence was wearing a thick jacket that prevented

the prongs from reaching his skin. Rhodes caught up with Lawrence as he was

running around the car to avoid arrest, and he attempted to wrestle him into a

position against the car so he could handcuff him. While holding Lawrence,

Rhodes told Sergeant Woodruff to take the taser, and she did.

Once again, Lawrence broke free from Rhodes' grip and scrambled back

toward the driver's door, this time moving in the opposite direction around the car.

And once again Rhodes caught up with Lawrence, pushed him against the car, and

pinned him. He had Lawrence's back pressed against the by-then closed driver's

door with the upper part of Lawrence's arms held to his chest by Rhodes' arm.

Lawrence shouted "Stop, don't do it! This is unlawful detainer!" Woodruff

moved towards him with the taser, which at that time was in drive stun mode.

Lawrence batted at the taser with his left arm as Woodruff jabbed it towards his

abdomen. Lawrence yelled "Stop, don't do it!," after which Woodruff tased him at

12

least twice in the abdomen. He jerked back and stopped talking but was not
incapacitated.

There is a factual dispute about what happened at this point. According to
Sergeant Woodruff, as she was attempting to tase Lawrence while Rhodes held
him, Lawrence used his one free arm and hand to grab her wrist and twist it and in
that way got the taser away from her. Her story is that after gaining control of the
taser, Lawrence turned it around in his hand so that his finger was on the trigger
and pushed it toward Rhodes' leg.[4] It was then that Officer Skipper grabbed onto
the taser and tried to pull it away from Rhodes' leg.

It is undisputed that during the three-second struggle between Skipper and
Lawrence, Woodruff drew her service weapon and shot Lawrence in the side.
There is no evidence that Lawrence made any effort to gain access to his own gun,
which was in the glove compartment of the car, and Woodruff herself testified
three times that the reason she shot Lawrence was not any concern that he might

---

[4] Rhodes testified in his deposition that two or three times during the struggle he felt
"some taser blasts come up my right leg," which he described as "a tingling sensation." But he
believed that was when the taser was still in the prong mode and resulted from the wires
contacting his leg. If so, that would have been while Sergeant Woodruff was attempting to use
the taser against Lawrence in the prong mode, before she took the cartridge out to convert the
taser to drive stun mode. Whatever its cause, the tingling sensation that Rhodes felt did not
interfere with his hold on Lawrence. Rhodes testified that he was "still able to hold onto him and
detain him."

13

have a firearm or get one from the car and use it against the officers.[5]  She testified

that she shot Lawrence because he had gripped the taser and she feared he might

use it to incapacitate Officer Rhodes, which would leave her to face Lawrence

without him, and maybe Lawrence could have seized Rhodes' firearm.  She was

asked why, if Lawrence had hurt Rhodes and tried to take his holstered firearm,

she could not have at that time stepped back and then shot Lawrence.  She gave a

nonresponsive answer.

Cantu's version of events differs. According to Cantu, while Lawrence was

being tased, he defensively grabbed the barrel of the taser but never attempted to

pull it out of Sergeant Woodruff's hand.  Instead, Lawrence tried to push the taser

away from his body to avoid being shocked anymore. While Lawrence and

Woodruff were still struggling, Skipper stepped in and pulled Lawrence's arm

towards her.  Woodruff quickly let go of the taser that she had been holding, pulled

---

[5]  The following questions were asked by Cantu's attorney and answered by Woodruff at her deposition.

"Q. So did you shoot him because you were afraid there might be – he might have a gun? A. No."

"Q. [A]re you saying you shot him because you thought he might have a gun?  A. No, sir."

"Q. . . . Do you think the death of Mr. Lawrence is justified because you were worried about his gun? A. No. Because he was trying to hurt my partner and God knows who else."

her firearm out of its holster, and without warning immediately shot Lawrence in the stomach.

That is Cantu's version. Of course, he and his attorneys were not present and their assertions or contentions are not evidence. But the videos are evidence. See Scott, 550 U.S. at 378. The dash camera video is a recording of the entire struggle leading up to the fatal shot. It is the most important piece of evidence in the case not only because of its unquestioned objectivity but also because the critical events happened quickly, and with a video recording, it is possible to freeze frame the images of them.

Important though it is, the dash camera video does not answer all of the questions. There are ambiguities and lack of clarity about some of the details, including important ones which, when considered against the account Sergeant Woodruff gave in her deposition, present material factual issues that "properly can be resolved only by a finder of fact because [they] may reasonably be resolved in favor of either party." Smith, 834 F.3d at 1291 (quotation marks omitted). That is why the requirement that we construe the evidence in the light most favorable to the non-movant tips the summary judgment scales in this case.

Some facts are undisputed. One is that while Officer Rhodes had Lawrence pinned against the car the final time, Sergeant Woodruff tased him at least twice in the abdomen by using the device in the drive stun mode. She testified to that in her

deposition, and Cantu asserts that it happened. The video shows that Officer Skipper stepped in and grabbed something, although it is not clear whether it was the taser or Lawrence's arm. The video apparently shows (and for defeating summary judgment against Cantu, that is close enough) that while Woodruff was tasing or attempting to tase Lawrence, Skipper raised her arm, and both Lawrence's arm and Woodruff's arm followed it upward. From that, a jury could reasonably find that until the moment when Woodruff let go of the taser or of Lawrence's hand and reached for her service weapon to shoot him, he did not have control of the taser; instead Woodruff and Skipper both had a hold of the taser or of Lawrence's hand that was grasping at it.

A jury could reasonably discredit Woodruff's contrary testimony in favor of that interpretation of the video. Or a jury could reasonably credit her testimony over that interpretation of the video. Considering both the deposition testimony of the officers and the video evidence, as we said in another excessive force case: "There is material evidence in the record supporting both accounts." Smith, 834 F. 3d at 1296.

One thing that is indisputable is that Sergeant Woodruff acted suddenly and without warning. So much so that both of the other officers were startled by the shot and didn't know where it came from. Officer Skipper testified that she was so surprised to hear the gunshot that she actually thought that she had been shot and

16

"went blank." Officer Rhodes had a similar reaction. He, too, was unaware that

Sergeant Woodruff had drawn her weapon and was going to shoot Lawrence. The

shot had been so unanticipated by Rhodes that, like Skipper, he at first thought that

he had been shot.

Officer Rhodes testified that when Woodruff fired the fatal shot, he had

Lawrence "backed up against the driver's side door" and was able to detain him.

He described his plan at the time this way: "I was just going to keep wrestling with

him as long as he wanted to until somebody else showed up." Another officer,

whom he described as "the primary officer," was on the way and Rhodes knew that

he "would help me detain Mr. Lawrence, and we would have put him in handcuffs.

And at that point in time, he would have gone to jail."

The video shows that less than two minutes after Lawrence had been

shot, the primary officer arrived to assist in subduing him. By then Lawrence was

writhing in agony on the pavement while his girlfriend and the three children

screamed from inside the car.

## II. PROCEDURAL HISTORY

In his second amended complaint, which is the operative one here, Cantu

claimed that the City of Dothan, Greg Benton, Chris Summerlin, and Adrianne

Woodruff violated Lawrence's Fourth Amendment rights based on the use of

17

excessive force against him under 42 U.S.C. § 1983. He also included a state law

assault and battery claim. The parties filed cross motions for summary judgment.

A magistrate judge issued a report that recommended granting summary

judgment to all of the defendants except Sergeant Woodruff because Cantu did not

oppose it as to those other defendants. Based on the video evidence in the case, the

report determined that there was a question of material fact about whether grabbing

at the taser was an act of "self-protection" by Lawrence and whether he possessed

the taser or came close to being able to use it. Concluding that there were material

questions of fact about qualified immunity, the report recommended denying

summary judgment to Woodruff on Cantu's § 1983 excessive force claim. It also

found there were factual questions about whether state agent immunity applied and

recommended denying Woodruff's motion for summary judgment on the state law

claim. Woodruff filed objections to the report and its recommendations.

The district court sustained Woodruff's objections, rejected the magistrate

judge's recommendations, and granted summary judgment for Sergeant Woodruff.

Of central importance to its decision, the court interpreted the dash camera video

as showing that during his struggle with the officers Lawrence did gain possession

of the taser. The court determined that "it is clear that he possessed the Taser and

continued to possess it until Woodruff shot him." Although not entirely clear, it

appears from the court's reasoning that it believed by possessing the taser it means

18

that Lawrence was controlling it.  That may be true, but as we have already indicated, a jury reasonably could reasonably interpret the video evidence differently.

The court also believed that "even in the less intense 'drive stun' mode, the Taser is a weapon capable of inflicting sufficient pain to impose compliance over another during a struggle."  The court acknowledged that "Lawrence was seemingly unaffected" by the taser shocks, but still concluded that a reasonable officer "could believe that Lawrence intended to use the Taser against officers to cause them severe pain in order to effect an escape."  In view of all of the circumstances, the court concluded that Sergeant Woodruff had probable cause to believe that Lawrence posed a threat of serious physical harm to the officers and, as a result, the deadly force Woodruff used against Lawrence without warning was not excessive and therefore did not violate the Constitution.

The district court also concluded that even if a constitutional violation had occurred, the law was not clearly established at the time of the shooting.  Finally, the court also determined that Woodruff had state agent immunity and was entitled to summary judgment on Cantu's assault and battery claim.

## III. STANDARD OF REVIEW

We review <u>de novo</u> a grant of summary judgment based on qualified immunity and state agent immunity.  <u>Hill v. Cundiff</u>, 797 F.3d 948, 967 (11th Cir.

2015). "When considering a motion for summary judgment, including one asserting qualified immunity, 'courts must construe the facts and draw all inferences in the light most favorable to the nonmoving party and when conflicts arise between the facts evidenced by the parties, [they must] credit the nonmoving party's version.'" Feliciano v. City of Miami Beach, 707 F.3d 144, 1252 (11th Cir. 2013) (quoting Davis v. Williams, 451 F.3d 759, 763 (11th Cir. 2006)). "Summary judgment is appropriate if the evidence before the court shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." McCullough v. Antolini, 559 F.3d 1201, 1204 (11th Cir. 2009) (quotation marks omitted).

## IV. QUALIFIED IMMUNITY

To be protected by the doctrine of qualified immunity, a government official must first establish that she was acting within the scope of her discretionary authority. Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1281 (11th Cir. 1998). Because that is undisputed in this case we proceed to the next steps in the analysis, which are whether the official violated the plaintiff's (or the plaintiff's decedent's) constitutional rights, and, if so, whether decisions of the Supreme Court or of this Court in existence at the time clearly established that it was a violation. See Pearson v. Callahan, 555 U.S. 223, 232 (2009); Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

20

A. The Constitutional Violation

Cantu contends that Woodruff violated Lawrence's Fourth Amendment right to be free from excessive force by shooting him to death without warning during an attempted arrest for a non-serious offense in which there was no immediate threat of serious bodily injury or death to the officers.  Determining whether the force used in a particular seizure was excessive and therefore unreasonable under the Fourth Amendment requires a court to consider the "nature and quality" of the intrusion on the individual's Fourth Amendment interests against the countervailing government interest at stake.  Graham v. Connor, 490 U.S. 386, 396 (1989).  We judge the reasonableness of the force used from the perspective of "a reasonable officer on the scene."  Id.  Because it is an objective test, we do not consider an individual officer's intent or motivation.  Id. at 397.  "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional."  Id.

The reasonableness of the force used can depend on a number of factors. The Supreme Court has instructed us to consider "the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight."  Id. at 396.  And in deadly force cases we are to determine whether the

21

officer had probable cause to believe that the suspect posed a threat of "serious

physical harm" to the officer or others, and whether the officer had given the

suspect a warning about the use of deadly force, if doing so was feasible.

McCullough, 559 F.3d at 1206 (quoting Vaughn v. Cox, 343 F.3d 1323, 1329–30

(11th Cir. 2003)).

Not all of the factors are relevant to all excessive force cases, as our decision

in Shaw v. City of Selma, 884 F.3d 1093 (11th Cir. 2018), shows.  In that case, an

officer shot to death a man who had not committed a crime, was not attempting to

escape, and was not aggressively resisting arrest.  Id. at 1097–98.  But he was

mentally ill, holding a hatchet and advancing on the officer despite repeated

commands to stop.  Id. at 1096–98.  We held the use of deadly force to protect the

officer was reasonable in those circumstances.  Id. at 1100.

Also instructive is the Fifth Circuit's Rockwell decision.  See Rockwell v.

Brown, 664 F.3d 985 (5th Cir. 2011).  The officers shot to death a man who had

committed a misdemeanor and was not attempting to evade arrest by flight.  Id. at

992.  Yet the court held that the use of deadly force was reasonable because he was

attacking the officers with two knives.  Id.  The Fifth Circuit explained that

"neither the Supreme Court nor this Court has ever held that *all* of

the *Graham* factors must be present for an officer's actions to be reasonable;

indeed, in the typical case, it is sufficient that the officer reasonably believed that

22

the suspect posed a threat to the safety of the officer or others." Id. To which we would add that, if feasible, the officer should provide a warning before shooting. See Tennessee v. Garner, 471 U.S. 1, 11–12 (1985); Vaughan, 343 F.3d at 1330.

That is the type of case we have before us. It is not one in which deadly force was used to prevent the escape of a suspect who had committed a violent or otherwise serious crime or who might harm others if not apprehended. The crime, if any, that Lawrence had committed was at most a low-level non-violent offense. The district court noted that it was undisputed that Lawrence's exasperated statement that he would just abandon the stray dog at the end of the road might have amounted to a threat to commit the misdemeanor offense of cruelty to animals, see Ala. Code § 13A-11-14(a)(2), which might justify the officers detaining and questioning him. Regardless of what the plaintiff conceded, we do not believe that Lawrence's statement he was going to abandon the stray dog that he had attempted to rescue earlier that same day provided probable cause to believe that he had "recklessly or with criminal negligence . . . subject[ed] any animal in his or her custody to cruel neglect . . ." which is an element of the crime. Id. Or that he intended to subject one to "cruel neglect" in the future, which is not within the definition of the crime. And as the district court pointed out, "[t]here is no evidence before the Court to suggest that Woodruff or Rhodes initiated the arrest of Lawrence due to his threat to abandon the dog."

23

The only basis that Sergeant Woodruff suggests for arresting Lawrence was that she had probable cause to believe that he had violated the Alabama law requiring all drivers to "have his or her license in his or her immediate possession at all times when driving a motor vehicle" and to "display the same, upon demand of . . . any . . . peace officer." Ala. Code § 32-6-9. Woodruff had probable cause to believe Lawrence had violated § 32-6-9, but it could hardly be a lower level offense — it is a misdemeanor punishable by a fine of $10 to $100, which under Alabama law is enforceable by summons instead of a custodial arrest. See Ala. Code §§ 32-6-18; 32-1-4(a). That is relevant to the amount of force that reasonably may be used to enforce the provision. See Smith, 834 F.3d at 1297 (holding the use of deadly force unreasonable where the suspect "had merely committed misdemeanor offenses and was completely surrounded [by officers].").

This is not a case in which the suspect aggressively or violently fought against being arrested. To be sure, Lawrence did resist being handcuffed and taken into custody. He wrestled with the officers, broke free twice, and ran around the car as they chased him. But resisting arrest alone is not enough to justify the use of deadly force. Smith, 834 F.3d at 1297 (collecting cases). Especially not when the resistance is non-violent, as it was in this case. Lawrence never threw any punches, never kicked any of the officers, never hit any of them, never tried to get one of their firearms, and never physically or verbally threatened to harm them.

24

He never even cursed, at them or otherwise, until he lay mortally wounded on the pavement.

Sergeant Woodruff's use of deadly force against Lawrence was unreasonable, and therefore, a violation of the Fourth Amendment unless she had probable cause to believe at the time she shot him that he posed a threat of serious physical harm or death to the one or more of the officers. See Graham, 490 U.S. at 396; Shaw, 884 F.3d at 1099. She has put forward only one theory about that, which is that when she shot Lawrence, he had already gained control of the taser and could have used it to incapacitate one or more officers, then could have taken a service pistol from one of them, and then could have used that weapon to shoot one or all of them. Because the case is here on summary judgment, the question is whether there is a genuine issue of material fact about that; if so, the reasonableness of the use of deadly force must be presented to a jury.

There is a genuine issue of material fact. As we have explained, in light of the dash camera video recording, a jury could reasonably find that at the time Woodruff shot Lawrence he did not have control of the taser, that Woodruff and Skipper had control of it, or at least they were preventing Lawrence from exercising control. See supra at 17. Viewing the video in the light most favorable to Cantu, Lawrence put his hand on the taser, or grabbed at it, as a defensive maneuver in an effort to prevent Woodruff from shocking him more with it. While

25

he and Woodruff were struggling over the taser, Skipper reached in to grab the taser while Woodruff still had her hand on it, and it was then that Woodruff immediately let go of the taser, drew her gun, and shot Lawrence without warning as he was being held by Officer Rhodes.  In that way, the officers' account of the facts — that Lawrence took the taser away from Woodruff and was controlling it when she shot him — is inconsistent with the video, or at least with a reasonable interpretation of the video.

A jury could also reasonably find that there was no real threat that Lawrence, even if he already had control of the taser or was gaining control of it, could have used the taser to disable an officer and take control of a service pistol and use it to shoot one or more of the three officers.  It is undisputed that the taser was not in prong mode, which is the mode designed to incapacitate.  It had been converted to drive stun mode, which is designed to inflict pain and generally does not incapacitate.  Woodruff knew the taser was in drive stun mode.  Knowing that, a reasonable officer in her position would also have known that if Lawrence had gotten control of the taser and used it against Rhodes it was unlikely to incapacitate him.  After all, Woodruff had just tased Lawrence at least twice in the abdomen, and that had not incapacitated him.

Not only that but three officers were present during the incident. So even if Lawrence had somehow broken loose from Officer Rhodes' hold, had succeeded in

26

pulling the taser away from Woodruff and Skipper, and had set about to tase one of

the officers with it, and had somehow disabled that officer, and then had taken the

officer's firearm from its holster, there is no reason to believe that Lawrence would

not have been shot by an officer before he could do all of that. Both Rhodes and

Woodruff were armed. The video shows that it took Woodruff only three seconds

to draw her weapon and shoot Lawrence once she let go of the taser or of his hand

or arm that had a partial hold on the taser. There is no reason Woodruff could not

have done the same thing and done it as quickly if Lawrence had gotten the taser

and set about to get Rhodes' firearm, or why Rhodes could not have shot Lawrence

if he had obtained the taser and set about to get Woodruff's firearm.

And it is undisputed that Sergeant Woodruff gave Lawrence no warning

before she shot him. Her action in shooting him was so unanticipated that both of

the other officers were taken by surprise. They were so surprised that each of them

initially thought that they had been shot. Woodruff's explanation for not giving a

warning is that there was no time to do so.

When considering whether it was feasible for a police officer to warn a

suspect that she plans to use deadly force, we consider both time and opportunity.

See Vaughn, 343 F.3d at 1331. Woodruff shot Lawrence a mere five seconds after

he touched the taser, so if she was justified in shooting immediately to protect

herself or others from a threat of serious physical harm, there was little or no time

27

or opportunity for her to warn him. "[T]he law does not require officers in a tense

and dangerous situation to wait until the moment a suspect uses a deadly weapon

to act to stop the suspect." Jean-Baptiste v. Gutierrez, 627 F.3d 816, 821 (11th Cir.

2010) (alteration in original) (quotation marks omitted).

But we have said that a taser generally is not a deadly weapon. See Fils v.

City of Aventura, 647 F.3d 1272, 1276 n.2 (11th Cir. 2011). Particularly when the

taser is in drive stun mode. And if Lawrence did not control the taser when

Woodruff shot him, which we must accept as true for purposes of summary

judgment, a reasonable officer would not have believed that she was compelled to

use deadly force immediately. She would have known to hold off doing so until

she had given a warning.

A jury reasonably could find the disputed facts in Cantu's favor and

determine that it was unreasonable for Sergeant Woodruff to shoot Lawrence

without any warning. Summary judgment should not have been granted on the

theory that there was no Fourth Amendment violation. We turn now to the issue of

qualified immunity.

## B. Clearly Established Law

Sergeant Woodruff is entitled to qualified immunity unless her shooting of

Lawrence was not only a violation of the Fourth Amendment, as we have

determined, but also a violation of it under clearly established law at the time. See

Brosseau, 543 U.S. at 198 ("If the law at the time did not clearly establish that the

officer's conduct would violate the Constitution, the officer should not be subject

to liability."). The usual way of establishing that a constitutional violation was

clearly established law is by pointing to a case, in existence at the time, in which

the Supreme Court or this Court found a violation based on materially similar

facts. Priester v. City of Riviera Beach, 208 F.3d 919, 926 (11th Cir. 2000)

("[U]nless a controlling and materially similar case declares the official's conduct

unconstitutional, a defendant is usually entitled to qualified immunity."). The

decision in a pre-existing case like that will "make it obvious to all reasonable

government actors, in the defendant's place, that what he is doing violates federal

law." Id.

A close factual fit between the pre-existing case and the present one is

essential. General propositions from earlier decisions will not do. See Saucier v.

Katz, 533 U.S. 194, 201 (2001) ("This inquiry, it is vital to note, must be

undertaken in light of the specific context of the case, not as a broad general

proposition."); Anderson v. Creighton, 483 U.S. 635, 640 (1987) ("[O]ur cases

establish that the right the official is alleged to have violated must have been

'clearly established' in a more particularized, and hence more relevant, sense.").

Close similarity of the facts between the cases is "especially important in the

Fourth Amendment context, where the Court has recognized that it is sometimes

29

difficult for an officer to determine how the relevant legal doctrine, here excessive

force, will apply to the factual situation the officer confronts." Mullenix v. Luna,

136 S. Ct. 305, 308 (2015) (alteration and quotation marks omitted).  In excessive

force cases, the Supreme Court has cautioned against relying on its Garner and

Graham decisions for clearly established law, because "following the lead of the

Fourth Amendment's text, [those decisions] are cast at a high level of generality."

Brosseau, 543 U.S. at 199; see also Scott, 550 U.S. at 382 ("Garner did not

establish a magical on/off switch that triggers rigid preconditions whenever an

officer's actions constitute 'deadly force.'").

That said, with extreme factual circumstances, a pre-existing decision with

material similarity is not always necessary to clearly establish the applicable law.

See Hope v. Pelzer, 536 U.S. 730, 741 (2002).  Even without a close fit, a plaintiff

with a Fourth Amendment claim can clear the clearly established law hurdle and

defeat a qualified immunity defense by "showing that the official's conduct lies so

obviously at the very core of what the Fourth Amendment prohibits that the

unlawfulness of the conduct was readily apparent to the official." Smith v. Mattox,

127 F.3d 1416, 1419 (11th Cir. 1997).  To do that in an excessive force case, "a

plaintiff must show that the official's conduct 'was so far beyond the hazy border

between excessive and acceptable force that [the official] had to know he was

violating the Constitution even without caselaw on point.'" Priester, 208 F.3d at

30

926. That means, as the Supreme Court recognized in the <u>Hope</u> decision, that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." <u>Hope</u>, 536 U.S. at 741.  The question remains the same:  Did the defendant have fair warning when she engaged in the conduct giving rise to the claim that the conduct was unconstitutional? <u>See</u> <u>id.</u>

The Supreme Court's <u>Hope</u> decision laid the groundwork for the "obvious clarity" exception — if "exception" is the proper word for it.  The plaintiff in that case was a prisoner who had been handcuffed to a hitching post on two occasions as punishment for his disruptive conduct.  <u>Id.</u> at 733–34.  On one of those occasions, he was kept shirtless in the hot sun for seven hours, was given no bathroom breaks, and was taunted by a guard for being thirsty.  <u>Id.</u> at 734–35.  Our Court held that conduct violated the Eighth Amendment's Cruel and Unusual Punishment Clause, but the guards were entitled to qualified immunity because the closest pre-existing decisions "though analogous were not materially similar."  <u>Id.</u> at 735–36 (cleaned up).

The Supreme Court agreed that the conduct violated the Eighth Amendment, but reversed our holding that the guards were entitled to qualified immunity.  In the course of doing so, it said that requiring all plaintiffs to find a "materially similar" pre-existing case was a "rigid gloss on the qualified immunity standard" that was "not consistent" with earlier precedent.  <u>Id.</u> at 739.  Instead, the Court held, "[a]s

31

the facts [were] alleged by Hope, the Eighth Amendment violation is obvious." Id.

at 738. It was obvious enough that a reasonable official would understand that

doing what the guards did violated the Eighth Amendment even though "the very

action in question ha[d not] previously been held unlawful." Id. at 739. The Court

elaborated: "Although earlier cases involving 'fundamentally similar' facts can

provide especially strong support for a conclusion that the law is clearly

established, they are not necessary to such a finding. The same is true of cases

with 'materially similar' facts." Id. at 741.

The Supreme Court has since cited Hope as the precedential basis for the

principle that conduct may so obviously violate the Constitution that no pre-

existing case law is needed to show that it is clearly established law. See Safford

Unified Sch. Dist. #1 v. Redding, 557 U.S. 364, 377–78 (2009) (citing Hope for

the proposition that "officials can still be on notice that their conduct violates

established law . . . in novel factual circumstances"); Brosseau, 543 U.S. at 199

("Of course, in an obvious case, these standards can 'clearly establish' the answer,

even without a body of relevant case law."); accord Tolan v. Cotton, 572 U.S. 650,

656 (2014).

A closer look at some of the Fourth Amendment excessive force cases in

which we have applied the obvious clarity principle will illustrate it. In Oliver v.

Fiorino, 586 F.3d 898, 901 (11th Cir. 2009), officers encountered a man standing

32

in the grassy median of a road, waving for help. He was behaving erratically and failed to follow some police orders, but he "never acted in a threatening or belligerent manner toward the officers, nor did he even curse at them" and he "did not try to grab [the officer next to him] or to swing at him." Id. at 902. Without warning, one of the officers tased him in prong mode, which caused him to lose control of his body and fall onto the "scorching hot asphalt." Id. at 902–03. After being tased the first time, he "never hit, kicked, punched, or threatened the officers." Id. at 903. Still, the officer tased him seven more times, and between the electrical shocks and hot pavement, his body temperature was raised to 107 degrees Fahrenheit, and he had a seizure. Id. at 903–04. He died as a result. Id. at 904.

We held that officer violated the man's Fourth Amendment rights and that the violation was clearly established under the obvious clarity exception. Id. at 907–08. It was because "the force employed was so utterly disproportionate to the level of force reasonably necessary that any reasonable officer would have recognized that his actions were unlawful." Id. at 908. We noted that "[t]he need for force was exceedingly limited" and that the plaintiff "was not accused of or suspected of any crime, let alone a violent one; he did not act belligerently or aggressively; he complied with most of the officers' directions; and he made no effort to flee." Id.

33

Another example is Mercado v. City of Orlando, 407 F.3d 1152 (11th Cir. 2005).  Police were called to the home of a man who had a knife and was threatening to commit suicide.  Id. at 1154.  When the officers entered his apartment, they found the man "sitting on the kitchen floor, crying.  He was holding the knife in both hands and pointing it toward his heart." Id.  The officers twice ordered him to drop the knife; he refused without making any threatening moves toward them.  Id. at 1154, 1157.  Fifteen to thirty seconds later, without warning, and from only six feet away, an officer fired at the head of the weeping man, who was still sitting on the floor.  Id. at 1154–55.  The officer used a "Sage Launcher" high velocity baton projectile, designed for use only in "deadly force situations." Id. at 1155.  The projectile, which was an-inch-and-a-half in diameter, hit the man in the head, fracturing his skull and causing brain damage.  Id.

There was no pre-existing case law that fit the facts of the Mercado case, but we reversed the grant of summary judgment in favor of the officer, concluding that "this is one of the cases that lie 'so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law.'" Id. at 1160; id. (explaining that the police officer did not need "case law to know that by intentionally shooting Mercado in the head, he was violating [his] Fourth Amendment rights").

34

Some of our decisions in other Fourth Amendment excessive force cases also illustrate the obvious clarity exception. See Perez v. Suszczynski, 809 F.3d 1213, 1222–23 (11th Cir. 2016) (holding that shooting a compliant suspect is "so inherently violative of the Fourth Amendment that it should be obvious to any reasonable officer that this conduct was unlawful" even without pre-existing case law); Fils, 647 F.3d at 1292 (holding that even without case law no reasonable officer would believe it was constitutional to use a taser in prong mode on a suspect who "showed no hostility to the Defendants, did not disobey any orders, and did not make any menacing gestures"); Vinyard v. Wilson, 311 F.3d 1340, 1355 (11th Cir. 2002) (holding that "no factually particularized, preexisting case law was necessary for it to be very obvious to every objectively reasonable officer" that it was unconstitutional to pull a suspect from the back of a police car, where she was already secure, in order to pepper spray her for being rude); Lee, 284 F.3d at 1199 (holding that even without previous case law on point "no reasonable officer could have believed that" it was constitutional to slam a suspect's head into the trunk of her car "after she was arrested, handcuffed, and completely secured, and after any danger to the arresting officer as well as any risk of flight had passed"). As in those cases, the constitutional violation here was clearly established, even though there was no decision in a "materially similar" pre-existing case that said so.

We recognize that the Supreme Court has repeatedly emphasized that the clearly established law standard is a demanding one. See, e.g., District of Columbia v. Wesby, 138 S. Ct. 577, 589–90 (2018); City & Cty. of San Francisco. v. Sheehan, 575 U.S. 600, 135 S. Ct. 1765, 1774 (2015). And to keep the standard demanding, the obvious clarity exception must be kept narrow. See generally Wesby, 138 S. Ct. 577, 589–90; White v. Pauly, 137 S. Ct. 548 (2017); Hunter v. Cole, 137 S. Ct. 497 (2016) (vacating and remanding Cole v. Carson, 802 F.3d 752 (5th Cir. 2015), which decided qualified immunity on obvious clarity grounds). This Court has followed those directions to keep the standard demanding and the exception to it narrow.

But the exception does exist and, viewing the evidence in the light most favorable to the plaintiff as required at this juncture, the use of lethal force was so obviously excessive that any reasonable officer would have known that it was unconstitutional, even without pre-existing precedent involving materially identical facts. As we have explained earlier in this opinion, Lawrence was not committing a dangerous felony, or even a non-dangerous one. He was just trying to drop off at an animal shelter a stray dog he had found in a parking lot earlier that day.

The underlying crime for which he was being arrested was, at worst, driving without a license, the maximum punishment for which is a $100 fine. The only flight he engaged in was running around his car on two occasions when he

36

managed to break loose from the officers who were trying to handcuff him. He did resist being handcuffed and arrested, but not violently. He never punched, hit, or kicked any of the officers or attempted to do so. He never tried to harm any of them in any way.

While being held by an officer who outweighed him by 75 pounds, another officer tased him at least twice in the abdomen. When he grabbed at the taser in an attempt to avoid being tased again, he and two of the three officers struggled over it, but Lawrence never gained control of it. At that point the officer who had been tasing him let go of the taser, drew her firearm, and fatally shot him without warning, all in the space of three seconds. She fired her pistol so suddenly that the other two officers initially did not know what had happened and thought that they had been shot.

This fatal shooting "lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent" even without a prior case on point. Lee, 284 F.3d at 1199 (quotation marks omitted). "Simply put, the grossly disproportionate force used in this case was clearly established as a constitutional violation because no reasonable officer could have believed that [Woodruff's] actions were legal." Id. Qualified immunity does not apply at the summary judgment stage given the light in which we must view the evidence now. See Cottrell v. Caldwell, 85 F.3d 1480, 1487 (11th Cir. 1996)

37

("[A] defendant who does not win summary judgment on qualified immunity

grounds may yet prevail on those grounds at or after trial on a motion for a

judgment as a matter of law.") (quoting <u>Kelly v. Curtis</u>, 21 F.3d 1544, 1546 (11th

Cir. 1994)).

## V. STATE AGENT IMMUNITY

Cantu also contends that the district court erred by finding that Woodruff

had state agent immunity from his assault and battery claim.  Under Alabama law,

a police officer is eligible for state agent immunity when she acts in a discretionary

function.  <u>Ex parte City of Tuskegee</u>, 932 So. 2d 895, 903 (Ala. 2005).  But an

officer can lose that immunity:

> (1) when the Constitution or laws of the United States, or the
> Constitution of [Alabama], or laws, rules, or regulations of
> [Alabama] enacted or promulgated for the purpose of regulating the
> activities of a governmental agency require otherwise; or
>
> (2) when the State agent act[ed] willfully, maliciously, fraudulently, in
> bad faith, beyond his or her authority, or under a mistaken
> interpretation of the law.

<u>Id.</u>

As we have already mentioned, it is undisputed that Woodruff was acting in

a discretionary function when she arrested Lawrence.  But Cantu contends that

because there is a genuine issue of fact about whether Woodruff violated

38

Lawrence's constitutional rights, a reasonable jury could also conclude that she acted "willfully, maliciously, in bad faith, and beyond her authority."

"The Alabama Supreme Court has largely equated qualified immunity with [state agent] immunity." Hunter v. Leeds, 941 F.3d 1265, 1284 (11th Cir. 2019). "Under both Alabama law and federal law, the core issue is whether a defendant violated clearly established law." Sheth v. Webster, 145 F.3d 1231, 1239 (11th Cir. 1998). That means the same facts that establish an officer is not entitled to qualified immunity "also establish that [she] is not entitled to" state agent immunity. Hunter, 941 F.3d at 1284.

Because Cantu established that a reasonable jury could find that Woodruff violated Lawrence's Fourth Amendment rights by using deadly force when no reasonable officer would have believed that the use of deadly force was constitutional, he has also established that a reasonable jury could find that she acted beyond her authority.

## VI. CONCLUSION

Taking the facts in the light most favorable to Cantu, a reasonable jury could find that Woodruff violated Lawrence's clearly established constitutional rights by shooting him. As a result, Woodruff is not entitled to summary judgment based on qualified immunity or based on state agent immunity.

**REVERSED AND REMANDED.**

39